UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF NEW YORK
_____

KEITH I. HURST,

                                    Plaintiff,

                                                        9:16-cv-1062
v.                                                      (DNH/TWD)

A. MOLLNOW and EISENSCHMIDT,

                                    Defendants.
_____

APPEARANCES:                                OF COUNSEL:

KEITH I. HURST
Plaintiff, *pro se*
105 Hunter Ave., #2
Albany, NY 12206

BARBARA D. UNDERWOOD                        MARK G. MITCHELL, ESQ.
Attorney General of the State of New York
Attorney for Defendants
The Capitol
Albany, NY 12224

**THÉRÈSE WILEY DANCKS**, United States Magistrate Judge

### ORDER AND REPORT-RECOMMENDATION

## I.    INTRODUCTION

This matter was referred for Report and Recommendation by the Hon. David N. Hurd,

United States District Judge, pursuant to 28 U.S.C. § 636(b) and Northern District of New York

Local Rule ("L.R.") 72.3(c).  *Pro se* Plaintiff Keith I. Hurst, a former inmate in the custody of

the New York State Department of Corrections and Community Supervision ("DOCCS"), has

commenced this action pursuant to 42 U.S.C. § 1983 alleging violations of his civil rights while

confined at Washington Correctional Facility ("Washington").  (Dkt. No. 1.)  The sole remaining

claim is Plaintiff's Eighth Amendment excessive force claim against Defendants A. Mollnow, a

Corrections Officer ("C.O.") and Eisenschmidt, a Sergeant ("Sgt.").  (Dkt. No. 12.)

Presently pending is Defendants' motion for summary judgment pursuant to Rule 56 of

the Federal Rules of Civil Procedure (Dkt. No. 41) for Plaintiff's failure to exhaust

administrative remedies before commencing this action.  (Dkt. No. 41-11 at 6-13.[1])  Defendants

also contend, to the extent Plaintiff's seeks monetary damages against them in their official

capacities, they are entitled to Eleventh Amendment immunity.  (Dkt. No. 41-11 at 13.)  Plaintiff

filed a response in opposition to Defendants' motion.  (Dkt. No. 57.)  Defendants filed a reply.

(Dkt. No. 60.)  For reasons that follow, the Court recommends that Defendants' motion for

summary judgment (Dkt. No. 41) be granted in part and denied in part.

## II.   BACKGROUND

### A.   July 1, 2016, Incident

Plaintiff alleges that on July 1, 2016, while an inmate at Washington, he was subjected to

excessive force by C.O. Mollnow and Sgt. Eisenschmidt.  (Dkt. No. 1 at 4-5.)  On that date,

Plaintiff claims he requested to speak to an "area supervisor" regarding his keeplock status.  *Id*.

at 4-5.  In response, C.O. Mollnow "pulled the pin on her walkie talkie" and several officers,

including Sgt. Eisenschmidt responded.  *Id*.  The officers physically assaulted Plaintiff, inflicting

numerous injuries, while hurling racial epithets at him.  *Id*.  Specifically, C.O. Mollnow kicked

Plaintiff in the left side of his face and spit on him while he was on the ground.  (Dkt. Nos. 1 at

5, 41-2 at 86-88.)  Sgt. Eisenschmidt punched Plaintiff in the head, face, and chest, banged his

head into the wall, and choked him.  (Dkt. Nos. 1 at 5, 41-2 at 157.)  The assault lasted

---

[1]  Page references to documents identified by docket number are to the numbers assigned by the
CM/ECF docketing system maintained by the Clerk's Office.

approximately ten minutes.  (Dkt. No. 41-2 at 98-100.)  Afterwards, Plaintiff was taken by bus to

Sgt. Eisenschmidt's office.  *Id*.  There, Sgt. Eisenschmidt punched, kicked, and choked Plaintiff,

and slammed his head against a wall.  *Id*. at 103-104.  Plaintiff was then sent to the Special

Housing Unit ("SHU").  *Id*.

### B.    Plaintiff's Inmate Misbehavior Reports

On July 1, 2016, C.O. Mollnow issued Plaintiff two inmate misbehavior reports for

creating a disturbance, harassment, refusing a direct order, making threats, and being out of

place.  (Dkt. No. 1 at 9, 11-12.)  As described in those misbehavior reports, at approximately

1:00 p.m., Plaintiff was "cube visiting" without permission.  (Dkt. No. 41-4 at 5.)  When C.O.

Mollnow told Plaintiff that he was not allowed to cube visit, Plaintiff yelled, "fuck you" and

returned to his cube.  *Id*.  At Sgt. Eisenschmidt's direction, C.O. Mollnow told Plaintiff he was

keeplocked.  *Id*.  Plaintiff argued with C.O. Mollnow about his keeplock status, but returned to

his cube.  *Id*.  At approximately 1:20 p.m., Plaintiff approached C.O. Mollnow's desk and

resumed arguing about his keeplock status.  *Id*. at 6.  C.O. Mollnow ordered Plaintiff to leave the

desk and return to his cube.  *Id*.  Plaintiff stepped onto the officer's podium in a threatening

manner.  *Id*.  C.O. Mollnow activated her alarm; Plaintiff ran to his cube.  *Id*.  A response team

arrived; Plaintiff was sent to the SHU.  *Id*.  No physical force was used in the incident.  *Id*. at 5,

6.

At two Tier III disciplinary hearings conducted on July 11, 2016, Plaintiff pleaded guilty

to two counts of creating a disturbance and was found guilty of all other charges.  *Id*. at 7; Dkt.

No. 41-2 at 122, 125.  He was sentenced to 90 days in the SHU, 90 days loss of recreation, and

90 days loss of good time credits, along with 120 days loss of package, commissary, and

telephone privileges.  (Dkt. No. 41-2 at 126.)  The hearing officer's determinations were

affirmed on administrative appeal.  (Dkt. No. 41-6 at 1.)  On July 15, 2016, Plaintiff was

transferred to Upstate Correctional Facility ("Upstate").  (Dkt. No. 41-2 at 142.)

### C.    Plaintiff's Grievance

In his verified complaint,[2] Plaintiff declares, "I exhausted all of my administrative

remedies, grievance, commissioner, governor, inspector general, special litigation of

Washington, D.C."  (Dkt. No. 1 at 2.)  Plaintiff further states, "I filed grievances to the higher

authority & never received a response.  The facility of Washington never responded to my

grievance."  *Id.* at 3.

At his deposition, Plaintiff testified that on or about July 14, 2016, while confined in the

SHU at Washington, he filed a grievance with Inmate Grievance Resolution Committee

("IGRC") regarding the July 1, 2016, assault:

> Q:  Did you file an inmate grievance with the IGRC about the
> incident on July 1, 2016?
>
> A:  Yeah.
>
> Q:  You did?  On what date?
>
> A:  July 14th or 13th.  It was the -- it was before they packed me
> up.
>
> Q:  And that was at Washington Correctional?
>
> A:  Yeah.
>
> Q:  All right.  Where did you put the grievance?
>
> A:  In the mailbox.
>
> Q:  What did the grievance say?

---

[2]  The Court finds Plaintiff's complaint was adequately verified under 28 U.S.C. § 1746 by
Plaintiff's declaration under penalty of perjury.  (Dkt. No. 1.)

A:  It was on a -- it was on a regular piece of paper and it says that
I was assaulted July 1st by several officers and -- the sergeant.

Q:  What else?

A:  I don't remember what it says.

Q:  All right.  And you put that in the mailbox at Washington?

A:  Yeah.  I know it was about my -- the assault.

(Dkt. No. 41-2 at 141.)  The next day, on or about July 15, 2016, Plaintiff was transferred to

Upstate.  *Id*. at 142.  Plaintiff testified he never received a response to his grievance that he filed

at Washington:

Q:  Did you get a response to that [grievance]?

A:  I never got a response from it.  I contacted the Upstate box --
Inmate Grievance Program to make sure they got my grievance
and they said that they never had received it.

Q:  All right.  So, you put -- you put this grievance in the mailbox
at Washington.  And then you were transferred to a different
facility?

A:  Yes, sir.

Q:  What date?

A:  On the 15th or 16th.  I think it was July 15th, when I was
transferred out of -- out of there.

Q:  Where did you go?

A:  Upstate Correctional Facility.

*Id*.  Plaintiff further explained, "I filed a grievance on [the July 1, 2016, assault] and they made it

disappear.  They said they never got it.  I wrote a grievance . . . ."  *Id*. at 93-94.  Plaintiff testified

he wrote the Commissioner, the Governor, and Special Litigations.  *Id*. at 94.  He "wrote

everybody that [] could consider a grievance."  *Id*.

For example, by letter dated August 14, 2016, Plaintiff sent a letter to the Commissioner, regarding the July 1, 2016, incident:

> I was assaulted by several officers, including a sergeant. I was called racial slurs & repeatedly kicked & punched. The female officer even kicked me in the face, causing my left eye to become blurry & spit on me. They assaulted me for a very long time. . . . I was beaten on the bus, then I was assaulted in the Sergeant office. He choked me & started banging my head into wall." . . . The Sergeant name is "Eisenschmidt" and the female office name is "A. Mollnow. . . . She also lied on the misbehavior report. I am not letting them get away with this & they should be placed under investigation. . . . Still heard no response from Inmate Grievance—dated 7.14.16. I hope you could look into this matter & save me from doing unnecessary box time. Do your job.

(Dkt. No. 1 at 6.)

Plaintiff testified that he also contacted Upstate's IGRC regarding the status of his grievance:

> Q: What response did you get?
>
> A: That Washington never received no grievances from Hurst.
>
> Q: Did you do an appeal to the superintendent?
>
> A: No -- I don't recall. I don't know. I know I -- I filed my grievance with Albany and the Governor.
>
> Q: So, you sent some letters to the Governor?
>
> A: Yeah. To back up the grievance.
>
> Q: All right. And when you say Albany, what do you mean?
>
> A: The Commissioner and I --.
>
> Q: All right. So, you wrote to the Commissioner and you wrote to the Governor?
>
> A: And I wrote the Inspector General and he came about five months later to see me.

(Dkt. No. 41-2 at 143.)  Plaintiff admitted he never appealed to the Central Office Review

Committee ("CORC"):

> Q:  Did you appeal to the Central Office Review Committee?
>
> A:  I'm saying, if they never received it, how could I appeal it?

*Id*. at 144-45.

During his deposition, Plaintiff confirmed that he never filed a grievance at Upstate

regarding the July 1, 2016, incident:

> Q:  How about when you -- when you got to Upstate on July 15, 2016, did you try putting a grievance in -- filing a grievance there about --
>
> A:  No.
>
> Q:  -- what had happened at Washington?
>
> A:  No.  Because I thought it -- my grievance had already -- I thought they already had it.  I thought they received it.  But after like a month of not hearing nothing from them, I decided to take it upon myself to respond to Upstate grievances, to respond to them because you can't send mail out like that.  You got it do it through the Grievance Program.
>
> Q:  All right.  Am I correct though you could of filed a grievance at Upstate, about something that happened at Washington?  Correct?
>
> A:  Yes.  Because it was -- it was less than twenty-one days that it occurred.
>
> Q:  All right.  But you didn't -- you didn't do that?
>
> A:  No.  Because I already did it.
>
> Q:  Okay.  Do you have a copy of the grievance that you say you filed on July 13 or July 14?
> A:  No.  If I had carbon paper I would of made one, but I didn't have no carbon paper.  Usually I do that, but I didn't have carbon paper at the time.
>
> Q:  Do you have written proof that you -- you filed that grievance?

7

> A:  No.  Oh, yeah.
>
> Q:  What?
>
> A:  I have written proof that I wrote to Albany -- Upstate Inmate Grievance, asking about that grievance and they wrote --
>
> Q:  Okay.
>
> A:  -- me back saying that they going to contact Washington Correctional Facility and they going to contact me, when they get a response.  And when they got a response, they saying that Washington never received a -- a grievance.

*Id*. at 145-47.  Plaintiff confirmed he sent a letter to Upstate regarding his grievance:

> Q:  You're saying that there was a letter from you to Upstate and you said something to the effect, what happened to my grievance at Washington?
>
> A:  Yes.
>
> Q:  And you said that Upstate wrote back and said we'll look into it?
>
> A:  Yeah.
>
> Q:  And then eventually, Upstate said there -- nothing was filed?
>
> A:  Yeah.

*Id*. at 149.[3]

Defendants have submitted evidence in support of their motion establishing Washington has no record of any grievance filed by Plaintiff regarding the alleged July 1, 2016, incident. (Dkt. No. 41-9 at 2-3.)  Matthew L. Waters, Inmate Grievance Program ("IGP") Supervisor, is one of the individuals responsible for keeping records of the grievances filed by inmates at

---

[3]  Plaintiff did not have a copy of the letters with him at the September 13, 2017, deposition. (Dkt. No. 41-2 at 147.)  Plaintiff indicated he would provide copies of the letters to Defendants, provided they were not destroyed in his sister's house fire.  *Id*. at 147-48.

Washington. *Id.* at 2. In his declaration, Waters explains he searched the IGP files to determine

if Plaintiff filed any grievance at Washington relating to the alleged July 1, 2016, incident. *Id.*

Based upon his search, Waters determined Washington has no record of any grievance filed by

Plaintiff relating to any issue connected to the alleged use of excessive force incident at

Washington in July 2016. *Id.* at 2-3.

     Defendants have also submitted evidence establishing CORC has no record of an appeal

relating to the alleged July 1, 2016, assault. (Dkt. No. 41-8 at 1-2.) Rachel Seguin is the

Assistant Director of the DOCCS IGP. *Id.* at 1. In that capacity, she is the custodian of the

records maintained by CORC, which is the body that renders final administrative decisions under

DOCCS' three-step IGP. *Id.* In her declaration, Seguin explains she searched CORC records

and, based upon her search, determined Plaintiff did not file a grievance appeal with CORC

related to any issue involving an alleged use of excessive force incident at Washington in July

2016. *Id.* Seguin has attached a computer printout showing that the only CORC appeal filed by

Plaintiff was in 2015, concerning an incident at Downstate, and that there are currently no active

CORC appeals pending for Plaintiff. *Id.* at 2.

## III.     APPLICABLE LEGAL STANDARD FOR SUMMARY JUDGMENT

     Summary judgment may be granted only if the submissions of the parties taken together

"show that there is no genuine issue of material fact and that the moving party is entitled to

judgment as a matter of law." Fed. R. Civ. P. 56(c); *see Anderson v. Liberty Lobby, Inc.*, 477

U.S. 242, 251-52 (1986). The party moving for summary judgment bears the initial burden of

showing, through the production of admissible evidence, that no genuine issue of material fact

exists. *Salahuddin v. Goord*, 467 F.3d 263, 272-73 (2d Cir. 2006). A dispute of fact is

"genuine" if "the [record] evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Liberty Lobby*, 477 U.S. at 248.

Only after the moving party has met this burden is the nonmoving party required to produce evidence demonstrating that genuine issues of material fact exist. *Salahuddin*, 467 F.3d at 272-73. The nonmoving party must do more than "rest upon the mere allegations . . . of the [plaintiff's] pleading" or "simply show that there is some metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 585-86 (1986). "Conclusory allegations, conjecture and speculation . . . are insufficient to create a genuine issue of fact." *Kerzer v. Kingly Mfg.*, 156 F.3d 396, 400 (2d Cir. 1998).

A party opposing summary judgment is required to submit admissible evidence. *See Spiegel v. Schulmann*, 604 F.3d 72, 81 (2d Cir. 2010) ("It is well established that in determining the appropriateness of a grant of summary judgment, [the court] . . . may rely only on admissible evidence.") (citation and internal quotation marks omitted). A plaintiff's verified complaint is to be treated as an affidavit. *Colon v. Coughlin*, 58 F.3d 865, 872 (2d Cir. 1995) ("A verified complaint is to be treated as an affidavit . . . and therefore will be considered in determining whether material issues of fact exist . . . .") (citations omitted).

In *Jeffreys v. City of New York*, the Second Circuit reminded that on summary judgment motions "[t]he mere existence of a scintilla of evidence in support of the plaintiff's position will be insufficient; there must be evidence on which the jury could *reasonably* find for the plaintiff." 426 F.3d 549, 554 (2d Cir. 2005). "To defeat summary judgment, . . . nonmoving parties may not rely on conclusory allegations or unsubstantiated speculation." *Id*. (citation and internal quotation marks omitted). "At the summary judgment stage, a nonmoving party must offer some hard evidence showing that its version of the events is not wholly fanciful." *Id*. (citation and

internal quotation marks omitted).  "To satisfy Rule 56(e), affidavits must be based upon

'concrete particulars,' not conclusory allegations."  *Schwapp v. Town of Avon*, 118 F.3d 106, 111

(2d Cir. 1997) (citation omitted); *Smith v. Woods*, No. 9:03-CV-480 (DNH/GHL), 2006 WL

1133247, at *3 & n.10 (N.D.N.Y. Apr. 24, 2006).[4]  "Statements that are devoid of any specifics,

but replete with conclusions, are insufficient to defeat a properly supported motion for summary

judgment."  *Bickerstaff v. Vassar Coll.*, 196 F.3d 435, 452 (2d Cir. 1999).

In determining whether a genuine issue of material fact exists, the court must resolve all

ambiguities and draw all reasonable inferences against the moving party.  *Major League

Baseball Props., Inc. v. Salvino, Inc.*, 542 F.3d 290, 309 (2d Cir. 2008).  "[T]he trial court's task

at the summary judgment motion stage of the litigation is carefully limited to discerning whether

there are any genuine issues of material fact to be tried, not to deciding them.  Its duty, in short,

is confined at the point to issue-finding; it does not extend to issue-resolution."  *Gallo v.

Prudential Residential Servs., Ltd. P'ship*, 22 F.3d 1219, 1224 (2d Cir. 1994).

Where a party is proceeding *pro se*, the court is obliged to "read [the *pro se* party's]

supporting papers liberally, and . . . interpret them to raise the strongest arguments that they

suggest."  *Burgos v. Hopkins*, 14 F.3d 787, 790 (2d Cir. 1994).  However, "a *pro se* party's 'bald

assertion,' unsupported by evidence, is not sufficient to overcome a motion for summary

judgment."  *Cole v. Artuz*, No. 93 Civ. 5981 (WHP)(JCF), 1999 WL 983876, at *3 (S.D.N.Y.

Oct. 28, 1999) (citing *Carey v. Crescenzi*, 923 F.2d 18, 21 (2d Cir. 1991)).

---

[4]  The Court will provide Plaintiff with copies of all unpublished decisions cited herein in
accordance with the Second Circuit's decision in *Lebron v. Sanders*, 557 F.3d 76 (2d Cir. 2009)
(per curiam).

## IV.    PLAINTIFF'S FAILURE TO COMPLY WITH L.R. 7.1(a)(3)

While courts are required to give due deference to a plaintiff's *pro se* status, that status "does not relieve [a *pro se*] plaintiff of his duty to meet the requirements necessary to defeat a motion for summary judgment." *Jorgensen v. Epic/Sony Records*, 351 F.3d 46, 50 (2d Cir. 2003). While Plaintiff has opposed Defendants' motion, he has failed to respond to Defendants' statement of material as required under L.R. 7.1(a)(3).[5]  (Dkt. No. 57.)  His response does not mirror Defendants' statement of material facts, nor does Plaintiff specifically admit or deny the statements therein or cite references to evidence in the record supporting of refuting Defendants' statements. *See id.*  Where a party has failed to respond to the movant's statement of material facts in the manner required under L.R. 7.1(a)(3), the facts in the movant's statement to which Plaintiff has not properly responded will be accepted as true (1) to the extent they are supported by evidence in the record,[6] and (2) the nonmovant, if proceeding *pro se*, has been specifically advised of the possible consequences of failing to respond to the motion.[7]  *See Champion v. Artuz*, 76 F.3d 483, 486 (2d Cir. 1996).

---

[5]  L.R. 7.1(a)(3) requires the opposing party to file a response to the movant's Statement of Material Facts.  Under the rule, the response "shall mirror the movant's Statement of Material Facts by admitting and/or denying each of the movant's assertions in matching numbered paragraphs.  Each denial shall set forth a specific citation to the record where the factual issue arises."

[6]  L.R. 7.1(a)(3) provides that "The Court shall deem admitted any properly supported facts set forth in the Statement of Material Facts that the opposing party does not specifically controvert." However, see *Vermont Teddy Bear Co., Inc. v. 1-800 Beargram Co.*, 373 F.3d 241, 244 (2d. Cir. 2004) ("[I]n determining whether the moving party has met his burden of showing the absence of a genuine issue for trial, the district court may not rely solely on the statement of undisputed facts in the moving party's [Statement of Material Facts].  It must be satisfied that the citation to evidence in the record supports the assertion.") (citations omitted).

[7]  Plaintiff was notified of the consequences of his failure to respond to Defendants' summary judgment motion pursuant to L.R. 56.2.  (Dkt. No. 43.)

This Circuit adheres to the view that nothing in Rule 56 imposes an obligation on the court to conduct a search and independent review of the record to find proof of a factual dispute where a non-movant willfully fails to respond to a properly filed summary judgment motion. *Amnesty Am. v. Town of West Hartford*, 288 F.3d 467, 470 (2d Cir. 2002). However, the Second Circuit, acknowledging a court's broad discretion to determine whether to overlook a failure to comply with local rules, has held that "while a court is not required to consider what the parties fail to point out in their [local rule statements of material facts], it may in its discretion opt to conduct an assiduous review of the entire record even where one of the parties has failed to file such a statement." *Holtz v. Rockefeller & Co., Inc.*, 258 F.3d 62, 73 (2d Cir. 2001) (citation and internal quotation marks omitted). In deference to Plaintiff's *pro se* status, the Court has opted to review the entire summary judgment record.

## V.    DISCUSSION

### A.    Exhaustion of Administrative Remedies

Defendants argue Plaintiff's excessive force claim arising from the July 1, 2016, incident should be dismissed on the ground that he failed to exhaust his administrative remedies.

#### 1.    Legal Standard

Under the Prison Litigation Reform Act of 1995 ("PLRA"), "[n]o action shall be brought with respect to prison conditions under section 1983 . . . by a prisoner confined in any jail, prison, or other correctional facility until such administrative remedies as are available are exhausted." 42 U.S.C. § 1997e(a); *see also Ross v. Blake*, 136 S. Ct. 1850, 1854-55 (2016). "There is no question that exhaustion is mandatory under the PLRA and that unexhausted claims cannot be brought in court." *Jones v. Bock*, 549 U.S. 199, 211 (2007). "[T]he PLRA's exhaustion requirement applies to all inmate suits about prison life, whether they involve general

circumstances or particular episodes, and whether they allege excessive force or some other wrong." *Porter v. Nussle*, 534 U.S. 516, 532 (2002).

The PLRA requires "proper exhaustion," which means using all steps required by the administrative review process applicable to the institution in which an inmate is confined and doing so properly. *Jones*, 549 U.S. at 218 (citing *Woodford v. Ngo*, 548 U.S. 81, 88 (2006)); *see also Amador v. Andrews*, 655 F.3d 89, 96 (2d Cir. 2011) (exhaustion necessitates "using all steps that the [government] agency holds out, and doing so properly") (internal quotations omitted). In New York State prisons, DOCCS has a well-established three-step IGP. *See* N.Y. Comp. Codes R. & Regs. tit. 7 ("7 NYCRR"), § 701.5.

First, an inmate must file a complaint with the facility IGP clerk within twenty-one days of the alleged occurrence. *Id*. § 701.5(a)(1). A representative of the facility's IGRC has sixteen calendar days from receipt of the grievance to informally resolve the issue. *Id*. § 701.5(b)(1). If there is no such informal resolution, the full IGRC conducts a hearing within sixteen calendar days of receipt of the grievance, *id*. § 701.5(b)(2), and issues a written decision within two working days of the conclusion of the hearing. *Id*. § 701.5(b)(3).

Second, a grievant may appeal the IGRC's decision to the facility superintendent within seven calendar days of receipt of the IGRC's written decision. *Id*. § 701.5(c)(1). If the grievance involves an institutional issue (as opposed to a DOCCS-wide policy issue), the superintendent must issue a written decision within twenty calendar days of receipt of the grievant's appeal. *Id*. § 701.5(c)(3)(ii). Grievances regarding DOCCS-wide policy issues are forwarded directly to CORC for a decision under the process applicable to the third step. *Id*. § 701.5(c)(3)(I).

Third, a grievant may appeal to CORC within seven working days of receipt of the superintendent's written decision.  *Id*. § 701.5(d)(1)(I).  CORC is to render a written decision within thirty calendar days of receipt of the appeal.  *Id*. § 701.5(d)(3)(ii).

Grievances claiming employee harassment, including claims of excessive force, "are of particular concern to the administration of [DOCCS] facilities," and subject to an expedited procedure whereby the grievance goes directly to the facility superintendent.  *Id*. § 701.8.[8]  The superintendent is required to initiate an in-house investigation by higher ranking supervisory personnel; request an investigation by the inspector general's office; or request an investigation by the New York State Police Bureau of Investigation if the superintendent determines that criminal activity may be involved.  *Id*. § 701.8(d).

A grievance referred to the superintendent and determined to be an allegation of harassment, may not be withdrawn and must be addressed by the superintendent.  *Id*. § 701.8(d). The superintendent is required to render a decision on the grievance within twenty-five calendar days, and extensions may be granted only with the consent of the grievant.  *Id*. § 701.8(f).  If the superintendent fails to respond within the required twenty-five days, the grievant may appeal the grievance to CORC by "filing a notice of decision to appeal (form #2133) with the inmate grievance clerk."  *Id*. § 701.8(g).

As set forth above, at each step of the IGP process, a decision must be rendered within a specified time period.  Where the IGRC and/or superintendent do not timely respond, an inmate is permitted to appeal "to the next step."  *Id*. §§ 701.6(g), 701.8(g).  Generally, if a plaintiff fails to follow each of the required three step of the above-described IGP, including receipt of a

---

[8]  Section 701.8 has been found applicable to claims of excessive force.  *See Torres v. Carry*, 691 F. Supp. 2d 366 (S.D.N.Y. 2009).

decision from CORC, prior to commencing litigation, he has failed to exhaust his administrative

remedies and required under the PLRA.  *See Ruggiero v. Cty. of Orange*, 467 F.3d 170, 176 (2d

Cir. 2006) ("[T]he PLRA requires proper exhaustion, which means using all steps that the

agency holds out, and doing so *properly* (so that the agency addresses the issues on the merits.")

(internal quotations and citations omitted)); *see, e.g.*, *Martin, II v. Niagara Cty. Jail*, No. 05-CV-

868 (JTC), 2012 WL 3230435, at *6 (W.D.N.Y. Aug. 6, 2012) (inmate who fails to exhaust his

administrative remedies is barred from commencing a federal lawsuit).

Because non-exhaustion is an affirmative defense, Defendants bear the burden of

showing that a prisoner has failed to satisfy the exhaustion requirements.  *See Jones*, 549 U.S. at

216; *Johnson v. Testman*, 380 F.3d 691, 695 (2d Cir. 2004), *overruled on other grounds,*

*Woodford*, 548 U.S. at 94-95.

### 2.    Plaintiff's Failure to Exhaust

Plaintiff has averred that on or about July 14, 2016, he submitted a grievance regarding

the July 1, 2016, incident while he was in the SHU at Washington.  (Dkt. No. 41-2 at 141-43.)

The undisputed record evidence establishes there is no record of this grievance having been filed

at Washington or appealed to CORC.  (Dkt. Nos. 41-9 at ¶ 9; 41-8 at ¶¶ 3, 4; 41-2 at 143-45.)

Therefore, the Court finds Defendants have satisfied their burden of showing that Plaintiff failed

to satisfy the exhaustion requirements before commencing this action.  *See Woodford*, 548 U.S.

at 93.[9]

---

[9] To the extent Plaintiff suggests he "exhausted" his administrative remedies by contacting the
Commissioner, Governor, and Inspector General, among others, regarding the July 1, 2016,
incident, "[t]he law is well-settled that informal means of communicating and pursuing a
grievance, even with senior prison officials, are not sufficient under the PLRA."  *Timmons v.
Schriro*, Nos. 14-CV-6606 RJS, 14-CV-6857 RJS, 2015 WL 3901637, at *3 (S.D.N.Y. June 23,
2015); *see also Salmon v. Bellinger*, No. 9:14-CV-0827 (LEK/DJS), 2016 WL 4411338, at *4
(N.D.N.Y. July 5, 2016), *report-recommendation adopted by*, 2016 WL 4275733 (N.D.N.Y.

### 3.     Availability of the DOCCS IGP

A prisoner's failure to exhaust does not end a court's exhaustion review.  While the PLRA mandates exhaustion of administrative remedies, it also "contains its own, textual exception to mandatory exhaustion."  *Ross*, 136 S. Ct. at 1858.  More specifically, section 1997e(a) provides that only those administrative remedies that "are available" must first be exhausted.  42 U.S.C. § 1997e(a); *see also Ross*, 136 S. Ct. at 1858 ("[T]he exhaustion requirement hinges on the availability of administrative remedies[.]") (quotations and citations omitted).  In the PLRA context, the Supreme Court has determined that "availability" means that "an inmate is required to exhaust those, but only those, grievance procedures that are capable of use to obtain some relief for the action complained of."  *Ross*, 136 S. Ct. at 1859 (quotations and citations omitted).

To guide courts in the "availability" analysis, the Supreme Court has identified three circumstances in which a court may find that internal administrative remedies are not available to prisoners under the PLRA.  *Id*. at 1859-60.  First, "an administrative procedure is unavailable when (despite what regulations or guidance materials may promise) it operates as a simple dead end—with officers unable or consistently unwilling to provide any relief to aggrieved inmates."  *Id*. at 1859.  "Next, an administrative scheme might be so opaque that it becomes, practically speaking, incapable of use."  *Id*.  The Court explained that, "[i]n this situation, some mechanism

---

Aug. 12, 2016); *Rodriguez v. Cross*, No. 15-CV-1079 (GTS/CFH), 2017 WL 2791063, at *4 (N.D.N.Y. May 9, 2017) (collecting cases); *see also Geer v. Chapman*, No. 9:15-CV-952 (GLS/ATB), 2016 WL 6091699, at *5 (N.D.N.Y. Sept. 26, 2016) ("It is well-settled that writing letters to prison officials, or other officials, is insufficient to properly exhaust administrative remedies.").  Thus, Plaintiff's informal complaints, whether written or verbal, outside of the grievance process, are insufficient to exhaust his administrative remedies.  *See also Jones*, 549 U.S. at 218 (proper exhaustion under the PLRA means using all steps required by the applicable administrative review process).

exists to provide relief, but no ordinary prisoner can discern or navigate it." *Id.*  Finally, an administrative remedy is not "available" when "prison administrators thwart inmates from taking advantage of a grievance process through machination, misrepresentation, or intimidation." *Id.* at 1860.  When one of the three circumstances is found, "an inmate's duty to exhaust 'available' remedies does not come into play." *Id.* at 1859.  Once a defendant has satisfied the burden of establishing a failure to exhaust, the plaintiff must establish that the IGP was unavailable to him. *See Jones*, 549 U.S. at 216.

The Court finds that the question of availability in this case is governed by *Williams v. Corr. Officer Priatno*, 829 F.3d 118 (2d Cir. 2016), in which the Second Circuit held that the opacity of 7 NYCRR § 708.1(g) rendered the DOCCS IGP procedure unavailable to the plaintiff inmate and found that the plaintiff had exhausted his administrative remedies by giving his grievance to the corrections officer.  Defendants' attempt to distinguish *Williams* from the case at bar is unpersuasive.  (*See* Dkt. No. 41-11 at 12.)

As in this case, the inmate plaintiff in *Williams* claimed to have drafted a grievance complaining of an assault by corrections officers.  *Williams*, 829 F.3d at 120-21.  The plaintiff alleged he gave the grievance to a corrections officer for delivery to the IGP office because he was in the SHU.  *Id.*  Here, Plaintiff testified he placed the grievance in the mailbox located in the SHU and, in his opposition submission, explains he handed the grievance to a corrections officer to be placed in the SHU mailbox.  (Dkt. Nos. 41-2 at 141-43; 57 at 4, 6.[10])  Significantly, the plaintiff in *Williams*, like Plaintiff herein, was transferred to another facility before hearing

---

[10]  In his opposition submission, Plaintiff states, "Plaintiff is 100% positive that he gave the on duty officer, that was working the special housing unit on July 14, 2016, the inmate grievance envelope to be placed into the facility out-going mailbox.  (Dkt. No. 57 at 6.)  The Court notes that according to the regulations, inmates in the SHU are instructed to file grievances by giving them to a corrections officer to file on behalf of the inmate.  *See* 7 NYCRR § 701.7.

anything regarding the grievance he had attempted to file.  *Id*.  As in this case, it was undisputed in *Williams* that the inmate plaintiff never received a response to the unfiled grievance and did not appeal the grievance to CORC under 7 NYCRR § 701.8(g).  *Id*. at 125.

The Second Circuit acknowledged in *Williams* that under the DOCCS regulation relevant in both *Williams* and this case, an inmate may appeal a grievance "to the next step" if he does not receive a timely response from the Superintendent.  *Williams*, 829 F.3d at 124.  The Court concluded, however, that:

> even if Williams technically could have appealed his grievance, we conclude that the regulatory scheme providing for that appeal is "so opaque" and "so confusing that . . . no reasonable prisoner can use [it]."  *Ross*, 136 S. Ct. at 1859 (quoting Tr. of Oral Arg. 23). The regulations simply do not contemplate the situation in which Williams found himself, making it practically impossible for him to ascertain whether and how he could pursue his grievance.

*Id*. (alternations in original).  Accepting Williams' allegation that the officer to whom he had given the grievance did not file it, the Court found:

> [u]nder that circumstance, the regulations do not adequately outline the process to appeal or otherwise exhaust administrative remedies.  On their face, the regulations only contemplate appeals of grievances that were actually filed.  For example, if the grievance had never been filed, the superintendent would never have received it and the timeline for her to provide a response within 25 days "of receipt of the grievance" would never have been triggered.  NYCRR tit. 7, § 701.8(f).  In turn, the textual provision allowing a grievant to appeal to the CORC would never have come into effect.  *See id*. § 701.8(g) ("If the superintendent fails to respond within the required 25 day calendar day time limit the grievant may appeal his/her grievance to CORC.") Accordingly, the regulations give no guidance whatsoever to an inmate whose grievance was never filed.

*Id*.  The Court noted in *Williams* that the obscurity of the regulation was compounded by Williams' transfer to another facility approximately two weeks after having given the grievance to the corrections officer.  *Id*. at 126.

19

Here, Defendants contend Plaintiff has failed to sustain his burden of demonstrating unavailability under *Ross* sufficient to raise a material issue of fact.  Specifically, Defendants argue Plaintiff has failed to show that the grievance procedure was so opaque as to render it incapable of use because "the regulations contemplate the very situation Plaintiff allegedly believed he was in—a filed grievance that went unanswered."  (Dkt. No. 60 at 5.)  In support of their motion, Defendants explain the regulations provide that an inmate who receives no response within the time allotted for response may go directly to the next step of the grievance process.  *Id.* (citing 7 NYCRR §§ 701.6(g)(2), 701.8(g)).  Thus, after receiving no response from the facility superintendent within 25 days of purportedly submitting his grievance, Plaintiff could have appealed to CORC.  *Id.*  In short, Defendants argue, "the grievance process provided Plaintiff with a 'clear avenue to proceed.'"  *Id.* (quoting *Cicio v. Wenderlich*, 714 F. App'x 96, 97-98 (2d Cir. 2018) (summary order) ("When a prisoner has filed a grievance, but receives no response, the regulations provide a right of appeal.")).[11]

However, "*Williams* holds that the process to appeal an *unfiled* and unanswered grievance is prohibitively opaque, such that no inmate could actually make use of it."  *Berman v. Drunkin*, No. 9:13-CV-0136 (LEK/DJS), 2017 WL 1215814, at *8 (N.D.N.Y. Mar. 10, 2017) (emphasis in original), *report and recommendation adopted by* 2017 WL 1207834 (N.D.N.Y. Mar. 31, 2017); *see also Juarbe v. Carnegie*, No. 9:15-CV-01485 (MAD/DEP), 2016 WL

---

[11]  In *Cicio*, the Second Circuit found that the grievance process in Cicio's case was not so opaque that it became "incapable of use."  *Cicio*, 714 F. App'x at 97-98 (citing *Ross*, 136 S. Ct. at 1859).  In so holding, the Court compared and distinguished Cicio's situation from that of the plaintiff in *Williams*.  *See id.* (*cf. Williams v. Priatno*, 829 F.3d 118, 126 (2d Cir. 2016) (finding that appellate process was too opaque in circumstances where inmate alleged that a prison guard did not file his grievance and the inmate had since been transferred)).  Here, by contrast, the Court finds Plaintiff's circumstances more closely resemble that of the plaintiff in *Williams*. Thus, for the same reasons, Defendants' reliance on recent rulings by summary order by the Second Circuit are easily distinguishable and inapposite.  (*See* Dkt. No. 41-11 at 12.)

6901277, at *1 (N.D.N.Y. Oct. 7, 2016) ("In *Williams*, the Second Circuit held that when a plaintiff's grievance is both unfiled and unanswered, the regulations do not clearly outline the process to appeal or otherwise exhaust administrative remedies, and therefore, the administrative remedies are unavailable under *Ross*."). Therefore, "[a]s long as [the plaintiff's] grievances were not actually filed, then [the plaintiff's] current situation falls squarely within the Second Circuit's decision in *Williams*[.]" *Juarbe*, 2016 WL 6901277, at *1.

Here, Plaintiff claims he submitted a grievance at Washington, and the next day he was transferred to Upstate. (Dkt. No. 41-2 at 141-42.) The undisputed evidence demonstrates Washington has no record of Plaintiff's grievance. (Dkt. No. 41-9 at 2-3.) Drawing all inferences in the non-moving party's favor, Plaintiff's grievance was both unfiled and unanswered. In that situation, the Second Circuit has held the procedures "are so opaque and confusing that they were, 'practically speaking, incapable of use.'" *Williams*, 829 F.3d at 126 (quoting *Ross*, 136 S. Ct. at 1859). In light of *Williams*, the Court finds material issues of fact as to the availability of the grievance process and whether Plaintiff attempted to exhaust his administrative remedies, precluding summary judgment. *See, e.g.*, *Fann v. Graham*, No. 9:15-CV-1339 (DNH/CFH), 2018 WL 1399331, at *6 (N.D.N.Y. Jan. 11, 2018) (finding issue of fact as to the availability of administrative remedies where the record suggested the plaintiff submitted grievances, which were unfiled and unanswered), *report and recommendation adopted by* 2018 WL 1399340 (N.D.N.Y. Mar. 19, 2018).

Therefore, the Court recommends that Defendants' motion for summary judgment on exhaustion grounds be denied without prejudice and with the opportunity to renew by way of an exhaustion hearing should Defendants request such a hearing.

**B.**    **Official Capacity Claims**

The Eleventh Amendment protects states against suits brought in federal court.  *Alabama v. Pugh*, 438 U.S. 781, 782 (1978).  The immunity granted to the states under the Eleventh Amendment extends beyond the states themselves to state agents and instrumentalities that are effectively arms of the state, *Woods v. Rondout Valley Cent. School Dist. Bd. of Educ.*, 466 F.3d 232, 236 (2d Cir. 2006), and, unless waived, bars all money damage claims against state officials acting in their official capacities.  *Kentucky v. Graham*, 473 U.S. 159, 167-68 (1985); *see also Davis v. New York*, 316 F.3d 93, 101 (2d Cir. 2002) (observing that an inmate-plaintiff's claims for damages against individual corrections department employees sued in their official capacities are considered claims against New York and, therefore, are barred by the state's Eleventh Amendment immunity).

Therefore, to the extent Plaintiff seeks monetary damages from C.O. Mollnow and Sgt. Eisenschmidt in their official capacities (*see* Dkt. No. 1 at 2, 15), the Court agrees with Defendants that such claims must be dismissed on Eleventh Amendment grounds.  (*See* Dkt. No. 41-11 at 13.)

**WHEREFORE**, based on the findings above, it is hereby

**RECOMMENDED** that Defendants' motion for summary judgment (Dkt. No. 41) be **GRANTED in part and DENIED in part**; and it is further

**RECOMMENDED** that insofar as it seeks dismissal of Plaintiff's Eighth Amendment excessive force claim against Defendants in their official capacities, the motion be **GRANTED**; and it is further

**RECOMMENDED** that insofar as it seeks dismissal of Plaintiff's Eighth Amendment excessive force claim against Defendants on exhaustion grounds, the motion be **DENIED**

**without prejudice** to Defendants renewing this argument and requesting an exhaustion hearing, and it is further

 **ORDERED** that the Clerk shall provide Plaintiff with a copy of this Report-Recommendation, along with copies of the unpublished decisions cited herein in accordance with *Lebron v. Sanders*, 557 F.3d 76 (2d Cir. 2008) (per curiam).

 Pursuant to 28 U.S.C. § 636(b)(1), the parties have fourteen days within which to file written objections to the foregoing report.[12]  Such objections shall be filed with the Clerk of the Court.  **FAILURE TO OBJECT TO THIS REPORT WITHIN FOURTEEN DAYS WILL PRECLUDE APPELLATE REVIEW.**  *Roldan v. Racette*, 984 F.2d 85 (2d Cir. 1993) (citing *Small v. Sec'y of Health and Human Servs.*, 892 F.2d 15 (2d Cir. 1989) (per curiam)); 28 U.S.C. § 636(b)(1) (Supp. 2013); Fed. R. Civ. P. 72, 6(a).


Dated: July 20, 2018
  Syracuse, NY

Thérèse Wiley Dancks
United States Magistrate Judge

---

[12]  If you are proceeding *pro se* and are served with this Order and Report-Recommendation by mail, three additional days will be added to the fourteen-day period, meaning that you have seventeen days from the date the Order and Report-Recommendation was mailed to you to serve and file objections.  Fed. R. Civ. P. 6(d).  If the last day of that prescribed period falls on a Saturday, Sunday, or legal holiday, then the deadline is extended until the end of the next day that is not a Saturday, Sunday, or legal holiday.  Fed. R. Civ. P. 6(a)(1)(C).

2006 WL 1133247
Only the Westlaw citation is currently available.
United States District Court,
N.D. New York.

Jeff SMITH, Plaintiff,

v.

Robert K. WOODS, Deputy Superintendent;
Joseph R. Belarge, Captain; G.J. O'Donnell,
Sergeant; F.S.A. Antonelli; and Wayne
Holt, Correction Officer, Defendants.

No. 9:03-CV-480.
|
April 24, 2006.

**Attorneys and Law Firms**

Jeff Smith Plaintiff, Pro Se, New York, NY.

Hon. Eliot Spitzer, Attorney General of the State of
New York, Kelly L. Munkwitz, Esq., Asst. Attorney
General, of Counsel, Department of Law, Albany, NY,
for Defendants.

**DECISION and ORDER**

DAVID N. HURD, District Judge.

 **\*1** Plaintiff, Jeff Smith, brought this civil rights
action pursuant to 42 U.S.C. § 1983. By Report-
Recommendation dated March 17, 2006, the Honorable
George H. Lowe, United States Magistrate Judge,
recommended that defendants' motion for summary
judgment be granted, and that plaintiff's motion for
partial summary judgment be denied. (Docket No.
51). The plaintiff has filed objections to the Report-
Recommendation. (Docket No. 53).

Based upon a de novo determination of the portions of
the report and recommendations to which the plaintiff has
objected, the Report-Recommendation is accepted and
adopted in whole. See 28 U .S.C. 636(b)(1). Accordingly,
it is ORDERED that

1. Defendants' motion for summary judgment is
GRANTED;

Plaintiff's motion for partial summary judgment is
DENIED. and

The complaint is DISMISSED in its entirety.

The Clerk is directed to enter judgment accordingly.

IT IS SO ORDERED.

GEORGE H. LOWE, Magistrate Judge.

**REPORT-RECOMMENDATION**

This matter has been referred to me for Report and
Recommendation by the Honorable David N. Hurd,
United States District Judge, pursuant to 28 U.S.C. §
636(b) and Local Rule 72.3(c) of the Rules of Practice
for this Court. In this *pro se* civil rights action brought
under 42 U.S.C. § 1983, Jeff Smith ("Plaintiff") alleges
that five employees of Upstate Correctional Facility-
Deputy Superintendent Robert K. Woods, Captain
Joseph R. Belarge, Sergeant G.J. O'Donnel, Food Service
Administrator Richard Antonelli, and Correction Officer
Wayne Holt ("Defendants")-violated his rights under the
First, Fourth, Eighth, and Fourteenth Amendments by
(1) retaliating against him for having previously filed a
complaint, (2) subjecting him to an unreasonable search
and seizure, (3) subjecting him to a damaged bunk bed
while he was housed in the Upstate Correctional Facility
Special Housing Unit, and (4) taking away his "good
time" credits without affording him due process. (Dkt.
No. 5 [Plf.'s Am. Compl.].) [1]

[1]   Given my duty to liberally construe a *pro se*
plaintiff's civil rights complaint, I construe Plaintiff's
Amended Complaint as including a claim that
various Defendants violated Plaintiff's rights under
the Fourth Amendment to be free from unreasonable
searches and seizures. See *Phillips v. Girdich,* 408
F.3d 124, 130 (2d Cir.2005) ("We leave it for the
district court to determine what other claims, if any,
[the plaintiff] has raised. In so doing, the court's
imagination should be limited only by [the plaintiff's]
factual allegations, not by the legal claims set out
in his pleadings.") [citations omitted].  *(See also*
Dkt. No. 5, ¶ 44 [Plf.'s Am. Compl., alleging that
Defendants Woods and Holt "violat[ed] plaintiff's
4th ... Amendment[ ] rights"], ¶ 15 [alleging that
Defendant Belarge "had plaintiff's personal property
searched by three officers, one of whom was Holt"];

2006 WL 1133247

Dkt. No. 37, Part 23, Ex. A at 26-28 [Munkowitz Decl., attaching transcript of deposition of Plaintiff, in which he explains his claim under the Fourth Amendment based on the alleged unjustified search and seizure of his property].)

Currently before the Court is Defendants' motion for summary judgment (Dkt. No. 37), and Plaintiff's motion for partial summary judgment (Dkt. No. 38), both brought pursuant to Rule 56 of the Federal Rules of Civil Procedure. Because both motions were filed on the same day (February 11, 2005), and neither was filed in response to the other, I construe each motion as a "motion" and neither motion as a "cross-motion." Both Plaintiff and Defendants have responded to each other's motion (Dkt.Nos.42, 45), and replied to the other's response (Dkt.Nos.47, 48).

Generally, Defendants' motion raises six issues: (1) whether Plaintiff has failed to establish (or even state) a First Amendment retaliation claim; (2) whether Plaintiff has failed to state a Fourth Amendment claim, (3) whether Plaintiff has failed to establish (or even state) an Eighth Amendment claim; (4) whether Plaintiff has failed to exhaust his available administrative remedies regarding his Eighth Amendment claim; (5) whether Plaintiff has failed to establish (or even state) a Fourteenth Amendment due process claim; (6) whether Plaintiff has failed to establish (or properly state) a conspiracy claim; and (7) whether Defendants are protected by qualified immunity. (Dkt. No. 37, Part 25 [Defs.' Mem. of Law].)

*2 Generally, Plaintiff's motion raises three issues: (1) whether Plaintiff is entitled to judgment as a matter of law on his First Amendment retaliation claim; (2) whether Plaintiff is entitled to judgment as a matter of law on his Eighth Amendment claim; and (3) whether Plaintiff is entitled to judgment as a matter of law on his Fourteenth Amendment due process claim. (Dkt. No. 38, Part 3 [Plf.'s Mem. of Law].) Although I liberally construe Plaintiff's Amended Complaint as containing a Fourth Amendment claim, I do not liberally construe his motion as requesting judgment as a matter of law on his Fourth Amendment claim, especially given the burden on a movant under the Federal Rules of Civil Procedure. See Fed.R.Civ.P. 7(b)(1) (requiring that movants "shall set forth the relief or order sought," and "shall state with particularity the grounds [for the relief requested]").

For the reasons discussed below, I answer each of the six questions posed in Defendants' motion in the affirmative, and I answer each of the three questions posed in Plaintiff's motion in the negative. As a result, I recommend that Defendants' motion for summary judgment be granted and that Plaintiff's motion for partial summary judgment be denied.

## I. SUMMARY JUDGMENT STANDARD

Under Rule 56(e) of the Federal Rules of Civil Procedure, summary judgment is warranted if "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed.R.Civ.P. 56(c). In determining whether a genuine issue of material [2] fact exists, the Court must resolve all ambiguities and draw all reasonable inferences against the moving party. Schwapp v. Town of Avon, 118 F.3d 106, 110 (2d Cir.1997) (citation omitted); Thompson v. Gjivoje, 896 F.2d 716, 720 (2d Cir.1990) (citation omitted).

[2]    A fact is "material" only if it would have some effect on the outcome of the suit. Anderson v. Liberty Lobby, 477 U.S. 242, 248 (1986).

However, when the moving party has met its initial burden of establishing the absence of any genuine issue of material fact, the nonmoving party must come forward with "specific facts showing that there is a genuine issue for trial." Fed.R.Civ.P. 56(e); see also Matsushita Electric Industrial Co., Ltd. v. Zenith Radio Corp., 475 U.S. 574, 585-87 (1986). The nonmoving party must do more than "simply show that there is some metaphysical doubt as to the material facts." Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp., 477 U.S. 574, 585-86 (1986); see also Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 247-48 (1986). "A dispute regarding a material fact is genuine if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." Ross v. McGinnis, 00-CV-0275, 2004 WL 1125177, at *8 (W.D.N.Y. March 29, 2004) [internal quotations omitted] [emphasis added].

Imposed over this general burden-shifting framework is the generous perspective with which the Court must view a pro se plaintiff's pleadings. "[I]n actions in which one of the parties appears pro se, this Court is faced with the ... responsibility of granting significant liberality in how pro se pleadings are construed." Aziz Zarif Shabazz

2006 WL 1133247

*v. Pico,* 994 F.Supp. 460, 467 (S.D.N.Y.1998); *see Haines v. Kerner,* 404 U.S. 519, 520-21 (1972) *(per curiam) (pro se* pleadings held "to less stringent standards than formal pleadings drafted by lawyers."); *Ortiz v. Cornetta,* 867 F.2d 146, 148 (2d Cir.1989). For example, where a plaintiff is proceeding *pro se,* and the defendant has filed a dispositive motion, the Court must construe the plaintiff's complaint and opposition papers liberally so as to raise the strongest arguments that they suggest. *See Weixel v. Bd. of Ed. of City of New York,* 287 F.3d 138, 146 (2d Cir.2002) (motion to dismiss in civil rights case); *Burgos v. Hopkins,* 14 F.3d 787, 790 (2d Cir.1994) (motion for summary judgment in civil rights case); *Thomas v. Irving,* 981 F.Supp. 794, 799 (W.D.N.Y.1997) (motion for summary judgment in civil rights case).

**\*3** However, although "[t]he work product of *pro se* litigants should be generously and liberally construed, ... [a *pro se* litigant's] failure to allege either specific facts or particular laws that have been violated renders [an] attempt to oppose defendants' motion ineffectual." *Kadosh v. TRW, Inc.,* 91-CV-5080, 1994 WL 681763, at *5 (S.D.N.Y. Dec. 5, 1994). In other words, "[p]roceeding pro se does not otherwise relieve a [party] from the usual requirements to survive a motion for summary judgment ." *Bussa v. Aitalia Line Aeree Italiane S.p.A.,* 02-CV-10296, 2004 WL 1637014, at *4 (S.D.N.Y. July 21, 2004) (citations omitted), *accord, Durran v. Selsky,* 251 F.Supp.2d 1208, 1211 (W.D.N.Y.2003) (citations omitted).

## II. STATEMENT OF MATERIAL FACTS

The facts set forth in a defendant's Rule 7.1(a)(3) Statement of Material Facts will be taken as true to the extent those facts are supported by the evidence in the record [3] and are not specifically controverted by the plaintiff. [4]

[3]    *See Vermont Teddy Bear Co., Inc. v. 1-800 Beargram Co.,* 373 F.3d 241, 244 (2d Cir.2004) (citations omitted).

[4]    *See* Local Rule 7.1(a)(3) ("*Any facts set forth in the Statement of Material Facts shall be deemed admitted unless specifically controverted by the opposing party.*").

To "specifically controvert[ ]" each of the statements of material fact in a defendant's Rule 7.1(a)(3) Statement of Material Facts, a plaintiff must file a *response* to the Statement of Material Facts that "mirror[s] the movant's Statement of Material Facts by admitting and/or denying each of the movant's assertions in matching numbered paragraphs" *and* that "set[s] forth a specific citation to the record where the factual issue arises." [5]

[5]    Local Rule 7.1(a)(3); *see, e.g., Jones v. Smithkline Beecham Corp.,* 309 F.Supp.2d 343, 346 (N.D.N.Y.2004) (McAvoy, J.) ("[W]here Plaintiff has failed to provide specific references to the record in support of her denials or has otherwise failed to completely deny Defendant's assertions of fact, those assertions will be taken as true."); *Lee v. Alfonso,* 97-CV-1741, 2004 U.S. Dist. LEXIS 20746, at *15 (N.D.N.Y. Feb. 10, 2004) (Scullin, C.J.) ("Plaintiff does not offer any facts to support his claims that would raise an issue of fact. Nor has he overcome his failure to respond to Defendants' Rule 7.1(a) (3) Statement. Therefore, Defendants' version of the facts remains uncontroverted."); *Margan v. Niles,* 250 F.Supp.2d 63, 67 (N.D.N.Y.2003) (Hurd, J.) ("Plaintiff's Rule 7.1(a)(3) statement, which contains numerous denials, does not contain a single citation to the record. Because plaintiff's response Rule 7.1(a) (3) statement does not comply with the local rules, it has not been considered."); *Mehlenbacher v. Slafrad,* 99-CV-2127, 2003 U.S. Dist. LEXIS 9248, at *4 (N.D.N.Y. June 4, 2003) (Sharpe, M.J.) ("Since [the plaintiff] has failed to respond to the defendant's statements of material fact, the facts as set forth in the defendants' Rule 7.1 Statement ... are accepted as true."); *Adams v. N.Y. State Thruway Auth.,* 97-CV-1909, 2001 U.S. Dist. LEXIS 3206, at *2, n. 1 (N.D.N.Y. March 22, 2001) (Mordue, J.) ("[T]o the extent plaintiff's responses violate Local Rule 7. 1, and are not properly admitted or denied, the Court will deem defendant's statement of fact admitted by plaintiff."); *see also Holtz v. Rockefeller,* 258 F.3d 62, 74 (2d Cir.2001) ("[A] Local Rule 56.1 statement is not itself a vehicle for making factual assertions that are otherwise unsupported in the record.").

Portions of the record sufficient to create a "factual issue" include affidavits or verified complaints (which are treated as affidavits for purposes of summary judgment). [6] However, to be sufficient to create a "factual issue," such an affidavit or verified complaint must, among other things, be based "on personal knowledge." [7] An affidavit or verified complaint is not based on personal knowledge

if, for example, it is based on mere "information and belief" or hearsay. [8]

6      *See Patterson v. County of Oneida,* 375 F.2d 206, 219
       (2d. Cir.2004) ("[A] verified pleading ... has the effect
       of an affidavit and may be relied upon to oppose
       summary judgment."); *Fitzgerald v. Henderson,* 251
       F.3d 345, 361 (2d Cir.2001) (holding that plaintiff
       "was entitled to rely on [his verified amended
       complaint] in opposing summary judgment"), *cert.
       denied,* 536 U.S. 922 (2002); *Colon v. Coughlin,* 58
       F.3d 865, 872 (2d Cir.1993) ("A verified complaint is
       to be treated as an affidavit for summary judgment
       purposes.") [citations omitted]; *Fed.R.Civ.P. 56(c)*
       ("The judgment sought shall be rendered forthwith if
       the ... affidavits ... show that there is no genuine issue
       as to any material fact....").

7      *Fed.R.Civ.P. 56(e)* ("Supporting and opposing
       affidavits shall be made on personal knowledge,
       shall set forth such facts as would be admissible
       in evidence, and shall show affirmatively that the
       affiant is competent to the matters stated therein.");
       *see also U.S. v. Private Sanitation Indus. Ass'n of
       Nassau/Suffolk, Inc.,* 44 F.3d 1082, 1084 (2d Cir.1995)
       [citations omitted], *cert. denied sub nom, Ferrante v.
       U.S.,* 516 U.S. 806 (1995).

8      *See Patterson,* 375 F.3d at 219 ("[Rule 56(e)'s]
       requirement that affidavits be made on personal
       knowledge is not satisfied by assertions made 'on
       information and belief.'... [Furthermore, the Rule's]
       requirement that the affiant have personal knowledge
       and be competent to testify to the matters asserted
       in the affidavits also means that the affidavit's
       hearsay assertion that would not be admissible at
       trial if testified to by the affiant is insufficient to
       create a genuine issue for trial."); *Sellers v. M .C.
       Floor Crafters, Inc.,* 842 F.2d 639, 643 (2d Cir.1988)
       ("[Defendant's] affidavit states that it is based on
       personal knowledge *or* upon information and belief....
       Because there is no way to ascertain which portions
       of [Defendant's] affidavit were based on personal
       knowledge, as opposed to information and belief,
       the affidavit is insufficient under *Rule 56* to support
       the motion for summary judgment."); *Applegate v.
       Top Assoc., Inc.,* 425 F.2d 92, 97 (2d Cir.1970)
       (rejecting affidavit made on "suspicion ... rumor and
       hearsay"); *Spence v. Maryland Cas. Co.,* 803 F.Supp.
       649, 664 (W.D.N.Y.1992) (rejecting affidavit made
       on "secondhand information and hearsay"), *aff'd,* 995
       F.2d 1147 (2d Cir.1993).

Similarly, such an affidavit or verified complaint must
not be conclusory. [9] Of course, an affidavit may be
conclusory because its assertions are too general. [10]
However, even where an affidavit's assertions are specific
(e.g., with respect to time, place, persons, events,
conversation, etc.), that affidavit may still be deemed
conclusory if it is (1) "largely unsubstantiated by any other
direct evidence" and (2) "so replete with inconsistencies
and improbabilities that no reasonable juror would
undertake the suspension of disbelief necessary to credit
the allegations made in the complaint." [11] Indeed, it
has long been the rule in the Second Circuit that
"issues of credibility sufficient to defeat a motion for
summary judgment are not created if the contradicting or
impeaching evidence is too incredible to be believed by
reasonable minds." *Price v. Worldvision Enterprises, Inc.,*
455 F.Supp. 252, 266, n. 25 (S.D.N.Y.1978), *aff'd without
opinion,* 603 F.2d 214 (2d Cir.1979).

9      *See Fed.R.Civ.P. 56(e)* (requiring that non-movant
       "set forth specific facts showing that there is a genuine
       issue for trial"); *Patterson,* 375 F.3d at 219 (2d.
       Cir.2004) ("Nor is a genuine issue created merely by
       the presentation of assertions [in an affidavit] that
       are conclusory.") [citations omitted]; *Applegate,* 425
       F.2d at 97 (stating that the purpose of *Rule 56[e]* is
       to "prevent the exchange of affidavits on a motion
       for summary judgment from degenerating into mere
       elaboration of conclusory pleadings").

10     *See, e.g., Bickerstaff v. Vassar Oil,* 196 F.3d 435, 452
       (2d Cir.1998) (McAvoy, C.J., sitting by designation)
       ("Statements [for example, those made in affidavits,
       deposition testimony or trial testimony] that are
       devoid of any specifics, but replete with conclusions,
       are insufficient to defeat a properly supported motion
       for summary judgment.") [citations omitted]; *West-
       Fair Elec. Contractors v. Aetna Cas. & Sur.,* 78 F.3d
       61, 63 (2d Cir.1996) (rejecting affidavit's conclusory
       statements that, in essence, asserted merely that there
       was a dispute between the parties over the amount
       owed to the plaintiff under a contract); *Meiri v.
       Dacon,* 759 F.2d 989, 997 (2d Cir.1985) (plaintiff's
       allegation that she "heard disparaging remarks about
       Jews, but, of course, don't ask me to pinpoint people,
       times or places.... It's all around us" was conclusory
       and thus insufficient to satisfy the requirements
       of *Rule 56[e]* ), *cert. denied,* 474 U.S. 829 (1985);
       *Applegate,* 425 F.2d at 97 ("[Plaintiff] has provided
       the court [through his affidavit] with the characters
       and plot line for a novel of intrigue rather than the

WESTLAW    © 2018 Thomson Reuters. No claim to original U.S. Government Works.

concrete particulars which would entitle him to a trial.").

11    *See, e.g., Jeffreys v. City of New York,* 426 F.3d 549, 554-555 (2d Cir.2005) (affirming grant of summary judgment to defendants in part because plaintiff's testimony about an alleged assault by police officers was "largely unsubstantiated by any other direct evidence" and was "so replete with inconsistencies and improbabilities that no reasonable juror would undertake the suspension of disbelief necessary to credit the allegations made in the complaint") [citations and internal quotations omitted]; *Argus, Inc. v. Eastman Kodak Co.,* 801 F.2d 38, 45 (2d Cir.1986) (affirming grant of summary judgment to defendants in part because plaintiffs' deposition testimony regarding an alleged defect in a camera product line was, although specific, "unsupported by documentary or other concrete evidence" and thus "simply not enough to create a genuine issue of fact in light of the evidence to the contrary"); *Allah v. Greiner,* 03-CV-3789, 2006 WL 357824, at *3-4 & n. 7, 14, 16, 21 (S.D.N.Y. Feb. 15, 2006) (prisoner's verified complaint, which recounted specific statements by defendants that they were violating his rights, was conclusory and discredited by the evidence, and therefore insufficient to create issue of fact with regard to all but one of prisoner's claims, although verified complaint was sufficient to create issue of fact with regard to prisoner's claim of retaliation against one defendant because retaliatory act occurred on same day as plaintiff's grievance against that defendant, whose testimony was internally inconsistent and in conflict with other evidence); *Olle v. Columbia Univ.,* 332 F.Supp.2d 599, 612 (S.D.N.Y.2004) (plaintiff's deposition testimony was insufficient evidence to oppose defendants' motion for summary judgment where that testimony recounted specific allegedly sexist remarks that "were either unsupported by admissible evidence or benign"), aff'd, 136 Fed. Appx. 383 (2d Cir.2005) (unreported decision).

**\*4** Here, Defendants have a filed Rule 7.1 Statement of Material Facts, and supporting affidavits and exhibits. (Dkt. No. 37, Parts 2-25.) Plaintiff has filed a response to Defendants' Rule 7.1 Statement. (Dkt. No. 42, Part 1.) In addition, Plaintiff has filed (1) declarations and exhibits in opposition to the affidavits of Defendants Woods, Belarge, Holt, Antonelli, and Holden (Dkt. No. 42, Parts 1, 3), and (2) a verified Amended Complaint (Dkt. No. 5). Finally, because Plaintiff is proceeding *pro se* and this is a civil rights action, I will consider, in evaluating

Plaintiff's response to Defendants' motion for summary judgment, Plaintiff's declaration and exhibits in support of his motion for partial summary judgment. (Dkt. No. 38, Parts 1, 4.)

I address Plaintiff's responsive documents in more detail below. However, a few general observations are appropriate here. Plaintiff's Rule 7.1 Response contains hardly any citations to the record, much less any citations to admissible evidence; rather, to the extent that Plaintiff's Rule 7.1 Response contains any citations at all, those citations are often to other portions of Plaintiff's Response or to his Amended Complaint (which are, themselves, conclusory), or to exhibits that do not support his denial of the fact asserted. Moreover, his Declarations and verified Amended Complaint are often argumentative in nature (in violation of Local Rule 7.1[a][2] ) and not based on personal knowledge (but only hearsay or pure speculation). Finally, his Declarations and verified Amended Complaint are often conclusory and replete with inconsistencies and improbabilities.

For example, he asserts that "[a]t no time did [he] possess[ ] [Inmate Alcivar's] legal materials other than [the times when he and Inmates Lipman and Robles approached Defendant Holt with such materials]." [12] However, his own letters and deposition testimony contain repeated representations that he was, at other times, in possession of such materials. [13]

12    (Dkt. No. 42, Part 1, ¶ 7 [Plf.'s Response to Woods Aff.].)

13    *(See, e.g.,* Dkt. No. 37, Part 22, Ex. A at 31 [Munkowitz Decl., attaching transcript of Plaintiff's deposition, in which he testifies that, when Defendant Holt failed to take "control" of Inmate Alcivar's legal documents, Defendant Holt left Plaintiff ***"stuck with them*** as well as the other two inmates"], 31-32 [admitting that he did not return the documents to the law clerk's work station in the law library out of a fear that the document may fall into another inmate's hands], 32 [admitting that he took the documents to "honor" Inmate Alcivar's "wishes"], 33 [admitting that he took the documents after Inmate Alcivar's death based on his belief that "they were not supposed to be in the law library after the inmate was deceased"]; Dkt. No. 37, Part 18, Ex. B at 6-9 [Antonelli Aff., attaching letter dated 7/4/02 from Plaintiff, in which he states, "There is [sic] two inmates

2006 WL 1133247

that Peter trusted with his papers and other legal documents, that is one inmate that housed [sic] in the same dorm as him and myself.... Peter told me that you have copies of all his papers, those of which are the same as the papers *I have here"]*; Dkt. No. 37, Part 18, Ex. B at 10-12, 14 [Antonelli Aff., attaching 7/16/02 letter from Plaintiff, in which he states, "I am going to *hold a copy of the complaint*" in Inmate Alcivar's federal civil rights action]; Dkt. No. 37, Part 7 [Ex. C to Woods Aff., attaching Plaintiff's 8/5/02 letter, in which he states, "in the future if anything should come of a matter of said documents *being in my possession ...* you and the administration cannot take any action against the inmate's family nor myself"] [emphasis added].)

Similarly, he asserts that the documents allegedly discovered by Defendant O'Donnell in Plaintiff's "cube" on August 31, 2002, were in fact "the exact same materials intercepted by Woods through the U.S. mail." [14] However, those documents contained copies of two letters-dated July 4, 2002, and July 16, 2002-from Plaintiff to Inmate Alcivar's two daughters. [15] Plaintiff offers no explanation as to why Inmate Alcivar's daughters would be returning copies of those letters to Plaintiff between August 19, 2006, and August 31, 2002-the time period during which Defendant Woods allegedly intercepted Plaintiff's mail. [16]

[14]   (Dkt. No. 42, Part 1, ¶ 5.B. [Plf.'s Response to Antonelli Aff.].)

[15]   (Dkt. No. 37, Part 18 at 6-8, 10-12 [Ex. B to Antonelli Aff., attaching contraband allegedly found in Plaintiff's "cube"].)

[16]   (Dkt. No. 5, ¶ 12 [Am. Compl.].)

Generally, I find such assertions by Plaintiff to be too incredible to be believed by reasonable minds.

Accordingly, the following material facts, even when viewed most favorably to Plaintiff, are supported by evidence in the record, and are not specifically controverted by Plaintiff:

Background

1. From July of 2002 until November of 2002 (the time period relevant to the allegations contained in Plaintiff's Amended Complaint), Plaintiff was an inmate in the care and custody of the New York State Department of Correctional Services ("DOCS"), incarcerated at the Greene Correctional Facility ("Greene C.F."). [17]

[17]   (Dkt. No. 37, Part 2, ¶ 2 [Defs.' Rule 7.1 Statement]; Dkt. No. 42, Part 1, ¶ 2 [Plf.'s Rule 7.1 Response]; Dkt. No. 5, ¶ 4 [Am. Compl.].)

**\*5** At all times relevant to this action, Defendant Robert K. Woods was the Deputy Superintendent for Security at Greene C.F.; Defendant Joseph R. Belarge was a Captain at Greene C.F.; Defendant G.J. O'Donnel was a Sergeant at Greene C.F.; Defendant Richard Antonelli was a Food Services Administrator at Greene C.F.; and Defendant Wayne Holt was a Corrections Officer at Greene C.F. [18]

[18]   (Dkt. No. 37, Part 2, ¶¶ 4-8 [Defs.' Rule 7.1 Statement]; Dkt. No. 42, Part 1, ¶¶ 4-8 [Plf.'s Rule 7.1 Response]; Dkt. No. 5, ¶¶ 3, 3(a), 3(b), 3(c) [Am. Compl.].)

Plaintiff's Legal Assistance to Inmate Peter Alcivar and Communications with Inmate Alcivar's Daughters

3. At some point in 2001, Inmate Peter Alcivar filed a civil rights action against DOCS and employees of Greene C.F. and Woodbourne C.F. in the United States District Court for the Northern District of New York (civil action number 9:01-CV-1198). [19]

[19]   (Dkt. No. 42, Part 1, ¶ 12 [Plf.'s Rule 7.1 Response]; Dkt. No. 5, "Facts of the Incident," ¶¶ 1-3 [Am. Compl.]; Dkt. No. 37, Part 18, Ex. B at 18-37 [Antonelli Aff., attaching pleading and motion from lawsuit].)

4. On or about May 7, 2002, Plaintiff provided legal assistance to Inmate Alcivar by answering a question regarding an affidavit. [20] At the time, Plaintiff was not an inmate law clerk. [21]

[20]   (Dkt. No. 37, Part 2, ¶ 12 [Defs.' Rule 7.1 Statement]; Dkt. No. 42, Part 1, ¶ 12 [Plf.'s Rule 7.1 Response, admitting that, on one occasion, Plaintiff answered a question posed by Inmate Alcivar regarding an affidavit, which question and answer were communicated with the help of Inmate Law Clerk George Robles]; Dkt. No. 5, "Facts of the

Case 9:16-cv-01062-DNH-TWD    Document 62    Filed 07/20/18    Page 30 of 116
Smith v. Woods, Not Reported in F.Supp.2d (2006)
2006 WL 1133247

Incident," ¶ 2 [Am. Compl.]; Dkt. No. 37, Part 18 [Ex. B. to Antonelli Aff.].)

**21**    (Dkt. No. 37, Part 2, ¶ 13 [Defs.' Rule 7.1 Statement]; Dkt. No. 42, Part 1, ¶ 13 [Plf.'s Rule 7.1 Response].)

5. On or about May 10, 2002, Inmate Alcivar was admitted to Albany Medical Center to receive treatment for cancer. **22**

**22**    (Dkt. No. 1, "Facts of the Incident," ¶ 1 [Am. Compl.]; Dkt. No. 42, Part 1, ¶ 6 [Plf.'s Response to Antonelli Aff., asserting that Inmate Alcivar was "admitted to Albany Medical Center Hospital three days after Robles asked plaintiff the question [about] an affidavit and its contents"].)

6. On or about July 4, 2002, Plaintiff wrote and sent a letter to Inmate Alcivar's two daughters about Inmate Alcivar's pending federal civil rights action. **23** In pertinent part, the letter stated,

**23**    (Dkt. No. 37, Part 18, Ex. B at 6-9 [Antonelli Aff., attaching letter dated 7/4/02 from Plaintiff to Raida and Raisa Alcivar, and letter dated 6/24/02]; Dkt. No. 37, Part 23, Ex. A at 79-80 [Munkwitz Dec., attaching transcript of Plaintiff's deposition, in which Plaintiff admits having written and sent the letter dated 7/4/02].)

I am writing to inform you of my assistance to Peter [Alcivar] in the above referenced matter [case number 9:01-CV-1198] where he has a Section 1983 of the U.S.C.A. Civil Rights complaint against the Department of Correctional Services now pending in the United States District Court for the Northern District of New York; that is if he (Peter) hasn't already told both of you that I am helping him with the filing of his motions, etc....
Getting right to the point for the purpose of writing you, and letting you know what is going on with Peter's case. There is [sic] two inmates that Peter trusted with his papers and other legal documents, that is one inmate that housed [sic] in the same dorm as him and myself....

I have already wrote [sic] to the court on June 24, 2002, informing said court as to Peter's current situation.... See copy of the *letter addressed to the court* ... enclosed with this letter I am writing you....

Peter told me that you have copies of all his papers, those of which are the same as the papers I have here....

[I]f you wish ... you all could come to the facility to see me, I would then go over the case with all of you, tell all of you what I know from Peter, the research that I have done for him and the list of cases of authority that I have and would cite in his motions and use at trial; I also could give you all of his legal documents right there....

Both of you should ... let Peter know that he should not worry about the case, it is not going to be dismissed ... because I already wrote to the court for him. **24**

**24**    (Dkt. No. 37, Part 18, Ex. B at 6-9 [Antonelli Aff., attaching letter dated 7/4/02 from Plaintiff to Raida and Raisa Alcivar, and letter dated 6/24/02].)

7. On or about July 6, 2002, Inmate Alcivar died at Albany Medical Center. **25**

**25**    (Dkt. No. 37, Part 2, ¶ 11 [Defs.' Rule 7.1 Statement]; Dkt. No. 42, Part 1, ¶ 11 [Plf.'s Rule 7.1 Response]; Dkt. No. 5, "Facts of the Incident," ¶ 3 [Am. Compl.].)

**\*6** 8. On or about July 16, 2002, Plaintiff wrote and sent a second letter to Alcivar's two daughters. **26** In pertinent part, the letter states: "The box containing the legal documents should be following this letter, I am going to hold a copy of the complaint so if you should find a lawyer he or she could visit me at the facility and go over the facts the claim is based on." **27** In addition, the last page of the letter states:

**26**    (Dkt. No. 37, Part 2, ¶ 18 [Defs.' Rule 7.1 Statement, asserting that Plaintiff wrote and sent the letter and memorandum]; Dkt. No. 42, Part 1, ¶ 18 [Plf.'s Rule 7.1 Response, not specifically denying that Plaintiff wrote and sent the letter and memorandum]; Dkt. No. 37, Part 16, ¶ 9 [Antonelli Aff.]; Dkt. No. 37, Part 18, Ex. B at 10-12, 14 [Antonelli Aff., attaching 7/16/02 letter, the last page of which refers to an attached "To/From" memorandum]; Dkt. No. 37, Part 23, Ex. A at 81-82 [Munkwitz Decl., attaching transcript of Plaintiff's deposition, in which he admitted writing and sending the letter and memorandum].)

**27**    (Dkt. No. 37, Part 18, Ex. B at 10 [Antonelli Aff., attaching 7/16/02 letter].)

NOTE: Read the "TO/From" memo form note that I made up, get it notarize [sic] and sign it in front of the

2006 WL 1133247

notary public. Make a copy for your files and send me the *original*.

It is an idea to have that note in my files so non [sic] of the officers and staff members would ask what I am doing with Mr. Alcivar [sic] legal documents if he is no longer here. By doing the above your [sic] are giving me consent to have said documents in my possession. [28]

[28]    (Dkt. No. 37, Part 18, Ex. B at 10-12, 14 [Antonelli Aff., attaching 7/16/02 letter, the last page of which refers to an attached "To/From" memorandum].)

9. On or about August 8, 2002, Plaintiff wrote and sent a third letter to Alcivar's two daughters. [29] In pertinent part, the letter states: "Please send me that 'To/From' note if you already have it notarized, I told you I need it for the copy of the complaint I told you that I would hold...."

[29]    (Dkt. No. 37, Part 16, ¶ 9 [Antonelli Aff.]; Dkt. No. 37, Part 18, Ex. B at 13 [Antonelli Aff., attaching 8/8/02 letter]; Dkt. No. 37, Part 23, Ex. A at 81-82 [Munkwitz Decl., attaching transcript of Plaintiff's deposition, in which he admitted writing and sending the letter].)

**Plaintiff's Communications with Defendant Woods and the Search of Plaintiff's Prison Cell (or "Cube")**

10. On or about July 16, 2002, Plaintiff wrote and sent a note to Defendant Woods. [30] The note stated: "Please be advised that I need to talk to you in reference to the above subject inmate [i.e., Inmate Alcivar] which is a matter of importance. This must be in person at your earliest convenience. Thank you for your professional attention to this request." [31]

[30]    (Dkt. No. 37, Part 3, ¶ 3 [Woods Aff.]; Dkt. No. 37, Part 4, Ex A [Woods Aff.]; Dkt. No. 37, Part 2, ¶ 20 [Defs.' Rule 7.1 Statement, asserting fact]; Dkt. No. 42, Part 1, ¶ 20 [Plf.'s Rule 7.1 Response, admitting fact].)

[31]    (Dkt. No. 37, Part 4, Ex A [Woods Aff.].)

11. On or about July 21, 2002, Plaintiff wrote and sent a second note to Defendant Woods. [32] The note stated: "Please note that on the above subject date [i.e., July 16, 2002] I wrote to you requesting to see you. I must speak

to you before July 23, 2002. This matter is very important. Thank you for your attention." [33]

[32]    (Dkt. No. 37, Part 3, ¶ 3 [Woods Aff.]; Dkt. No. 37, Part 5 [Ex. B to Woods Aff.]; Dkt. No. 37, Part 2, ¶ 20 [Defs.' Rule 7.1 Statement, asserting fact]; Dkt. No. 42, Part 1, ¶ 20 [Plf.'s Rule 7.1 Response, admitting fact].)

[33]    (Dkt. No. 37, Part 5 [Ex. B to Woods Aff.].)

12. Defendant Woods did not respond to Plaintiff's notes for two reasons: (1) Defendant Woods did not receive either of the two notes until after the date referenced by Plaintiff (i.e., July 23, 2002) had passed; and (2) Defendant Woods believed that Plaintiff's notes were "cryptic." [34]

[34]    (Dkt. No. 37, Part 3, ¶¶ 4-5 [Woods Aff.]; Dkt. No. 37, Part 2, ¶ 21 [Defs.' Rule 7.1 Statement, asserting fact]; Dkt. No. 42, Part 1, ¶ 21 [Plf.'s Rule 7.1 Response, not specifically controverting either that Defendant Woods did not receive the notes until after July 23, 2003, or that Defendant Woods believed the notes to be "cryptic"]; Dkt. No. 37, Part 8, Ex. D [Woods Aff., attaching Defendant Woods' 8/6/02 memorandum to Plaintiff stating that Plaintiff's two notes were "brief and very vague" and lacked "specifics"].)

13. On or about August 5, 2002, Plaintiff wrote and sent a third note to Deputy Superintendent Woods. [35] The note stated, in pertinent part:

[35]    (Dkt. No. 37, Part 3, ¶ 6 [Woods Aff.]; Dkt. No. 37, Part 7, Ex. C [Woods Aff., attaching note]; Dkt. No. 37, Part 2, ¶ 22 [Defs.' Rule 7.1 Statement, asserting that Plaintiff wrote and sent note]; Dkt. No. 42, Part 1, ¶ 22 [Plf.'s Rule 7.1 Response, not specifically controverting that Plaintiff wrote and sent note].)

Please take notice that since you have neglected to answer the above two (2) requests [i.e., dated July 16, 2002, and July 21, 2002] to meet with me about a very serious matter concerning a *<DEAD>* man's legal documents, in the future if anything should come of a matter of said documents being in my possession or the inmate's family should have any questions of same and I answer those questions according to law, you and the administration cannot take any action against the inmate's family nor myself. [36]

[36]    (Dkt. No. 37, Part 7 [Ex. C to Woods Aff.].)

**\*7** 14. On or about August 6, 2002, Defendant Woods sent a memorandum to Plaintiff. [37] That memorandum stated, in pertinent part:

[37]   (Dkt. No. 37, Part 3, ¶ 6 [Woods Aff., asserting that he sent this memorandum]; Dkt. No. 42, Part 1, ¶ 6 [Plf.'s Response to Woods Aff., admitting that Defendant Woods sent Plaintiff this memorandum]; Dkt. No. 37, Part 8, Ex. D [Woods Aff., attaching the memorandum].)

Your August 5th letter ... makes reference to legal documents belonging to deceased Inmate Alcivar.... I have directed Law Library Officer Holt to speak to you and recover from you any legal documents of deceased Inmate Alcivar.... In fact, you should have turned over any such documents to Law Library Officer Holt immediately. [38]

[38]   (Dkt. No. 37, Part 7, Ex. D [Woods Aff., attaching the 8/6/02 memorandum].)

15. On August 7, 2002, Plaintiff received Defendant Woods' memorandum. [39]

[39]   (Dkt. No. 5, "Facts of the Incident," ¶ 11 [Plf.'s Am. Compl.].)

16. Meanwhile, on or about August 5, 2002, Defendant Holt asked Plaintiff for Inmate Alcivar's legal documents. [40] Plaintiff denied having such documents. [41]

[40]   (Dkt. No. 37, Part 2, ¶ 24 [Defs.' Rule 7.1 Statement, asserting fact]; Dkt. No. 42, Part 1, ¶ 24 [Plf.'s Rule 7.1 Response, not specifically controverting fact]; Dkt. No. 37, Part 29, ¶ 7 [Holt Aff.]; Dkt. No. 5, "Facts of the Incident," ¶ 10 [Plf.'s Am. Compl.].)

[41]   (Dkt. No. 37, Part 2, ¶ 24 [Defs.' Rule 7.1 Statement, asserting fact]; Dkt. No. 42, Part 1, ¶ 24 [Plf.'s Rule 7.1 Response, not specifically controverting that Plaintiff denied to Defendant Holt having Inmate Alcivar's legal documents, only citing to Paragraph 12 of Plaintiff's Rule 7.1 Response, which is not material to the asserted fact]; Dkt. No. 37, Part 29, ¶ 7 [Holt Aff.].)

17. As a result, at some point between August 5, 2002, and August 31, 2002, Defendant Woods directed Defendant Belarge to have Plaintiff's cell (or "cube") searched and to interview Plaintiff about his statements made in his August 5, 2002, note. [42]

[42]   (Dkt. No. 37, Part 3, ¶¶ 8, 9 [Woods Aff.]; Dkt. No. 37, Part 8, ¶ 3 [Belarge Aff.]; Dkt. No. 37, Part 2, ¶ 25 [Defs.' Rule 7.1 Statement, asserting that Defendant Woods directed Defendant Belarge to have Plaintiff's cell searched]; Dkt. No. 42, Part 1, ¶ 24 [Plf.'s Rule 7.1 Response, admitting that Defendant Woods directed Defendant Belarge to have Plaintiff's "cube" searched].)

18. At some point on August 31, 2002 (apparently between 8:30 a.m. and 11:00 a.m.), Defendant Belarge had Plaintiff's cell (or "cube") searched by Defendant O'Donnell (and apparently Defendant Holt and two other corrections officers). [43] At some point (apparently during this search), Defendant O'Donnell discovered Inmate Alcivar's legal documents (as well as various correspondence between Plaintiff and Inmate Alcivar's two daughters). [44]

[43]   (Dkt. No. 37, Part 8, ¶ 4 [Belarge Aff.]; Dkt. No. 37, Part 2, ¶¶ 25-26 [Defs.' Rule 7.1 Statement]; Dkt. No. 42, Part 1, ¶¶ 25-26 [Plf.'s Rule 7.1 Response]; Dkt. No. 37, Part 17, Ex. A [Antonelli Aff., attaching misbehavior report which suggests that Defendants Belarge and O'Donnell had in their possession Inmate Alcivar's legal documents as well as various correspondence between Plaintiff and Inmate Alcivar's two daughters, before those Defendants interviewed Plaintiff at 11:00 a.m. on August 31, 2002]; Dkt. No. 5, "Facts of the Incident," ¶¶ 13-14 [Plf.'s Am. Compl., stating that Defendant Belarge had in his possession a letter that Plaintiff had written to Raisa Alcivar by the time he interviewed Plaintiff at 10:57 a.m. on August 31, 2002].)

[44]   (Dkt. No. 37, Part 2, ¶ 26 [Defs.' Rule 7.1 Statement, asserting this fact]; Dkt. No. 42, Part 1, ¶ 26 [Plf.'s Rule 7.1 Response, not citing any admissible evidence in support of his denial of this fact]; Dkt. No. 37, Part 8, ¶ 4 [Belarge Aff.]; Dkt. No. 37, Part 3, ¶ 10 [Woods Aff.]; Dkt. No. 37, Part 16, ¶ 5 [Antonelli Aff.]; Dkt. No. 37, Part 18, Ex. B [Antonelli Aff., attaching documents discovered in Plaintiff's cell, and "Chain of Custody" Record indicating that Defendant O'Donnell was the one who found the documents]; Dkt. No. 38, Part 4 at 90 [exhibit to Plaintiff's motion for summary judgment, attaching Contraband Receipt issued by Defendant O'Donnell]; Dkt. No. 37, Part 22, Ex. A at 31-33 [Munkowitz Decl., attaching transcript of Plaintiff's deposition, in which he admits numerous times that,

after Defendant Holt failed to take "control" of Inmate Alcivar's legal documents, Plaintiff, along with two other inmates, retained possession of those documents, out of a fear that those documents would be stolen by another inmate, and out of a sense of duty to Inmate Alcivar]; Dkt. No. 37, Part 18, Ex. B at 10-12, 14 [Antonelli Aff., attaching 7/16/02 letter from Plaintiff, in which he states, "I am going to hold a copy of the complaint" in Inmate Alcivar's federal civil rights action]; Dkt. No. 37, Part 7 [Ex. C to Woods Aff., attaching Plaintiff's 8/5/02 letter, in which he states, "in the future if anything should come of a matter of said documents being in my possession ... you and the administration cannot take any action against the inmate's family nor myself"]; *see also* Dkt. No. 37, Part 19, ¶ 3 [Holden Aff., testifying that at some point in the summer of 2002 Plaintiff told Holden that he was helping an inmate who had been taken to the hospital due to an illness]; Dkt. No. 45, Part 6, ¶¶ 4-5 [Belarge Reply Aff., swearing that evidence in question did not come from any interception of Plaintiff's mail, but from Plaintiff's personal belongings].)

19. At approximately 11:00 a.m. on August 31, 2002, Defendants Belarge and O'Donnell interviewed Plaintiff about his statements in his August 5, 2002, note to Defendant Woods.[45] At approximately 2:50 p.m. on August 31, 2002, Defendant O'Donnell stored Inmate Alcivar's legal documents (as well as various correspondence between Plaintiff and Inmate Alcivar's two daughters) in an evidence locker at Greene C.F.[46]

[45]    (Dkt. No. 37, Part 2, ¶ 28 [Defs.' Rule 7.1 Statement, asserting that interview took place]; Dkt. No. 42, Part 1, ¶ 28 [Plf.'s Rule 7.1 Response, admitting that interview took place despite his blanket statement "Deny"]; Dkt. No. 37, Part 8, ¶ 5 [Belarge Aff.]; Dkt. No. 5, "Facts of the Incident," ¶¶ 13-15 [Plf.'s Am. Compl., stating that interview took place at 10:57 a.m. on 8/31/02]; Dkt. No. 37, Part 17, Ex. A [Antonelli Aff., attaching 8/31/02 misbehavior report, stating that the interview took place at 11:00 a.m. on 8/31/02].)

[46]    (Dkt. No. 37, Part 18, Ex. B [Antonelli Aff., attaching documents discovered in Plaintiff's cell, and "Chain of Custody" Record indicating that Defendant O'Donnell stored the documents in an evidence locker at 2:50 p.m. on 8/31/02]; Dkt. No. 37, Part 17, Ex. A at 2 [Antonelli Aff., attaching 8/31/02 misbehavior report, stating that Defendant O'Donnell stored the documents in an evidence locker on 8/31/02].)

### Plaintiff's Misbehavior Report, Disciplinary Hearing, and Appeal

20. Relying on the documents discovered and the subsequent interview conducted, Defendants Belarge and O'Donnell issued Plaintiff a misbehavior report on August 31, 2002.[47] The misbehavior report charged Plaintiff with three offenses: (1) providing legal assistance to Inmate Alcivar without prior authorization in violation of Inmate Rule 180.17; (2) exchanging legal materials with Inmate Alcivar without authorization in violation of Inmate Rule 113.15; and (3) soliciting materials from Inmate Alcivar's family members without authorization in violation of Inmate Rule 103.20.[48]

[47]    (Dkt. No. 37, Part 8, ¶ 6 [Belarge Aff.]; Dkt. No. 37, Part 17, Ex. A [Antonelli Aff., attaching 8/31/02 misbehavior report].)

[48]    (Dkt. No. 37, Part 17, Ex. A [Antonelli Aff., attaching 8/31/02 misbehavior report]; Dkt. No. 37, Part 2, ¶ 29 [Defs.' Rule 7.1 Statement, asserting this fact]; Dkt. No. 42, Part 1, ¶ 29 [Plf.'s Response, admitting receipt of the misbehavior report, and not specifically denying that he was charged with the three offenses stated in Defendants' assertion of fact].)

21. During the time period at issue (i.e., May through August of 2002), Rule 180.17 of DOCS' Standards of Inmate Behavior prohibited inmates from providing legal assistance to other inmates without prior approval from the Superintendent or his designee;[49] Rule 113.15 of DOCS' Standards of Inmate Behavior prohibited inmates from exchanging personal property (such as legal materials) with other inmates without authorization;[50] and Rule 103.20 of DOCS' Standards of Inmate Behavior prohibited inmates from requesting or soliciting goods or services from any person other than an immediate family member without the consent or approval of the Superintendent or his designee.[51]

[49]    (Dkt. No. 37, Part 16, ¶ 7 [Antonelli Aff.]; Dkt. No. 37, Part 2, ¶ 14 [Defs.' Rule 7.1 Statement, asserting this fact]; Dkt. No. 42, Part 1, ¶ 14 [Plf.'s Response, not denying this fact, only asserting that he received

permission to assist Inmate Alicvar from Defendant Holt].) *See also* 7 N.Y.C.R.R. § 270.02[B][26][vii].

50    (Dkt. No. 37, Part 3, ¶ 7 [Woods Aff.]; Dkt. No. 37, Part 16, ¶ 8 [Antonelli Aff.]; Dkt. No. 37, Part 2, ¶ 10 [Defs.' Rule 7.1 Statement, asserting this fact]; Dkt. No. 42, Part 1, ¶ 10 [Plf.'s Response, admitting this fact].) *See also* 7 N.Y.C.R.R. § 270.02[B][14][v].

51    (Dkt. No. 37, Part 16, ¶ 9 [Antonelli Aff.]; Dkt. No. 37, Part 2, ¶ 19 [Defs.' Rule 7.1 Statement, asserting this fact]; Dkt. No. 42, Part 1, ¶ 19 [Plf.'s Response, not specifically denying this fact, only denying that he indeed requested or solicited "goods or services" from Inmate Alcivar's daughters].) *See also* 7 N.Y.C.R.R. § 270.02[B][4][ii].

**\*8** 22. On September 6, 2002, Plaintiff received a disciplinary hearing, conducted by Defendant Antonelli. [52] Defendant Antonelli found Plaintiff guilty of all three charges, and imposed the following penalties: 90 days in S.H.U., 90 days loss of packages privileges, 90 days loss of commissary privileges, 90 days loss of telephone privileges, and three months loss of "good time" credits . [53] In reaching his finding of guilt, Defendant Antonelli relied on (1) the assertions by Defendants Belarge and O'Donnell in Plaintiff's misbehavior report that Plaintiff had made certain admissions to them during an interview, (2) Defendant Antonelli's belief that Plaintiff had made certain admissions in his correspondence to Inmate Alcivar's daughters, and (3) Defendant Antonelli's understanding that certain legal materials belonging to Inmate Alcivar had been found in Plaintiff's cell (or "cube"). [54]

52    (Dkt. No. 37, Part 2, ¶ 30 [Defs.' Rule 7.1 Statement, asserting this fact]; Dkt. No. 42, Part 1, ¶ 30 [Plf.'s Response, admitting this fact].)

53    (Dkt. No. 37, Part 2, ¶ 31 [Defs.' Rule 7.1 Statement, asserting this fact]; Dkt. No. 42, Part 1, ¶ 31 [Plf.'s Response, admitting this fact].)

54    (Dkt. No. 37, Part 16, ¶¶ 4-6, 11 [Antonelli Aff., asserting this fact]; Dkt. No. 42, Part 1, ¶¶ 4-6, 11 [Plf.'s Response to Antonelli Aff., admitting part of this fact, not specifically controverting the rest of this fact, and, in any event not citing any admissible evidence in support of any denial of this fact]; Dkt. No. 38, Part 4 at 43-44 [exhibit to Plaintiff's motion for summary judgment, attaching Defendant Antonelli's written hearing decision]; Dkt. No. 5,

¶ 17 [Am. Compl., acknowledging that Defendant Antonelli had, in reaching his decision, relied on, among other things, Plaintiff's misbehavior report and various letters between Plaintiff and Inmate Alcivar's daughters].)

23. Also on September 6, 2002, Plaintiff appealed Defendant Antonelli's disciplinary decision to Donald Seksky, Director of DOCS' Special Housing/Inmate Disciplinary Program, who affirmed that decision on October 28, 2002. [55] Plaintiff's appeal did not complain about any lack or denial of witnesses at his disciplinary hearing; similarly, Mr. Selky's appellate decision did not address such a complaint. [56]

55    (Dkt. No. 37, Part 2, ¶ 32 [Defs.' Rule 7.1 Statement, asserting this fact]; Dkt. No. 42, Part 1, ¶ 32 [Plf.'s Response, admitting this fact]; Dkt. No. 42, Part 23 at 46-48 [Munkowitz Decl., attaching transcript of Plaintiff's deposition, in which he discusses the appeal]; Dkt. No. 38, Part 3 at 46, 68 [exhibits to Plaintiff's motion for summary judgment, attaching his appeal and Mr. Selsky's affirmance].)

56    (Dkt. No. 42, Part 23 at 46-48 [Munkowitz Decl., attaching transcript of Plaintiff's deposition, in which he discusses his one-page appeal and acknowledges that it did not complain about any lack or denial of witnesses]; Dkt. No. 38, Part 3 at 46, 68 [exhibits to Plaintiff's motion for summary judgment, attaching his appeal and Mr. Selsky's affirmance].)

24. On October 24, 2002, Greene C.F. officials conducted a discretionary review of Plaintiff's SHU sentence. [57] Based upon this review, Plaintiff's SHU time was reduced from 90 days to 75 days. [58] However, Plaintiff's good time loss was unaffected by the discretionary review. [59]

57    (Dkt. No. 37, Part 2, ¶ 31 [Defs.' Rule 7.1 Statement, asserting this fact]; Dkt. No. 42, Part 1, ¶ 3 1 [Plf.'s Response, admitting part of this fact, not specifically controverting the rest of this fact, and, in any event not citing any admissible evidence in support of any denial of this fact]; Dkt. No. 37, Part 8, ¶ 8 [Belarge Aff.].)

58    *(Id.)*

59    *(Id.)*

2006 WL 1133247

#### Meetings Between Defendants Woods, Belarge and O'Donnell

25. At some point between August 5, 2002, and August 31, 2002, Defendant Woods met with Defendant Belarge to discuss Plaintiff. [60] Defendant Belarge then met with Defendant O'Donnell to discuss Plaintiff. [61]

[60] (Dkt. No. 37, Part 2, ¶ 37 [Defs.' Rule 7.1 Statement, asserting this fact]; Dkt. No. 42, Part 1, ¶ 37 [Plf.'s Response, not specifically controverting this fact, and, in any event not citing any admissible evidence in support of any denial of this fact]; Dkt. No. 37, Part 3, ¶¶ 9, 13 [Wood Aff.]; Dkt. No. 37, Part 8, ¶¶ 3, 9 [Belarge Aff.]; Dkt. No. 42, Part 23 at 35-37 [Munkowitz Decl., attaching transcript of Plaintiff's deposition, asserting that such a meeting took place between Defendants Woods and Belarge at some point].)

[61] (Dkt. No. 37, Part 2, ¶ 38 [Defs.' Rule 7.1 Statement, asserting this fact]; Dkt. No. 42, Part 1, ¶ 38 [Plf.'s Response, admitting this fact]; Dkt. No. 37, Part 8, ¶ 9 [Belarge Aff.]; Dkt. No. 42, Part 22 at 35-37 [Munkowitz Decl., attaching transcript of Plaintiff's deposition, asserting that such a meeting took place between Defendants Belarge and O'Donnell at some point].)

26. Both meetings (which were held *prior* to the issuance of Plaintiff's misbehavior report on August 31, 2002) were held according to standard procedure at Greene C.F. [62] Specifically, the purpose of the meetings was to discuss how to investigate whether Plaintiff had violated prison rules. [63]

[62] (Dkt. No. 37, Part 2, ¶ 39 [Defs.' Rule 7.1 Statement, asserting this fact]; Dkt. No. 42, Part 1, ¶ 39 [Plf.'s Response, not specifically controverting that the pre-misbehavior report meeting between Defendants Woods and Belarge, and the pre-misbehavior report meeting between Defendants Belarge and O'Donnell, were held according to standard procedure at Greene C.F., and, in any event not citing any admissible evidence in support of any denial of this fact]; Dkt. No. 37, Part 3, ¶ 13 [Wood Aff.]; Dkt. No. 37, Part 8, ¶ 9 [Belarge Aff.]; Dkt. No. 37, Part 19, ¶ 2 [Holden Aff., disclaiming any knowledge about an alleged unlawful

meeting between Defendants Woods, Belarge, and O'Donnell concerning Plaintiff].)

[63] (Dkt. No. 37, Part 2, ¶¶ 37-39 [Defs.' Rule 7.1 Statement, asserting this fact]; Dkt. No. 42, Part 1, ¶¶ 37-39 [Plf.'s Response, not specifically controverting this fact, and, in any event not citing any admissible evidence in support of any denial of this fact]; Dkt. No. 37, Part 3, ¶ 13 [Wood Aff.]; Dkt. No. 37, Part 8, ¶¶ 3, 9 [Belarge Aff.]; Dkt. No. 37, Part 19, ¶ 2 [Holden Aff., disclaiming any knowledge about an alleged unlawful meeting between Defendants Woods, Belarge, and O'Donnell concerning Plaintiff].)

#### Plaintiff's Bunk(s) in SHU

27. As a result of his disciplinary conviction, Plaintiff was housed in Greene C.F.'s SHU from approximately September 6, 2002, to November 21, 2002. [64]

[64] (Dkt. No. 5, ¶¶ 26, 37 [Am. Comp.]; Dkt. No. 37, Part 23, Ex. A at 57-58 [Munkwitz Decl., attaching transcript of Plaintiff's deposition]; Dkt. No. 42, Part 1, ¶ 43 [Plf.'s Rule 7.1 Response, stating, "Plaintiff left S-Block November 21, 2002...."].)

28. At no point (either during or after the above-described time period) did Plaintiff file any written grievances, or submit any letters of complaint, about an alleged defect in any of the bunk beds that he was assigned while in SHU. [65]

[65] (Dkt. No. 37, Part 2, ¶ 41 [Defs.' Rule 7.1 Statement, asserting this fact]; Dkt. No. 42, Part 1, ¶ 41 [Plf.'s Response, not specifically controverting this fact]; Dkt. No. 37, Part 23, Ex. A at 58-62 [Munkwitz Decl., attaching transcript of Plaintiff's deposition, in which he acknowledged this fact]; Dkt. No. 48, Part 6 [Belin Aff.].)

29. On February 8, 2005, Defendant Belarge had photographs taken of the bunk beds that Plaintiff was assigned while he was in SHU; and on April 22, 2005, Defendant Belarge had photographs taken of the other bunk beds that Plaintiff suggests he may have been assigned. [66] Those photographs are made part of the record at Exhibit A to the February 10, 2005, Affidavit of Defendant Belarge, and at Exhibits A and B to the April 29, 2005, Affidavit of Kenneth Scattergood. [67] Between September 6, 2002, and February 10, 2005, there was

no record of any repairs made to any of the bunk beds
that Plaintiff was assigned while in SHU; and between
September 6, 2002, and April 22, 2005, there was no record
of any repairs made to any of the other bunk beds that
Plaintiff suggests he may have been assigned while in
SHU. [68]

[66]  (Dkt. No. 37, Part 2, ¶ 42 [Defs.' Rule 7.1 Statement,
      asserting this fact]; Dkt. No. 42, Part 1, ¶ 42 [Plf.'s
      Rule 7.1 Response, not specifically controverting this
      fact, and in any event not citing any admissible
      evidence in support of any denial of this fact]; Dkt.
      No. 37, Part 8, ¶¶ 11-12 [Belarge Aff.]; Dkt. No.
      37, Parts 9-12 [Ex. A to Belarge Aff., attaching
      photographs]; Dkt. No. 48, Parts 4, 8-17 [Defs.' reply
      affidavits and exhibits, attaching photographs].)

[67]  (Dkt. No. 37, Part 8, ¶¶ 11-12 [Belarge Aff.]; Dkt.
      No. 37, Parts 9-12 [Ex. A to Belarge Aff., attaching
      photographs]; Dkt. No. 48, Parts 4, 8-17 [Defs.' reply
      affidavits and exhibits, attaching photographs].)

[68]  (Dkt. No. 37, Part 2, ¶ 43 [Defs.' Rule 7.1 Statement,
      asserting this fact]; Dkt. No. 42, Part 1, ¶ 43 [Plf.'s
      Rule 7.1 Response, not specifically controverting this
      fact, and in any event not citing any admissible
      evidence in support of any denial of this fact]; Dkt.
      No. 37, Part 8, ¶¶ 13-14 [Belarge Aff.]; Dkt. No.
      37, Parts 13-15, Ex. B [Belarge Aff., attaching work
      orders]; Dkt. No. 48, Parts 4-5 [Defs.' reply affidavit
      and exhibits, attaching work orders].)

## III. ANALYSIS

A. Whether Plaintiff Has Failed to Establish (or Even
State) a First Amendment Retaliation Claim

**\*9**  In their memorandum of law, Defendants argue
that Plaintiff has failed to establish (or even state) a
First Amendment retaliation claim against Defendant
Antonelli because (1) he fails to establish that he had
been engaging in speech or conduct that is protected
by the First Amendment, and (2) in any event, he
fails to establish a causal link between that protected
activity and any adverse action against him by Defendant
Antonelli. (Dkt. No. 37, Part 25 at 15-16 [Defs.' Mem.
of Law].) Liberally construed, Plaintiff's response papers
argue that (1) he had a constitutionally protected liberty
right to make an oral and written complaint about
Defendant Antonttelli's management of the prison mess
hall, and (2) as a result of Plaintiff's complaints (and
an "encounter" between Plaintiff and Antonelli one

week before Plaintiff's disciplinary hearing), Defendant
Antonelli retaliated against Plaintiff during Plaintiff's
disciplinary hearing by, among other things, depriving
Plaintiff of his statutorily protected right to receive "good
time" credits (which would have accelerated Plaintiff's
release on parole). (Dkt. No. 42, Part 2 at 9 [Plf.'s
Response].)

Claims of retaliation like those asserted by Plaintiff find
their roots in the First Amendment. *See Gill v. Pidlypchak,
389 F.3d 379, 380-81 (2d Cir.2004).* Central to such claims
is the notion that in a prison setting, corrections officials
may not take actions which would have a chilling effect
upon an inmate's exercise of First Amendment rights.
*See Gill, 389 F.3d at 381-383.* Because of the relative
ease with which claims of retaliation can be incanted,
however, courts have scrutinized such retaliation claims
with "skepticism and particular care." *Colon v. Coughlin,
58 F.3d 865, 872 (2d. Cir.1995); see also Flaherty v.
Coughlin, 713 F.2d 10, 13 (2d Cir.1983).* As the Second
Circuit has noted,

> [t]his is true for several reasons. First,
> claims of retaliation are difficult to
> dispose of on the pleadings because
> they involve questions of intent and
> are therefore easily fabricated. Second,
> prisoners' claims of retaliation pose
> a substantial risk of unwarranted
> judicial intrusion into matters of
> general prison administration. This is
> so because virtually any adverse action
> taken against a prisoner by a prison
> official-even those otherwise not rising
> to the level of a constitutional
> violation-can be characterized as a
> constitutionally proscribed retaliatory
> act.

*Dawes v. Walker,* 239 F.3d 489, 491 (2d Cir.2001)
(citations omitted), overruled on other grounds,
*Swierkewicz v. Sorema N.A.,* 534 U.S. 506 (2002).

To prevail on a First Amendment claim under 42 U.S.C.
§ 1983, a Plaintiff must prove by the preponderance of
the evidence that: (1) the speech or conduct at issue was
"protected"; (2) the defendants took "adverse action"
against the plaintiff-namely, action that would deter a
similarly situated individual of ordinary firmness from

exercising his or her constitutional rights; and (3) there was a causal connection between the protected speech and the adverse action-in other words, that the protected conduct was a "substantial or motivating factor" in the defendants' decision to take action against the plaintiff. *Mount Healthy City Sch. Dist. Bd. of Educ. v. Doyle,* 429 U.S. 274, 287 (1977); *Gill,* 389 F.3d at 380 (citing *Dawes v. Walker,* 239 F.3d 489, 492 [2d. Cir.2001] ). Under this analysis, adverse action taken for both proper and improper reasons may be upheld if the action would have been taken based on the proper reasons alone. *Graham v. Henderson,* 89 F.3d 75, 79 (2d Cir.1996) (citations omitted).

**\*10** Here, Plaintiff's claim fails for several reasons. I acknowledge that the First Amendment protects, not only the filing of written grievances and complaints, but, under some circumstances, the making of oral complaints to corrections officers. [69] However, even assuming Plaintiff had a constitutionally protected right to make both written and *oral* complaints about Defendant Antonelli, no evidence exists establishing (or even suggesting) that any complaints by Plaintiff against Defendant Antonelli impacted Defendant Antonelli's disciplinary decision.

[69]   *See Malik'El v. N.Y. State DOCS,* 96-CV-0669, 1998 U.S. Dist. LEXIS 5471, at \*7 & n. 1 (N.D.N.Y. March 4, 1998) (Sharpe, M.J .) (under circumstances, plaintiff's oral complaint to corrections officer might state a First Amendment claim), *adopted by* 1998 U.S. Dist. 5465 (N.D.N.Y. Apr. 8, 1998) (Pooler, D.J.); *but see Rodriguez v. Phillips,* 66 F.3d 470, 479 (2d Cir.1995) ("In the context of the confrontation described in [the plaintiff's] own words, there was no clearly established First Amendment right to approach and speak to Officer Rubin.") (emphasis added); *Garrido v. Coughlin,* 716 F.Supp. 98, 101 (S.D.N.Y.1989) (plaintiff's "verbal confrontation" with corrections officer was not protected speech or conduct under the First Amendment).

For example, no evidence exists that Plaintiff submitted any grievances or complaints against Defendant Antonelli, only that he submitted a letter to Deputy Superintendent Eldred complaining about "Mess Hall Dishwashing Machines" approximately three weeks before the disciplinary hearing. [70] Plaintiff's letter did not mention Defendant Antonelli. [71] In any event, no evidence exists indicating that Defendant Antonelli knew about any grievances against him by Plaintiff at the time of

Plaintiff's disciplinary hearing. [72] Similarly, no evidence exists that he ever confronted Defendant Antonelli with an oral complaint about the mess hall-other than Plaintiff's vague and uncorroborated assertions that he "met" with, or had an "encounter" with, Defendant Antonelli about the mess hall before the disciplinary hearing. [73] Finally, the record evidence establishes that Defendant Antonelli could, and indeed would, have reached the same disciplinary hearing decision (and imposed the same penalties) despite any such complaints or grievances by Plaintiff (i.e., based upon the evidence as presented to him at Plaintiff's disciplinary hearing decision). [74]

[70]   (Dkt. No. 48, Parts 6-7, ¶ 6 [Berlin Aff., testifying that the only grievance on file from Plaintiff, from between August 2002 to December 2002 was a grievance dated 8/8/02 about the legal mail limit at Greene C.F., attaching that grievance at Exhibit A]; Dkt. No. 37, Part 24 [Munkowitz Decl., attaching Plaintiff's 8/16/02 letter of complaint to Deputy Superintendent Eldred regarding the "Mess Hall Dishwashing Machines"]; Dkt. No. 37, Part 23, Ex. A at 86-90 [Munkwitz Decl., attaching transcript of Plaintiff's deposition].)

[71]   (Dkt. No. 37, Part 24 [Munkowitz Decl., attaching Plaintiff's 8/16/02 letter of complaint to Deputy Superintendent Eldred regarding the mess hall dishwashing machines, not mentioning any specifics, much less the name or position of Defendant Antonelli]; Dkt. No. 37, Part 23, Ex. A at 86-90 [Munkwitz Decl., attaching transcript of Plaintiff's deposition, in which Plaintiff admits this fact].)

[72]   (Dkt. No. 37, Part 17, ¶ 13 [Antonelli Aff., testifying that "I ... understand that plaintiff alleges that I retaliated against him based upon a grievance that plaintiff made against me. I am not aware of any grievances filed by plaintiff against me"]; Dkt. No. 42, Part 1, ¶ 12 [Plf.'s Response to Antonelli Aff., containing no response to Paragraph 13 of Antonelli's affidavit, and asserting conclusorily that "[the tier office] had chosen Antonelli to preside over plaintiff's tier hearing on September 6, 2002 ... and that was due to Antonelli's encounter with plaintiff one week prior to holding said hearing," without providing any specifics about the alleged "encounter," without providing any assertion that it was Antonelli who was motivated by the alleged "encounter," and without providing reason to believe Plaintiff had personal

knowledge of the Tier Office's motivation in assigning Antonelli as the hearing officer].)

73 (Dkt. No. 42, Part 1¶ 12 [Plf.'s Response to Antonelli Aff., asserting that, one week before the disciplinary hearing, Plaintiff had an "encounter" with Defendant Antonelli]; Dkt. No. 37, Part 23, Ex. A at 89 [Munkwitz Decl., attaching transcript of Plaintiff's deposition, in which Plaintiff states that, days before the disciplinary hearing, he "met" with Defendant Antonelli about the condition of the "utensils, dish washing machines, et cetera" in the mess hall].)

74 (*See, supra,* Statement of Fact Nos. 22-23 [stating evidence upon which Defendant Antonelli based his hearing decision, and fact that the decision was affirmed on appeal].)

As a result, I recommend that the Court dismiss Plaintiff's First Amendment retaliation claim.

### B. Whether Plaintiff Has Failed to State a Fourth Amendment Claim

I do not construe Defendants' memorandum of law as expressly arguing that any Fourth Amendment claim asserted by Plaintiff should be dismissed for failure to state a claim under Rule 12(b)(1) of the Federal Rules of Civil Procedure, which permits motions to dismiss for "lack of jurisdiction over the subject matter" of a claim. However, I do construe that memorandum of law, as well as defense counsel's questions of Plaintiff during his deposition, as *suggesting* that Plaintiff has failed to assert a Fourth Amendment claim (regarding the search of his property by Defendants at Greene C.F.) over which federal courts have subject matter jurisdiction. 75

75 (Dkt. No. 37, Part 25 at 8-9 [Defs.' Mem. of Law, addressing the conclusory nature of Plaintiff's claims about a "conspiracy" against him, the subject of which included the search of his property]; Dkt. No. 37, Part 22, Ex. A at 14 [Munkwitz Decl., attaching transcript of Plaintiff's deposition, in which defense counsel stated, "I don't see how the [F]ourth [A]mendment gives you a right to be free from harmful situations. So I would like you to explain that to me," and Plaintiff stated, "[T]he [F]ourth [A]mendment does not apply to the specific paragraph that you are referring to", i.e., Paragraph 43 of the Amended Complaint], 22 [in which defense counsel asked, "Is there anything else in your second cause of action ..." other than a due process claim, and Plaintiff answered, "Not at this point, ma'am"

even though that cause of action cites the Fourth Amendment], 26 [in which defense counsel asked, "You have a constitutional right to be free from search and seizure as an inmate?" and Plaintiff answered, "As an inmate, no, ma'am"].) *See Clissuras v. CUNY,* 359 F.3d 79, 81 n. 3 (2d Cir.2004) (treating a "suggestion" to the court, in the form of a letter, that subject matter jurisdiction was lacking as a request for a dismissal order under Rule 12[h][3] ).

Under Rule 12 of the Federal Rules of Civil Procedure, "[w]henever it appears by suggestion of the parties or otherwise that the court lacks jurisdiction of the subject matter, the court shall dismiss the action." Fed.R.Civ.P. 12(h)(3). Thus, the Court has a duty to examine whether or not it has subject matter jurisdiction over Plaintiff's attempted Fourth Amendment claim.

Here, I find that the Court does not have subject matter jurisdiction (pursuant to 42 U.S.C. § 1983 or otherwise) over that claim, which is asserted in Paragraphs 44 and 15 of Plaintiff's Amended Complaint. 76 Specifically, the allegations contained in Paragraph 15 of his Amended Complaint are the sole *factual* basis for Plaintiff's Fourth Amendment claim. 77 In pertinent part, that paragraph alleges that on "August 31, 2002, 11:20 A.M., Belarge ... had plaintiff's personal property searched [for Alcivar's materials] by three officers, one of whom was Holt...." 78

76 (*See* Dkt. No. 5, ¶ 44 [Plf.'s Am. Compl., alleging that Defendants Woods and Holt "violat[ed] plaintiff's 4th ... Amendment [ ] rights"], ¶ 15 [alleging that Defendant Belarge "had plaintiff's personal property searched by three officers, one of whom was Holt"]; Dkt. No. 37, Part 23, Ex. A at 14-22, 26-28 [Munkowitz Decl., attaching transcript of deposition of Plaintiff, in which he explains his claim under the Fourth Amendment based on the alleged unjustified search and seizure of his property].)

77 (Dkt. No. 37, Part 22, Ex. A at 14 [Munkwitz Decl., attaching transcript of Plaintiff's deposition, in which Plaintiff stated, "[T]he [F]ourth [A]mendment does not apply to" Plaintiff's first cause of action], 22 [in which defense counsel asked, "Is there anything else in your second cause of action ..." other than a due process claim, and Plaintiff answered, "Not at this point, ma'am" even though the cause of action cites the Fourth Amendment], 28 [in which defense counsel asked, "Are you alleging that the facts in paragraph

15 give rise to a constitutional claim for search and seizure?" and Plaintiff answered, "Yes, ma'am"].)

78      (Dkt. No. 5, ¶ 14 [Am. Compl.].)

**\*11** The problem with Plaintiff's Fourth Amendment claim is that, even if the search occurred as Plaintiff alleged, that search was of a prisoner's cell (or "cube"). "[T]he Fourth Amendment proscription against unreasonable searches does not apply within the confines of a prison cell." *Hudson v. Palmer,* 468 U.S. 517, 526 (1984). [79] Nor does the Fourth Amendment proscription apply within the confines of a prison "cube." [80] Indeed, Plaintiff appears to recognize this point of law. [81]

79      *See also Tinsley v. Greene,* 95-CV-1765, 1997 WL 160124, at \*7 (N.D.N.Y. March 31, 1997) ("Plaintiff thus may assert no cause of action here based on an alleged violation of his Fourth Amendment rights."); *Demaio v. Mann,* 877 F.Supp. 89, 95 (N.D.N.Y.) ("Searches of prison cells, even arbitrary searches, implicate no protected constitutional rights."), *aff'd,* 122 F.3d 1055 (2d Cir.1995).

80      *See Freeman v. Goord,* 02-CV-9033, 2005 U.S. Dist. LEXIS 32019, at \*5 & n. 4 (S.D.N.Y. Dec. 7, 1995) (granting defendants' motion for summary judgment, in part because plaintiff had no reasonable expectation of privacy, under the Fourth Amendment, in his cell, which plaintiff referred to as his "cube"); *Rodriguez v. Coughlin,* 795 F.Supp. 609, 611, 613 (W.D.N.Y.1992) (granting defendants' motion for summary judgment, in part because prison officials have same need, and right, to search prisoner's "cell" as his "cubicle").

81      (Dkt. No. 37, Part 22, Ex. A at 26 [Munkwitz Decl., attaching transcript of Plaintiff's deposition, in which defense counsel asked, "You have a constitutional right to be free from search and seizure as an inmate?" and Plaintiff answered, "As an inmate, no, ma'am"].)

I note that I do not liberally construe Plaintiff's Amended Complaint as asserting a Fourth Amendment claim against Defendant Woods for (allegedly) unreasonably searching and seizing various pieces of Plaintiff's outgoing and incoming mail in August of 2002. However, even if I did so construe that Amended Complaint, I would conclude that this Court would not have subject matter jurisdiction over that claim. The only portion of Plaintiff's Amended Complaint that regards such a search and seizure by Defendant Woods of Plaintiff's mail is

vague and conclusory. [82] Even taking as true Plaintiff's allegations, the mail in question consisted of clearly identifiable contraband (e.g., legal materials belonging to Inmate Alcivar in packages to, or from, persons bearing the last name of Alcivar). [83] I fail to see how any search and confiscation of such contraband would have violated the Fourth Amendment. Indeed, such a search and confiscation would appear to have been expressly authorized by DOCS Directive No. 4422 (which regards the Inmate Correspondence Program). [84]

82      (Dkt. No. 5, ¶ 12 [Am. Compl.].)

83      I note that the alleged "interception" by Defendant Woods of these packages was preceded by a letter from Plaintiff to Woods referring to "documents [belonging to Inmate Alcivar] being in [Plaintiff's] possession" and referring to Inmate Alcivar's family members. Furthermore, I note that the alleged contents of these packages would have reasonably appeared (at the very least) to consist of contraband (i.e., allegedly being the same documents that later gave rise to three disciplinary charges against Plaintiff, which charges resulted in a conviction that was affirmed on appeal).

84      *See, e.g.,* DOCS Directive No. 4422, § III.B.17. ("Inmates shall not be permitted to use their correspondence privileges to solicit ... services, or goods."), § III.G.1. ("All incoming general correspondence will be opened and inspected for ... photocopied materials, or contraband.") (5/18/02).

As a result, I recommend that the Court dismiss Plaintiff's Fourth Amendment claim.

### C. Whether Plaintiff Has Failed to Establish (or Even State) an Eighth Amendment Claim

In their memorandum of law, Defendants argue that Plaintiff has failed to establish (or even state) an Eighth Amendment claim because (1) Plaintiff has not established (or even alleged) a deprivation that is "sufficiently serious" for purposes of the Eighth Amendment, and (2) he has not established that Defendants were *deliberately* indifferent to Plaintiff's health or safety. (Dkt. No. 37, Part 25 at 11, 13-14 [Defs.' Mem. of Law].) Liberally construed, Plaintiff's response papers argue that (1) he has established a deprivation that is "sufficiently serious" through his evidence that he experienced a back injury while in SHU as a result of his "twisted bunk," and (2) he has established

2006 WL 1133247

such deliberate indifference through his testimony that he orally complained to Defendants Woods and Belarge (as well as others) of his back injury and the fact that they "ignored" his complaints. (Dkt. No. 42, Part 2 at 13-15 [Plf.'s Response].)

"[A] prison official violates the Eighth Amendment only when two requirements are met. First, the deprivation must be, objectively, 'sufficiently serious'.... [Second,] a prison official must have a 'sufficiently culpable state of mind.' " *Farmer v. Brennan,* 511 U.S. 825, 834 (1994). "In prison-conditions cases that state of mind is one of deliberate indifference to inmate health or safety...." *Farmer,* 511 U.S. at 834.

 **\*12** With regard to the first element, "the plaintiff must demonstrate that the conditions of his confinement resulted in 'unquestioned and serious deprivations of basic human needs' or 'deprive inmates of the minimal civilized measures of life's necessities.' " *Davidson v. Murray,* 371 F.Supp.2d 361, 370 (W .D.N.Y.2005) (citing *Rhodes v. Chapman,* 452 U.S. 337, 347 [1981] ). "As recognized by the Supreme Court in *Rhodes,* 'the Constitution does not mandate comfortable prisons,' ... and conditions that are 'restrictive and even harsh ... are part of the penalty that criminal offenders pay for their offenses against society.' " *Davidson,* 371 F.Supp.2d at 370 (quoting *Rhodes,* 452 U.S. at 347, 349).

With regard to the second element, "[i]n prison-conditions cases [the requisite] state of mind is one of deliberate indifference to inmate health or safety...." *Farmer,* 511 U.S. at 834. "[D]eliberate indifference describes a state of mind more blameworthy than negligence." *Id.* at 835. "Deliberate indifference" exists if an official "knows of and disregards an excessive risk to inmate health or safety; the official must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference." *Id.* at 837.

### 1. Sufficiently Serious Deprivation

Plaintiff alleges that he was diagnosed with "spondylolisthesis" [85] in September of 2002 as a result of sleeping on a defective bed. [86] As far as I can tell from available reported decisions, all federal courts faced with evidence of such an injury on a dispositive motion in a prisoner civil rights case explicitly or implicitly assume, for

the sake of argument, that the injury constitutes a serious medical need. [87] I do not make such an assumption here because, unlike the prisoners in those other civil rights cases, Plaintiff does not allege that his Eighth Amendment deprivation consisted of his "spondylolisthesis" but his defective (or "twisted") bunk bed. In addition to being supported by the express language of Plaintiff's Amended Complaint, [88] this reading of Plaintiff's allegations is supported by his testimony in his deposition that he is not asserting a claim that the medical staff was deliberately indifferent to any serious medical need. [89]

---

85    "Spondylolisthesis" is defined as "forward movement of the body of one of the lower lumbar vertebrae on the vertebra below it, or upon the sacrum." *Rowland v. Hildreth,* 92-CV-6140, 1993 U.S. Dist. LEXIS 10233, at *35, n. 6 (S.D.N.Y. July 27, 1993) (citing *Stedman's Medical Dictionary* at 1456 [25th ed.1990] ).

86    (Dkt. No. 5, ¶ 27 [Am. Compl.]; Dkt. No. 38, Part 4 at 58-62 [Plf.'s Motion for Summary Judgment, attaching medical records repeatedly stating "spondylolisthesis"]; Dkt. No. 37, Part 23 at 54-58 [Munkowitz Decl., attaching transcript of Plaintiff's deposition testimony, in which Plaintiff describes his injury generally].)

87    *See Villante v. N .Y. State DOCS,* 96-CV-1484, 2002 U.S. Dist. LEXIS 26279, at *4, 8-9 (N.D.N.Y. March 28, 2002) (Mordue, J.), *adopting report-recommendation,* 2002 U.S. Dist. LEXIS, at *11-12 (N.D.N.Y. Oct. 26, 2001) (Homer, M.J.); *Rowland,* 1993 U.S. Dist. LEXIS 10233, at *13-16, 30; *Smith v. Umar,* 89-CV-6988, 1989 U.S. Dist. LEXIS 14170, at *4-6, 8-10 (E.D.Pa. Nov. 28, 1989).

88    (Dkt. No. 5, ¶¶ 35, 37, 38, 43 [Am. Compl., alleging that Defendants-who are non-medical personnel-violated Plaintiff's Eighth Amendment rights by placing him in, and keeping him in, SHU, despite knowing of the allegedly substandard conditions there, which included his allegedly defective bunk].)

89    (Dkt. No. 37, Part 23 at 42-43, 53, 58 [Munkowitz Decl., attaching transcript of Plaintiff's deposition testimony, in which Plaintiff testifies that he was not asserting any claim regarding the medical treatment that he received, or that the medical staff was deliberately indifferent to a serious medical need].)

This is apparently why Defendants, in their motions papers, do not challenge Plaintiff's allegation that he suffered from "spondylolisthesis," but do challenge his

allegation that he was assigned a bunk bed that was in any way defective. [90] In support of that argument, Defendants submit evidence that none of the bunk beds to which Plaintiff was assigned while in SHU (1) showed any visible defects (much less the defect that Plaintiff alleges, i.e., being "twisted") at or after the time in question, and (2) were either complained about by other inmates or repaired at or after the time in question. [91]

[90]    (Dkt. No. 37, Part 25 at 14 [Defs.' Mem. of Law, arguing that "plaintiff cannot demonstrate that his bunk was 'damaged' in any manner," citing record evidence in an attempt to support that argument].)

[91]    (*See, supra,* Statement of Fact No. 29.)

**\*13**   More convincing, however, is the temporal disconnect between the onset of Plaintiff's back injury and his assignment to the allegedly defective bunk bed in question. Although Defendants do not appear to argue that the onset of Plaintiff's injury pre-dated his assignment to the allegedly defective bunk bed, [92] there is evidence indicating that Plaintiff's back injury existed *before* he was assigned to the allegedly defective bunk bed (i.e., Bunk Number "OS-A1-20(b)") on September 23, 2002. [93] There is even evidence indicating that Plaintiff's back injury existed before he was admitted to SHU on September 6, 2002. [94]

[92]    (Dkt. No. 37, Part 25 at 11, 13-14 [Defs.' Mem. of Law].)

[93]    (*Compare* Dkt. No. 42, Part 1, ¶¶ 10(a), 11 [Plf.'s Response to Belarge Aff., swearing that he was assigned to the allegedly "dilapidated" bunk in question-Bunk Number "OS-A1-20(b)"-on **9/23/02,** after having been assigned to two different SHU cells, i.e., first in Cell "SH-0013" and then in Cell "B1-18"] *with* Dkt. No. 5, ¶¶ 26-27 [Plf.'s Am. Compl., containing a sworn allegation that the onset of his back injury was on or before **9/13/02,** and that the date of diagnosis was **9/20/02**] *and* Dkt. No. 42, Part 1, ¶ 15 [Plf.'s Response to Belarge Aff., swearing that he orally complained to Belarge about the bunk on **9/18/02**] *and* Dkt. No. 37, Part 23 at 58 [Munkowitz Decl., attaching transcript of Plaintiff's deposition testimony, in which Plaintiff testifies that he first requested sick call on **9/9/02,** or three days after his admission to SHU].)

[94]    (Dkt. No. 38, Part 4 at 58-62 [Plf.'s Motion for Summary Judgment, attaching medical record printed on **9/9/02** containing a typed notation, apparently entered on 8/23/02 stating, "Reason for Consultation: H/O sciatica type pain which has responded to PT **in the past.** I request a **repeat treatment** series for 6 weeks" and noting that Plaintiff was 51 years old at the time] [emphasis added].)

Even if Plaintiff were alleging that his back injury existed before September 6, 2002, but that his injury was *exacerbated* by his various bunk beds while in SHU, I would reach the same conclusion. As I described above, the first element of the Eighth Amendment's two-part test is "objective," not "subjective." Simply stated, the Eighth Amendment does not mandate "comfortable" bunk beds. [95] For these reasons, I find that Plaintiff has failed to establish a "sufficiently serious" deprivation for purposes of the Eighth Amendment.

[95]    *See Faunce v. Gomez,* No. 97-16943, 1998 U.S.App. LEXIS. 22703, at \*3 (9th Cir. Sept. 14, 1998) (affirming district court's grant of summary judgment to defendants in part because the plaintiff's Eighth Amendment claim was premised on his complaint that his mattress was uncomfortable and his bedding was insufficient); *Page v. Kirby,* 314 F.Supp.2d 619, 620 (N.D.W.Va.) (dismissing prisoner's Eighth Amendment claim premised on complaint that his mattress was uncomfortable); *Levi v. District of Columbia,* 92-CV-2653, 1993 U.S. Dist. LEXIS 1948, at \*5 (D.D.C. Feb. 24, 1993) dismissing prisoner's Eighth Amendment claim premised on complaint that his mattress was uncomfortable).

### 2. Deliberate Indifference

Even if Plaintiff had established a "sufficiently serious" deprivation for purposes of the Eighth Amendment, I would find that he has not established that Defendants acted with deliberate indifference to Plaintiff's health or safety.

To the extent that Plaintiff alleges that any of the Defendants "knew" that Plaintiff would be assigned to an allegedly defective bunk (Bunk Number "OS-A1-20(b)" in Cell "A1-20") *before* Plaintiff began his incarceration in the Greene C.F. SHU on September 6, 2002, I find that those allegations are wholly conclusory and without any evidentiary support whatsoever in the record. (Dkt. No. 5, ¶¶ 3 5, 37, 39, 43 [Am. Compl.].)

2006 WL 1133247

However, Plaintiff also asserts (rather conclusorily) that Defendants knew about the allegedly defective bunk *after* Plaintiff was assigned to it. [96] More specifically, Plaintiff submits testimony that (1) he orally complained to Defendant Woods about the bunk in question on or about September 27, 2002, (2) Plaintiff orally complained to Defendant Belarge about the bunk in question on September 18, 2002, and (3) Plaintiff orally complained to other corrections officers about the bunk in question at various other times. [97] Setting aside the lack of any testimony (of which I am aware) that Plaintiff ever orally complained to Defendants O'Donnell, Antonelli or Holt, there is a fatal flaw with Plaintiff's reliance on this evidence.

[96]    (Dkt. No. 5, ¶ 38 [Am. Compl.].)

[97]    (*See, e.g.,* Dkt. No. 42, Part 1, ¶ 15 [Plf.'s Response to Belarge Aff., swearing that he orally complained to Belarge about the bunk on September 18, 2002]; *compare* Dkt. No. 42, Part 1, ¶ 14 [Plf.'s Response to Woods Aff., swearing that his oral complaint to Woods was made on September 27, 2002] *with* Dkt. No. 42, Part 2 at 13 [Mem. of Law, arguing that his oral complaint to Woods was made on September 12, 2002].)

The problem is that, even if this evidence is true, there is no evidence that Defendants or *anyone* "ignored" Plaintiff's oral complaints. Indeed, the evidence shows that Plaintiff was assigned to the allegedly defective bunk bed for only about two weeks (between September 23, 2002, and October 7, 2002), and that he was then moved in response to his oral complaints. [98] Any assertion by Plaintiff that Defendants Woods and Belarge, upon hearing Plaintiff orally complain about the bunk, told Plaintiff to "[t]ell the officer about it" or "tell it to the officer on the unit" does not indicate deliberate indifference by supervisors such as Defendants Woods or Belarge, especially given that Plaintiff was subsequently then purposely assigned to a different bunk. [99]

[98]    (Dkt. No. 37, Part 8, ¶ 11 [Belarge Aff., identifying second bunk Plaintiff was assigned while in "S-Block" as Bunk Number "OS-A1-20(b)"]; Dkt. No. 42, Part 1, ¶ 11 [Plf.'s Response to Belarge Aff., admitting that fact], ¶ 10(a) [swearing that he was assigned to the allegedly "dilapidated" bunk in question on 9/23/02], ¶ 10(b) [swearing that, at 9:45 p.m. on or about 10/7/02-fourteen days after 9/23/02-he was purposely

moved to a cell "with a better bunk," i.e., Cell "B2-40"].) Any assertions by Plaintiff to the contrary are purely conclusory, self-contradictory, and frankly too incredible to be believed by reasonable minds. (Dkt. No. 5, ¶ 28 [Am. Compl., alleging conclusorily that his verbal complaints about his bunk bed "went unsolved"]; *compare* Dkt. No. 37, Part 23 at 58 [Munkowitz Decl., attaching transcript of Plaintiff's deposition testimony, in which Plaintiff testifies that he was assigned to the same bunk bed during his entire stay in SHU] *with* Dkt. No. 42, Part 1, ¶ 11 [Plf.'s Response to Belarge Aff., admitting that he served his time in SHU in four different cells], ¶ 10(a) [swearing that he was not assigned to the allegedly "dilapidated" bunk in question until 9/23/02, despite his admission to SHU on 9/6/02, and that it was the *third* such bunk to which he had been assigned in SHU], ¶ 10(b) [swearing that, at 9:45 p.m. on or about 10/7/02-fourteen days after 9/23/02-he was purposely moved to a cell "with a better bunk," i.e., Cell "B2-40"].)

[99]    (*Compare* Dkt. No. 42, Part 1, ¶ 14 [Plf.'s Response to Woods Aff.] *and* Dkt. No. 42, Part 1, ¶ 15 [Plf.'s Response to Belarge Aff.] *with* Dkt. No. 42, Part 1, ¶ 10(c) [Plf.'s Response to Belarge Aff.].)

**\*14** In addition, the evidence shows that no one at Greene C.F. in any way interfered with the prompt and adequate medical care provided to Plaintiff regarding his back. Plaintiff acknowledges that his medical care at Greene C.F. included the following: (1) a CAT scan on October 17, 2002, and second CAT scan at some point between October 22, 2002, and December 11, 2002, (2) physical therapy on October 24, November 5, November 8, and November 18, 2002; (3) an MRI examination on January 10, 2003; and (4) being provided "pain killers" on September 13, 2002, five packets of Naproxen (500 mg. each) on December 11, 2002, and more "pain killers" on or after January 10, 2003, along with a back brace. [100]

[100]    (Dkt. No. 5, ¶¶ 26-33 [Am. Compl.].)

Finally, I note that the evidence shows that, on October 24, 2002, Greene C.F. officials shortened Plaintiff's stay in SHU 15 days (reducing his sentence in SHU from 90 days to 15 days). [101] Under the circumstances, I find that no reasonable fact-finder could conclude, based on the record before me, that Defendants acted with deliberate indifference to Plaintiff's health or safety

[101]    (*See, supra,* Statement of Fact No. 24.)

As a result, I recommend that the Court dismiss Plaintiff's Eighth Amendment claim.

### D. Whether Plaintiff Has Failed to Exhaust His Available Administrative Remedies Regarding His Eighth Amendment Claim

In their memorandum of law, Defendants argue Plaintiff has failed to established that he exhausted his available administrative remedies regarding his Eighth Amendment claim because he acknowledges that he did not file a written administrative grievance with respect to the alleged condition of his bunk bed. (Dkt. No. 37, Part 25 at 11-13 [Defs.' Mem. of Law].) Liberally construed, Plaintiff's response papers argue that (1) no administrative remedy was available because a complaint about a defective bunk bed is not a grievable matter, (2) even if a complaint about a bunk bed were a grievable matter, he was misled by the Supervisor of the Inmate

Grievance Resolution Committee ("IGRC") into believing that the matter was not grievable, and (3) in any event, although he did not file a written grievance regarding his bunk, he filed several oral complaints regarding the bunk (i.e., to Defendant Woods, Defendant Belarge, the IGRC Supervisor, and various other corrections officers and/or sergeants). (Dkt. No. 42, Part 2 at 13-15 [Plf.'s Response].)

The Prison Litigation Reform Act of 1995 ("PLRA") requires that prisoners who bring suit in federal court must first exhaust their available administrative remedies: "No action shall be brought with respect to prison conditions under § 1983 ... by a prisoner confined in any jail, prison, or other correctional facility until such administrative remedies as are available are exhausted." 42 U.S.C. § 1997e. The Department of Correctional Services ("DOCS") has available a well-established three-step grievance program:

> First, an inmate is to file a complaint with the Grievance Clerk. An inmate grievance resolution committee ("IGRC") representative has seven working days to informally resolve the issue. If there is no resolution, then the full IGRC conducts a hearing and documents the decision. Second, a grievant may appeal the IGRC decision to the superintendent, whose

decision is documented. Third, a grievant may appeal to the central office review committee ("CORC"), which must render a decision within twenty working days of receiving the appeal, and this decision is documented.

**\*15** *White v. The State of New York,* 00-CV-3434, 2002 U.S. Dist. LEXIS 18791, at \*6 (S.D.N.Y. Oct 3, 2002) (citing N.Y. Comp.Codes R. & Regs. Tit. 7, § 701.7). Generally, if a prisoner has failed to follow each of these steps prior to commencing litigation, he has failed to exhaust his administrative remedies. *Rodriguez v. Hahn,* 209 F.Supp.2d 344, 347-48 (S.D.N.Y.2002); *Reyes v. Punzal,* 206 F.Supp.2d 431, 433 (W.D.N.Y.2002).

However, the Second Circuit has recently held that a three-part inquiry is appropriate where a defendant contends that a prisoner has failed to exhaust his available administrative remedies, as required by the PLRA. *See Hemphill v. State of New York,* 380 F.3d 680, 686, 691 (2d Cir.2004). First, "the court must ask whether [the] administrative remedies [not pursued by the prisoner] were in fact 'available' to the prisoner." *Hemphill,* 380 F.3d at 686 (citation omitted). Second, if those remedies were available, "the court should ... inquire as to whether [some or all of] the defendants may have forfeited the affirmative defense of non-exhaustion by failing to raise or preserve it ... or whether the defendants' own actions inhibiting the [prisoner's] exhaustion of remedies may estop one or more of the defendants from raising the plaintiff's failure to exhaust as a defense." *Id.* (citations omitted). Third, if the remedies were available and some of the defendants did not forfeit, and were not estopped from raising, the non-exhaustion defense, "the Court should consider whether 'special circumstances' have been plausibly alleged that justify the prisoner's failure to comply with the administrative procedural requirements." *Id.* (citations and internal quotations omitted).

### 1. Availability of Administrative Remedies

Plaintiff admits (repeatedly) that he filed no written grievance about his bunk bed.[102] He argues, however, that no written grievance could have been filed, because a defective bunk bed is not a grievable matter. In support of this argument, he offers only conclusory assertions,

testimony containing (at best) inadmissible hearsay, and documents that are completely immaterial to the fact in question. [103] Defendants, on the other hand, offer the affidavit of IGRC Supervisor Marilyn Berlin, who swears, *inter alia,* that "[c]omplaints about maintenance issues and cell conditions [such as defective bunk beds] are proper subjects of grievances." (Dkt. No. 48, Part 6, ¶ 3 [Berlin Aff.].) As a result, I must reject Plaintiff's unsupported assertion that a defective bunk bed is not grievable.

[102]   (Dkt. No. 37, Part 23 at 58, 61, 63, 65 [Munkowitz Decl., attaching transcript of Plaintiff's deposition].)

[103]   (*See, e.g.,* Dkt. No. 42, Part 2 at 13-15 [Plf.'s Response Mem. of Law, in which Plaintiff appears to argue-without any citation to evidence-that he orally complained about his bunk bed to an unidentified IGRC Supervisor, whom Plaintiff alleges orally informed him that a defective bunk bed is not a grievable matter]; Dkt. No. 37, Part 23 at 60, 63, 65 [Munkowitz Decl., attaching transcript of Plaintiff's deposition, apparently alluding to the same hearsay remark by the IGRC Superintendent]; Dkt. No. 38, Part 4 at 50, 52, 54, 66 [Plf.'s Motion for Summary Judgment, attaching, as exhibits, documents regarding Plaintiff's grievance about the grounds for his disciplinary conviction and not his allegedly defective bunk bed].)

This does not end the inquiry, however, because "a remedy that prison officials prevent a prisoner from utilizing is not an 'available' remedy under [the Prison Litigation Reform Act]." *Miller v. Norris,* 247 F.3d 736, 740 (8th Cir.2001), *cited by Abney v. McGinnis,* 380 F.3d 663, 669 (2d Cir.2004) (holding that "[t]he defendants' failure to implement the multiple rulings in [plaintiff's] favor rendered administrative relief 'unavailable' under the PLRA."). More specifically, case law exists supporting the proposition that, assuming plaintiff was instructed by prison officials, contrary to prison regulations, that he could not file a grievance, *and plaintiff indeed did not initiate the grievance process by filing that grievance in reliance on that misrepresentation,* "the formal grievance proceeding required by [the prison grievance system] was never 'available' to [plaintiff] within the meaning of [the PLRA]." *See Brown v. Croak,* 312 F.3d 109, 112-113 (3d Cir.2002), *cited by Giano v. Goord,* 380 F.3d 670, 677 n. 6 (2d Cir.2004).

**\*16**  Here, however, I can find absolutely no evidence in the record before me that IGRC Supervisor Berlin (or any

prison official at Greene C.F.) at any time advised Plaintiff that a defective bunk bed is not a grievable matter. Again, in support of his argument that the IGRC made such a remark to him, Plaintiff offers only vague testimony containing (at best) inadmissible hearsay, and documents that are immaterial to the fact in question. [104] Plaintiff's vague and conclusory argument is made even more incredible in light of IGRC Supervisor Berlin's sworn statement denying that Plaintiff ever orally complained to her about his (allegedly) defective bunk bed, or that she told him that the matter was not grievable. [105]

[104]   (*See, e.g.,* Dkt. No. 42, Part 2 at 13-15 [Plf.'s Response Mem. of Law]; Dkt. No. 37, Part 23 at 60, 63, 65 [Munkowitz Decl., attaching transcript of Plaintiff's deposition]; Dkt. No. 38, Part 4 at 50, 52, 54, 66 [Plf.'s Motion for Summary Judgment, attaching exhibits regarding a grievance about a different matter].)

[105]   (Dkt. No. 48, Part 6, ¶¶ 4-5, 8-11 [Berlin Aff.].)

### 2. Estoppel

Defendants have preserved their affirmative defense of non-exhaustion by raising it in their Answer. (Dkt. No. 17, ¶ 29 [Defs.' Answer] ) Moreover, no evidence (or even an argument) exists that any *Defendant* is estopped from raising this defense because of his or her actions inhibiting Plaintiff's exhaustion of remedies; Plaintiff merely argues that a non-party to this action (the IGRC Supervisor) advised him that his allegedly defective bunk bed was not a grievable matter.

### 3. "Special Circumstances" Justifying Failure to Exhaust

Finally, Plaintiff provides no evidence that "special circumstances" exist justifying his failure to exhaust his available administrative remedies. Plaintiff alleges that, on several occasions during the relevant time period, he made oral complaints about his allegedly defective bunk bed to various employees of Greene C.F., including Defendants Woods and Belarge. For the sake of argument, I will set aside the vagueness of this allegation, its incredibility given numerous other inconsistencies and improbabilities in Plaintiff's papers, and its total lack of support by any corroborating evidence. The problem with Plaintiff's reliance on this allegation is that, even if it were true, it would not justify Plaintiff's failure to file a written grievance about his bunk bed.

Plaintiff was 51 years old at the time of this incident; he had been incarcerated in several New York State correctional facilities before the incident; and he had even attended a year of law school.[106] He admits that, at the time of the incident, he was familiar with the grievance process at Greene C.F.[107] Indeed, he had filed grievances immediately before and during this very time period.[108] Simply stated, it would have been unreasonable for Plaintiff to believe that he could fulfill the grievance requirement-which included a requirement that the IGRC's decision be appealed to the Greene C.F. Superintendent and then to CORC before exhaustion had occurred-by making some oral complaints to various passers by, whomever they might be.

[106]    (Dkt. No. 37, Part 23 at 6-11 [Munkowitz Decl., attaching transcript of Plaintiff's deposition]; Dkt. No. 38, Part 4 at 58 [Plf.'s Motion for Summary Judgment, attaching medical record showing his date of birth].)

[107]    (Dkt. No. 37, Part 23 at 59 [Munkowitz Decl., attaching transcript of Plaintiff's deposition].)

[108]    (Dkt. No. 38, Part 4 at 50 [Plf.'s Motion for Summary Judgment, attaching Plaintiff's grievance dated 9/18/02, about the grounds for his disciplinary conviction]; Dkt. No. 48, Part 7 [Defs. Reply, attaching grievance dated 8/7/02, about mail room, and appeal from decision regarding that grievance].)

As a result of Plaintiff's failure to exhaust his available administrative remedies, I recommend that his Eighth Amendment claim be dismissed.

E. Whether Plaintiff Has Failed to Establish (or Even State) a Fourteenth Amendment Due Process Claim

**\*17** In their memorandum of law, Defendants argue that Plaintiff's due process claim (which is based on the manner in which his disciplinary hearing was conducted, and which sought damages only and not injunctive relief) is not cognizable because a judgment in his favor would necessarily imply the invalidity of his disciplinary conviction (which resulted in a loss of good-time credits and thus affected the overall length of Plaintiff's confinement) and Plaintiff has not established that that conviction has been reversed, expunged, or invalidated. (Dkt. No. 37, Part 25 at 10-11 [Defs.' Mem. of Law, citing, *inter alia, Heck v. Humphrey,* 512 U .S.

477 (1994) and *Edwards v. Balisok,* 520 U.S. 641 (1997)].) Liberally construed, Plaintiff's response papers argue (without any legal support) that, even though Plaintiff's loss of his good-time credits had not been invalidated on appeal, for Defendants to obtain summary judgment "they must prove their innocence beyond a shadow of a reasonable doubt," which (he argues) they have not done. (Dkt. No. 42, Part 2 at 10-13 [Plf.'s Response].)

I reject Plaintiff's argument, and specifically his proffered legal standard on this motion for summary judgment. Under the circumstances, Defendants have met their modest threshold burden with regard to this issue.[109] To avoid dismissal on summary judgment grounds, Plaintiff must introduce evidence raising a question of fact as to (1) whether or not his disciplinary conviction affected the overall length of Plaintiff's confinement by resulting in a loss of good-time credits or (2) whether or not his disciplinary conviction has been reversed, expunged, or invalidated.[110] He has not done so. Indeed, the evidence shows (and Plaintiff concedes) that (1) Plaintiff's disciplinary conviction affected the overall length of Plaintiff's confinement by resulting in a loss of good-time, and (2) his disciplinary conviction was not reversed, expunged, or invalidated.[111]

[109]    *See Celotex Corp. v. Catrett,* 477 U.S. 317, 323-324 (1986); *Ciaprazi v. Goord,* 02-CV-0915, 2005 WL 3531464, at \*8 (N .D.N.Y. Dec. 22, 2005) (Sharpe, J.) (adopting Report-Recommendation by Peebles, M.J.) ("[D]efendants' decision to rely ... upon the lack of evidentiary support for plaintiff's retaliation claims ... is sufficient to cast the burden upon the plaintiff to come forward with evidence demonstrating the existence of genuinely disputed material issues of fact at trial with regard to those claims.") [citations omitted].

[110]    *See Griffin v. Selsky,* 326 F.Supp.2d 429, 430 (W.D.N.Y.2004); *McNair v. Jones,* 01-CV03253, 2003 U.S. Dist. LEXIS 15825, at \*7-8 (S.D.N.Y.2003); *Dawes v. Dibiase,* 91-CV-0479, 1997 WL 376043, at \*7-8 (N.D.N.Y. July 3, 1997) (McAvoy, J.).

[111]    *(See, e.g.,* Dkt. No. 5, ¶ 18 [Am. Compl., containing sworn allegation that Plaintiff was sentenced to three months loss of good-time credits]; Dkt. No. 42, Part 1 [Plf.'s Response to Belarge Aff., admitting Defendants' assertion that the discretionary review of Plaintiff's disciplinary sentence did not affect

Plaintiff's loss of good-time credits]; Dkt. No. 38, Part 4 at 32 [Plf.'s Motion for Summary judgment, attaching disciplinary hearing decision, showing sentence imposed]; Dkt. No. 42, Part 2 at 13 [Plf.'s Response, arguing that "even though plaintiff's good time was not reversed, expunged, or declared invalid, that by itself does not make plaintiff's claims 'not cognizable'...."].)

As a result, I recommend that Plaintiff's Fourteenth Amendment due process claim be dismissed.

**F. Whether Plaintiff Has Failed to Establish (or Even State) a Claim for Conspiracy**

In their memorandum of law, Defendants argue that Plaintiff has failed to establish (or even state) a claim for conspiracy because (1) such a claim falls not under 42 U.S.C. § 1983 but 42 U.S.C. § 1985, which applies specifically to conspiracies, (2) to succeed on a conspiracy claim under 42 U.S.C. § 1985, Plaintiff must allege and show "a meeting of the minds," and (3) Plaintiff has not alleged and shown such a meeting of the minds but has offered mere speculative and conclusory allegations of conspiracy, *see, e.g.,* Dkt. No. 5, ¶¶ 21-22 (Am.Compl.). (Dkt. No. 37, Part 25 at 8-9 [Defs.' Mem. of Law].) Liberally construed, Plaintiff's response argues that the evidence does establish such a meeting of the minds because (1) in their affidavits, Defendants Woods, Antonelli, and Belarge all swear that they met to plan a strategy regarding Plaintiff, and (2) that strategy clearly violated DOCS' policies and procedures, which never involve a group of high-ranking officials (such as a deputy superintendent, captain, and sergeant) meeting to plan a strategy regarding an inmate, but which involve merely letting a disciplinary charge be filed and decided by a hearing officer. (Dkt. No. 42, Part 2 at 7-8 [Plf.'s Response].)

**\*18** I agree with Defendants largely for the reasons stated, and based upon the cases cited, in their memorandum of law. (Dkt. No. 37, Part 25 at 8-9 [Defs.' Mem. of Law].) Plaintiff's attempted conspiracy claim, which is asserted under 42 U.S.C. § 1983, should actually be asserted under 42 U.S.C. § 1985. *See Webb v. Goord,* 340 F.3d 105, 110 (2d. Cir.2003) (construing Section 1983 claim styled as "Conspiracy to Violate Civil Rights" as Section 1985 claim). To maintain an action under Section 1985, a plaintiff "must provide some factual basis supporting a meeting of the minds, such that defendants entered into an agreement, express or tacit, to achieve the

unlawful end." *Webb,* 340 F.3d at 110 [internal quotation marks and citations omitted]. Where a plaintiff does not provide such a factual basis, but only conclusory, vague or general allegations, such a conspiracy claim fails. *Id.* (dismissing conclusory allegation "that any such meeting of the minds occurred among any or all of the defendants"); *Boddie v. Schneider,* 105 F.3d 857, 862 (2d. Cir.1997) (dismissal of "conclusory, vague or general allegations of conspiracy to deprive a person of constitutional rights" is proper).

Here, Plaintiff's conspiracy claim is conclusory, vague and general. It is uncontroverted that, at some point between August 5, 2002, and August 31, 2002, a meeting took place between Defendant Woods and Defendant Belarge, and a meeting took place between Defendant Belarge and Defendant O'Donnell, and that the purpose of both meetings was to discuss Plaintiff. *(See, supra,* Statement of Fact Nos. 25-26.) The issue is whether the purpose of that meeting was "to achieve an unlawful end" or to simply investigate whether Plaintiff had violated prison rules.

Defendants offer evidence that the purpose of the meeting was to lawfully investigate Plaintiff, and Plaintiff has offered no *evidence* to the contrary. Plaintiff merely argues that DOCS' policies and procedures would *never* involve a group of high-ranking officials (such as a deputy superintendent, captain, and sergeant) meeting to discuss a Plaintiff. Even if Plaintiff had made this assertion in an affidavit or declaration rather than in a memorandum of law, I would have difficulty imagining how Plaintiff (despite his legal training and considerable experience as an inmate) could possibly have personal knowledge of such a fact. Furthermore, as a matter of common sense, it seems to me that where (as here) an inmate has made a mysterious representation to a deputy superintendent implying that he has possession of a deceased inmate's legal materials, it would be entirely conceivable (and appropriate) for the deputy superintendent to initiate an investigation of the matter, which investigation would involve lawful meetings with subordinates.

In any event, I need not base my recommendation on Plaintiff's lack of personal knowledge or on my common sense: the fact is that Plaintiff has adduced absolutely no evidence in support of his vague and conclusory allegation that Defendants Woods, Belarge and O'Donnell entered into an agreement to achieve an unlawful end. As a result,

I recommend that the Court dismiss Plaintiff's conspiracy claim.

### G. Whether Defendants Are Protected by Qualified Immunity

**\*19** In their memorandum of law, Defendants argue that they are entitled to qualified immunity because they could not have reasonably known that their conduct was in violation of a clearly established statutory or constitutional right. (Dkt. No. 37, Part 25 at 17 [Defs.' Mem. of Law].) Liberally construed, Plaintiff's response argues (without citing any evidence) that, under the circumstances, any reasonable person would have reasonably known their conduct was violating Plaintiff's clearly established constitutional rights. (Dkt. No. 42, Part 2 at 15-17 [Plf.'s Response].)

Again, I must reject Plaintiff's conclusory argument. "Once qualified immunity is pleaded, plaintiff's complaint will be dismissed unless defendant's alleged conduct, when committed, violated 'clearly established statutory or constitutional rights of which a reasonable person would have known.' " *Williams,* 781 F .2d at 322 (quoting *Harlow v. Fitzgerald,* 457 U.S. 800, 815 [1982] ). Regarding the issue of whether a particular right was *clearly established,* courts in this circuit consider three factors:

> (1) whether the right in question was defined with 'reasonable specificity'; (2) whether the decisional law of the Supreme Court and the applicable circuit court support the existence of the right in question; and (3) whether under preexisting law a reasonable defendant official would have understood that his or her acts were unlawful.

*Jermosen v. Smith,* 945 F.2d 547, 550 (2d Cir.1991) (citations omitted), cert. denied, 503 U.S. 962 (1992).[112] Regarding the issue of whether *a reasonable person would have known* he was violating such a clearly established right, this "objective reasonableness"[113] test is met if "officers of reasonable competence could disagree on [the legality of defendant's actions]." *Malley v. Briggs,* 475 U.S. 335, 341 (1986); *see also Malsh v. Correctional Officer Austin,* 901 F.Supp. 757, 764 (S.D.N.Y.1995)

(citing cases); *Ramirez v. Holmes,* 921 F.Supp. 204, 211 (S.D.N.Y.1996). As the Supreme Court explained,

[112]  *See also Calhoun v. N.Y.S. Div. of Parole,* 999 F.2d 647, 654 (2d Cir.1993); *Prue v. City of Syracuse,* 26 F.3d 14, 17-18 (2d Cir.1994).

[113]  *See Anderson v. Creighton,* 107 S.Ct. 3034, 3038 (1987) ( "[W]hether an official protected by qualified immunity may be held personally liable for an allegedly unlawful official action generally turns on the 'objective reasonableness of the action.' ") (quoting *Harlow,* 457 U.S. at 819); *Benitez v. Wolff,* 985 F.2d 662, 666 (2d Cir.1993) (qualified immunity protects defendants "even where the rights were clearly established, if it was objectively reasonable for defendants to believe that their acts did not violate those rights").

[T]he qualified immunity defense ... provides ample protection to all but the plainly incompetent or those who knowingly violate the law.... Defendants will not be immune if, on an objective basis, it is obvious that no reasonably competent officer would have concluded that a warrant should issue; but if officers of reasonable competence could disagree on this issue, immunity should be recognized.

*Malley,* 475 U.S. at 341. Furthermore, courts in the Second Circuit recognize that "the use of an 'objective reasonableness' standard permits qualified immunity claims to be decided as a matter of law." *Malsh,* 901 F.Supp. at 764 (citing *Cartier v. Lussier,* 955 F.2d 841, 844 [2d Cir.1992] [citing Supreme Court cases] ).

Here, based on my liberal construction of all of Plaintiff's motion papers and response papers, I will assume, for the sake of argument, that Plaintiff is claiming he had, among others, the following rights: (1) a right to have Defendant Holt take control of Inmate Alcivar's legal materials when Plaintiff offered those materials to Defendant Holt, and to later acknowledge his failure to take control of those materials; (2) a right to have Defendant Woods personally visit Plaintiff in his "cube," and not launch a disciplinary investigation against him, following Plaintiff's notes to Defendant Woods; (3) a right to have Defendants Belarge and O'Donnell not open or read Plaintiff's correspondence to and from Inmate Alcivar's two daughters, following Plaintiff's notes to Defendant Woods; (4) a right to have Defendant Antonelli recuse himself based on the (alleged) fact that Plaintiff and Defendant Antonelli, one week before the disciplinary hearing, had had an "encounter"

regarding the conditions of the equipment in the prison mess hall; and (5) a right to be either transferred to a new cell in SHU, or provided with a new bunk bed in SHU, *immediately* upon making an oral complaint about his bunk bed to Defendants Woods, Belarge, O'Donnell, Antonelli and/or Holt (or upon the observations of that bunk bed by those Defendants).

**\*20**  As an initial matter, it is unclear to me that any of these rights were "clearly established" in the summer and fall of 2002 (or are clearly established now). In any event, even if these rights were clearly established, it appears entirely reasonable to me for Defendants to have concluded that their treatment of Plaintiff did not violate these rights (or any rights). Simply stated, I can find no *evidence* in the record that Defendants Holt, Woods, Belarge, O'Donnell or Antonelli did anything wrong. At the very least, officers of reasonable competence could have disagreed as to the lawfulness of Defendants' actions..

As a result, even if the Court does not dismiss all of Plaintiff's claims for the reasons stated earlier in this Report-Recommendation, I recommend that the Court dismiss all of Plaintiff's claims based on qualified immunity.

H. Plaintiff's Motion for Partial Summary Judgment
Based on the above reasons, I find that Plaintiff's motion for partial summary judgment–which (at best) contains arguments regarding the issues discussed above–is without merit. I reach this conclusion for the independent reason that Plaintiff's Rule 7.1 Statement of Material Facts (Dkt. No. 38, Part 2) generally does not contain any citations to the record; and, to the extent that Rule 7.1 Statement does contain citations to the record, the record generally does not actually support the facts asserted. *See* N.D .N.Y. L.R. 7.1(a)(3) ( *"Failure of the moving party to submit an accurate and complete Statement of Material Facts shall result in a denial of the motion."*) [emphasis in original].

As a result, I recommend the denial of Plaintiff's motion for partial summary judgment.

**ACCORDINGLY,** it is

RECOMMENDED that Defendants' motion for summary judgment (Dkt. No. 37) be *GRANTED;* and it is further

RECOMMENDED that Plaintiff's motion for partial summary judgment (Dkt. No. 38) be *DENIED.*

Pursuant to 28 U.S.C. § 636(b)(1) and Local Rule 72.1(c), the parties have ten days within which to file written objections to the foregoing report. Such objections shall be filed with the Clerk of the Court. **FAILURE TO OBJECT TO THIS REPORT WITHIN TEN DAYS WILL PRECLUDE APPELLATE REVIEW.** *Roldan v. Racette,* 984 F.2d 85, 89 (2d Cir.1993) (citing *Small v. Sec'y of Health and Human Svcs.,* 892 F.2d 15 [2d Cir.1989] ); 28 U.S.C. § 636(b); Fed.R.Civ.P. 6(a), 6(e), 72.

**All Citations**

Not Reported in F.Supp.2d, 2006 WL 1133247

---

End of Document

© 2018 Thomson Reuters. No claim to original U.S. Government Works.

1999 WL 983876
Only the Westlaw citation is currently available.
United States District Court, S.D. New York.

Craig COLE, Plaintiff,

v.

Christopher P. ARTUZ, Superintendent, Green
Haven Correctional Facility, R. Pflueger, A.
Glemmon, Sgt. Stevens, Lt. Haubert, Capt.
W.M. Watford, Capt. T. Healey, and John
Doe # 1–5, all as individuals, Defendants.

No. 93 Civ. 5981(WHP) JCF.
|
Oct. 28, 1999.

**Attorneys and Law Firms**

Mr. Craig Cole, Bare Hill Correctional Facility, Malone,
New York, Legal Mail, Plaintiff, pro se.

William Toran, Assistant Attorney General, Office of the
Attorney General of the State of New York, New York,
New York, for Defendant.

*MEMORANDUM & ORDER*

PAULEY, J.

**\*1** The remaining defendant in this action, Correction
Officer Richard Pflueger, having moved for an order,
pursuant to Fed.R.Civ.P. 56, granting him summary
judgment and dismissing the amended complaint, and
United States Magistrate Judge James C. Francis IV
having issued a report and recommendation, dated
August 20, 1999, recommending that the motion
be granted, and upon review of that report and
recommendation together with plaintiff's letter to this
Court, dated August 28, 1999, stating that plaintiff does
"not contest the dismissal of this action", it is

ORDERED that the attached report and
recommendation of United States Magistrate Judge
James C. Francis IV, dated August 20, 1999, is adopted in
its entirety; and it is further

ORDERED that defendant Pflueger's motion for
summary judgment is granted, and the amended
complaint is dismissed; and it is further

ORDERED that the Clerk of the Court shall enter
judgment accordingly and close this case.

*REPORT AND RECOMMENDATION*

FRANCIS, Magistrate J.

The plaintiff, Craig Cole, an inmate at the Green Haven
Correctional Facility, brings this action pursuant to 42
U.S.C. § 1983. Mr. Cole alleges that the defendant
Richard Pflueger, a corrections officer, violated his First
Amendment rights by refusing to allow him to attend
religious services. The defendant now moves for summary
judgment pursuant to Rule 56 of the Federal Rules of Civil
Procedure. For the reasons set forth below, I recommend
that the defendant's motion be granted.

*Background*

During the relevant time period, Mr. Cole was an
inmate in the custody the New York State Department
of Correctional Services ("DOCS"), incarcerated at the
Green Haven Correctional Facility. (First Amended
Complaint ("Am.Compl.") ¶ 3). From June 21, 1993 to
July 15, 1993, the plaintiff was in keeplock because of
an altercation with prison guards. (Am.Compl.¶¶ 17–
25). An inmate in keeplock is confined to his cell for
twenty-three hours a day with one hour for recreation.
(Affidavit of Anthony Annucci dated Dec. 1, 1994 ¶
5). Pursuant to DOCS policy, inmates in keeplock must
apply for written permission to attend regularly scheduled
religious services. (Reply Affidavit of George Schneider
in Further Support of Defendants' Motion for Summary
Judgment dated September 9, 1996 ("Schneider Aff.") ¶
3). Permission is granted unless prison officials determine
that the inmate's presence at the service would create
a threat to the safety of employees or other inmates.
(Schneider Aff. ¶ 3). The standard procedure at Green
Haven is for the captain's office to review all requests
by inmates in keeplock to attend religious services.
(Schneider Aff. ¶ 3). Written approval is provided to the
inmate if authorization is granted. (Affidavit of Richard
Pflueger dated April 26, 1999 ("Pflueger Aff.") ¶ 5). The
inmate must then present the appropriate form to the
gate officer before being released to attend the services.
(Pflueger Aff. ¶ 5).

**\*2** On June 28, 1993, the plaintiff submitted a request to attend the Muslim services on July 2, 1993. (Request to Attend Scheduled Religious Services by Keep–Locked Inmate dated June 28, 1993 ("Request to Attend Services"), attached as Exh. B to Schneider Aff.) On June 30, 1993, a supervisor identified as Captain Warford signed the request form, indicating that the plaintiff had received permission to attend the services. (Request to Attend Services). Shortly before 1:00 p.m. on July 2, 1993, the plaintiff requested that Officer Pflueger, who was on duty at the gate, release him so that he could proceed to the Muslim services. (Pflueger Aff. ¶ 3). However, Officer Pflueger refused because Mr. Cole had not presented the required permission form. (Pflueger Aff. ¶ 3). The plaintiff admits that it is likely that he did not receive written approval until some time thereafter. (Deposition of Craig Cole dated February 28, 1999 at 33–35, 38).

On August 25, 1993, the plaintiff filed suit alleging that prison officials had violated his procedural due process rights. On December 4, 1995, the defendants moved for summary judgment. (Notice of Defendants' Motion for Summary Judgment dated December 4, 1995). The Honorable Kimba M. Wood, U.S.D.J., granted the motion and dismissed the complaint on the grounds that the plaintiff failed to show that he had been deprived of a protected liberty interest, but she granted the plaintiff leave to amend. (Order dated April 5, 1997). On May 30, 1997, the plaintiff filed an amended complaint, alleging five claims against several officials at the Green Haven Correctional Facility. (Am.Compl.) On November 16, 1998, Judge Wood dismissed all but one of these claims because the plaintiff had failed to state a cause of action or because the statute of limitations had elapsed. (Order dated Nov. 16, 1998). The plaintiff's sole remaining claim is that Officer Pflueger violated his First Amendment rights by denying him access to religious services on July 2, 1993. The defendant now moves for summary judgment on this issue, arguing that the plaintiff has presented no evidence that his First Amendment rights were violated. In addition, Officer Pflueger contends that he is entitled to qualified immunity. (Defendants' Memorandum of Law in Support of Their Second Motion for Summary Judgment).

A. *Standard for Summary Judgment*

Pursuant to Rule 56 of the Federal Rules of Civil Procedure, summary judgment is appropriate where "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed.R.Civ.P. 56(c); *see also Tomka v. Seiler Corp.,* 66 F.3d 1295, 1304 (2d Cir.1995); *Richardson v. Selsky,* 5 F.3d 616, 621 (2d Cir.1993). The moving party bears the initial burden of demonstrating "the absence of a genuine issue of material fact." *Celotex Corp. v. Catrett,* 477 U.S. 317, 323 (1986). Where the movant meets that burden, the opposing party must come forward with specific evidence demonstrating the existence of a genuine dispute concerning material facts. Fed.R.Civ.P. 56(c); *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 249 (1986). In assessing the record to determine whether there is a genuine issue of material fact, the court must resolve all ambiguities and draw all factual inferences in favor of the nonmoving party. *Anderson,* 477 U.S. at 255; *Vann v. City of New York,* 72 F.3d 1040, 1048–49 (2d Cir.1995). But the court must inquire whether "there is sufficient evidence favoring the nonmoving party for a jury to return a verdict for that party" and grant summary judgment where the nonmovant's evidence is conclusory, speculative, or not significantly probative. *Anderson,* 477 U.S. at 249–50 (citation omitted). "The litigant opposing summary judgment may not rest upon mere conclusory allegations or denials, but must bring forward some affirmative indication that his version of relevant events is not fanciful." *Podell v. Citicorp Diners Club, Inc.,* 112 F.3d 98, 101 (2d Cir.1997) (citation and internal quotation omitted); *Matsushita Electric Industrial Co. v. Zenith Radio Corp.,* 475 U.S. 574, 586 (1986) (a non-moving party "must do more than simply show that there is some metaphysical doubt as to the material facts"); *Goenaga v. March of Dimes Birth Defects Foundation,* 51 F.3d 14, 18 (2d Cir.1995) (nonmovant "may not rely simply on conclusory statements or on contentions that the affidavits supporting the motion are not credible") ((citations omitted)). In sum, if the court determines that "the record taken as a whole could not lead a rational trier of fact to find for the non-moving party, there is no 'genuine issue for trial.' " *Matsushita Electric Industrial Co.,* 475 U.S. at 587 (quoting *First National Bank of Arizona v. Cities Service Co.,* 391 U.S. 253, 288 (1968)); *Montana v. First Federal Savings & Loan Association,* 869 F.2d 100, 103 (2d Cir.1989).

**\*3** Where a litigant is *pro se,* his pleadings should be read liberally and interpreted "to raise the strongest arguments that they suggest." *McPherson v. Coombe,* 174

F.3d 276, 280 (2d Cir.1999) (quoting *Burgos v. Hopkins,* 14 F.3d 787, 790 (2d Cir.1994)). Nevertheless, proceeding *pro se* does not otherwise relieve a litigant from the usual requirements of summary judgment, and a *pro se* party's "bald assertion," unsupported by evidence, is not sufficient to overcome a motion for summary judgment. *See Carey v. Crescenci,* 923 F.2d 18, 21 (2d Cir.1991); *Gittens v. Garlocks Sealing Technologies,* 19 F.Supp.2d 104, 110 (W.D.N.Y.1998); *Howard Johnson International, Inc. v. HBS Family, Inc.,* No. 96 Civ. 7687, 1998 WL 411334, at *3 (S.D .N.Y. July 22, 1998); *Kadosh v. TRW, Inc.,* No. 91 Civ. 5080, 1994 WL 681763, at *5 (S.D.N.Y. Dec. 5, 1994) ("the work product of *pro se* litigants should be generously and liberally construed, but [the *pro se*' s] failure to allege either specific facts or particular laws that have been violated renders this attempt to oppose defendants' motion ineffectual"); *Stinson v. Sheriff's Department,* 499 F.Supp. 259, 262 (S.D.N.Y.1980) (holding that the liberal standard accorded to *pro se* pleadings "is not without limits, and all normal rules of pleading are not absolutely suspended").

**B.** *Constitutional Claim*
It is well established that prisoners have a constitutional right to participate in congregate religious services even when confined in keeplock. *Salahuddin v. Coughlin,* 993 F.2d 306, 308 (2d Cir.1993); *Young v. Coughlin,* 866 F.2d 567, 570 (2d Cir1989). However, this right is not absolute. *See Benjamin v. Coughlin,* 905 F.2d 571, 574 (2d Cir.1990) (right to free exercise balanced against interests of prison officials). Prison officials can institute measures that limit the practice of religion under a "reasonableness" test that is less restrictive than that which is ordinarily applied to the alleged infringement of fundamental constitutional rights. *O'Lone v. Estate of Shaabazz,* 482 U.S. 342, 349 (1986). In *O'Lone,* the Court held that "when a prison regulation impinges on inmates' constitutional rights, the regulation is valid if it is reasonably related to legitimate penological interests." *Id.* at 349 (quoting *Turner v. Safley,* 482 U.S. 78, 89 (1987)). The evaluation of what is an appropriate and reasonable penological objective is left to the discretion of the administrative officers operating the prison. *O'Lone,* 482 U.S. at 349. Prison administrators are "accorded wide-ranging deference in the adoption and execution of policies and practices that in their judgment are needed to preserve internal order and discipline and to

maintain institutional security." *Bell v. Wolfish,* 441 U.S. 520, 547 (1979).

The policy at issue here satisfies the requirement that a limitation on an inmate's access to religious services be reasonable. The practice at Green Haven was to require inmates in keeplock to present written approval to the prison gate officer before being released to attend religious services. This policy both accommodates an inmate's right to practice religion and allows prison administrators to prevent individuals posing an active threat to security from being released. The procedure is not overbroad since it does not permanently bar any inmate from attending religious services. Rather, each request is decided on a case-by-case basis by a high ranking prison official and denied only for good cause.

**\*4** Furthermore, in order to state a claim under § 1983, the plaintiff must demonstrate that the defendant acted with deliberate or callous indifference toward the plaintiff's fundamental rights. *See Davidson v. Cannon* 474 U.S. 344, 347–48 (1986) (plaintiff must show abusive conduct by government officials rather than mere negligence). Here, there is no evidence that the defendant was reckless or even negligent in his conduct toward the plaintiff or that he intended to violate the plaintiff's rights. Officer Pflueger's responsibility as a prison gate officer was simply to follow a previously instituted policy. His authority was limited to granting access to religious services to those inmates with the required written permission. Since Mr. Cole acknowledges that he did not present the necessary paperwork to Officer Pflueger on July 2, 1993, the defendant did nothing improper in denying him access to the religious services. Although it is unfortunate that the written approval apparently did not reach the plaintiff until after the services were over, his constitutional rights were not violated. [1]

[1]     In light of this finding, there is no need to consider the defendant's qualified immunity argument.

*Conclusion*
For the reasons set forth above, I recommend that the defendant's motion for summary judgment be granted and judgment be entered dismissing the complaint. Pursuant to 28 U.S.C. § 636(b)(1) and Rules 72, 6(a), and 6(e) of the Federal Rules of Civil Procedure, the parties shall have ten (10) days to file written objections to this report and recommendation. Such objections shall be filed with

the Clerk of the Court, with extra copies delivered to the chambers of the Honorable William H. Pauley III, Room 234, 40 Foley Square, and to the Chambers of the undersigned, Room 1960, 500 Pearl Street, New York, New York 10007. Failure to file timely objections will preclude appellate review.

Respectfully submitted,

**All Citations**

Not Reported in F.Supp.2d, 1999 WL 983876

---

**End of Document**

© 2018 Thomson Reuters. No claim to original U.S. Government Works.

2012 WL 3230435
Only the Westlaw citation is currently available.
United States District Court,
W.D. New York.

Cornelius MARTIN, II, Plaintiff,

v.

The NIAGARA COUNTY JAIL, et al,, Defendants.

No. 05–CV–868(JTC).
|
Aug. 6, 2012.

**Attorneys and Law Firms**

Cornelius Martin, II, pro se.

Webster Szanyi, LLP (Charles E. Graney, Esq. and Mark C. Davis, Esq., of Counsel), Buffalo, NY, for Defendants Niagara County Jail, Beilein, Mahar, Drehs, and Woock.

Roach, Brown, McCarthy & Gruber, P.C. (Joel J. Java, Jr., Esq., of Counsel), Buffalo, NY, for Defendants Hohensee, Aikin, and Inter–Community Memorial Hospital.

JOHN T. CURTIN, District Judge.

## INTRODUCTION

**\*1** Plaintiff brought this action pursuant to 42 U.S.C. § 1983 seeking compensatory and punitive damages for the alleged deliberate indifference to his serious medical needs and the deprivation of medical care. Currently pending before the court are the defendants' motions for summary judgment (Items 59, 60) and plaintiff's cross-motion for summary judgment on liability (Item 62).

## BACKGROUND

Plaintiff commenced this action on December 12, 2005 with the filing of a *pro se* complaint pursuant to Title 42 U.S.C. § 1983 (Item 1). He filed an amended complaint on March 30, 2006 (Item 6). Plaintiff seeks injunctive relief and compensatory and punitive damages for the alleged deliberate indifference to his medical needs in violation of his rights under the Eighth Amendment to the United States Constitution.

Answers to the amended complaint were filed on November 13, 2006, by defendants Mahar, Drehs, Woock, Niagara County Jail, and Beilein ("the County defendants") (Item 18), and on November 15, 2006 by defendants Hohensee, Aikin, and Inter–Community Memorial Hospital ("the medical defendants") (Item 22). Plaintiff's deposition was taken on September 4, 2008. Following the deposition, the parties stipulated to the following: 1) plaintiff agreed to withdraw his claims against the defendants based on excessive dust, regarding his treatment for sinus problems, and arising from his lack of a mattress and pillow for 12 hours; 2) plaintiff agreed to withdraw his claims against defendants Drehs and Woock individually; 3) all issues regarding plaintiff's CPAP machine were resolved; and 4) plaintiff acknowledged that his claim that he did not receive an inmate handbook did not constitute a violation of the Eighth Amendment (Item 53).

Pursuant to a case management order and following the parties' exchange of discovery materials, on August 27, 2009, the medical defendants moved for summary judgment pursuant to Fed.R.Civ.P. 56 (Item 59). On August 28, 2009, the County defendants filed a motion for summary judgment (Item 60). Defendants assert the following grounds for summary judgment: 1) the plaintiff failed to exhaust his administrative remedies in accordance with the Prison Litigation Reform Act of 1995; 2) Inter–Community Memorial Hospital cannot be held liable on the basis of *respondeat superior;* 3) there was no deliberate indifference to plaintiff's medical needs; 4) defendants are entitled to qualified immunity; and 5) plaintiff's claims against Sheriff Beilein must be dismissed as they are based on a policy that does not exist.

Plaintiff filed his cross-motion for summary judgment on August 31, 2009 (Item 62). He asserted that administrative remedies were unavailable to him as he never received an inmate handbook at the Niagara County Jail. Plaintiff also argued that he suffers from a serious medical need and that the interference by the defendants with his ongoing medical treatment constituted deliberate indifference.

**\*2** On October 30, 2009, defendants filed responses in opposition to plaintiff's motion for summary judgment (Items 66, 67). Plaintiff filed a response to defendant's motions on November 5, 2009 and agreed to withdraw his claim against Inter–Community Memorial Hospital

Case 9:16-cv-01062-DNH-TWD  Document 62  Filed 07/20/18  Page 54 of 116
Martin v. Niagara County Jail, Not Reported in F.Supp.2d (2012)
2012 WL 3230435

(Item 68, p. 3). Thereafter, on January 27, 2010, the medical defendants filed a reply (Item 70), and the County defendants filed a reply on January 29, 2010 (Item 71).

The court has determined that oral argument is unnecessary. For the reasons that follow, defendants' motions for summary judgment are granted, and plaintiff's motion for summary judgment is denied.

## FACTS [1]

[1]  This factual statement is taken from the plaintiff's medical and grievance records (Item 59, Exhs. G, J–M), the plaintiff's deposition testimony (Item 59, Exh. H), the affidavits of James Hohensee, M.D., Christopher Aikin, N.P. and Paul Adler, D.O., with exhibits (Item 59, atts. 17–21), and the affidavits of Rebecca Mahar, Duane Vendetta, and John T. Saxton (Item 60, atts. 6–8).

Plaintiff was incarcerated at the Niagara County Jail ("NCJ") from May 11, 2005 through July 5, 2005, and again from October 7, 2005 until February 3, 2006. At the time he entered the jail, he had been undergoing treatment following multiple spinal surgeries which consisted of physical therapy; two 80 milligram time-released oxycontin pills, one taken at night and one in the morning; and five milligram oxycodone pills to be taken in combination with aspirin or tylenol for breakthrough pain (Item 59, Exh. H, "Martin Dep.," p. 20). Plaintiff stated that while he was not addicted to oxycontin, he was physically "dependent" on the medication. *Id.,* p. 34.

At the time he was booked into the NCJ on May 11, 2005, plaintiff was evaluated by defendant Mahar, a nurse employed by the NCJ. She noted a diagnosis of diabetes and sleep apnea and a prior history of spinal surgery (Item 60, Att. 6, "Mahar Aff.," Exh. A). Nurse Mahar contacted defendant Aikin, the nurse practitioner for the NCJ, who issued a telephone order for plaintiff to be started on the facility's diabetes and detoxification protocols. *Id.,* ¶¶ 14–15. According to the signed standing medical orders of the detox protocol, Nurse Mahar gave plaintiff one tablet of darvocet on the evening of May 11, 2005. *Id.,* ¶ 16.

As a result of being on the detox protocol, plaintiff was housed in an area of the NCJ that he described as "squalor" (Martin Dep., pp. 51, 97). On May 13, 2005, plaintiff asked to be removed from the detox program so that he could be moved to more suitable housing for federal prisoners. *Id.,* p. 98. As a result of being denied oxycontin, plaintiff testified that he suffered sweats, tremors, extremely high blood pressure, diarrhea, and pain in his extremities which lasted about a week to ten days. *Id.,* p. 41, 42. Other than extremity pain, the withdrawal symptoms plaintiff experienced as a result of the detox protocol have all resolved. *Id.,* p. 47. While housed at the NCJ, plaintiff was also prescribed Ultram for pain, nasal spray for rhinitis, Imodium for diarrhea, and blood pressure medication for hypertension. *Id.,* pp. 44, 54, 106–07.

Prior to his admission to the NJC, plaintiff had not spent a significant amount of time in custody in a New York State jail or prison. He spent 14 days at the Erie County Medical Center awaiting extradition to Ohio in 1995, and approximately one hour in Fredonia awaiting bail in 1990 (Martin Dep., pp. 61–62). He was not familiar with the grievance process and had never filed a grievance. *Id.,* pp. 62–63. Plaintiff stated that he learned of the grievance process in December 2005 or January 2006 by reading the New York State "Minimum Standards" binder in the facility law library. *Id.,* pp. 65, 86.

**\*3** During the intake process, plaintiff signed a form acknowledging receipt of a inmate handbook, although he denies receiving the handbook either time he was processed. Plaintiff stated that he simply signed the acknowledgment because he was told to do so by the admitting officer (Martin Dep., pp. 80, 84–85). He filed a grievance related to his Eighth Amendment claim on January 2, 2006 and pursued the grievance through the appeals process. *Id.,* pp. 71–72.

In support of the motion for summary judgment, defendants submitted an affidavit of Captain Duane Vendetta, grievance coordinator for the Niagara County Sheriff's Department (Item 60, att. 7). The grievance policy in effect at the time plaintiff was incarcerated provided that inmates must complete and submit a grievance form within five days of the act or occurrence giving rise to the grievance. *Id.,* ¶ 9. If the inmate is dissatisfied with the decision of the grievance coordinator, he can appeal to the Chief Administrative Officer of the facility. *Id.,* ¶ 10. After receiving a response from the Chief Administrative Officer, the inmate could seek review of the decision with the Citizen's Policy and Complaint

Review Council ("CPCRC") of the New York State Commission of Correction. *Id.,* ¶ 11. Capt. Vendetta stated he reviewed the grievance file for the time period that plaintiff was incarcerated at the NCJ and found no grievances filed by the plaintiff until January 3, 2006 and January 13, 2006. *Id.,* ¶¶ 15–16. Additionally, Capt. Vendetta stated that it is standard practice for all incoming inmates to receive an inmate handbook that outlines the grievance process. *Id.,* ¶ 24. Even if plaintiff did not receive a handbook, the grievance process is outlined in reference books available in the NCJ law library. *Id.,* ¶ 25. All officers in the housing units are familiar with the grievance process and are instructed to provide grievance forms to any inmate wishing to report a problem. *Id.,* ¶ 26.

In further support of the motion for summary judgment, Dr. James Hohensee stated that at the NCJ, the use of narcotics for pain control is strictly scrutinized (Item 59, att. 17, ¶ 14). In a correctional facility, there is a preference for non-narcotic pain management, if medically possible, but narcotics are prescribed in some cases. *Id.,* ¶ 15. The detoxification protocol at the NCJ in 2005 consisted of a set of standing orders. *Id.,* ¶ 17. The order to place plaintiff on the detox protocol was given by Nurse Practitioner Christopher Aikin and carried out by Rebecca Mahar, a jail nurse. *Id.,* ¶ 18. Thereafter, Dr. Hohensee reviewed plaintiff's chart and countersigned the detox order. *Id.,* ¶ 19. Dr. Hohensee saw plaintiff on June 28, 2005 for a scheduled follow-up visit. Plaintiff complained that the Ultracet he was prescribed was not helping his pain and that he had swelling in his legs. *Id.,* ¶ 22. Dr. Hohensee did not believe narcotics were clinically warranted and chose to add 600 mg. of Motrin to be given three times per day. *Id.,* ¶ 23. On December 2, 2005, Dr. Hohensee saw plaintiff for sinus complaints. *Id.,* ¶ 25. Dr. Hohensee saw plaintiff on December 30, 2006 for complaints of knee pain. He saw no evidence of acute injury and did not feel additional medication was necessary. *Id.,* ¶ 28. Dr. Hohensee saw plaintiff for the last time on January 27, 2006. Plaintiff complained of nosebleeds associated with his use of a CPAP machine. *Id.,* ¶ 27.

**\*4** In his affidavit, Christopher Aikin stated that he practices medicine at the NCJ in collaboration with Dr. Hohensee. As a licensed nurse practitioner, he may examine patients, write prescriptions, and order tests (Item 59, att. 18, ¶ 8). On May 11, plaintiff was booked at the NCJ and was evaluated by Rebecca Mahar, R.N. *Id.,* ¶ 14. At NJC, narcotic medications

are strictly regulated, although there is no blanket prohibition against their use when medically necessary. *Id.,* ¶ 17. Mr. Aikin examined plaintiff on May 12, 2005. He confirmed that plaintiff was appropriately on the detox protocol, requested plaintiff's medical records from his neurosurgeon, and determined that narcotic pain medication was not medically necessary. *Id.,* ¶ 19. On May 13, 2005, plaintiff denied detox symptoms, told Mr. Aikin that he had taken only dose of oxycontin in the last 14 days, and requested to be removed from the detox protocol. *Id.,* ¶ 21. On May 16, 2005, Mr. Aikin ordered Zestril for plaintiff's hypertension. *Id.,* ¶ 23. On May 19, 2005, Mr. Aikin saw plaintiff again, discontinued the Zestril, ordered Imodium for gastrointestinal complaints, and prescribed Ultracet for pain. *Id.,* ¶ 25. On June 3, 2005, Mr. Aikin increased the dosage of Ultracet. *Id.,* ¶ 27. On June 14, 2005, Mr. Aikin saw plaintiff, who complained of constipation. Mr. Aikin ordered magnesium citrate and advised plaintiff to increase his fruit and vegetable intake. *Id.,* ¶ 28. Upon his return to the NCJ in October 2005, plaintiff had lost 75 pounds, no longer needed blood pressure medication, and was taking only Ibuprofen for pain. *Id.,* ¶¶ 31–33. He was seen by Mr. Aikin on October 12, 2005 for treatment of a sebaceous cyst and for sinus problems. *Id.,* ¶ 34. He was seen again on November 15, 2005 for sinus complaints, at which time Mr. Aikin prescribed a different allergy medication. *Id.,* ¶ 35. On December 16, 2006, plaintiff was seen by Mr. Aikin, complaining of knee pain. Mr. Aikin tested the knee for ligament tears and ordered x-rays. *Id.,* ¶ 38. The last time Mr. Aikin saw the plaintiff was on January 6, 2006 for a follow-up visit regarding his knee. The x-ray was negative for fracture but indicated osteoarthritis. *Id.,* ¶ 41. During plaintiff's second incarceration, he never presented in sick call for complaints related to neck or back pain. *Id.,* ¶ 42.

Dr. Paul Adler reviewed plaintiff's records from the NCJ, the Federal Bureau of Prisons, and the Northeast Ohio Correctional Center, the amended complaint, plaintiff's responses to interrogatories, and his deposition testimony. He stated that "it is well within the standard of care for nurse practitioners to see and treat patients with the plaintiff's medical issues both in and out of a correctional setting." (Adler Aff., ¶ 13). It is also standard practice in the hospital or correctional setting for a nurse to execute a telephone order from a physician or nurse practitioner. *Id.,* ¶ 16. Dr. Adler stated that Mr. Aikin's initial examination of plaintiff on May 12, 2005 was consistent with the standard of care and his

**Martin v. Niagara County Jail, Not Reported in F.Supp.2d (2012)**

2012 WL 3230435

order to begin detoxification was "within good medical judgment." *Id.,* ¶ 20. During plaintiff's initial incarceration at NCJ, defendants Aikin and Hohensee evaluated and addressed plaintiff's various medical issues, changing and/or increasing his pain medication as needed. *Id.,* ¶ 33. Additionally, during his subsequent incarceration at NCJ, plaintiff's complaint regarding knee pain was appropriately evaluated. *Id.,* ¶¶ 43, 47, 49.

**\*5** Dr. Adler stated that detoxification in correctional facilities is a "standard intervention," and the "decision of whether to prescribe narcotic versus non-narcotic pain relief is in the judgment of the prescribing physician." (Adler Aff., ¶ 52). The plaintiff was seen in sick call 14 times during the less-than six months he was housed at the NCJ, and was seen and treated for various reasons, including detoxification, pain, edema, hypertension, diabetes, sleep apnea, rhinitis, and knee pain. *Id.,* ¶ 56. In Dr. Adler's opinion, the medical care rendered to plaintiff by defendants Hohensee and Aikin "reflects not deliberate indifference, but clearly health care that is consistent with the applicable standard of care." *Id.,* ¶ 57.

In her affidavit, defendant Mahar stated that she followed medical orders provided to her by the Chief Medical Officer or the nurse practitioner. She never deviated from these orders and merely dispensed medication that had been prescribed by authorized medical providers (Mahar Aff., ¶¶ 19–20).

Major John T. Saxton, chief administrative officer of the NCJ, stated in an affidavit that the NCJ does not have, nor did it have at any time relevant to this litigation, a blanket prohibition preventing the Chief Medical Officer, Dr. James Hohensee, or Nurse Practitioner Aikin from prescribing narcotic pain medication in appropriate circumstances (Item 60, att. 8, ¶ 6). It is the policy of the NCJ to provide narcotic pain medication "when and if such medication is medically necessary." *Id.,* ¶ 7.

## DISCUSSION

### 1. Summary Judgment Standard

Rule 56 provides that, "[t]he court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed.R.Civ.P. 56(a).

Although the language of this Rule has been amended in recent years, the well-settled standards for considering a motion for summary judgment remain unchanged. *See, e.g., Faulkner v. Arista Records LLC,* 797 F.Supp.2d 299, 311 n. 7 (S.D.N.Y.2011). Under those standards, the party seeking summary judgment bears the initial burden of establishing that no genuine issue of material fact exists. *Rockland Exposition, Inc. v. Great American Assur. Co.,* 746 F.Supp.2d 528, 532 (S.D.N.Y.2010), *aff'd,* 445 Fed.Appx. 387 (2d Cir.2011). A "genuine issue" exists "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). A fact is "material" if it "might affect the outcome of the suit under the governing law .... " *Id.*

Once the court determines that the moving party has met its burden, the burden shifts to the opposing party to "come forward with specific facts showing that there is a genuine issue for trial." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,* 475 U.S. 574, 587, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986) (internal quotation marks and citation omitted). The nonmoving party may not rest upon mere conclusory allegations or denials, but must set forth "concrete particulars showing that a trial is needed ...." *R.G. Group, Inc. v. Horn & Hardart Co.,* 751 F.2d 69, 77 (2d Cir.1984) (internal quotation marks and citation omitted) (quoted in *Kaminski v. Anderson,* 792 F.Supp.2d 657, 662 (W.D.N.Y.2011). In considering whether these respective burdens have been met, the court "is not to weigh the evidence but is instead required to view the evidence in the light most favorable to the party opposing summary judgment, to draw all reasonable inferences in favor of that party, and to eschew credibility assessments." *Amnesty Am. v. Town of W. Hartford,* 361 F.3d 113, 122 (2d Cir.2004) (internal quotation marks and citation omitted).

**\*6** The court recognizes its duty to "extend extra consideration" to *pro se* plaintiffs and that *"pro se* parties are to be given special latitude on summary judgment motions." *Bennett v. Goord,* 2006 WL 2794421, at \*3 (W.D.N.Y. Aug.1, 2006), *aff'd,* 2008 WL 5083122 (2d Cir.2008) (quoting *Salahuddin v. Coughlin,* 999 F.Supp. 526, 535 (S.D.N.Y.1998)); *see also McPherson v. Coombe,* 174 F.3d 276, 280 (2d Cir.1999) (*pro se* party's pleadings should be read liberally and interpreted "to raise the strongest arguments that they suggest"). "Nevertheless, proceeding *pro se* does not otherwise relieve a litigant from

2012 WL 3230435

the usual requirements of summary judgment, and a *pro se* party's 'bald assertion,' unsupported by evidence, is not sufficient to overcome a motion for summary judgment." *Cole v. Artuz,* 1999 WL 983876, at *3 (S.D.N.Y. October 28, 1999) (citing cases).

The defendants contend that summary judgment should be granted dismissing the complaint as plaintiff failed to exhaust his administrative remedies in accordance with the grievance procedures in place at the NCJ. Additionally, they argue that plaintiff has not shown deliberate indifference to his medical needs. Plaintiff contends that administrative remedies were unavailable to him as he was unaware of the grievance procedures at the NCJ and was never given an inmate handbook. He also argues that the defendants violated the Eighth Amendment by interfering with his ongoing treatment for pain related to his spinal surgeries, by denying him narcotic pain medication, and by providing medical evaluation and treatment by a registered nurse and nurse practitioner.

**2. Exhaustion of Administrative Remedies**

The Prisoner Litigation Reform Act of 1995 ("PLRA"), mandates exhaustion by prisoners of all administrative remedies before bringing an action regarding prison conditions. *See* 42 U.S.C. § 1997e(a). Specifically, the PLRA provides that "[n]o action shall be brought with respect to prison conditions under section 1983 of this title, or any other Federal law, by a prisoner confined in any jail, prison, or other correctional facility until such administrative remedies as are available are exhausted." *Id.* The Supreme Court has held that the PLRA's "exhaustion requirement applies to all inmate suits about prison life, whether they involve general circumstances or particular episodes, and whether they allege excessive force or some other wrong." *Smart v. Goord,* 441 F.Supp.2d 631, 636 (S.D.N.Y.2006) (quoting *Porter v. Nussle,* 534 U.S. 516, 532, 122 S.Ct. 983, 152 L.Ed.2d 12 (2002)). Failure to exhaust is an absolute bar to an inmate's action in federal court; section 1997e(a) "requires exhaustion of available administrative remedies before inmate-plaintiffs may bring their federal claims to court at all." *Neal v. Goord,* 267 F.3d 116, 122 (2d Cir.2001), *overruled on other grounds by Porter v. Nussle,* 534 U.S. 516, 122 S.Ct. 983, 152 L.Ed.2d 12 (2002).

In assessing the affirmative defense of non-exhaustion, the Second Circuit employs a three-part inquiry. *See*

*Hemphill v. New York,* 380 F.3d 680, 686 (2d Cir.2004). A court must (1) determine whether administrative remedies were in fact "available" to the prisoner; (2) consider whether the defendant has forfeited the affirmative defense of non-exhaustion or is estopped from raising it; and (3) determine whether "special circumstances" justify the prisoner's failure to comply with administrative procedural requirements. *Id.* "Courts should be careful to look at the applicable set of grievance procedures, whether city, state or federal" in assessing availability. *Mojias v. Johnson,* 351 F.3d 606, 610 (2d Cir.2003).

**\*7** In New York, formal exhaustion for prisoners in county jails requires compliance with the three-step grievance and appeal procedure outlined in the New York State Minimum Standards for Management of County Jails. *See* N.Y. Comp.Codes R. & Regs. tit. 9 ("9 N.Y.C.R.R."), § 7032.1. In this case, the NCJ employed a three-tiered grievance process with review of an inmate's complaint by the grievance coordinator, the Chief Administrative Officer of the facility, and finally the New York State Commission of Correction. Generally, "[a] prisoner has not exhausted his administrative remedies until he goes through all three levels of the grievance procedure." *Hairston v. LaMarche,* 2006 WL 2309592, at *7 (S.D.N.Y. August 10, 2006) (citing cases).

Here, as stated by Capt. Vendetta, there was a grievance procedure in place at the NJC that was available to plaintiff (Item 60, att. 7, ¶ 5). Pursuant to this policy, an inmate must complete and submit a grievance within five days of the act or occurrence giving rise to the grievance. *Id.,* ¶ 9. Capt. Vendetta stated he reviewed the grievance file for the relevant time period and found no formal grievances filed by the plaintiff between May 11 and July 5, 2005, the dates of his initial incarceration at the NCJ. *Id.,* ¶ 16. On January 3, 2006, plaintiff filed a grievance claiming that the NCJ seized oxycontin and oxycodone upon his initial admission to the NJC and that he was unlawfully placed on the detox protocol in May 2005. *Id.,* ¶ 17. Capt. Vendetta stated that this grievance was untimely, as it referenced events that occurred significantly more than five days prior to its filing. Despite the untimeliness, the grievance was processed through the system. *Id.,* ¶ 20.

Plaintiff contends that he did not file a timely grievance because he was unaware of the grievance procedure and was never issued an inmate handbook upon his admission

to the NJC. Grievance procedures may be deemed unavailable "where plaintiff is unaware of the grievance procedures or did not understand [them] or where defendants' behavior prevents plaintiff from seeking administrative remedies." *Murrary v. Palmer,* 2010 WL 1235591, at *5 (N.D.N.Y. March 31, 2010); *Hargrove v. Riley,* 2007 WL 389003, at *8 (E.D.N.Y. January 31, 2007).* Here, there is no dispute that plaintiff had not spent a significant amount of time in custody in New York State. While he signed an intake form acknowledging his receipt of an inmate handbook on both of his admissions to the NCJ, plaintiff stated that he signed the form without reading it and because he was told to do so by the admitting officer. He was unaware of the grievance policies and procedures until approximately December 2005, when he read the grievance policy in the law library. Construing the facts in the light most favorable to plaintiff, he has raised a material fact as to whether a similarly situated person would have been unaware of the grievance process, rendering it unavailable. *See Brown v. Fischer,* 2010 WL 5797359 (N.D.N.Y. December 8, 2010) (failure to exhaust administrative remedies was excusable where inmate was unaware of the grievance procedures and there was no evidence he received an inmate handbook). Accordingly, the defendants' motions for summary judgment based on the plaintiff's failure to exhaust administrative remedies are denied.

### 3. Constitutional Claims

**\*8** Even excusing plaintiff's failure to exhaust his administrative remedies, the complaint must nonetheless be dismissed as plaintiff has failed to establish a violation of the Eighth Amendment.

Title 42 U.S.C. § 1983 provides in relevant part:

> Every person who, under color of any statute, ordinance, regulation, custom, or usage, of any State or Territory or the District of Columbia, subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an

action at law, suit in equity, or other proper proceeding for redress ....

42 U.S.C. § 1983. "In order to maintain a section 1983 action, two essential elements must be present: (1) the conduct complained of must have been committed by a person acting under color of state law; and (2) the conduct complained of must have deprived a person of rights, privileges, or immunities secured by the Constitution or laws of the United States." *Pitchell v. Callan,* 13 F.3d 545, 547 (2d Cir.1994); *see also Kasiem v. Guzman,* 2011 WL 4352387, at *3 (W.D.N.Y. September 16, 2011).

"The Eighth Amendment's prohibition against cruel and unusual punishment has been construed to include the denial of adequate medical care for an inmate's serious medical needs." *Woods v. Goord,* 2002 WL 31296323, *2 (S.D.N.Y. October 10, 2002); *see also Farmer v. Brennan,* 511 U.S. 825, 832, 114 S.Ct. 1970, 128 L.Ed.2d 811 (1994); *Estelle v. Gamble,* 429 U.S. 97, 104, 97 S.Ct. 285, 50 L.Ed.2d 251 (1976). The care provided to prisoners to treat their injuries or illnesses must meet minimum medical standards of adequacy and be reasonably intended to satisfy their medical needs. To show that prison medical treatment was so inadequate as to amount to "cruel or unusual punishment" prohibited by the Eighth Amendment, plaintiff must prove that defendants' actions or omissions amounted to "deliberate indifference to serious medical needs." *Estelle v. Gamble,* 429 U.S. at 106; *Harrison v. Barkley,* 219 F.3d 132, 136 (2d Cir.2000).

Under 42 U.S.C. § 1983, every claim for deliberate indifference to a serious medical need must pass a two-pronged test consisting of objective and subjective elements. First, the court must determine whether, objectively speaking, plaintiff's condition is such that the alleged deprivation of medical assistance is "sufficiently serious." *Woods,* 2002 WL 31296325, at *3 (citing *Hathaway v. Coughlin,* 37 F.3d 63, 66–67 (2d Cir.1994)); *see also Wilson v. Seiter,* 501 U.S. 294, 298, 111 S.Ct. 2321, 115 L.Ed.2d 271 (1991). Second, the court must consider whether the official " 'knew that an inmate faced a substantial risk of serious harm, and disregarded that risk by failing to take reasonable measures to abate it.' " *Woods* 2002 WL 31296325 at *3 (internal cites and alterations omitted); *Harrison v. Barkley,* 219 F.3d at 137.

A serious medical need is one with some urgency or one which, if ignored, may produce death, degeneration, or

extreme pain. *Hathaway,* 37 F.3d at 66. As the Second Circuit held in *Brock v. Wright,* 315 F.3d 158, 162 (2d Cir.2003), there is no precise metric to guide the court in its estimation of the seriousness of a prisoner's medical condition. Any inquiry into the objective component of an Eighth Amendment claim must be tailored to the specific facts of each case. *Smith v. Carpenter,* 316 F.3d 178, 185 (2d Cir.2003). In *Chance v. Armstrong,* 143 F.3d 698, 702 (2d Cir.1998), the court set forth a non-exhaustive list of factors that are relevant to the inquiry whether a given medical condition is serious. These factors include: (1) whether a reasonable doctor or patient would perceive the medical need in question as "important and worthy of comment or treatment;" (2) whether the medical condition significantly affects daily activities; and (3) "the existence of chronic and substantial pain." *Chance,* 143 F.3d at 702.

**\*9** Plaintiff's medical conditions included pain as a result of previous spinal surgeries, edema from a blood pressure medication, and knee pain. He acknowledges that the defendants adequately responded to his complaints of allergic rhinitis and sleep apnea. Edema and knee pain are not sufficiently serious to cause death, degeneration, or extreme pain. Accordingly, the plaintiff's only medical conditions that are arguably "serious" relate to plaintiff's pain resulting from his previous spinal surgeries.

Even if the court were to assume that plaintiff's pain as a result of multiple spinal surgeries constituted a serious medical need, there is no evidence of defendants' deliberate indifference to that medical need. Plaintiff's Eighth Amendment claim is based on his assumption that there is a policy against the prescription of any and all narcotic pain medications in the NCJ. He complains that defendant Mahar ordered the detox protocol and that Major Saxton, the Chief Administrative Officer of the NCJ, implemented a policy of no narcotic pain medication. Plaintiff offers no proof to support these factual assumptions. In contrast, the defendants have established that there is no blanket prohibition against the prescription of narcotic medications and that Nurse Mahar initiated the detox protocol upon the order of Nurse Practitioner Aikin.

Plaintiff also complains that he was not seen by Dr. Hohensee until June 28, 2005, 48 days after his arrival at the NCJ. He argues that given his serious medical need, he should have been seen by a physician earlier. "A difference of opinion between a prisoner and prison officials regarding medical treatment does not, as a matter of law, constitute deliberate indifference." *Sonds v. St. Barnabas Hosp. Corr. Health Serv.,* 151 F.Supp.2d 303, 311 (S.D.N.Y.2001); *see also Chance,* 143 F.3d 698 at 703; *McCloud v. Delaney,* 677 F.Supp. 230, 232 (S.D.N.Y.1988) ("[T]here is no right to the medical treatment of one's choice if the prescribed treatment is based on applicable medical standards."). Additionally, "[m]ere delay in the rendering of medical treatment in and of itself does not rise to the level of a constitutional violation." *Smith v. Montefiore Med. Ctr.-Health Serv. Div.,* 22 F.Supp.2d 275, 280 (S.D.N.Y.1998). "Nor does the fact that an inmate might prefer an alternative treatment, or feels that he did not get the level of medical attention he preferred." *Sonds,* 151 F.Supp.2d at 311; *see also Dean v. Coughlin,* 804 F.2d 207, 215 (2d Cir.1986). "To demonstrate a constitutional violation, a plaintiff must show that he sustained substantial harm because of the delay in the rendering of medical treatment." *Smith,* 22 F.Supp.2d at 280. "As long as the medical care is adequate, there is no Eighth Amendment violation." *Sonds,* 151 F.Supp.2d at 311; *see also Wandell v. Koenigsmann,* 2000 WL 1036030, \*3 (S.D.N.Y. July 27, 2000) ("So long as the treatment given is adequate, the fact that a prisoner might prefer a different treatment does not give rise to an Eighth Amendment violation.").

**\*10** Additionally, plaintiff contends that the medical staff of the NCJ improperly interfered with his treatment by his personal physician by discontinuing his use of oxycontin and oxycodone and placing him on the detox protocol. Plaintiff's assertion that he should have been given narcotic pain medication is likewise a disagreement over the course of treatment. "[M]ere disagreement over the proper treatment does not create a constitutional claim." *Chance,* 143 F.3d at 703. Although plaintiff claims that the defendants ignored and overruled the treatment plan in place when he entered NCJ, an inmate is not entitled to the treatment of his choice. *Id.* at 702. Plaintiff's demand for narcotic pain medications and defendants' unwillingness to prescribe them does not create an Eighth Amendment claim. *See Ifill v. Weinstock,* 2012 WL 162405, \*4 (W.D.N.Y. January 19, 2012); *Guarneri v. Wood,* 2011 WL 4592209, at \*13 (N.D.N.Y. September 2, 2011) ("Defendants regularly offered [plaintiff] non-narcotic pain medication ..... [Plaintiff]'s complaints about the type of medication given to him for pain again amounts to a disagreement over treatment, which is insufficient to allege a constitutional violation.").

Case 9:16-cv-01062-DNH-TWD    Document 62    Filed 07/20/18    Page 60 of 116
Martin v. Niagara County Jail, Not Reported in F.Supp.2d (2012)
2012 WL 3230435

In this case, plaintiff was seen by a registered nurse on the day of his admission. He was seen by Nurse Practitioner Aikin on May 12, 13, 16, and 19, 2005, June 3 and 14, 2005, October 12, 2005, November 15, 2005, December 16, 2005, and January 6, 2006. He was seen by Dr. Hohensee on June 28, 2005, December 2, and 30, 2005, and January 27, 2005. He received medication, medical advice, diagnostic x-rays, and followup care with a physician. Even granting plaintiff the benefit of every favorable inference, it cannot be said that this medical care was inadequate or evinces deliberate indifference on the part of the defendants. Based on the foregoing, no reasonable jury could find that the defendants acted with deliberate indifference to plaintiff's medical needs in violation of his rights under the Eighth and Fourteenth Amendments. Accordingly, defendants are entitled to summary judgment as a matter of law dismissing plaintiff's complaint. The court need not address the argument that the defendants are entitled to qualified immunity.

## CONCLUSION

The defendants' motions for summary judgment (Items 59, 60) are granted and the complaint is dismissed. Plaintiff's cross motion for summary judgment (Item 62) is denied. The Clerk of the Court is directed to enter judgment in favor of defendants and to close this case.

The Court hereby certifies, pursuant to 28 U.S.C. § 1915(a)(3), that any appeal from this Order would not be taken in good faith, and leave to appeal to the Court of Appeals as a poor person is denied. *Coppedge v. United States,* 369 U.S. 438, 82 S.Ct. 917, 8 L.Ed.2d 21 (1962). Further requests to proceed on appeal as a poor person should be directed, on motion, to the United States Court of Appeals for the Second Circuit, in accordance with Rule 24 of the Federal Rules of Appellate Procedure.

 **\*11**  So Ordered.

**All Citations**

Not Reported in F.Supp.2d, 2012 WL 3230435

---

**End of Document**                    © 2018 Thomson Reuters. No claim to original U.S. Government Works.

2017 WL 1215814
Only the Westlaw citation is currently available.
United States District Court,
N.D. New York.

Barry BERMAN, Plaintiff,

v.

Charles DURKIN, et al., Defendants.

Civ. No. 9:13-CV-0136 (LEK/DJS)
|
Signed 03/10/2017

**Attorneys and Law Firms**

BARRY BERMAN, 20 Glenn Cove Rise, Rochester,
New York 14617, Pro Se.

HON. ERIC T. SCHNEIDERMAN, OF COUNSEL:
JOSHUA E. McMAHON, ESQ., Assistant Attorney
General, Attorney General of the State of New York,
The Capitol, Albany, New York 12224, Attorney for
Defendants.

**REPORT-RECOMMENDATION and ORDER**

Daniel J. Stewart, U.S. Magistrate Judge

**\*1** *Pro se* Plaintiff Barry Berman commenced this civil
rights action on February 1, 2013. Dkt. No. 1, Compl.
The following claims remain: (1) an Eighth Amendment
excessive force claim against Defendants Correction
Officer ("C.O.") Devereaux, Sergeant ("Sgt.") King, and
John Does ## 1-3 and # 5 arising from an alleged assault
on May 27, 2010; (2) an Eighth Amendment excessive
force claim and a First Amendment retaliation claim
against Defendants C.O. Mitchell and Sgt. Durkin arising
from an alleged assault on June 13, 2010 that occurred
in retaliation when Plaintiff reported the May 27, 2010
incident; and (3) Eighth Amendment deliberate medical
indifference claims against Defendant Drs. Ramineni and
Mannava. *See* Dkt. No. 127, Am. Compl.

Presently before the Court is Defendants' Motion for
Summary Judgment. Dkt. No. 190, Defs.' Mot. Summ.
J. Defendants argue that: (1) Plaintiff's claims against the
unidentified John Doe Defendants should be dismissed;
(2) Plaintiff failed to exhaust his administrative remedies
with respect to his claims arising from the incidents alleged

to have occurred on May 27, 2010 and June 13, 2010;
and (3) Defendants are entitled to summary judgment on
each of Plaintiff's claims. *Id.* Despite being granted two
extensions of time to file a response, Plaintiff has not filed
a response. Dkt. Nos. 194 & 198. For the reasons that
follow, the Court recommends that Defendants' Motion
be **granted in part and denied in part**.

**I. SUMMARY JUDGMENT STANDARD**

Pursuant to FED. R. CIV. P. 56(a), summary judgment is
appropriate only where "there is no genuine dispute as to
any material fact and the movant is entitled to judgment
as a matter of law." The moving party bears the burden
to demonstrate through "pleadings, depositions, answers
to interrogatories, and admissions on file, together with
[ ] affidavits, if any," that there is no genuine issue of
material fact. *F.D.I.C. v. Giammettei*, 34 F.3d 51, 54 (2d
Cir. 1994) (quoting *Celotex Corp. v. Catrett*, 477 U.S. 317,
323 (1986)).

To defeat a motion for summary judgment, the non-
movant must set out specific facts showing that there
is a genuine issue for trial, and cannot rest merely
on allegations or denials of the facts submitted by the
movant. FED. R. CIV. P. 56(c); *see also Scott v. Coughlin*,
344 F.3d 282, 287 (2d Cir. 2003) ("Conclusory allegations
or denials are ordinarily not sufficient to defeat a motion
for summary judgment when the moving party has set
out a documentary case."); *Rexnord Holdings, Inc. v.
Bidermann*, 21 F.3d 522, 525-26 (2d Cir. 1994). To that
end, sworn statements are "more than mere conclusory
allegations subject to disregard ... they are specific and
detailed allegations of fact, made under penalty of perjury,
and should be treated as evidence in deciding a summary
judgment motion" and the credibility of such statements
is better left to a trier of fact. *Scott v. Coughlin*, 344 F.3d
at 289 (citing *Flaherty v. Coughlin*, 713 F.2d 10, 13 (2d
Cir. 1983) and *Colon v. Coughlin*, 58 F.3d 865, 872 (2d
Cir. 1995)). "A verified complaint is to be treated as an
affidavit for summary judgment purposes, and therefore
will be considered in determining whether material issues
of fact exist." *Colon v. Coughlin*, 58 F.3d at 872.

**\*2** When considering a motion for summary judgment,
the court must resolve all ambiguities and draw all
reasonable inferences in favor of the non-movant. *Nora
Beverages, Inc. v. Perrier Group of Am., Inc.*, 164 F.3d 736,

742 (2d Cir. 1998). "[T]he trial court's task at the summary judgment motion stage of the litigation is carefully limited to discerning whether there are any genuine issues of material fact to be tried, not to deciding them. Its duty, in short, is confined at this point to issue-finding; it does not extend to issue-resolution." *Gallo v. Prudential Residential Servs., Ltd. P'ship*, 22 F.3d 1219, 1224 (2d Cir. 1994). Furthermore, where a party is proceeding *pro se*, the court must "read [his or her] supporting papers liberally, and ... interpret them to raise the strongest arguments that they suggest." *Burgos v. Hopkins*, 14 F.3d 787, 790 (2d Cir. 1994), *accord*, *Soto v. Walker*, 44 F.3d 169, 173 (2d Cir. 1995). Nonetheless, summary judgment is appropriate "[w]here the record taken as a whole could not lead a rational trier of fact to find for the non-moving party." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986).

When a motion for summary judgment is unopposed, the court may "grant summary judgment if the motion and supporting materials—including the facts considered undisputed—show that the movant is entitled to it." FED. R. CIV. P. 56(e)(3); *see also* N.D.N.Y.L.R. 7.1(b)(3) ("Where a properly filed motion is unopposed and the Court determines that the moving party has met its burden to demonstrate entitlement to the relief requested therein, the non-moving party's failure to file or serve any papers ... shall be deemed as consent to the granting or denial of the motion."). "If the evidence adduced in support of the summary judgment motion does not meet [the movant's] burden [of production], 'summary judgment must be denied *even if no opposing evidentiary matter is presented.*' " *Amaker v. Foley*, 247 F.3d 677, 681 (2d Cir. 2001) (quoting *Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 160 (1970)). "An unopposed summary judgment motion may also fail where the undisputed facts fail to 'show that the moving party is entitled to judgment as a matter of law.' " *Vermont Teddy Bear Co. v. 1-800 Beargram Co.*, 373 F.3d 241, 244 (2d Cir. 2004) (quoting *Champion v. Artuz*, 76 F.3d 483, 486 (2d Cir. 1996)). "In the case of a *pro se*, the district court should examine every claim or defense with a view to determining whether summary judgment is legally and factually appropriate." *Jackson v. Fed. Exp.*, 766 F.3d 189, 198 (2d Cir. 2014).

Pursuant to this District's Local Rules, "[t]he Court shall deem admitted any properly supported facts set forth in the Statement of Material Facts that the opposing party does not specifically controvert." N.D.N.Y.L.R. 7.1(a)

(3). Although a *pro se* litigant is entitled to a liberal construction of his filings, *see Sykes v. Bank of America*, 723 F.3d 399, 403 (2d Cir. 2013), his *pro se* status does not relieve him of his obligation to comply with the relevant procedural rules, *see Edwards v. INS*, 59 F.3d 5, 8-9 (2d Cir. 1995). However, the Second Circuit, acknowledging a court's broad discretion to determine whether to overlook a failure to comply with local rules, has held that the court may in its discretion opt to conduct a review of the entire record even where one of the parties has failed to file a 7.1 statement. *Holtz v. Rockefeller & Co., Inc.*, 258 F.3d 62, 73 (2d Cir. 2001); *see also Jackson v. Fed. Exp.*, 766 F.3d at 194 (noting that "the court may rely on other evidence in the record even if uncited" in determining the undisputed material facts). Due to Plaintiff's *pro se* status, the Court has opted to review the entire summary judgment record to ascertain the undisputed material facts. The Court will cite to the facts as set forth in Defendants' Rule 7.1 Statement of Facts only when properly supported by the record. Dkt. No. 190-16, Defs.' Rule 7.1. Statement of Material Facts ("Defs.' SMF"); *see also GlobalRock Networks, Inc. v. MCI Commc'ns Servs., Inc.*, 943 F. Supp. 2d 320, 329 (N.D.N.Y. 2013) ("Where the non-movant either does not respond to the motion or fails to dispute the movant's statement of material facts, the court may not rely solely on the moving party's Rule 56.1 statement; rather the court must be satisfied that the citations to evidence in the record support the movant's assertions.") (citing *Giannullo v. City of New York*, 322 F.3d 139, 143 n.5 (2d Cir. 2003)).

## II. MAY 27, 2010 AND JUNE 13, 2010 EXCESSIVE FORCE INCIDENTS

### A. Background

**\*3** The Court here summarizes Plaintiff's allegations and sets forth the undisputed material facts regarding the alleged assaults that occurred on May 27 and June 13, 2010, when he was incarcerated at Clinton Correctional Facility ("Clinton").

On May 27, 2010, Plaintiff was going to the yard when he was stopped by Defendant C.O. Devereaux for a pat frisk. Defs.' SMF at ¶ 38; Am. Compl. at ¶ 15. Plaintiff stated that there was nothing in his pockets, but alleges that he forgot that he was carrying a pencil. Defs.' SMF at ¶ 38; Am. Compl. at ¶ 16. As C.O. Devereaux searched

2017 WL 1215814

Plaintiff, he reached into Plaintiff's right front pocket and pricked his finger on the pencil. Defs.' SMF at ¶ 38. Plaintiff alleges that he returned to his cell and that C.O. Devereaux later came and discussed the incident. Am. Compl. at ¶ 17. Plaintiff apologized and explained that he was taking medication and C.O. Devereaux stated that he would meet with his supervisor regarding whether to issue a misbehavior report. *Id.*

Approximately ten minutes after his conversation with C.O. Devereaux, Plaintiff claims that C.O. Devereaux, Defendant Sgt. King, and John Does ## 1-3 came and ordered him to exit his cell. *Id.* at ¶ 18. The Defendants ordered Plaintiff to face and grab the cell bars, which Plaintiff did. *Id.* at ¶ 19. Plaintiff was then punched repeatedly in his head, sides, and back. *Id.* Plaintiff collapsed, but was ordered to get up, and when he did, was again punched repeatedly in his head, sides, and back. *Id.* at ¶¶ 21-23. Plaintiff attempted to look at one of the John Doe Defendant's name tags, but was ordered to look away. *Id.* at ¶ 23. The Defendants warned Plaintiff that if he reported the assault, they would return and "it would be worse." *Id.* at ¶ 24. No Unusual Incident Report was filed regarding the alleged assault. Defs.' SMF at ¶ 45. Defendants C.O. Devereaux and Sgt. King deny that they assaulted Plaintiff on any occasion. *Id.* at ¶¶ 51-52. [1]

[1]     Defendants' Motion papers do not include affidavits of the correctional officer Defendants, but rather contain unsworn statements taken during investigation of Plaintiff's allegations. *See* Dkt. No. 190-5, Decl. of Joshua McMahon, dated Aug. 25, 2016, Ex. D, at pp. DEF000473-486.

On May 28, 2010, the following day, Plaintiff went to sick call. Am. Compl. at ¶ 25. Plaintiff claims that he was accompanied by C.O. Bushey who threatened him not to report the assault. *Id.* Plaintiff complained of pain on his right side and stated that he had fallen down some stairs. Dkt. No. 190-1, Decl. of Joshua McMahon, dated Aug. 25, 2016, Ex. A, [2] at p. 413. No bruising or marks were noted and Plaintiff was observed getting onto and off of the exam table without signs of pain or discomfort. *Id.*

[2]     Exhibit A to the McMahon Declaration is at Docket Number 190-2.

As a result of the pat frisk conducted by C.O. Devereaux, Plaintiff was issued a misbehavior report, which charged him with making false statements, refusing a direct order,

and refusing a search or frisk. Defs.' SMF at ¶ 40. A Tier II Disciplinary Hearing was held on June 1, 2010. *Id.* at ¶ 41. Plaintiff testified at the hearing, but was found guilty of the charges and assessed with fifteen days loss of recreation, phone, packages, and commissary. *Id.* at ¶ 43. Plaintiff appealed the determination and it was affirmed. Dkt. No. 190-3, McMahon Decl., Ex. B, [3] at p. 23.

[3]     Exhibit B to the McMahon Declaration is at Docket Number 190-3.

**\*4** On June 8, 2010, Plaintiff sent a complaint concerning the alleged assault to the New York Inspector General ("IG"). McMahon Decl., Ex. D, [4] at pp. DEF000511-000514. In his Amended Complaint, Plaintiff alleges that Defendant Sgt. Durkin acquired a copy of the letter to the IG and attempted to instigate other inmates to retaliate against Plaintiff for being a "snitch." Am. Compl. at ¶ 29. Plaintiff claims that on June 13, 2010, Defendants Sgt. Durkin and C.O. Mitchell came to his cell and escorted him to a room at the front of the block. *Id.* at ¶ 30. Sgt. Durkin then told Plaintiff that he was going to ask him questions about his letter to the IG and that whenever he gave a wrong answer, C.O. Mitchell would punch him in the face. *Id.* Sgt. Durkin proceeded to ask Plaintiff questions and C.O. Mitchell punched Plaintiff at least ten times in the face. *Id.*

[4]     Exhibit D to the McMahon Declaration is at Docket Numbers 190-5, 190-6, 190-7, and 190-8.

Defendants then escorted Plaintiff to Sgt. Durkin's office. *Id.* at ¶ 31. Prior to entering the office, Sgt. Durkin ordered Plaintiff to face and grab the bars in order to be searched. *Id.* While Plaintiff was holding the bars, C.O. Mitchell repeatedly punched Plaintiff in his head, back, and sides. *Id.* Plaintiff was then taken into the office and further questioned. *Id.* at ¶ 32. The Defendants accused Plaintiff of having contraband tattoo guns and threatened him not to report the incident. *Id.* at ¶¶ 33 & 35. Again, no Unusual Incident Report was filed regarding this alleged assault. Defs.' SMF at ¶ 45. Plaintiff was not taken to medical following the incident and next went to sick call on June 24, 2010, where he again did not report any assault by staff. *Id.* at ¶ 36. Plaintiff alleges that, on June 17, 2010, photographs were taken of the "visible injuries" to his face. [5] Am. Compl. at ¶ 38.

[5]     These photographs are not in the record.

Following the alleged incidents on May 27 and June 13, Plaintiff alleges that Sgt. Durkin continued to harass and threaten him. Plaintiff alleges that Sgt. Durkin moved Plaintiff's cell twice and confiscated some of his legal papers, envelopes, and toilet paper. *Id.* at ¶¶ 46, 48, & 52. Sgt. Durkin allegedly threatened Plaintiff to not talk about the incidents. *Id.* at ¶ 47. Plaintiff also claims that Sgt. Durkin stated that he planned to "set [P]laintiff up" by submitting a memo identifying Plaintiff as a drug dealer. *Id.* at ¶ 49. Plaintiff alleges that he suffered lasting abdominal pain following the alleged assaults. *Id.* at ¶ 71.

### B. John Doe Defendants

Defendants first move to dismiss Plaintiff's claims against the unidentified John Doe Defendants, who allegedly participated in the May 27, 2010 assault. Dkt. No. 190-15, Defs.' Mem. of Law at pp. 2-3. In the District Court's initial review pursuant to 28 U.S.C. §§ 1915(e)(2)(B) and 1915A(b), Plaintiff was advised that he must "take reasonable steps through discovery to ascertain the identity of any Doe Defendants and, if appropriate, file a motion to amend his Amended Complaint ... to add any such individual." Dkt. No. 17 at p. 11. Through discovery, Plaintiff was able to identify "John Doe # 4" as Sgt. King, but was unable to identify any of the other Doe Defendants. *See* Dkt. No. 112 at pp. 28-29. "Where discovery has closed and the Plaintiff has had ample time and opportunity to identify and serve John Doe Defendants, it is appropriate to dismiss those Defendants without prejudice." *Delrosario v. City of New York*, 2010 WL 882990, at *5 (S.D.N.Y. Mar. 4, 2010). Dismissal of an unidentified Doe Defendant is appropriate pursuant to FED. R. CIV. P. 41(b), which permits a court to dismiss an action for failure to prosecute or to comply with a court order, and FED. R. CIV. P. 4(m), under which a court must dismiss, absent a showing of "good cause," claims against a defendant who is not served within ninety days of the filing of the complaint. *See Cusamano v. Sobek*, 604 F. Supp. 2d 416, 501-02 (N.D.N.Y. 2009). Therefore, because discovery is closed and Plaintiff has not identified Defendant John Does ## 1-3 and John Doe # 5, the Court recommends that Plaintiff's claims against those Defendants be **dismissed**.

### C. Exhaustion

**\*5** Defendants argue that Plaintiff's claims arising from the May 27, 2010 and June 13, 2010 incidents should be dismissed on the ground that he failed to exhaust his administrative remedies.

*1. Exhaustion Procedure*

The Prison Litigation Reform Act ("PLRA") provides, in pertinent part, that "[n]o action shall be brought with respect to prison conditions under section 1983 of this title, or any other Federal law, by a prisoner confined in any jail, prison, or other correctional facility until such administrative remedies as are available are exhausted." 42 U.S.C. § 1997e(a). The Supreme Court has held that "the PLRA's exhaustion requirement applies to all inmate suits about prison life, whether they involve general circumstances or particular episodes, and whether they allege excessive force or some other wrong." *Porter v. Nussle*, 534 U.S. 516, 532 (2002) (citation omitted). Exhaustion in prisoner cases covered by § 1997e(a) is mandatory. *Id.* at 524; *Ross v. Blake*, 136 S. Ct. 1850, 1856 (2016) (stating that mandatory language of § 1997e(a) forecloses judicial discretion to craft exceptions to the requirement). Furthermore, § 1997e(a) requires "proper exhaustion," which means using all steps of the administrative process and complying with "deadlines and other critical procedural rules." *Woodford v. Ngo*, 548 U.S. 81, 93 (2006). The defendant bears the burden of proving that the administrative remedies available to the plaintiff were not exhausted prior to the initiation of a civil action. *Howard v. Goord*, 1999 WL 1288679, at *3 (E.D.N.Y. Dec. 28, 1999). [6]

6    Exhaustion of administrative remedies is an affirmative defense which must be raised by the defendant. *See Jenkins v. Haubert*, 179 F.3d 19, 28-29 (2d Cir. 1999). Defendants properly raised the affirmative defense in their Answer. *See* Dkt. Nos. 143 at ¶ 14 & 170 at ¶ 14.

In New York, the administrative remedies consist of a three-step Inmate Grievance Program ("IGP"). First, a grievance is submitted to the Inmate Grievance Resolution Committee ("IGRC"), a committee comprised of both inmates and facility employees. N.Y. COMP. CODES R. & REGS. tit. 7, § 701.5(b). An inmate must submit a grievance "within 21 calendar days of the alleged occurrence." *Id.* at § 701.5(a). In addition, an inmate may request an extension of the time limit within forty-

five days of the date of the alleged occurrence. *Id.* at § 701.6(g). The IGRC reviews and investigates the formal complaints and then issues a written determination. *Id.* at § 701.5(b). Second, upon appeal of the IGRC decision, the superintendent of the facility reviews the IGRC's determination and issues a decision. *Id.* at § 701.5(c). Finally, upon appeal of the superintendent's decision, the Cental Office Review Committee ("CORC") makes the final administrative determination. *Id.* at § 701.5(d). Only upon exhaustion of all three levels of review may a prisoner seek relief in federal court. *Bridgeforth v. Bartlett*, 686 F. Supp. 2d 238, 239 (W.D.N.Y. 2010) (citing, *inter alia*, *Porter v. Nussle*, 534 U.S. at 524); *see also Neal v. Goord*, 267 F.3d 116, 121 (2d Cir. 2001), *overruled on other grounds by Porter v. Nussle*, 534 U.S. 516).

In addition to the formal grievance procedure described above, the regulations provide for an expedited grievance procedure for claims of employee "harassment." N.Y. COMP. CODES R. & REGS. tit. 7, § 701.8. Pursuant to this expedited procedure, the inmate may first report the incident to the employee's immediate supervisor. *Id.* at § 701.8(a). The inmate's allegations are then given a grievance number and the superintendent (or his designee) must promptly decide whether the grievance, if true, would represent a bona fide case of harassment. *Id.* at §§ 701.8(b) & (c).

**\*6** If the superintendent determines that the allegations do not represent a bona fide case of harassment, the allegations are automatically routed to the IGRC for resolution according to the formal three-step grievance procedure outlined above. *Id.* at § 701.8(c). If the superintendent finds that the allegations do represent a bona fide case of harassment, then he must either initiate an in-facility investigation by higher ranking personnel, or request an investigation by the IG's Office, and if criminal activity is involved, the superintendent may request an investigation by the New York State Police Bureau of Criminal Investigations. *Id.* at §§ 701.8(d); *see also Perez v. Blot*, 195 F. Supp. 2d 539, 542-43 (S.D.N.Y. 2002) (describing the grievance system).

The superintendent must render a decision within twenty-five calendar days of receipt of the grievance. N.Y. COMP. CODES R. & REGS. tit. 7, § 701.8(f). If the superintendent fails to respond within this required time-frame, the inmate may appeal his grievance to CORC by filing a notice of decision to appeal with the inmate

grievance clerk. *Id.* at § 701.8(g). If the inmate receives a response from the superintendent and wishes to appeal to CORC, he must file a notice of decision to appeal with the inmate grievance clerk within seven calendar days of receipt of the response. *Id.* at § 701.8(h).

In sum, the expedited procedure set forth above allows inmates to bypass filing a formal grievance by instead "reporting" the incident. *See Perez v. Blot*, 195 F. Supp. 2d at 544. Such a process is wholly consistent with the underlying concern of employee harassment.

### 2. *Plaintiff's Failure to Exhaust Administrative Remedies*

The record establishes that Plaintiff did not file grievances with the IGP at Clinton relative to his claims arising from the May 27, 2010 and June 13, 2010 incidents. In the records provided by Defendants, it appears that the Clinton IGP received seven grievances filed by Plaintiff, all of which concerned Plaintiff's medical problems. *See* McMahon Decl., Ex. B. These seven grievances do not complain of the alleged assaults or of injuries that Plaintiff incurred in such assaults. *See id.* Plaintiff only appealed five of these grievances to CORC. *See* Dkt. No. 190-19, Decl. of Jeffery Hale, dated Aug. 17, 2016, Ex. B.

Normally, the absence of records of an appeal to CORC would be sufficient to establish Plaintiff's failure to exhaust his administrative remedies. However, in addition to the seven grievances received by the Clinton IGP, the record contains numerous other letters sent by Plaintiff, which require further discussion. These letters include the following:

- Two letters addressed to legal aid attorneys, dated June 3, 2010 and June 6, 2010, in which Plaintiff complains of the May 27 assault and numerous other assaults allegedly occurring in Clinton. McMahon Decl., Ex. D, at pp. DEF000491-495 & DEF000497-499.

- Three letters addressed to Superintendent LaValley and Deputy Superintendent Racette, dated July 11, 2010, July 12, 2010, and July 13, 2010, requesting protective custody on account of fear of assaults by staff. *Id.* at pp. DEF000528-529 & DEF000538-539.

- A letter addressed to the IG's office, dated June 8, 2010, complaining of the May 27 assault. *Id.* at pp. DEF000511-514.

- Grievance letters addressed to the supervisor of the IGP, dated June 4, 2010 and June 30, 2010, complaining, respectively, of the May 27 and June 13 assaults. *Id.* at pp. DEF000533-536. These letters are noted as "received" in the upper right corners, but are not stamped as received by the IGP and do not have assigned grievance numbers. *Id.*

- A letter addressed to Superintendent LaValley, dated July 6, 2010, claiming that Plaintiff's grievances were not being processed. *Id.* at p. DEF000545.

**\*7** The record also includes Grievance No. MS-20123-10, which was filed on July 28, 2010 at Mid-State. Hale Decl., Ex. C. In MS-20123-10, Plaintiff claims that he filed grievances following the May 27 and June 13 incidents that were never processed. *Id.* at p. DEF000611. MS-20123-10 was denied because there were no grievances on record at Clinton alleging staff misconduct. Hale Decl., Ex. C at p. DEF000610. Additionally, in his Amended Complaint, Plaintiff alleges, in conclusory terms, that grievances filed against corrections officers at Clinton would not be processed; Plaintiff claims that he attempted to file several grievances that were either not processed or accepted. Am. Compl. at ¶¶ 58 & 61.

Many of the letters noted above—in particular, the letters addressed to the Superintendent requesting protective custody and raising other complaints and the letter requesting investigation by the IG's office— are insufficient to satisfy the exhaustion requirement. Generally, "the law is well-settled that informal means of communicating and pursuing a grievance, even with senior prison officials, are not sufficient under the PLRA." *Timmons v. Schriro*, 2015 WL 3901627, at *3 (S.D.N.Y. June 23, 2015); *see also Muhammad v. Pico*, 2003 WL 21792158, at *8 (S.D.N.Y. Aug. 5, 2003) ("District court decisions in this circuit have repeatedly held that complaint letters to the DOCS Commissioner or the facility Superintendent do not satisfy the PLRA's exhaustion requirements."); *Grey v. Sparhawk*, 2000 WL 815916, at *2 (S.D.N.Y. June 23, 2000) ("Any complaint ... made directly to the Inspector General's office does not serve to excuse plaintiff from adhering to the available administrative procedures.").

Thus, Plaintiff's informal complaints outside of the grievance process, even if they might have had the effect of providing notice of his claims, are insufficient to exhaust his administrative remedies.

However, a different conclusion follows from the two grievances addressed to the IGP and MS-20123-10. Together, this record evidence indicates (1) that Plaintiff attempted to raise his assault complaints by filing grievances with the IGP, (2) that Clinton staff notated/ stamped the grievances as "received," and (3) that his grievances were never processed or filed with the IGP. This record evidence creates an issue of fact as to whether administrative remedies were available to Plaintiff. Specifically, although both grievances are notated as "received," it is unclear how or if they were processed. Were these grievances simply not processed? Or were they treated as harassment grievances and investigated by the Superintendent's office (the June 4 grievance is stamped as received by the Superintendent's office)? Notably, Defendants do not provide an affidavit of either the inmate grievance supervisor at Clinton or any other individual with personal knowledge of how these grievances were processed. As the Court describes below, the failure to resolve such questions creates an issue of fact as to whether administrative remedies were available to Plaintiff.

Defendants' argument as to the unfiled grievances is that even if the grievances were never processed, Plaintiff was nonetheless obligated under DOCCS regulations to appeal and complete the grievance process when he did not receive a response. *See* Defs.' Mem. of Law at p. 8 (citing *Goodson v. Silver*, 2012 WL 4449937, at *4 (N.D.N.Y. Sept. 25, 2012)). This, however, is no longer an accurate statement of the law after the Second Circuit's decision in *Williams v. Priatno*, 829 F.3d 118 (2d Cir. 2016).

*Williams* was issued following the Supreme Court's decision in *Ross v. Blake*, 136 S. Ct. 1850 (2016), in which the Supreme Court clarified the circumstances in which a failure to exhaust may be excused. As the *Ross* Court stated, "[a]n inmate ... must exhaust available remedies, but need not exhaust unavailable ones." 136 S. Ct. at 1858. The Court stated three potential circumstances where administrative remedies may be unavailable: (1) where the administrative procedure technically exists but operates as a "dead end—with officers unable or consistently

unwilling to provide any relief to aggrieved inmates"; (2) where the administrative scheme is "so opaque that it becomes, practically speaking, incapable of use"; and (3) where prison administrators "thwart inmates from taking advantage of a grievance process through machination, misrepresentation, or intimidation." *Id.* at 1859-60.

**\*8** In *Williams*, after the district court granted the defendants' motion to dismiss on non-exhaustion, the Second Circuit considered whether administrative remedies had actually been "available" to the plaintiff, applying the "unavailability" inquiry outlined in *Ross*. [7] *Williams v. Priatno*, 829 F.3d at 123. The plaintiff alleged that, while housed in the special housing unit ("SHU"), he drafted a grievance that he delivered to a correction officer to forward to the grievance office on his behalf. *Id.* at 120-121. Approximately two weeks later, the plaintiff was transferred to a different facility. *Id.* at 121. He never received a response to his grievance and he alleged that it was never filed by the correction officer to whom he had given it. *Id.* It was undisputed that he never appealed the grievance. *Id.*

[7]     The Circuit recognized that *Ross* "supplant[ed]" the inquiry which had been set forth in *Hemphill v. New York*, 380 F.3d 680 (2d Cir. 2004), excusing the failure to exhaust when: "(1) administrative remedies are not available to the prisoner; (2) defendants have either wived the defense of failure to exhaust or acted in such a way as to estop them from raising the defense; or (3) special circumstances, such as a reasonable misunderstanding of the grievance procedures, justify the prisoner's failure to comply with the exhaustion requirement." *Ruggiero v. Cty. of Orange*, 467 F.3d 170, 175 (2d Cir. 2006) (citing *Hemphill v. New York*, 380 F.3d at 686).

The defendants argued that even if the grievance was never filed, the plaintiff was required to appeal it and complete the grievance process. *Id.* at 124. The defendants relied on a DOCCS regulation that provided that "an inmate may appeal a grievance 'to the next step' if he does not receive a timely response." *Id.* (quoting N.Y. COMP. CODES R. & REGS. tit. 7, § 701.6(g)(2)). The Second Circuit rejected this argument and held that for an inmate in the plaintiff's situation, the regulatory scheme was so "opaque" and "confusing" as to be practically unavailable. *Id.* The Circuit found that DOCCS regulations "only contemplate appeals of grievances that [have been] actually filed ... [and] give no guidance whatsoever to an inmate whose

grievance was never filed." *Id.* Thus, *Williams* holds that "the process to appeal an *unfiled* and unanswered grievance is prohibitively opaque, such that no inmate could actually make use of it." *Id.* at 126 (emphasis added); *see also Juarbe v. Carnegie*, 2016 U.S. Dist. LEXIS 140241, at \*19 n.13 (N.D.N.Y. Oct. 7, 2016) (explaining that *Williams* appears to draw a distinction between an "unfiled and unanswered" grievance and a simply "unanswered" grievance, insofar as the regulations provide that an inmate may appeal an unanswered grievance), *report and recommendation adopted by*, 2016 U.S. Dist. LEXIS 162262, 2016 WL 6901277 (N.D.N.Y. Nov. 23, 2016).

Returning to the case at hand, the Court finds that the record, viewed in the light most favorable to Plaintiff, suggests that Plaintiff's grievances were unfiled and unanswered, creating an issue of fact as to the availability of administrative remedies under *Williams*. Defendants' failure to provide an affidavit explaining how Plaintiff's grievances were processed is insufficient to carry their burden of proving the affirmative defense on the present record. Accordingly, the Court recommends that Defendants' Motion for Summary Judgment on Plaintiff's claims arising from the May 27 and June 13 incidents be **denied**. If this recommendation be accepted, the Court recommends that an exhaustion hearing be scheduled prior to any trial of this case.

### D. Whether Summary Judgment is Appropriate on Plaintiff's Excessive Force Claims

Under the Eighth Amendment's prohibition on "cruel and unusual punishment," "inmates have the right to be free from the 'unnecessary and wanton infliction of pain' at the hands of prison officials." *Romano v. Howarth*, 998 F.2d 101, 104 (2d Cir. 1993) (quoting *Estelle v. Gamble*, 429 U.S. 97, 104 (1976)). In the context of an inmate's excessive force claim, the core inquiry is "whether force was applied in a good faith effort to maintain or restore discipline or maliciously and sadistically for the very purpose of causing harm." *Hudson v. McMillian*, 503 U.S. 1, 6 (1992) (quoting *Whitley v. Albers*, 475 U.S. 312, 302-21 (1986)). To assert a violation of the Eighth Amendment through the use of excessive force, an inmate must prove two components: (1) an objective component focusing "on the harm done in light of contemporary standards of decency," and (2) a subjective component showing that

2017 WL 1215814

the defendant "had the necessary level of culpability, shown by actions characterized by 'wantonness' in light of the particular circumstances surrounding the challenged conduct." *Wright v. Goord*, 554 F.3d 255, 268 (2d Cir. 2009) (citing *Hudson v. McMillian*, 503 U.S. at 8 and *Blyden v. Mancusi*, 186 F.3d 252, 262 (2d Cir. 1999)).

**\*9** With respect to the objective component, the inmate must establish that the conduct alleged is "sufficiently serious" to reach constitutional dimensions. *Farmer v. Brennan*, 511 U.S. 825, 834 (1994) (quoting *Wilson v. Seiter*, 501 U.S. 294, 298 (1991)). This inquiry is "context specific, turning upon contemporary standards of decency." *Blyden v. Mancusi*, 186 F.3d at 263. "When prison officials maliciously and sadistically use force to cause harm, contemporary standards of decency are always violated. This is true whether or not significant injury is evident." *Hudson v. McMillian*, 503 U.S. at 9 (citation omitted). Nonetheless, not "every malevolent touch by a prison guard gives rise to a federal cause of action." *Id.* (citing *Johnson v. Glick*, 481 F.2d 1028, 1033 (2d Cir. 1973)). "The Eighth Amendment's prohibition of 'cruel and unusual punishment' necessarily excludes from constitutional recognition *de minimis* uses of physical force, provided that the use of force is not of a sort 'repugnant to a conscience of mankind.' " *Id.* at 9-10 (quoting *Whitley v. Albers*, 475 U.S. at 327). In this regard, "[t]he extent of injury may ... provide some indication of the amount of force applied." *Wilkins v. Gaddy*, 559 U.S. 34, 37 (2010). "Injury and force, however, are only imperfectly correlated, and it is the latter that ultimately counts." *Id.* at 38. "The absence of serious injury is therefore relevant to the Eighth Amendment inquiry, but does not end it." *Hudson v. McMillian*, 503 U.S. at 7.

To determine whether defendants acted maliciously or wantonly at the subjective prong, a court must consider:

> the extent of the plaintiff's injuries; the need for the application of force; the correlation between that need and the amount force used; the threat reasonably perceived by the defendants; and any efforts made by the defendants to temper the severity of a forceful response.

*Romano v. Howarth*, 998 F.2d 101 at 105 (citing *Hudson v. McMillian*, 503 U.S. at 7). As stated by the Second Circuit, "*Hudson* simply makes clear that excessive force is defined

as force not applied in a 'good faith effort to maintain or restore discipline.' " *Blyden v. Mancusi*, 186 F.3d at 263 (quoting *Hudson v. McMillian*, 503 U.S. at 7).

In this case, Plaintiff asserts excessive force claims arising out of the May 27, 2010 and June 13, 2010 incidents. On both occasions, Plaintiff alleges that he was "repeatedly" punched, without provocation, in his head, back, and sides. *See* Am. Compl. at ¶¶ 21 & 30. The basis of Defendants' Motion is that (1) under *Jeffreys v. City of New York*, 426 F.3d 549 (2d Cir. 2005), no reasonable jury could credit Plaintiff's version of events and (2) Plaintiff's medical records establish that he suffered only minor injuries and therefore, Defendants, at most, applied *de minimis* force. Defs.' Mem. of Law at pp. 10-13. For the reasons stated below, the Court recommends that Defendants' Motion be **denied**.

Defendants argue that Plaintiff's allegations are not credible because: (1) he did not seek medical attention immediately following the May 27 incident; (2) he did not mention an assault when he was seen at sick call on May 28, June 1, and June 7, but instead claimed that he had fallen down stairs; (3) he did not request medical attention immediately following the June 13 incident and was not seen in sick call until June 24, and he again did not report that he had been assaulted; (4) Plaintiff testified at the Tier II Disciplinary Hearing for the May 27 misbehavior report but did not mention the assault; and (5) the IG's investigation of Plaintiff's allegations found that they could not be proven. *Id.* Defendants rely on *Jeffreys*, where the Second Circuit held that "in the rare circumstance where the plaintiff relies almost exclusively on his own testimony, much of which is contradictory and incomplete, it will be impossible for a district court to determine whether 'the jury could reasonably find for the plaintiff' ... without making some assessment of the plaintiff's account." *Jeffreys v. City of New York*, 426 F.3d at 554 (citation omitted).

The Court does not agree that the "rare circumstance" described in *Jeffreys* applies here. Although it is correct that Plaintiff's claims are almost exclusively based on his own allegations in his verified Amended Complaint, in order for *Jeffreys* to apply, Plaintiff's accounts must be "contradictory and incomplete." *Id.* at 554. In *Jeffreys*, for example, the plaintiff claimed that several police officers had beaten him and thrown from a third story window. *Id.* at 551. However, before he filed his federal

action, he had confessed on at least three occasions that he had jumped out of the window. *Id.* at 552. Furthermore, he was unable to identify or even describe any of the officers who allegedly participated in the attack. *Id.* Here, by contrast, Plaintiff's account of the events has been entirely consistent; there are no significant discrepancies between the allegations in the verified Amended Complaint and Plaintiff's claims in his grievances and other complaint letters. *Compare* Am. Compl. at ¶¶ 15-35 *with* McMahon Decl., Ex. D, at pp. DEF000492-493, DEF000498, DEF000511-512, & DEF000533-536. Defendants do not identify any contradictory account or explain how Plaintiff's account is incomplete.

**\*10** Instead of pointing to any inconsistencies in Plaintiff's account, Defendants focus on evidence in the record that undermines Plaintiff's account—namely, the minimal medical evidence. However, the "narrow exception" in *Jeffreys* applies where the plaintiff's account is "so lacking in credibility that no reasonable juror could find for the plaintiff." *Blake v. Race*, 487 F. Supp. 2d 187, 202 (E.D.N.Y. 2007). Although the minimal medical evidence may tend to undercut Plaintiff's credibility, it does not render it so thoroughly unbelievable that the Court should reject it as a matter of law. Defendants ignore certain allegations and record evidence that the Court must consider in viewing the evidence in the light most favorable to Plaintiff. First, Plaintiff claims that he was threatened not to report the assaults and was accompanied by a corrections officer to sick call. Am. Compl. at ¶¶ 24-26 & 35. He alleges that he reported that he injured himself falling down the stairs in order to avoid retaliation. *Id.* at ¶ 26. Second, Plaintiff's medical records show that he reported pain in his ribs, consistent with his allegations of the assaults, for several weeks. *See* Hale Decl., Ex. C at pp. DEF000627-628 & DEF000633. Plaintiff also received x-rays of his ribs on May 28, 2010, *id.* at p. DEF000624, although he claims that the x-rays were of the wrong area, *id.* at p. DEF000611. Thus, the medical records provide some corroboration for Plaintiff's version of the events. Furthermore, even in the absence of medical evidence, "[c]ourts in this district have not required that injuries caused by the alleged use of excessive force be corroborated by medical records." *Ninortey v. Shova*, 2008 WL 4067107, at \*12 (S.D.N.Y. Sept. 2, 2008).

Considering all of the evidence, [8] the Court finds that Plaintiff's account of the events is not so implausible

that it may be rejected as a matter of law. The evidence pointed to by Defendants essentially goes to Plaintiff's credibility, and "[a]ssessments of credibility and choices between conflicting versions of the events are matters for the jury, not for the court on summary judgment." *Rule v. Brine, Inc.*, 85 F.3d 1002, 1011 (2d Cir. 1996).

[8]    The Court again notes that Defendants have not offered affidavits from any of the officers accused of using excessive force contradicting Plaintiff's version of events. The only evidence offered by Defendants are unsworn statements. McMahon Decl., Ex. D at pp. DEF000473-486. Under *Jeffreys*, the defendant "still must meet the difficult burden of demonstrating that there is no evidence in the record upon which a reasonable factfinder could base a verdict in the plaintiff's favor." *Jeffreys v. City of New York*, 426 F.3d at 554.

Defendants next argue that even if the Court accepts Plaintiff's allegations at true, his medical records establish that he suffered, at most, minor and temporary injuries and therefore any forced applied was necessarily *de minimis.* Defs.' Mem. of Law at pp. 13-14. Defendants' contention fails because while "[t]he extent of injury may ... provide some indication of the amount of force applied ... it is the latter that ultimately counts." *Wilkins v. Gaddy*, 559 U.S. at 37-38. "The absence of serious injury is therefore relevant to the Eighth Amendment inquiry, but does not end it." *Hudson v. McMillian*, 503 U.S. at 7. Here, Plaintiff's alleges more than a *de minimis* application of force: namely, that Defendants "repeatedly" punched him in his head, ribs, and back in order to cause him harm on two occasions. Am. Compl. at ¶¶ 22 & 30-31. Plaintiff's medical records document that he complained of pain in his ribs consistent with his excessive force allegations for several weeks following the assaults. The medical records do not disclose injuries that are so minor that the Court can conclude that Defendants applied *de minimis* force.

Accordingly, for the foregoing reasons, the Court recommends that Defendants' Motion for Summary Judgment on Plaintiff's excessive force claims be **denied**.

### E. Whether Summary Judgment is Appropriate on Plaintiff's Retaliation Claim

Defendants also move for summary judgment on Plaintiff's retaliation claim against Defendants Sgt.

Durkin and C.O. Mitchell. To state a First Amendment claim for retaliation, an inmate must demonstrate (1) he or she was engaged in constitutionally protected speech or conduct, (2) the defendant took adverse action against the plaintiff, and (3) there was a causal connection between the protected activity and the adverse action in that the alleged conduct was substantially motivated by the protected activity. *Gill v. Pidlypchak*, 389 F.3d 379, 380 (2d Cir. 2004) (citing *Dawes v. Walker*, 239 F.3d 489, 492 (2d Cir. 2001), *overruled on other grounds*, *Swierkewicz v. Sorema N.A.*, 534 U.S. 506 (2002)). Briefly stated, Plaintiff's retaliation claim is that (1) he engaged in a protected conduct by sending a complaint letter to the IG's office and (2) after Sgt. Durkin obtained a copy of the letter, he and C.O. Mitchell assaulted Plaintiff. *See* Am. Compl. at ¶¶ 29-35. Defendants argue that summary judgment is appropriate on Plaintiff's retaliation claim on the same ground that they argued for summary judgment on his excessive force claim: that is, "no reasonable jury could conclude that Plaintiff was subjected to the adverse action." Defs.' Mem. of Law at p. 15. Since the Court has found a disputed issue of fact on whether Plaintiff was subjected to excessive force, the Court therefore recommends that Defendants' Motion also be **denied** as to Plaintiff's retaliation claim.

## III. PLAINTIFF'S MEDICAL INDIFFERENCE CLAIMS

### A. Legal Standard

**\*11** To state an Eighth Amendment claim for denial of adequate medical care, a prisoner must demonstrate that prison officials acted with "deliberate indifference to serious medical needs." *Estelle v. Gamble*, 429 U.S. 97, 104 (1976). "[T]he plaintiff must allege conduct that is 'repugnant to the conscience of mankind' or 'incompatible with the evolving standards of decency that mark the progress of a maturing society.' " *Ross v. Kelly*, 784 F. Supp. 35, 44 (W.D.N.Y.), *aff'd*, 970 F.2d 896 (2d Cir. 1992) (quoting *Estelle v. Gamble*, 429 U.S. at 102, 105-06). To state a claim for denial of medical care, a prisoner must demonstrate (1) a serious medical condition and (2) deliberate indifference. *Farmer v. Brennan*, 511 U.S. 825, 834-35 (1994); *Hathaway v. Coughlin ("Hathaway I")*, 37 F.3d 63, 66 (2d Cir. 1994).

The first prong is an objective standard and considers whether the medical condition is "sufficiently serious." *Farmer v. Brennan*, 511 U.S. at 834 (quoting *Wilson v. Seiter*, 501 U.S. 294, 297 (1991)). A court must consider two inquiries in determining whether a deprivation of care is sufficiently serious. *Salahuddin v. Goord*, 467 F.3d 263, 279 (2d Cir. 2006). First, the court must determine "whether the prisoner was actually deprived of adequate medical care." *Id.* Medical care is adequate where the care provided is a "reasonable" response to the inmate's medical condition. *Id.* The second inquiry is "whether the inadequacy in medical care is sufficiently serious." *Id.* at 280. In cases where there is a failure to provide any treatment, the court examines whether the inmate's medical condition is sufficiently serious. *Smith v. Carpenter*, 316 F.3d 178, 185-86 (2d Cir. 2003). The Second Circuit has stated that a medical need is serious if it presents "a condition of urgency that may result in degeneration or extreme pain." *Chance v. Armstrong*, 143 F.3d 698, 702 (2d Cir. 1998) (internal quotation marks and citation omitted). Among the relevant factors to consider are "[t]he existence of an injury that a reasonable doctor or patient would find important and worthy of comment or treatment; the presence of a medical condition that significantly affects an individual's daily activities; or the existence of chronic and substantial pain." *Id.* (quoting *McGuckin v. Smith*, 974 F.2d 1050, 1059-60 (9th Cir. 1992)). In cases where medical treatment is given, but is inadequate, "the seriousness inquiry is narrower." *Salahuddin v. Goord*, 467 F.3d at 280. "For example, if the prisoner is receiving on-going treatment and the offending conduct is an unreasonable delay or interruption in that treatment, the seriousness inquiry 'focus[es] on the challenged delay or interruption in treatment rather than the prisoner's underlying medical condition alone.' " *Id.* (quoting *Smith v. Carpenter*, 316 F.3d at 185).

The second prong is a subjective standard requiring a plaintiff to demonstrate that the defendant acted with the requisite culpable mental state similar to that of criminal recklessness. *Wilson v. Seiter*, 501 U.S. at 301-03; *Hathaway I*, 37 F.3d at 66. A plaintiff must demonstrate that the defendant acted with reckless disregard to a known substantial risk of harm. *Farmer v. Brennan*, 511 U.S. at 836. This requires "something more than mere negligence ... [but] something less than acts or omissions for the very purpose of causing harm or with knowledge that harm will result." *Id.* at 835; *see also Weyant v. Okst*, 101 F.3d 845, 856 (2d Cir. 1996)

(citing *Farmer v. Brennan*, 511 U.S. at 835). Further, a showing of medical malpractice is insufficient to support an Eighth Amendment claim unless "the malpractice involves culpable recklessness, i.e., an act or a failure to act by the prison doctor that evinces 'a conscious disregard of a substantial risk of serious harm.' " *Chance v. Armstrong*, 143 F.3d at 702 (quoting *Hathaway v. Coughlin ("Hathaway II")*, 99 F.3d 550, 553 (2d Cir. 1996)); *see also Hernandez v. Keane*, 341 F.3d 137, 144 (2d Cir. 2003) (citations omitted).

### B. Analysis

**\*12** The basis of Plaintiff's Eighth Amendment claims against Defendants Dr. Ramineni and Dr. Mannava is that he was denied adequate medical treatment for his complaints of headaches, fungus on his hands and feet, sinus problems, abdominal pain, back pain, left shoulder pain, right elbow pain, high cholesterol, and a wart on his right finger. Am. Compl. at ¶¶ 96 & 111-17. The record, however, documents that Plaintiff received extensive treatment for his medical conditions. Between July 16, 2010 and June 14, 2013, Plaintiff was seen by medical personnel at Mid-State approximately 250 times. Defs.' SMF at ¶ 55. Based on the voluminous medical records provided by Defendants, and for the reasons set forth below, the Court recommends that summary judgment be **granted** on Plaintiff's deliberate medical indifference claims.

### 1. Shoulder Pain

Plaintiff repeatedly complained of left shoulder pain, which was incident to acromioplasty surgery that he had five years earlier. *See* Ramineni Decl. at ¶ 22 (citing dates on which Plaintiff complained of shoulder pain at pp. DEF000362, DEF000365, DEF000366, DEF000390, DEF000391, DEF000392, DEF000393, DEF000394, DEF000396, DEF000397, DEF000434, DEF000436, and DEF000438). "[C]hronic pain can be a serious medical condition." *Price v. Reilly*, 697 F. Supp. 2d 344, 363 (E.D.N.Y. 2010) (citing *Brock v. Wright*, 315 F.3d 158, 163 (2d Cir. 2003)). Furthermore, courts have found allegations of "severe pain" and "reduced mobility" in the shoulder sufficient to raise issues of fact as to whether a "shoulder injury constitutes a sufficiently serious medical condition to satisfy the objective prong of the deliberate

indifference standard." *Sereika v. Patel*, 411 F. Supp. 2d 397, 406 (S.D.N.Y. 2006). However, based on its review of the record, the Court finds that there is nothing that suggests that Plaintiff's shoulder injury was a sufficiently serious condition to satisfy the objective prong of the Eighth Amendment analysis. Even if Plaintiff was able to show that his shoulder injury was sufficiently serious, he is also unable to show that Defendants deprived him of adequate care in response to his complaints of shoulder pain.

Despite Plaintiff's complaints of pain, on examination Plaintiff did not have an "obvious deformity" or "muscle wasting", *id.* at p. DEF000394 and was noted to have a good range of motion in his shoulder, *id.* at p. DEF000378. For treatment, Dr. Ramineni prescribed Motrin 600mg three times daily and referred Plaintiff to physical therapy. Pl.'s AHR at p. DEF000397. In his evaluation for physical therapy, Plaintiff's physical therapist assessed him with "residual [rotator cuff] weakness from old injury" and "possible AC [joint] separation." Pl.'s AHR at p. DEF000438. The physical therapist opined that Plaintiff did not have "much potential for significant improvement" due to "heavy muscle build and workout lifestyle." *Id.* at p. DEF000438. Plaintiff attended two sessions of physical therapy, but did not tolerate the exercises and reported increasing pain. *Id.* at pp. DEF000433-434. Although he did not the tolerate physical therapy, *id.* at p. DEF000433, Plaintiff continued to lift weights throughout the relevant time period on a daily basis, *see id.* at pp. DEF000378, DEF000392, & DEF000438. Dr. Ramineni determined that there was no indication to refer Plaintiff to an orthopedic specialist. *See id.* at pp. DEF000390 & DEF000394. Throughout Plaintiff's complaints, Dr. Ramineni "found nothing other than discomfort arising from earlier surgery or resulting from his continued weight lifting." Ramineni Decl. at ¶ 31. Dr. Ramineni attests that shoulder pain is common following acromioplasty surgery. *Id.* at ¶ 23.

Here, even viewed in the light most favorable to Plaintiff, the record does not suggest that Plaintiff's shoulder injury was "a condition of urgency that [could] result in degeneration or extreme pain." *Chance v. Armstrong*, 143 F.3d at 702. The record documents that Plaintiff retained a normal range of motion in his shoulder and was able to lift weights on a daily basis. There is no evidence that Plaintiff suffered "severe pain." Dr. Ramineni determined that Plaintiff was experiencing normal discomfort incident

to acromioplasty surgery. Under the objective prong, "an assertion of pain sensation alone, unaccompanied by any large medical complications, does not amount to a serious medical need." *Evan v. Manos*, 336 F. Supp. 2d 255, 260 (W.D.N.Y. 2004) (citation omitted). Furthermore, even if Plaintiff's shoulder pain was a serious medical need, the record establishes that the treatment Defendants provided him—over-the-counter pain medication and a referral to physical therapy—was adequate. Plaintiff's claim that he should have been referred to an orthopedic specialist, *see* Am. Compl. at ¶ 112, is insufficient to establish that Defendants acted with deliberate indifference. "It is well-established that mere disagreement over the proper treatment does not create a constitutional claim. So long as the treatment given is adequate, the fact that a prisoner might prefer a different treatment does not give rise to an Eighth Amendment violation." *See Chance v. Armstrong*, 143 F.3d at 703; *see also Sonds v. St. Barnabas Hosp. Correctional Health Servs.*, 151 F. Supp. 2d 303, 312 (S.D.N.Y. 2001) ("Thus, disagreements over medications, diagnostic techniques (e.g., the need for X-rays), forms of treatment, or the need for specialists or the timing of their intervention, are not adequate grounds for a Section 1983 claim. These issues implicate medical judgments and, at worst, negligence amounting to medical malpractice, but not the Eighth Amendment.").

**\*13** The record also contains complaints of an injury Plaintiff sustained to his right shoulder lifting weights. Pl.'s AHR at p. DEF000366. Dr. Ramineni determined that it was a muscle strain and x-rays were taken that showed minor degenerative changes in Plaintiff's acromioclavicular joint. *Id.* at pp. DEF000317 & DEF000365. A month after the injury, Plaintiff was noted to be in no significant discomfort. *Id.* at p. DEF000362. Based on this record, there is nothing that suggests that Plaintiff's injury to his right shoulder was a sufficiently serious injury.

## 2. *Sinusitis*

Plaintiff repeatedly complained of nasal and sinus congestion, which caused difficulty breathing, pain, and bleeding. *See* Ramineni Decl. at ¶ 45 (citing dates on which Plaintiff complained of sinus problems at Pl.'s AHR at pp. DEF000292, DEF000370, DEF000371, DEF000380, DEF000385, & DEF000394); Mannava Decl. at ¶¶ 16, 22, & 28. Plaintiff had sinus surgery in the past and Dr.

Ramineni observed that Plaintiff had thickening of the sinus lining on a past x-ray. Pl.'s AHR at p. DEF000394.

Plaintiff's medical records establish that he cannot show that his sinus problems were a serious medical need or that he was deprived of adequate care. Throughout his incarceration at Mid-State, Plaintiff was provided with over-the-counter NACL nasal spray and prescriptions for Nasacort AQ and Claritin for sinus irritation and allergies. Ramineni Decl. at ¶¶ 13 & 43; Mannava Decl. at ¶ 16. On occasions when he complained of sinus infections, Plaintiff was prescribed Augmentin 875mg twice daily. Pl.'s AHR at pp. DEF000292 and DEF000394. Plaintiff was examined for complaints of difficulty breathing, but his nasal passages were found to be normal and without inflammation. *Id.* at pp. DEF000380 & DEF000385. Plaintiff also once claimed that he was bleeding from his nose, but Dr. Ramineni did not observe any blood or yellow discharge. *Id.* at p. DEF000380. On August 9, 2011, x-rays were taken that showed no evidence of sinusitis; Plaintiff had some post-surgical changes in the mandible, some soft tissue swelling over the nasal region, but no convincing air fluid level indicative of sinusitis. *Id.* at p. DEF000319.

Even viewed in the light most favorable to Plaintiff, Plaintiff's nasal congestion does not amount to a condition that could "result in degeneration or extreme pain." *Chance v. Armstrong*, 143 F.3d at 702. Furthermore, the record demonstrates that Defendants appropriately responded to Plaintiff's complaints of sinus problems, providing over-the-counter nasal sprays, prescription allergy medication, antibiotics for sinus infections, and referring him for x-rays. Plaintiff's claim that Defendants should have referred him to an Ear, Nose, and Throat specialist, *see* Am. Compl. at ¶ 113, amounts to a mere dispute over the proper course of treatment and is insufficient to establish that Defendants acted with deliberate indifference. *Chance v. Armstrong*, 143 F.3d at 703.

## 3. *Headaches*

In late 2012, Plaintiff began complaining of headaches and other symptoms that he believed were indicative of a stroke, including numbness, the feeling of "pins and needles" in his left arm, pain in his left biceps extending to his armpit and chest, and slowness of gait

and confusion. *See* Pl.'s AHR at p. DEF000282. In his Amended Complaint, Plaintiff alleges that his headaches were "severe," occurred "almost daily," and interfered with his daily activities. Am. Compl. at ¶¶ 77, 90, & 100.

Contrary to Plaintiff's claims that Defendants ignored a possible stroke, the record shows that Defendants evaluated Plaintiff's symptoms and found no symptoms indicative of a stroke. Plaintiff first expressed that he thought he suffered a stroke on September 12, 2012. Pl.'s AHR at p. DEF000285. He stated that he had a headache for four days and his arm felt "weird and trembly" *Id.* The nurse noted that Plaintiff did not appear to be in acute distress, had a normal gait, spoke clearly, and had actively been going to the law library and gym. *Id.* Plaintiff saw Dr. Ramineni two days later, who noted that Plaintiff had a normal gait and was fully oriented. *Id.* Dr. Ramineni found no evidence that Plaintiff had suffered a stroke or that he was at an elevated risk of suffering one. Ramineni Decl. at ¶ 73. Plaintiff raised similar complaints to Dr. Mannava three months later, who similarly found no symptoms indicative of a stroke. Mannava Decl. at ¶¶ 21 & 24. Specifically, Plaintiff denied nausea, vomiting, burning, tingling, and weakness in his extremities; was alert and fully oriented; had no tenderness or masses on his head; his pupils equally reacted to light; he could move his extremities well with good strength; and had no sensory or motor deficits. *Id.* at ¶ 21. Dr. Mannava ordered blood tests, which came back normal. *Id.* at ¶¶ 21-22. With respect to his numbness in his left arm, an electromyogram was completed on November 28, 2012, which showed mild C7 radiculopathy, chronic C5 radiculopathy, and early, mild neuropathy of the median nerve. *Id.* at ¶ 20. Thus, Plaintiff's concern that he had suffered a stroke was unfounded and provides no basis for an Eighth Amendment claim.

**\*14** As to Plaintiff's headaches, the record contains numerous complaints of chronic and severe headaches beginning in September 2012. *See generally* Pl.'s AHR at pp. DEF000252-285. Painful and debilitating headaches may constitute an objectively serious medical need. *See Peterson v. Miller*, 2007 WL 2071743, at *7 (N.D.N.Y. July 13, 2007). However, even assuming for the purposes of this Motion that Plaintiff's headaches were a sufficiently serious condition, Plaintiff is unable to show that Defendants denied him adequate treatment. Based on his assessment that Plaintiff's headaches were either tension headaches or psychogenic, Dr. Mannava

directed Plaintiff to take ibuprofen for his headaches. Mannava Decl. at ¶¶ 14, 21-22, 25, & 29. Dr. Mannava also referred Plaintiff for an eye exam as a result of which new glasses were ordered. Pl.'s AHR at pp. DEF000257 & DEF000265. The record therefore demonstrates that Defendants reasonably responded to Plaintiff's complaints of headaches. *See Peterson v. Miller*, 2007 WL 2071743, at *10 (finding that migraine headaches were appropriately treated with pain relief medication). To the extent that Plaintiff claims that Defendants should have prescribed a stronger pain medication or ordered a CT scan, "disagreements over medications, diagnostic techniques, forms of treatment, the need for specialists, and the timing of their intervention implicate medical judgments and not the Eighth Amendment." *Wright v. Genovese*, 694 F. Supp. 2d 137, 155 (N.D.N.Y. Mar. 9, 2010).

### 4. Fungus

Plaintiff complains of a fungal infection that spread along his right hand and on his toe nails. Am. Compl. at ¶¶ 94 & 106. Plaintiff claims that the infection "consumed" a fingernail and caused his fingers to bleed. *Id.* Plaintiff claims the fungus caused him severe pain and exposed him to the risk of other infections. *Id.* at ¶ 111. The medical records contradict Plaintiff's claims that his fungal infection was a serious medical condition, and further demonstrate that Defendants provided adequate treatment and were not deliberately indifferent towards the condition.

Plaintiff complained twice to Dr. Ramineni of a fungal infection on his toenail, but on examination, Dr. Ramineni determined that it was a dystrophic nail, and no intervention was necessary. Pl.'s AHR at pp. DEF000306 & DEF000400. Plaintiff also complained of fungus on his fingernails and was given an over-the-counter fungal cream. *Id.* at p. DEF000305. Plaintiff complained to Dr. Mannava of "scaling and pimply" skin on his feet and right hand and deformed toenails and a right finger nail. *Id.* at p. DEF000279. Dr. Mannava assessed Plaintiff with onychomycosis and athlete's foot, but referred him for a dermatology consult before determining a treatment plan. *Id.* The dermatology consult confirmed the diagnoses of dystrophic finger and toenails and onychomycosis. *Id.* at p. DEF000271. Dr. Mannava put in a request for a prescription for Lamisil 250mg daily, but the request was

denied because the treatment was considered "cosmetic." *Id.* at pp. DEF000268 & DEF000271. Plaintiff continued to complain that the fungus on his hands was spreading, but no changes were observed. *Id.* at pp. DEF000254 & DEF000264. A nurse noted that Plaintiff was complaining about the "same small areas" that he had previously complained of, and that the condition was neither "acute" or "consuming." *Id.* at p. DEF000264. Later, a nurse noted peeling skin on Plaintiff's palm, but no fungus. *Id.* at p. DEF000254.

Based on these records, there is nothing that suggests that Plaintiff's fungal infections were an objectively serious medical need. *See Thompson v. Carlsen*, 2010 WL 3584409, at *6 (N.D.N.Y. Aug. 16, 2010) (finding that "dry, cracked, and itchy skin" did not amount to an objectively serious medical condition); *Scott v. Laux*, 2008 WL 4371778, at *5 (N.D.N.Y. Sept. 18, 2008) ("Fungal infections of the feet have not been found to constitute serious medical needs in federal court."). Furthermore, the records evidence that Defendants provided appropriate treatment and were not deliberately indifferent towards Plaintiff's fungal infections.

### 5. Abdominal Pain

Plaintiff made repeated complaints of right abdominal pain. Pl.'s AHR at pp. DEF000380, DEF000389, DEF000390, DEF000395, DEF000400, & DEF000402. On different occasions, Plaintiff expressed concern that the pain indicated problems with his liver, pancreas, and gall bladder. *Id.*

**\*15** However, the record shows that Plaintiff's concern about his abdominal pain was unfounded. On repeated examinations, Plaintiff's abdomen was soft, non-tender, and without any masses. *Id.* at pp. DEF000380, DEF000390, DEF000400, & DEF000402. Plaintiff had multiple negative liver function tests and a negative Hepatitis C test. *Id.* at pp. DEF000390 & DEF000389. Thus, there was no objective evidence to support Plaintiff's complaints of abdominal pain. *See* Ramineni Decl. at ¶ 42. In January 2011, after Plaintiff made undocumented complaints of vomiting and doubling over in pain, Pl.'s AHR at p. DEF000389, he was admitted to the infirmary for observation for one week, during which time he was not observed to have any episodes of abdominal pain, vomiting, or nausea, *id.* at p. DEF000346. On this record,

there is nothing indicating that Plaintiff's abdominal pain was an objectively serious medical condition. *See Thomas v. Nassau Cty. Correctional Ctr.*, 288 F. Supp. 2d 333, 338 (E.D.N.Y. 2003) ("[S]ubjective complaints of pain are not sufficient to satisfy [the objective prong]."). Furthermore, Plaintiff cannot show that Defendants failed to adequately respond to his complaints, as they conducted physical examinations and ordered Hepatitis C and liver function tests.

### 6. Right Elbow Pain

Throughout the Summer of 2012, Plaintiff complained of pain in his right elbow, which he believed to be bursitis. Pl.'s AHR at pp. DEF000288, DEF000290, DEF000293, DEF000297, DEF000298, & DEF000299. Plaintiff repeatedly requested that his elbow be drained or that he receive a cortisone shot, and, on August 17, 2012, requested surgery. *Id.* at pp. DEF000288 & DEF000297.

The record again does not evidence that Plaintiff's elbow pain was an objectively serious medical condition, or that Defendants failed to adequately respond to his complaints. During his examinations, Dr. Ramineni observed that Plaintiff's elbow moved normally and without discomfort and that there was no bursal swelling. Ramineni Decl. at ¶ 56. His assessment was that Plaintiff had mild musculoskeletal pain. Pl.'s AHR at p. DEF000298. He found no indication for intervention since there was no evidence of bursitis. *Id.* at p. DEF000297. He did, however, note a small bony projection on Plaintiff's elbow and ordered x-rays. *Id.* at pp. DEF000290 & DEF000297. The x-rays showed a small spur on the olecranon that Dr. Ramineni determined was clinically insignificant. *Id.* at p. DEF000298. Dr. Ramineni recommended that Plaintiff use an elbow brace if he continued to experience pain. *Id.* Thus, there is nothing in the record that demonstrates that Plaintiff's elbow pain was a condition that could result in "degeneration or extreme pain." Nor does the record suggest that Defendants failed to appropriately respond to Plaintiff's complaints.

### 7. Plaintiff's Remaining Medical Conditions

In his Amended Complaint, Plaintiff also complains of back pain, a wart on his finger, and high cholesterol.

However, a review of the record shows that none of these conditions amounted to an objectively serious medical condition.

Plaintiff complained to Dr. Ramineni of his back pain on a single occasion; Dr. Ramineni noted that x-rays of Plaintiff's spine showed minimal changes, that Plaintiff's gait was normal, and that there was no tingling in Plaintiff's legs. Pl.'s AHR at p. DEF000402. Dr. Ramineni recommended that Plaintiff take NSAIDs as needed and complete back exercises to strengthen the area. *Id.* While severe back pain can amount to a serious medical need, nothing in the record suggests that Plaintiff's back caused him extreme pain. *See Nelson v. Rodas*, 2002 WL 31075804, at *14 (S.D.N.Y. Sept. 17, 2002).

Plaintiff's complaints of a wart on his finger are similarly insufficient. Plaintiff complained of a wart on his right index finger on several occasions. Pl.'s AHR at pp. DEF000293, DEF000300, DEF000301, DEF000310, DEF000357, & DEF000359. Dr. Ramineni observed a pinhead sized wart, which did not have the characteristics of a true wart. *Id.* at pp. DEF000357 & DEF000359. He prescribed Plaintiff Condylox gel for treatment. *Id.* at pp. DEF000301 & DEF000357. The record does not suggest that Plaintiff's wart was a serious medical condition. *See Whitfeld v. O'Connell*, 2010 WL 1010060, at *8 (S.D.N.Y. Mar. 18, 2010) ("Warts do not constitute a serious medical need under the Eighth Amendment.").

**\*16** Finally, as to Plaintiff's high cholesterol, it is undisputed that Plaintiff's prescriptions for Lipitor 60mg and Lopid 600mg twice daily were continued when he arrived at Mid-State. Ramineni Decl. at ¶ 13. Lab work was ordered on July 28, 2010, in order that Plaintiff's medications could be adjusted if he was not within the target cholesterol range. Pl.'s AHR at p. DEF000403. On July 14, 2011, Dr. Ramineni noted that results of Plaintiff's cholesterol lab work and ordered that Plaintiff's Lipitor be increased and that Plaintiff be placed on a low cholesterol diet. *See id.* at pp. DEF000365, DEF000370,

& DEF000374. Thus, Plaintiff's high cholesterol is insufficient to give rise to an Eighth Amendment claim.

## IV. CONCLUSION

For the reasons stated herein, it is hereby

**RECOMMENDED**, that Defendants' Motion for Summary Judgment (Dkt. No. 190) be **GRANTED** as to Plaintiff's Eighth Amendment deliberate indifference claims against Defendants Dr. Ramineni and Dr. Mannava who should be dismissed as Defendants to this action; and **GRANTED** as to the Doe Defendants who should also be dismissed as Defendants to this action; and **DENIED** in all other respects; and it is further

**RECOMMENDED**, that if the Court's recommendations are accepted, that this matter be deemed trial ready and an exhaustion hearing should be scheduled prior to such trial; and it is further

**ORDERED**, that the Clerk of the Court serve a copy of this Report-Recommendation and Order upon the parties to this action.

Pursuant to 28 U.S.C. § 636(b)(1), the parties have fourteen (14) days within which to file written objections to the foregoing report. Such objections shall be filed with the Clerk of the Court. **FAILURE TO OBJECT TO THIS REPORT WITHIN FOURTEEN (14) DAYS WILL PRECLUDE APPELLATE REVIEW.** *Roldan v. Racette*, 984 F.2d 85, 89 (2d Cir. 1993) (citing *Small v. Sec'y of Health and Human Servs.*, 892 F.2d 15 (2d Cir. 1989)); *see also* 28 U.S.C. § 636(b)(1); FED. R. CIV. P. 72 & 6(a).

**All Citations**

Slip Copy, 2017 WL 1215814

---

**End of Document**                    © 2018 Thomson Reuters. No claim to original U.S. Government Works.

2017 WL 1207834
Only the Westlaw citation is currently available.
United States District Court,
N.D. New York.

Barry BERMAN, Plaintiff,

v.

Charles DURKIN, et al., Defendants.

9:13-CV-0136 (LEK/DJS)
|
Signed 03/31/2017

**Attorneys and Law Firms**

Barry Berman, Rochester, NY, pro se.

Joshua E. McMahon, Maria E. Lisi-Murray, New York State Attorney General, Albany, NY, for Defendants.

**ORDER**

Lawrence E. Kahn, U.S. District Judge

**\*1** This matter comes before the Court following a Report-Recommendation filed on March 10, 2017, by the Honorable Daniel J. Stewart, U.S. Magistrate Judge, pursuant to 28 U.S.C. § 636(b) and Local Rule 72.3. Dkt. No. 200 ("Report-Recommendation").

Within fourteen days after a party has been served with a copy of a magistrate judge's report-recommendation, the party "may serve and file specific, written objections to the proposed findings and recommendations." Fed. R. Civ. P. 72(b); L.R. 72.1(c). If no objections are made, or if an objection is general, conclusory, perfunctory, or a mere reiteration of an argument made to the magistrate judge, a district court need review that aspect of a report-recommendation only for clear error. Barnes v. Prack, No. 11-CV-857, 2013 WL 1121353, at \*1 (N.D.N.Y. Mar. 18, 2013); Farid v. Bouey, 554 F. Supp. 2d 301, 306–07, 306 n.2 (N.D.N.Y. 2008); see also Machicote v. Ercole, No. 06-CV-13320, 2011 WL 3809920, at \*2 (S.D.N.Y. Aug. 25,

2011) ("[E]ven a pro se party's objections to a Report and Recommendation must be specific and clearly aimed at particular findings in the magistrate's proposal, such that no party be allowed a second bite at the apple by simply relitigating a prior argument."). "A [district] judge ... may accept, reject, or modify, in whole or in part, the findings or recommendations made by the magistrate judge." 28 U.S.C. § 636(b).

No objections were filed in the allotted time period. Docket. Thus, the Court has reviewed the Report-Recommendation for clear error and has found none.

Accordingly, it is hereby:

**ORDERED**, that the Report-Recommendation (Dkt. No. 200) is **APPROVED and ADOPTED in its entirety**; and it is further

**ORDERED**, that Defendants' Motion for Summary Judgment (Dkt. No. 190) is **GRANTED** as to Plaintiff's Eighth Amendment deliberate indifference claims against defendants Dr. Ramineni and Dr. Mannava and as to the claims against the Doe Defendants, and **DENIED** in all other respects; and it is further

**ORDERED**, that the Clerk of the Court terminate Dr. Ramineni, Dr. Mannava, and the Doe Defendants from this action; and it is further

**ORDERED**, that this matter is trial ready and an exhaustion hearing conducted by the magistrate judge shall be held before trial; and it is further

**ORDERED**, that the Clerk of the Court serve a copy of this Order on all parties in accordance with the Local Rules.

**IT IS SO ORDERED.**

**All Citations**

Slip Copy, 2017 WL 1207834

---

    © 2018 Thomson Reuters. No claim to original U.S. Government Works.

WESTLAW    © 2018 Thomson Reuters. No claim to original U.S. Government Works.    1

2016 WL 6901277
Only the Westlaw citation is currently available.
United States District Court,
N.D. New York.

Jose Juarbe, Plaintiff,

v.

John Carnegie, Correctional Officer, Mid-State Correctional Facility; Robert Hart, Correctional Officer, Mid-State Correctional Facility; Mark Tolman, Correctional Officer, Mid-State Correctional Facility, Defendants.

9:15-CV-01485 (MAD/DEP)
|
Signed 11/23/2016

**Attorneys and Law Firms**

JOSE JUARBE, 14-A-5209, Southport Correctional Facility, P.O. Box 2000, Pine City, New York 14871, Plaintiff Pro Se.

OFFICE OF THE NEW YORK STATE ATTORNEY GENERAL, The Capitol, OF COUNSEL: HELENA LYNCH, AAG, Albany, New York 12224, Attorneys for Defendants.

**ORDER**

Mae A. D'Agostino, U.S. District Judge:

**\*1** *Pro se* Plaintiff, Jose Juarbe ("Plaintiff"), currently incarcerated at Southport Correctional Facility, brings this civil rights action pursuant to 42 U.S.C. § 1983 ("Section 1983"). *See* Dkt. No. 1. On March 7, 2016, Correction Officers John Carnegie, Robert Hart, and Mark Tolman (collectively, "Defendants") moved for summary judgment in lieu of an answer, *see* Dkt. No. 20, and Plaintiff opposed that motion, *see* Dkt. Nos. 26, 30, 33. On April 8, 2016, Plaintiff cross-moved for summary judgment on the issue of liability, *see* Dkt. No. 28, and Defendants opposed that motion, *see* Dkt. No. 36. On October 7, 2016, Magistrate Judge David E. Peebles issued a Report and Recommendation, recommending that both motions for summary judgment be denied. *See* Dkt. No. 44. The parties have not filed any objections to the Report and Recommendation.

Plaintiff alleges that, on June 24, 2015, while he was incarcerated at Mid-State Correctional Facility ("Mid-State"), Defendant Tolman removed Plaintiff from his cube and took him to a dayroom, where Defendant Tolman threw Plaintiff against a wall. *See* Dkt. No. 1 at 2-3. Plaintiff claims that Defendants Hart, Carnegie, and an unknown corrections officer then took Plaintiff into the hallway and assaulted him. *See id.* at 3. Plaintiff was examined at the Mid-State infirmary after the incident and complained of various injuries to his face, shoulders, and leg. *See* Dkt. No. 28-1 at 2-3. Plaintiff claims that he was transferred to the Auburn Correctional Facility ("Auburn") the morning after the alleged assault and placed into a special housing unit ("SHU") cell, where he filed two grievances regarding the assault at Mid-State. *See* Dkt. No. 26-2 at 2-3. However, Plaintiff never received a response or decision regarding the grievances, and a sergeant at Auburn told Plaintiff that nothing could be done at Auburn concerning the assault that allegedly occurred at Mid-State. *See id.*

In their motion for summary judgment, Defendants argue that Plaintiff failed to exhaust his administrative remedies that were available to him prior to commencing this Section 1983 action, which is in violation of the Prison Litigation Reform Act of 1996 ("PLRA"), 42 U.S.C. § 1997e(a). *See* Dkt. No. 20-1 at 7. Specifically, Defendants argue that Plaintiff was required to file a grievance at Mid-State instead of Auburn because the alleged conduct occurred at Mid-State. *See id.* In Plaintiff's motion for summary judgment, he argues that there are no questions of material fact regarding the force that Defendants used against him, and that he is entitled to judgment as a matter of law. *See* Dkt. No. 28-2 at 10-14. Defendants counter that Plaintiff cannot establish that he was subjected to excessive force as a matter of law, and that Plaintiff's motion is premature as there has been no discovery. *See* Dkt. No. 36 at 10-13.

In an October 7, 2016 Report and Recommendation, Magistrate Judge Peebles recommended that both motions for summary judgment be denied. *See* Dkt. No. 44 at 25. Specifically, Magistrate Judge Peebles found that Defendants' motion should be denied since Defendants have not shown that Plaintiff was required to file a grievance at Mid-State instead of Auburn. *See id.* at 15-16. Further, Magistrate Judge Peebles concluded that administrative remedies were "unavailable" to Plaintiff under the Supreme Court's decision in *Ross v. Blake*, 136

S. Ct. 1850 (2016), and as such, Plaintiff was not required to exhaust administrative remedies. Magistrate Judge Peebles concluded that, although Plaintiff claims that he filed two grievances at Auburn, there is no conclusive evidence that Plaintiff's grievances were actually recorded as having been filed at Auburn. See Dkt. No. 44 at 16-17. As long as Plaintiff's grievances were not actually filed, then Plaintiff's current situation falls squarely within the Second Circuit's decision in *Williams v. Correction Officer Priatno*, 829 F.3d 118 (2d Cir. 2016). In *Williams*, the Second Circuit held that when a plaintiff's grievance is both unfiled and unanswered, the regulations do not clearly outline the process to appeal or otherwise exhaust administrative remedies, and therefore, the administrative remedies are unavailable under *Ross*. See *Williams*, 829 F.3d at 123-25. As such, Magistrate Judge Peebles recommended that Defendants' motion for summary judgment be denied. Magistrate Judge Peebles further recommended that Plaintiff's cross-motion be denied because of the parties' starkly contrasting versions of events and because questions of fact remain as to whether Defendants' use of force was justified. See Dkt. No. 44 at 24.

**\*2** In reviewing a report and recommendation, a district court "may accept, reject, or modify, in whole or in part, the findings or recommendations made by the magistrate judge." 28 U.S.C. § 636(b)(1)(C). When a party makes specific objections to a magistrate judge's report, the district court engages in *de novo* review of the issues raised in the objections. See *id.*; *Farid v. Bouey*, 554 F. Supp. 2d 301, 307 (N.D.N.Y. 2008). When a party fails to make specific objections, the court reviews the magistrate judge's report for clear error. See *Farid*, 554 F. Supp. 2d at 307; *see also Gamble v. Barnhart*, No. 02-CV-1126, 2004 WL 2725126, \*1 (S.D.N.Y. Nov. 29, 2004). Here, the parties have not filed any objections to the Report and Recommendation.

A litigant's failure to file objections to a magistrate judge's report and recommendation, even when that litigant is proceeding *pro se*, waives any challenge to the report on appeal. See *Cephas v. Nash*, 328 F.3d 98, 107 (2d Cir. 2003) (holding that, "[a]s a rule, a party's failure to object to any purported error or omission in a magistrate judge's report waives further judicial review of the point" (citation omitted)). A *pro se* litigant must be given notice of this rule; notice is sufficient if it informs the litigant that the failure to timely object will result in the waiver of further

judicial review and cites pertinent statutory and civil rules authority. See *Frank v. Johnson*, 968 F.2d 298, 299 (2d Cir. 1992); *Small v. Sec'y of Health and Human Servs.*, 892 F.2d 15, 16 (2d Cir. 1989) (holding that a *pro se* party's failure to object to a report and recommendation does not waive his right to appellate review unless the report explicitly states that failure to object will preclude appellate review and specifically cites 28 U.S.C. § 636(b)(1) and Rules 72, 6(a), and former 6(e) of the Federal Rules of Civil Procedure).

A court may grant a motion for summary judgment only if it determines that there is no genuine issue of material fact to be tried and that the facts as to which there is no such issue warrant judgment for the movant as a matter of law. See *Chambers v. TRM Copy Ctrs. Corp.*, 43 F.3d 29, 36 (2d Cir. 1994) (citations omitted). When analyzing a summary judgment motion, the court "cannot try issues of fact; it can only determine whether there are issues to be tried." *Id.* at 36-37 (quotation and other citation omitted). Moreover, it is well-settled that a party opposing a motion for summary judgment may not simply rely on the assertions in its pleadings. See *Celotex Corp. v. Catrett*, 477 U.S. 317, 324 (1986) (quoting Fed. R. Civ. P. 56(e)).

In assessing the record to determine whether any such issues of material fact exist, courts are required to resolve all ambiguities and draw all reasonable inferences in favor of the nonmoving party. See *Chambers*, 43 F.3d at 36 (citing *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986)) (other citations omitted). Where the non-movant either does not respond to the motion or fails to dispute the movant's statement of material facts, the court may not rely solely on the moving party's Rule 56.1 statement; rather the court must be satisfied that the citations to evidence in the record support the movant's assertions. See *Giannullo v. City of N.Y.*, 322 F.3d 139, 143 n.5 (2d Cir. 2003) (holding that not verifying in the record the assertions in the motion for summary judgment "would derogate the truth-finding functions of the judicial process by substituting convenience for facts").

"[I]n a *pro se* case, the court must view the submissions by a more lenient standard than that accorded to 'formal pleadings drafted by lawyers.' " *Govan v. Campbell*, 289 F. Supp. 2d 289, 295 (N.D.N.Y. 2007) (quoting *Haines v. Kerner*, 404 U.S. 519, 520 (1972)) (other citations omitted). The Second Circuit has opined that courts are obligated to "make reasonable allowances to protect *pro se* litigants" from inadvertently forfeiting legal rights merely because

they lack a legal education. *Id.* (quoting *Traguth v. Zuck*, 710 F.2d 90, 95 (2d Cir. 1983)). However, this does not mean that a *pro se* litigant is excused from following the procedural requirements of summary judgment. *See id.* at 295 (citing *Showers v. Eastmond*, 00 CIV. 3725, 2001 WL 527484, \*1 (S.D.N.Y. May 16, 2001)).

**\*3** The Prison Litigation Reform Act ("PLRA") states that "no action shall be brought with respect to prison conditions under section 1983 of this title, or any other Federal law, by a prisoner confined in any jail, prison, or other correctional facility until such administrative remedies as are available are exhausted." 42 U.S.C. § 1997e(a). This exhaustion requirement applies to all suits brought by inmates regarding aspects of prison life. *See Porter v. Nussle*, 534 U.S. 516, 532 (2002).

New York State has a three-step administrative review process. First, a grievance is submitted to the Inmate Grievance Resolution Committee ("IGRC"), and the IGRC has up to sixteen days to informally resolve the issue. *See* N.Y. Comp. Codes R. & Regs. ("N.Y.C.R.R.") tit. 7, § 701.5(b). If the issue is not informally resolved, there is a formal IGRC hearing to answer the grievance or make a recommendation to the superintendent. *See id.* Second, if the IGRC decision is appealed, the superintendent of the facility issues a decision after reviewing the IGRC's determination. *See id.* § 701.5(c). Third, if the superintendent's decision is appealed, the final administrative decision is made by the Central Office Review Committee ("CORC"). *See id.* § 701.5(d). If all three of these levels of review are exhausted, then the prisoner may seek relief in federal court pursuant to Section 1983. *See Bridgeforth v. Bartlett*, 686 F. Supp. 2d 238, 239 (W.D.N.Y. 2010) (citing *Porter v. Nussle*, 534 U.S. 516, 524 (2002); *Singh v. Goord*, 520 F. Supp. 2d 487, 495-96 (S.D.N.Y. 2007) (quoting *Hemphill v. New York*, 380 F.3d 680, 686 (2d Cir. 2004)).

Section 1997e(a) of the PLRA provides that only administrative remedies that are "available" must be exhausted before a plaintiff brings a Section 1983 action. *See* 42 U.S.C. § 1997e(a). The Supreme Court's recent decision in *Ross* identified several situations in which administrative remedies are "unavailable": (1) when the procedure operates as a simple dead end, with officers consistently unwilling to provide any relief; (2) when an administrative scheme is so opaque that it becomes essentially incapable to use; and (3) when prison

administrators prevent inmates from using the grievance process. *See Ross*, 136 S. Ct. at 1859-60.

In *Williams*, the Second Circuit had to determine whether administrative remedies were "available" when the plaintiff's grievance was allegedly never filed and the plaintiff received no response. *Williams*, 829 F.3d at 120-21. The Second Circuit concluded that the regulations do not clearly outline the process to appeal an unfiled and unanswered grievance. *See id.* at 124. As such, the Second Circuit held that "the grievance procedures that were technically available to [the plaintiff] are so opaque and confusing that they were, 'practically speaking, incapable of use.' " *Id.* (quoting *Ross*, 136 S. Ct. at 1859).

In the present matter, the Court agrees with Magistrate Judge Peebles that Defendants' motion for summary judgment should be denied. At the outset, Defendants' argument that Plaintiff was required to file the grievance at Mid-State is unavailing. The cases cited by Defendants do not directly support their assertion, and the regulations state that grievances should "only be filed at the facility where the inmate is housed even if it pertains to another facility." *See* 7 N.Y.C.R.R. § 701.5(a). Since Plaintiff claims that he was transferred to Auburn after the incident and filed the grievance at Auburn, he was not required to file the grievance at Mid-State. [1]

[1]     Defendants argue that Plaintiff's transfer to Auburn did not occur the day after the alleged incident. *See* Dkt. No. 36-1 at 1. The Court agrees with Magistrate Judge Peebles that questions of fact still remain as to when Plaintiff was transferred. *See* Dkt. No. 44 at 14 n.9. However, in viewing the facts most favorable to the non-moving party, the Court assumes for the purposes of Defendants' motion that Plaintiff was transferred the day after the incident.

**\*4** The Court also agrees with Magistrate Judge Peebles that Plaintiff's situation is, at least when drawing all inferences in Plaintiff's favor, very similar to the situation in *Williams* where the grievances were both unanswered and unfiled. Here, Plaintiff's grievance was certainly unanswered, and Defendants do not seem to contest that point. *See* Dkt. No. 26-2 at 2-3; Dkt. No. 20-1 at 3. The only question is whether Plaintiff's grievances can be considered unfiled. Magistrate Judge Peebles noted that, while Plaintiff alleges that he filed two grievances at Auburn, there is no conclusive evidence that the grievances were recorded as having been filed.

Moreover, Defendants have provided no evidence that any Auburn official received or processed Plaintiff's grievances. Although Plaintiff does not specify exactly how he "filed" the grievances, according to the Inmate Grievance Program, inmates in the SHU are instructed to file grievances by giving them to a corrections officer to file on behalf of the inmate. *See* 7 N.Y.C.R.R. § 701.7. Here, when Plaintiff asked the SHU sergeant about his grievances, the sergeant allegedly replied that since the incident happened at Mid-State, there was nothing that could be done at Auburn concerning the alleged assault. *See* Dkt. No. 26-2 at 2-3. There is no clear indication from Defendants that the grievances were ever technically filed at Auburn. At the very least, questions of fact remain regarding the filing of the grievances, which precludes summary judgment. As such, at least when drawing all inferences in the non-moving party's favor, Plaintiff's grievances were both unfiled and unanswered. The Second Circuit has held that in that situation, the procedures "are so opaque and confusing that they were, 'practically speaking, incapable of use.' " *Williams*, 829 F.3d at 126 (quoting *Ross*, 136 S. Ct. at 1859). Since the procedures were incapable of use, they are considered "unavailable" to Plaintiff, and Plaintiff "need not exhaust remedies if they are not 'available.' " *Ross*, 136 S. Ct. at 1855. Accordingly, Defendants' motion for summary judgment is denied without prejudice.

The Court also agrees with Magistrate Judge Peebles that Plaintiff's motion for summary judgment should be denied. The parties offer very different versions of events regarding the alleged assault. Defendants contend that, on the night of the incident, Plaintiff was acting suspiciously and tried to conceal an item in his pocket. *See*

Dkt. No. 36-4 at 2. Defendants also claim that Plaintiff struck Defendant Carnegie in the face with his elbow when Defendant Carnegie tried to restrain him. *See id.* Plaintiff also allegedly punched Defendants Tolman and Hart several times. *See id.*; Dkt. No. 36-6 at 2. As such, genuine issues of material fact exist regarding the incident, including whether the force applied by Defendants was justified. Accordingly, Plaintiff's motion for summary judgment is denied.

After carefully considering Magistrate Judge Peebles's October 7, 2016 Report and Recommendation, and the applicable law, and for the reasons stated herein, the Court hereby

**ORDERS** that Magistrate Judge Peebles's October 7, 2016 Report and Recommendation is **ADOPTED** in its entirety for the reasons stated therein; and the Court further

**ORDERS** that Defendants' motion for summary judgment (Dkt. No. 20) is **DENIED**; and the Court further

**ORDERS** that Plaintiff's cross-motion for summary judgment (Dkt. No. 28) is **DENIED**; and the Court further

**ORDERS** that the Clerk of the Court shall serve a copy of this Order on all parties in accordance with Local Rules.

**IT IS SO ORDERED.**

**All Citations**

Not Reported in F.Supp.3d, 2016 WL 6901277

---

**End of Document**                    © 2018 Thomson Reuters. No claim to original U.S. Government Works.

2018 WL 1399331
Only the Westlaw citation is currently available.
United States District Court, N.D. New York.

Jermaine FANN, Plaintiff,
v.
H. GRAHAM, Superintendent Auburn
Correctional Facility, et al., Defendants.

No. 9:15-CV-1339 (DNH/CFH)
|
Signed 01/11/2018

**Attorneys and Law Firms**

Jermaine Fann, 430 Main Street, Apt. 306, Dunkirk, New York 14048, pro se.

Hon. Eric T. Schneiderman, Attorney General for the State of New York, OF COUNSEL: WILLIAM A. SCOTT, ESQ., NICOLE E. HAIMSON, ESQ., Assistant Attorneys General, The Capitol, Albany, New York 12224, Attorney for Defendants.

## REPORT-RECOMMENDATION AND ORDER [1]

[1]    This matter was referred to the undersigned for Report-Recommendation and Order pursuant to 28 U.S.C. § 636(b) and N.D.N.Y.L.R. 72.3(c).

Christian F. Hummel, U.S. Magistrate Judge

**\*1** Plaintiff pro se Jermaine Fann ("plaintiff"), a former inmate who was, at all relevant times, in the custody of the New York State Department of Corrections and Community Supervision ("DOCCS"), brings this action pursuant to 42 U.S.C. § 1983, alleging that defendants Superintendent ("Supt.") H. Graham, Deputy Superintendent ("DSS") Fagan, Lieutenant ("Lieut.") Ouimetto, Sergeant ("Sgt.") Ederer, Corrections Officer ("C.O.") M. Cornell, C.O. Lovejoy, C.O. Steinberg, C.O. C. Thomas, and C.O. R.F. Schramm—who, at all relevant times, were employed at the Auburn Correctional Facility ("Auburn")—violated his constitutional rights under the First, Fourth, and Fourteenth Amendments. Dkt. No. 79. ("Am. Compl."). Presently pending before the Court are plaintiff's Motion for Summary Judgment and defendants' Motion for Summary Judgment, both filed pursuant to Federal Rules of Civil Procedure ("Fed. R. Civ. P.") 56. Dkt Nos. 119, 120. Plaintiff and defendant opposed the respective motions, and defendant filed a reply. Dkt. Nos. 124, 125, 126. For the following reasons, it is recommended that defendants' motion be granted in part and denied in part, and plaintiff's motion be denied.

## I. Arguments

### A. Plaintiff's Motion for Summary Judgment

In support of his Motion for Summary Judgment, plaintiff filed a Statement of Material Facts. [2] On review of plaintiff's Motion for Summary Judgment, the facts will be related herein in the light most favorable to defendants as the nonmoving party. See subsection II (A) infra; Rattner v. Netburn, 930 F.2d 204, 209 (2d Cir. 1991) ("In assessing the record ... to determine whether there is a genuine issue as to any material fact, the court is required to resolve all ambiguities and draw all factual inferences in favor of the party against whom summary judgment is sought."). On May 10, 2015, plaintiff filed a grievance against C.O. Thomas for denying him the right to attend morning breakfast. Dkt. No. 119-2 ¶¶ 7-8. On June 6, 2015, C.O. Thomas approached plaintiff regarding the May 10, 2015 grievance. Id. ¶ 10. The next day, C.O. Thomas informed plaintiff that he was confined to his cell because of the grievance plaintiff filed against him. Id. ¶ 11. C.O. Thomas then issued plaintiff a false misbehavior report because of plaintiff's May 10, 2015 grievance against him. Id. ¶ 12. On June 12, 2015, plaintiff received thirty days confinement and loss of all privileges pursuant to C.O. Thomas' June 7, 2015 misbehavior report. Id. ¶ 13.

[2]    Local Rule 7.1(a)(3) states:
Summary Judgment Motions
Any motion for summary judgment shall contain a Statement of Material Facts. The Statement of Material Facts shall set forth, in numbered paragraphs, each material fact about which the moving party contends there exists no genuine issue. Each fact listed shall set forth a specific citation to the record where the fact is established. The record for purposes of the Statement of Material Facts includes the pleadings, depositions, answers to interrogatories, admissions and affidavits.

WESTLAW    © 2018 Thomson Reuters. No claim to original U.S. Government Works.

> The opposing party shall file a response to the Statement of Material Facts. The non-movant's response shall mirror the movant's Statement of Material Facts by admitting and/or denying each of the movant's assertions in matching numbered paragraphs. Each denial shall set forth a specific citation to the record where the factual issue arises. The non-movant's response may also set forth any additional material facts that the non-movant contends are in dispute. Any facts set forth in the Statement of Material Facts shall be deemed admitted unless specifically controverted by the opposing party.
>
> N.D.N.Y. L.R. 7.1(a)(3).

**\*2** On June 3, 2015, C.O. Cornell and C.O. Steinberg performed an "unreasonable" visual body cavity search —also known as a "strip frisk" or "strip search"— on plaintiff "under filthy prison conditions." Dkt. No. 119-2 ¶¶ 14-15, 17. The strip frisk room "was filthy, bug infested, and extremely cold." Id. ¶ 16. Supt. Graham, who has worked at Auburn for ten-and-a-half years, knew Auburn corrections officers were conducting unreasonable searches. Id. ¶ 18-19. The same day, plaintiff filed a grievance against C.O. Cornell and C.O. Steinberg alleging an unreasonable strip frisk. Id. ¶ 20. On June 13, 2015, C.O. Cornell "responded to the plaintiff's [ ] grievance." Id. ¶ 21. On July 8, 2015, C.O. Cornell confronted plaintiff regarding the June 3, 2015 grievance plaintiff filed against him. Id. ¶ 22. On July 9, 2015, Sgt. Ederer authorized C.O. Cornell to perform a visual body cavity search on plaintiff. Id. ¶¶ 29, 32. During the strip frisk, C.O. Cornell "made statements" to plaintiff regarding the June 3, 2015 grievance that plaintiff filed against him. Id. ¶ 28. C.O. Cornell was not supervised during the strip frisk, nor did he conduct the search in a "suitable and comfortable location." Id. ¶¶ 30, 31.

The same day, C.O. Cornell and C.O. Lovejoy conducted a cell search of plaintiff's cell. Dkt. No. 119-2 ¶ 33. During the search, C.O. Cornell, C.O. Lovejoy, and C.O. Schramm destroyed plaintiff's legal materials and medication. Id. ¶ 34. C.O. Lovejoy escorted plaintiff to the hospital for a urine test. Id. ¶ 35. C.O. Lovejoy and C.O. Schramm "harassed and threatened the plaintiff for his grievance activities." Id. ¶ 36. C.O. Cornell "planted drugs on the plaintiff for filing [a] grievance." Id. ¶ 37. On July 10, 2015, C.O. Cornell issued plaintiff a misbehavior report in retaliation for his June 3, 2015 grievance that plaintiff filed against him. Id. ¶¶ 38-39. On July 28, 2015, "plaintiff was found guilty of the false misbehavior report

written by [C.O.] Cornell." Id. ¶ 40. On October 1, 2015, "Albany" reversed the July 28, 2015 disciplinary decision. Id. ¶ 41.

In opposition, defendants argue that the Court should deny plaintiff's motion because plaintiff's motion papers "affirmatively demonstrate" that his claims are without merit, and, therefore, should be dismissed. Dkt. No. 124-1 at 6.

**B. Defendants' Motion for Summary Judgment**

In support of their Motion for Summary Judgment, defendants filed a Statement of Material Facts. Dkt. No. 120-1. The facts relating to defendants' Motion for Summary Judgment are related herein in the light most favorable to plaintiff as the nonmoving party. See subsection II (A), infra; Rattner, 930 F.2d at 209 ("In assessing the record ... to determine whether there is a genuine issue as to any material fact, the court is required to resolve all ambiguities and draw all factual inferences in favor of the party against whom summary judgment is sought."). On June 3, 2015, plaintiff alleges that C.O. Cornell and C.O. Steinberg strip frisked him. Dkt. No. 120-1 ¶ 11. C.O. Cornell conducted a pat frisk on that date, but did not perform a strip frisk. Id. ¶ 12. C.O. Steinberg did not perform a pat frisk or strip frisk on plaintiff on June 3, 2015. Id. ¶ 13.

On June 7, 2015, C.O. Thomas issued plaintiff a Tier II disciplinary ticket for sleeping during morning count. Dkt. No. 120-1 ¶ 18. On June 12, 2015, Lieut. Ouimette commenced a Tier II disciplinary hearing. Id. ¶ 19. During the hearing, Lieut. Ouimette denied plaintiff's request to call Supt. Graham as a witness because he did not issue the disciplinary ticket, and was not present during the incident that resulted in the ticket. Id. ¶¶ 20-21. Although Lieut. Ouimette denied plaintiff's request, he allowed plaintiff to testify that he had filed a prior grievance against C.O. Thomas. Id. ¶¶ 22, 23. Lieut. Ouimette found plaintiff guilty, and sentenced him to thirty days keeplock. [3]

---

[3]     "Keeplock is a form of disciplinary confinement segregating an inmate from other inmates and depriving him of participation in normal prison activities." Green v. Bauvi, 46 F.3d 189, 192 (2d Cir. 1995); N.Y. COMP. CODES R. & REGS. tit. 7, § 301.6.

**\*3** On July 9, 2015, Sgt. Ederer authorized C.O. Cornell and C.O. Lovejoy to conduct a cell search of plaintiff's cell. Dkt. No. 120-1 ¶ 27. In conjunction with the cell search, C.O. Cornell performed a pat frisk of plaintiff. Id. ¶ 28. During the pat frisk, C.O. Cornell found a "green leafy substance" on plaintiff that was later found to be marijuana, along with a "suspicious lump" in plaintiff's "groin area." Id. ¶ 29. C.O. Cornell requested permission to conduct a strip frisk. Id. ¶ 30. C.O. Cornell found no further contraband during the strip frisk. Id. ¶ 31. C.O. Cornell was the only officer present during plaintiff's strip frisk. Id. ¶ 32. C.O. Lovejoy completed the search of plaintiff's cell and found no other contraband. Id. ¶ 34. Because plaintiff possessed marijuana, Auburn staff took plaintiff to the hospital for urine sample testing. Id. ¶ 35. Plaintiff tested positive for marijuana use. Id. ¶ 36. C.O. Cornell issued plaintiff a misbehavior report for possession and use of marijuana. Id. ¶ 37.

On July 14, 2015, Lieut. Ouimette commenced a Tier III disciplinary hearing regarding the July 9, 2015 misbehavior report. Dkt. No. 120-1 ¶ 38. At the outset, Lieut. Ouimette dismissed the drug use charge because plaintiff had already tested positive for marijuana use within the past thirty days, and the July 9, 2015 test results could not be validated. Id. ¶¶ 39-40. Lieut. Ouimette found plaintiff guilty of drug possession, and sentenced him to ninety days keeplock. Id. ¶ 41. The disciplinary disposition was reversed on appeal, and plaintiff served approximately sixty days in keeplock. Id. ¶ 42.

In opposition, plaintiff argues that the Court should deny defendants' motion because: (1) he exhausted his administrative remedies; and (2) he has stated claims against the defendants. Dkt. No. 125. In reply, defendants contend that plaintiff failed to exhaust his administrative remedies. Dkt. No. 126.

## II. Discussion [4]

[4]    All unpublished opinions cited in this Report-Recommendation and Order, unless otherwise noted, have been provided to plaintiff.

### A. Legal Standards

"A court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." FED. R. CIV. P. 56(a). The moving party has the burden of showing the absence of disputed material facts by providing the Court with portions of "pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any," which support the motion. FED. R. CIV. P. 56(c); Celotex Corp. v. Catrett, 477 U.S. 317, 323, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). A fact is material if it may affect the outcome of the case as determined by substantive law, such that "a reasonable jury could return a verdict for the nonmoving party." Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). "In determining whether summary judgment is appropriate, [the Court will] resolve all ambiguities and draw all reasonable inferences against the moving party." Skubel v. Fuoroli, 113 F.3d 330, 334 (2d Cir. 1997).

To avoid summary judgment, a non-moving party "must do more than simply show that there is some metaphysical doubt as to the material facts." Carey v. Crescenzi, 923 F.2d 18, 19 (2d Cir. 1991) (quoting Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp., 475 U.S. 574, 586, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986)) (internal quotation marks omitted). A non-moving party must support such assertions by evidence showing the existence of a genuine issue of material fact. Id. "When no rational jury could find in favor of the non-moving party because the evidence to support is so slight, there is no genuine issue of material fact and a grant of summary judgment is proper." Gallo v. Prudential Services, Ltd. P'ship, 22 F.3d 1219, 1224 (2d Cir. 1994).

Where, as here, a party seeks judgment against a pro se litigant, a court must afford the non-movant special solicitude. See Triestman v. Fed. Bureau of Prisons, 470 F.3d 471, 477 (2d Cir. 2006). As the Second Circuit has stated,

**\*4** [t]here are many cases in which we have said that a pro se litigant is entitled to "special solicitude," ... that a pro se litigant's submissions must be construed "liberally," ... and that such submissions must be read to raise the strongest arguments that they "suggest,".... At the same time, our cases have also indicated that we cannot read into pro se submissions claims that are not "consistent" with the pro se litigant's allegations, ... or arguments that the submissions themselves do not

"suggest," ... that we should not "excuse frivolous or vexatious filings by pro se litigants," ... and that pro se status "does not exempt a party from compliance with relevant rules of procedural and substantive law....

Id. (citations and footnote omitted); see also Sealed Plaintiff v. Sealed Defendant, 537 F.3d 185, 191-92 (2d Cir. 2008).

**B. Exhaustion**

As a threshold matter, defendants contend that plaintiff has failed to exhaust his administrative remedies. Dkt. No. 120-4 ("Def. Mem. of Law") at 10-13. Defendants argue that because plaintiff failed to exhaust his administrative remedies as to Supt. Graham, DSS Fagan, Sgt. Ederer, C.O. Lovejoy, and C.O. Schramm, any claims involving those defendants should be dismissed. Def. Mem. of Law at 13. Defendants further argue that plaintiff failed to exhaust his administrative remedies as to the July 9, 2015 incident. Id.[5] Plaintiff contends that he properly filed a grievance regarding the July 9, 2015 incident. Dkt. No. 125 at 7-8. Plaintiff also claims that he was aware "of the facility attitude toward the grievance program" and "properly followed all steps to exhaust his claims." Id. at 8. Plaintiff argues that "the [d]efendants failure to properly deliver and or have a proper where grievances are safe and secure does not fall at [his] feet, [and] should not be an escape route for claims to be dismissed." Id. In reply, defendants argue that plaintiff supports his "conclusory allegation" that he exhausted his administrative remedies with "handwritten letters that, by [p]laintiff's own acknowledgement [sic], were never acknowledged as received by DOCCS." Dkt. No. 126 at 4. Defendants contend that plaintiff's prior grievance filings and Jeffery Hale and Cheryl Parmiter's declarations invalidate plaintiff's claim of unavailability. Id.

[5]   Defendants concede that plaintiff exhausted his administrative remedies regarding C.O. Cornell and C.O. Steinberg's June 3, 2015 strip frisk, and C.O. Thomas' June 7, 2015 misbehavior report. Def. Mem. of Law at 13.

The Prison Litigation Reform Act ("PLRA") requires that a prisoner exhaust any administrative remedies available to him or her before bringing an action for claims arising out of his or her incarceration. See Porter v. Nussle, 534 U.S. 516, 524, 122 S.Ct. 983, 152 L.Ed.2d 12 (2002); see

also Woodford v. Ngo, 548 U.S. 81, 82, 126 S.Ct. 2378, 165 L.Ed.2d 368 (2006). The exhaustion requirement applies "to all inmate suits about prison life, whether they involve general circumstances or particular episodes, and whether they allege excessive force or some other wrong." Porter, 534 U.S. at 532, 122 S.Ct. 983. Further, the exhaustion requirement applies even where the prisoner seeks relief not available in the administrative grievance process, such as monetary damages. Id. at 524, 122 S.Ct. 983. To exhaust administrative remedies, the inmate must complete the full administrative review process set forth in the rules applicable to the correctional facility in which he or she is incarcerated. Jones v. Bock, 549 U.S. 199, 218, 127 S.Ct. 910, 166 L.Ed.2d 798 (2007) (internal citation omitted).

Although the Supreme Court has deemed exhaustion mandatory, the Second Circuit has recognized that "certain caveats apply." Ruggiero v. Cty. of Orange, 467 F.3d 170, 175 (2d Cir. 2006) (citation omitted). The Supreme Court recently held that "[c]ourts may not engraft an unwritten 'special circumstances' exception onto the PLRA's exhaustion requirement." Ross v. Blake, ––– U.S. ––––, 136 S.Ct. 1850, 1862, 195 L.Ed.2d 117 (2016). Thus, the "special circumstances" exception in Hemphill v. New York, 680 F.3d 680, 686 (2d Cir. 2004) is no longer consistent with the statutory requirements of the PLRA. Williams v. Priatno, 829 F.3d 118, 123 (2d Cir. 2016).[6]

[6]   In Williams v. Priatno, the Second Circuit debated Ross's effect on Hemphill's estoppel exception. See Williams, 829 F.3d at 123. The Williams Court stated that "Ross largely supplants our Hemphill inquiry by framing the exception issue entirely within the context of whether administrative remedies were actually available to the aggrieved inmate." Id. (citing Ross, 136 S.Ct. at 1858-59).

***5** Although Ross eliminates the "special circumstances" exception, courts must still consider the PLRA's "textual exception to mandatory exhaustion." Ross, 136 S.Ct. at 1858. Under this exception, courts must determine whether administrative remedies were "available" to a prisoner. Id. The Supreme Court identified three circumstances where administrative remedies may be unavailable to a prisoner. First, "an administrative procedure is unavailable when (despite what regulations or guidance materials may promise) it operates as a simple dead end—with officers unable or consistently

unwilling to provide any relief to aggrieved inmates." Id. at 1859 (citing Booth v. Churner, 532 U.S. 731, 736, 738, 121 S.Ct. 1819, 149 L.Ed.2d 958 (2001)). "Next, an administrative scheme might be so opaque that it becomes, practically speaking, incapable of use." Id. Lastly, administrative remedies are unavailable where "prison administrators thwart inmates from taking advantage of a grievance process through machination, misrepresentation, or intimidation." Id. at 1860.

### 1. Did Plaintiff Exhaust his Administrative Remedies?

Although plaintiff seems to suggest that the Auburn grievance process was unavailable, there is no genuine dispute that at all relevant times, DOCCS had in place a three-step inmate grievance program. N.Y. COMP. CODES R. & REGS. tit. 7, § 701.5. [7]

[7]    First, the inmate must file a complaint with an inmate grievance program ("IGP") clerk within twenty-one days of the alleged incident. N.Y. COMP. CODES R. & REGS. tit. 7, § 701.5(a)(1). An IGP representative has sixteen calendar days to informally resolve the issue. Id. § 701.5(b)(1). If no informal resolution occurs, the IGRC must hold a hearing within sixteen days of receipt of the grievance and must issue a written decision within two working days after the conclusion of the hearing. Id. §§ 701.5(b)(2)(i)-(ii). If the determination is unfavorable to the inmate, the inmate may appeal the IGRC's determination to the facility superintendent within seven calendar days of receipt of the determination. Id. § 701.5(c)(1). If the superintendent's determination is unfavorable, the inmate may appeal to CORC within seven days after receipt of the superintendent's determination. Id. §§ 701.5(d)(i)-(ii). CORC must "review each appeal, render a decision on the grievance, and transmit its decision to the facility, with reasons stated, for the [inmate], the grievance clerk, the superintendent, and any direct parties within thirty (30) calendar days from the time the appeal was received." Id. § 701.5(d)(3)(ii).

### a. DSS Fagan

Plaintiff concedes that he did not exhaust his administrative remedies as to claims against DSS Fagan, and that summary judgment should be granted. Dkt. No. 125 at 9. Accordingly, it is recommended that defendants'

Motion for Summary Judgment, insofar as it relates to claims against DSS Fagan, be granted.

### b. Supt. Graham and Lieut. Ouimetto

Insofar as plaintiff seeks relief against Supt. Graham for supervisory liability and Lieut. Ouimetto for Fourteenth Amendment due process, plaintiff has failed to exhaust his administrative remedies. DOCCS records establish that plaintiff did not name either Supt. Graham or Lieut. Ouimetto in grievances pertaining to the conduct at issue. See Dkt. No. 120-30; Dkt. No. 120-29 ("Hale Decl.") at 4 (detailing plaintiff's subject grievances). Notably, in opposition, plaintiff does not allege that he exhausted his administrative remedies as to Supt. Graham or Lieut. Ouimetto, and does not claim that defendants prevented or obstructed him from filing grievances against Supt. Graham or Lieut. Ouimetto. Further, there is nothing in the record indicating that Supt. Graham, Lieut. Ouimetto, or any other defendant prevented him from filing grievances. See Dkt. No. 125 at 8 (noting, in plaintiff's exhaustion section, that he "properly exhausted" claims against defendants Cornell, Lovejoy, Ederer, and Schramm). [8] Therefore, because plaintiff failed to exhaust his administrative remedies as to Supt. Graham and Lieut. Ouimetto, it is recommended that defendants' Motion for Summary Judgment, insofar as it relates to claims against Supt. Graham and Lieut. Ouimetto, be granted.

[8]    Plaintiff testified that he filed a grievance against Supt. Graham for failure to release him from keeplock, such conduct—by plaintiff's own admission—is not related to the instant case. Dkt. No. 120-3 ("Pl. Dep.") at 125, 222; Dkt. No. 120-34.

### c. July 9, 2015 Incident

**\*6**  Plaintiff claims that on July 14, 2015, he filed a grievance regarding the July 9, 2015 "retaliatory cell search, visual body cavity search, urine test, verbal threats, harassment, and the false misbehavior report." Am. Compl. ¶ 169. Plaintiff testified that he handed this grievance to the "rounds officer" while he was on keeplock confinement. Dkt. No.120-3 ("Pl. Dep.") at 213. On July 17, 2015, after he did not receive a copy of the grievance or a grievance number, plaintiff filed a second grievance.

Am. Compl. ¶ 171. Plaintiff testified that he handed the second grievance to the sergeant on duty. Pl. Dep. at 217. On August 13, 2015, after not receiving a response from Auburn's IGRC, plaintiff filed a notice of appeal "in accordance with the rules and regulations" requesting that his grievance be sent to CORC. Am. Compl. ¶ 177.

Defendants contend that plaintiff never filed a grievance with respect to the July 9, 2015 strip frisk by C.O. Cornell, cell search by C.O. Cornell, C.O. Lovejoy, C.O. Schramm, and Sgt. Ederer, destruction of property by C.O. Cornell and C.O. Schramm, and a falsified misbehavior report. Def. Mem. of Law at 12-13. Auburn's IGP Supervisor Cheryl Parmiter declared that a search of the DOCCS database confirms that, although plaintiff filed six grievances while housed at Auburn, five were filed prior to July 9, 2015. Dkt. No. 120-35 ("Parmiter Decl.") at 3. The grievance filed after July 9, 2015 does not relate to the wrongdoings plaintiff alleged occurred on July 9, 2015. Id. at 4. DOCCS' Assistant Director of IGP Jeffery Hale declared that a search of the CORC database confirms that "plaintiff filed a number of grievance appeals with CORC, but none of those appeals concern matters stemming from incidents of an allegedly improper strip frisk, an allegedly improper cell search, or the issuance of an allegedly false misbehavior report on July 9, 2015." Hale Decl. at 4. However, plaintiff has proffered a copy of the July 17, 2015 grievance alleging that "several officers"[9] subjected him "to an unnecessary pat frisk, strip, frisk, cell search, verbal threats, and an [sic] urine test and false report." Dkt. No. 125-2 at 18. Plaintiff further provides his August 13, 2015 notice of appeal to CORC, which details plaintiff's attempts to exhaust his administrative remedies and expresses his desire to further "appeal to the next level of review." Id.[10]

[9]    In New York State, the IGP regulations do not require that an inmate's grievance contain the name of the offending corrections officer. See Espinal v. Goord, 558 F.3d 119, 126 (2d Cir. 2009). "[T]he IGP regulations offer the general guidance that a grievance should 'contain a concise, specific description of the problem,' ... and the complaint form does not instruct the inmate to name the officials allegedly responsible for misconduct." Id. (internal citations omitted). Therefore, an inmate "is not required to name responsible parties in a grievance in order to exhaust his administrative remedies." Id.

[10]    Plaintiff's July 2015 grievance involves staff misconduct or harassment, which follows an expedited procedure and is immediately sent to the superintendent for review. See N.Y. COMP. CODES R. & REGS. tit. 7, § 701.8(a), (b); Dkt. No. 125-2 at 18.

Viewing the facts in the light most favorable to plaintiff, the record suggests that plaintiff's grievances were submitted, but were unfiled and unanswered, creating an issue of fact as to whether the grievance process was available and whether plaintiff attempted to exhaust his administrative remedies as to C.O. Cornell, C.O. Lovejoy, C.O. Schramm, and Sgt. Ederer in relation to the July 9, 2015 incident. See Williams, 829 F.3d at 126 (concluding that "the process to appeal an unfiled and unanswered grievance is prohibitively opaque, such that no inmate could actually make use of it."); Thaxton v. Simmons, No. 9:10-CV-1318 (MAD/RFT), 2013 WL 4806457, at *4 (N.D.N.Y. Sept. 9, 2013) ("[A] question of fact exists as to whether [p]laintiff never filed his initial grievance on April 29, as [d]efendants claim, or that, as [p]laintiff claims, he filed a timely grievance that was lost or tampered with by [d]efendants. Such credibility assessments are to be resolved by a trier of fact."). Accordingly, the undersigned recommends that defendants' Motion for Summary Judgment on plaintiff's claims arising from the July 9, 2015 incident be denied, without prejudice and with the opportunity to renew by way of an exhaustion hearing, should defendants request such a hearing.

## C. Fourth Amendment

**\*7**  Plaintiff alleges that C.O. Cornell and C.O. Steinberg violated his Fourth Amendment rights during a June 3, 2015 strip search. Dkt. No. 119-3 ("Pl. Mem. of Law") at 4-5. Defendants argue that the strip frisk never occurred, and in the alternative, neither C.O. Cornell nor C.O. Steinberg had physical contact with plaintiff. Def. Mem. of Law at 19. The Fourth Amendment establishes that "[t]he right of the people to be secure in their persons ... against unreasonable searches and seizures[ ] shall not be violated." U.S. CONST. amend. IV. However, inmates are generally not afforded the same privacy rights as non-inmates because "[l]oss of ... privacy [is an] inherent incident[ ] of confinement." Bell v. Wolfish, 441 U.S. 520, 536, 99 S.Ct. 1861, 60 L.Ed.2d 447 (1979); Perez v. N.Y.S. Dep't of Corr. Servs., No. 9:08-CV-1031, 2010 WL 1235637, at *5 (N.D.N.Y. Mar. 17, 2010). "Strip

frisks pass constitutional muster, even if the strip frisk is conducted without probable cause, so long as the search is reasonable and not abusive." Shabazz v. Pico, 994 F.Supp. 460, 473 (S.D.N.Y. 1998) (citing Bell, 411 U.S. at 558-60, 93 S.Ct. 1713). In assessing reasonableness under the Fourth Amendment, "[c]ourts must consider the scope of the particular intrusion, the manner in which it is conducted, the justification for initiating it, and the place in which it is conducted." Bell, 441 U.S. at 558, 99 S.Ct. 1861. C.O. Cornell concedes that he pat frisked plaintiff on June 3, 2015, but denies conducting a strip frisk. Def. Mem. of Law at 19; Dkt. No. 120-18 ("Cornell Decl.") ¶ 4. C.O. Steinberg denies strip frisking plaintiff on June 3, 2015. Def. Mem. of Law at 19; Dkt. No. 120-21 ("Steinberg Decl.") ¶ 4. C.O. Steinberg further states that he did not witness C.O. Cornell pat frisk plaintiff on June 3, 2015. Steinberg Decl. ¶ 4.

The record contains disputed issues of material fact as to whether the June 3, 2015 strip frisk occurred, and if it did occur, whether the strip frisk was reasonable under the Fourth Amendment. However, even assuming the strip frisk occurred as plaintiff alleges, and occurred without probable cause, plaintiff fails to establish that the June 3, 2015 strip frisk was unreasonable. Plaintiff testified that the June 3, 2015 search was illegal, in part, because C.O. Cornell conducted it in a "racist manner" by forcing plaintiff to "have [his] hands above [his] head, strapped to some bars, standing naked." Pl. Dep. at 222-23. DOCCS Directive 4190 states that a corrections officer may require an inmate to "lift[ ] his arms to expose his armpits" during a strip frisk. Dkt. No. 120-8 at 6. Plaintiff has not further demonstrated how standing with his "hands above [his] head, strapped to some bars" constitutes racist conduct on behalf of C.O. Cornell or C.O. Steinberg. Pl. Dep. at 222-23. Moreover, there is no indication that C.O. Cornell or C.O. Steinberg exceeded the scope of the strip frisk, as plaintiff concedes that neither C.O. Cornell or C.O. Steinberg made physical contact with him during the frisk. Pl. Dep. at 152. Insofar as plaintiff suggests that C.O. Cornell and C.O. Steinberg violated DOCCS Directive 4190 by conducting the strip search in the alleged unsanitary area at issue in C-Block, C.O. Cornell and C.O. Steinberg's failure to follow a DOCCS directive does not amount to a constitutional violation. See Burroughs v. Petrone, 138 F.Supp.3d 182, 219 (N.D.N.Y. 2015); Sanders v. Gifford, No. 11-CV-0326, 2014 WL 5662775, at *4 (N.D.N.Y. Nov. 4, 2014). Therefore, viewing the facts in the light most

favorable to plaintiff, plaintiff fails to establish that the June 3, 2015 strip frisk was unreasonable. Accordingly, it is recommended that plaintiff's Motion for Summary Judgment as to the June 3, 2015 strip search be denied, and defendants' Motion for Summary Judgment be granted.

### D. First Amendment

Plaintiff claims that C.O. Thomas subjected him to a false misbehavior report in retaliation for filing a grievance against him. Pl.'s Mem. of Law at 6-7. Defendants argue that plaintiff "has no viable claim for Officer Thomas' filing of a false misbehavior report [because] [h]e was granted a hearing on the charges and does not raise any viable claim that such hearing failed to provide him due process." Def.'s Mem. of Law at 20. Moreover, defendants argue that the only evidence plaintiff offers of C.O. Thomas' retaliation are the inadmissible declarations of inmates who purported to have overheard conversations between C.O. Thomas and plaintiff. Dkt. No. 124-1 at 8-9.

**\*8** Courts are to "approach [First Amendment] retaliation claims by prisoners 'with skepticism and particular care[.]' " See, e.g., Davis v. Goord, 320 F.3d 346, 352 (2d Cir. 2003) (quoting Dawes v. Walker, 239 F.3d 489, 491 (2d Cir. 2001), overruled on other grounds by Swierkiewicz v. Sorema, N. A., 534 U.S. 506, 122 S.Ct. 992, 152 L.Ed.2d 1 (2002)). A retaliation claim under Section 1983 may not be conclusory and must have some basis in specific facts that are not inherently implausible on their face. See Ashcroft v. Iqbal, 556 U.S. 662, 678, 129 S.Ct. 1937, 173 L.Ed.2d 868 (2009); South Cherry St., LLC v. Hennessee Grp. LLC, 573 F.3d 98, 110 (2d Cir. 2009). "To prove a First Amendment retaliation claim under Section 1983, a prisoner must show that '(1) that the speech or conduct at issue was protected, (2) that the defendant took adverse action against the plaintiff, and (3) that there was a causal connection between the protected speech and the adverse action.' " Espinal v. Goord, 558 F.3d 119, 128 (2d Cir. 2009) (quoting Gill v. Pidlypchak, 389 F.3d 379, 380 (2d Cir. 2004), overruled on other grounds by Swierkiewicz, 534 U.S. at 560, 122 S.Ct. 999).

To satisfy the first element of a retaliation claim, a plaintiff must show that he engaged in a protected activity. See Espinal, 558 F.3d at 128. The Second Circuit has concluded that use of the prison grievance system

Case 9:16-cv-01062-DNH-TWD    Document 62    Filed 07/20/18    Page 88 of 116

constitutes a protected activity. See Gill, 389 F.3d at 384; Franco v. Kelly, 854 F.2d 584, 589 (2d Cir. 1988) ("Moreover, intentional obstruction of a prisoner's right to seek redress of grievances is precisely the sort of oppression that section 1983 is intended to remedy.") (alteration and internal quotation marks omitted); see also Roseboro v. Gillespie, 791 F.Supp.2d 353, 367 (S.D.N.Y. 2011) (finding that the filing of a grievance is a protected activity); Mateo v. Fischer, 682 F.Supp.2d 423, 433 (S.D.N.Y. 2010) (same). Plaintiff states that he filed a grievance against C.O. Thomas on May 10, 2015. Pl.'s Mem. of Law at 6-7; Dkt. No. 119-4 at 4. Thus, plaintiff satisfies the first prong of the test as he has engaged in a protected activity. See id.; Gill, 389 F.3d at 384.

A defendant's retaliatory filing of a falsified misbehavior report that results in disciplinary segregated confinement constitutes adverse action. See Gill, 389 F.3d at 384 (finding that a false misbehavior report that resulted in the plaintiff's placement in keeplock constituted adverse action); Gayle v. Gonyea, 313 F.3d 677, 682 (2d Cir. 2002) (emphasis added) ("An allegation that a prison official filed false disciplinary charges in retaliation for the exercise of a constitutionally protected right, such as the filing of a grievance, states a claim under § 1983."). "[T]he mere allegation that a false misbehavior report has been issued to an inmate, standing alone, does not rise to [a] level of constitutional significance." Reed v. Doe No. 1, No. 9:11-CV-0250 (TJM/DEP), 2012 WL 4486086, at *5 (N.D.N.Y. July 26, 2012) (citing Boddie v. Schnieder, 105 F.3d 857, 862 (2d Cir. 1997)). However, a plaintiff's allegation that a defendant issued a false misbehavior report in response to the plaintiff's protected activity can support a claim of unlawful retaliation. Id. (citing Franco v. Kelly, 854 F.2d 584, 589 (2d Cir. 2008)). The plaintiff bears the burden of establishing that "the protected conduct was a substantial or motivating factor in the prison officials' decision to discipline the plaintiff." Gayle, 313 F.3d at 682.

> In determining whether a causal connection exists between the plaintiff's protected activity and a prison official's actions, a number of factors may be considered, including: (i) the temporal proximity between the protected activity and the alleged retaliatory act; (ii) the inmate's prior good disciplinary record; (iii) vindication at a hearing

on the matter; and (iv) statements by the defendant concerning his motivation.

**\*9** Baskerville v. Blot, 224 F.Supp.2d 723, 732 (S.D.N.Y. 2002). "The causal connection must be sufficient to support an inference that the protected conduct played a substantial part in the adverse action." Id. In assessing temporal proximity, the Second Circuit has held that, generally, to establish a temporal proximity sufficient to support an inference of causal connection, there may be no more than six months between the temporal proximity and the adverse action. See Espinal, 558 F.3d at 129.

Plaintiff alleges that on May 10, 2015, he filed a grievance against C.O. Thomas. Pl.'s Mem. of Law at 6-7; Dkt. No. 119-4 at 4. On June 6, 2015, C.O. Thomas submitted a memorandum to the Auburn IGP denying the allegations set forth in the grievance. Dkt. No. 119-4 at 6. The following day, C.O. Thomas confined plaintiff to his cell. Pl.'s Mem. of Law at 7. When plaintiff questioned why he was confined, C.O. Thomas stated, "you filed [a] grievance, this is what you had asked for." Id. C.O. Thomas issued plaintiff a misbehavior report for failure to comply with facility count procedures (112.21) and refusing a direct order (106.10) stemming from plaintiff's failure to wake up during morning count. Id.; Dkt. No. 119-4 at 15. Lieut. Ouimette conducted a disciplinary hearing on June 12, 2015 and sentenced plaintiff to thirty days keeplock. Id. at 17.

Defendants argue that plaintiff "provides no admissible evidence in support of this claim and Officer Thomas has specifically denied the allegations of retaliation." Dkt. No. 124-1 at 8. Defendants also discredit plaintiff's reliance on Kenneth Boyd's Declaration, which they contend is "insufficient and inadmissible as it is based upon his own supposition regarding Officer Thomas' mental state and his alleged conversations with the Plaintiff." Id. at 9. Although defendants are correct that "[a]ffidavits submitted in support of or in opposition to the summary judgment motion must 'be made on personal knowledge, ... [and] set forth facts as would be admissible in evidence,' " plaintiff's submission of the Boyd Declaration is not fatal to his claim. Patterson v. County of Oneida, N.Y., 375 F.3d 206, 219 (2d Cir. 2004) (quoting FED. R. CIV. P. 56(e)). Indeed, the record establishes that plaintiff has presented sufficient circumstantial and direct evidence to raise a material

question of fact whether C.O. Thomas retaliated against him.

Plaintiff has suggested facts supporting two of the factors set forth in Baskerville. Baskerville, 224 F.Supp.2d at 732. Plaintiff filed a grievance against C.O. Thomas on May 10, 2015. Pl.'s Mem. of Law at 6-7; Dkt. No. 119-4 at 4. On June 6, 2015, C.O. Thomas submitted a memorandum to the Auburn IGP in conjunction with the grievance investigation denying the allegations against him. Dkt. No. 119-4 at 6. The next day, C.O. Thomas filed an allegedly false misbehavior report. Pl.'s Mem. of Law at 7; Dkt. No. 119-4 at 15. C.O. Thomas learned of plaintiff's grievance, at the latest, on June 6, 2015, and issued the misbehavior report on June 7, 2015; therefore, the temporal proximity sufficiently supports an inference of causal connection. See Washington v. Afify, 681 Fed.Appx. 43, 46 (2d Cir. 2017) (summary order) (finding that the defendant's questioning of the plaintiff about a grievance he filed, and subsequently filing an allegedly false misbehavior report against the plaintiff two days later supports an inference of causal connection). Moreover, upon confining plaintiff in his cell, C.O. Thomas stated, "you filed [a] grievance, this is what you had asked for." Pl.'s Mem. of Law at 7. In support of that contention, plaintiff has proffered the sworn affidavit of inmate Rodolfo Casiano, who testified that he was housed in a neighboring cell and witnessed the conversation between plaintiff and "the officer that worked that day." Dkt. No. 119-4 at 8. Mr. Casiano states that he heard C.O. Thomas make the abovementioned comment, as well as the statement, "it's funny how things work." Id. Although C.O. Thomas denies issuing the misbehavior report in retaliation for plaintiff's grievance, affording plaintiff special solicitude, a question of material fact is raised as to whether C.O. Thomas had retaliatory intent. See Washington, 681 Fed.Appx. at 46. Defendants do not argue that plaintiff would have been issued a misbehavior report but for the exercise of his First Amendment rights. See Gayle, 313 F.3d at 682 ("The burden then shifts to the defendant to show that the plaintiff would have received the same punishment even absent the retaliatory motivation."). Arguably, defendants may be suggesting that plaintiff received a misbehavior report because he slept through the morning facility count; however, as plaintiff denies this conduct, a material fact is in dispute. See Dkt. No. 119-4 at 15. Because a genuine issue of material fact exists with regard to C.O. Thomas' retaliatory intent, it is recommended that

plaintiff's Motion for Summary Judgment be denied, and defendants' Motion for Summary Judgment be denied as to plaintiff's First Amendment claim against C.O. Thomas.

### III. Conclusion

 *10 WHEREFORE, for the reasons stated herein, it is hereby

RECOMMENDED, that plaintiff's Motion for Summary Judgment (Dkt. No. 119) be DENIED; and it is further

RECOMMENDED, that defendants' Motion for Summary Judgment (Dkt. No. 120) be GRANTED IN PART:

> (1) Insofar as it seeks dismissal of plaintiff's supervisory liability claims against Deputy Superintendent Fagan;

> (2) Insofar as it seeks dismissal of plaintiff's supervisory liability claim against Supt. Graham;

> (3) Insofar as it seeks dismissal of plaintiff's Fourteenth Amendment due process claim against Lieut. Ouimette,

> (4) Insofar as it seeks dismissal of plaintiff's Fourth Amendment unreasonable search claim against C.O. Cornell and C.O. Steinberg,

the motion be GRANTED, and the claims be DISMISSED with prejudice; and it is further

RECOMMENDED, that defendants' Motion for Summary Judgment (Dkt. No. 120) be DENIED IN PART:

> (1) Insofar as it seeks dismissal of plaintiff's First Amendment retaliation claim against C.O. Thomas, the motion be DENIED,

> (2) Insofar as it seeks dismissal of plaintiff's First and Fourth Amendment claims against C.O. Cornell, C.O. Lovejoy, C.O. Schramm, and Sgt. Ederer for the incidents occurring on July 9, 2015, the motion be DENIED, without prejudice, to defendants renewing this argument and requesting a hearing to assess whether plaintiff exhausted his administrative remedies, and it is further,

**ORDERED**, that the Clerk of the Court serve a copy of this Report-Recommendation and Order on all parties in accordance with Local Rules.

**IT IS SO ORDERED**.

Pursuant to 28 U.S.C. § 636(b)(1) and Local Rule 72.1(c), the parties have fourteen days within which to file written objections to the foregoing report. Such objections shall be filed with the Clerk of the Court. **FAILURE TO OBJECT TO THIS REPORT WITHIN FOURTEEN (14) DAYS WILL PRECLUDE APPELLATE REVIEW**. Roldan v. Racette, 984 F.2d 85, 89 (2d Cir. 1993) (citing Small v. Secretary of Health and Human Servs., 892 F.2d 15 (2d

Cir. 1989)); 28 U.S.C. § 636(b)(1); FED R. CIV. P. 6(a), 6(e), 72. [11]

[11]    If you are proceeding pro se and are served with this Order by mail, three additional days will be added to the fourteen-day period, meaning that you have seventeen days from the date the Order was mailed to you to serve and file objections. FED. R. CIV. P. 6(d). If the last day of that prescribed period falls on a Saturday, Sunday, or legal holiday, then the deadline is extended until the end of the next day that is not a Saturday, Sunday, or legal holiday. Id. § 6(a)(1)(C).

**All Citations**

Slip Copy, 2018 WL 1399331

---

**End of Document**                    © 2018 Thomson Reuters. No claim to original U.S. Government Works.

2018 WL 1399340
Only the Westlaw citation is currently available.
United States District Court, N.D. New York.

Jermaine FANN, Plaintiff,

v.

H. GRAHAM, Superintendent Auburn Correctional
Facility; Lt. Ouimette [1], Lieutenant, Auburn
Correctional Facility; Sgt. Ederer, Sergeant, Auburn
Correctional Facility; M. Cornell, Correctional
Officer, Auburn Correctional Facility; Lovejoy,
Correctional Officer, Auburn Correctional Facility;
Steinberg, Correctional Officer, Auburn Correctional
Facility, formerly known as Stienberg; C. Thomas,
Correctional Officer, Auburn Correctional Facility;
R. F. Schramm, Correctional Officer and Certified
Drug Tester, Auburn Correctional Facility, formerly
known as R. F. Shramm; and Fagan, Deputy
Superintendent of Security, Auburn Correctional
Facility, in his official capacity, Defendants.

[1]    The Clerk is directed to amend the docket to reflect
       the correct spelling of Lt. Ouimette's name.

9:15-CV-1339 (DNH/CFH)
|
Signed 03/19/2018

**Attorneys and Law Firms**

JERMAINE FANN, 430 Main Street-Apt. #306,
Dunkirk, NY 14048, pro se.

HON. ERIC T. SCHNEIDERMAN, Attorney General
for the State of New York, OF COUNSEL: WILLIAM
A. SCOTT, ESQ., NICOLE E. HAIMSON, ESQ., Ass't
Attorneys General, The Capitol, Albany, NY 12224,
Attorney for Defendants.

## DECISION and ORDER

DAVID N. HURD, United States District Judge

**\*1**  Pro se plaintiff Jermaine Fann brought this civil
rights action pursuant to 42 U.S.C. § 1983. On
January 11, 2018, the Honorable Christian F. Hummel,
United States Magistrate Judge, advised by Report-

Recommendation that defendants' motion for summary
judgment be granted in part and denied in part, and
plaintiff's motion for summary judgment be denied in its
entirety. Plaintiff and defendants filed timely objections to
the Report-Recommendation, and defendants submitted
an additional though untimely response to plaintiff's
objections.

Based upon a careful review of the Report-
Recommendation and the portions to which the parties
objected, the Report-Recommendation is accepted in
whole. See 28 U.S.C. § 636(b)(1).

Therefore, it is

ORDERED that

1. Plaintiff's motion for summary judgment is DENIED
in its entirety;

2. Defendants' motion for summary judgment is
GRANTED in part and DENIED in part;

3. Plaintiff's supervisory liability claims against
defendants Fagan and Graham are DISMISSED with
prejudice;

4. Plaintiff's Fourteenth Amendment due process
claim against defendant Ouimette is DISMISSED with
prejudice;

5. Plaintiff's Fourth Amendment unreasonable search
claims against defendants Cornell and Steinberg are
DISMISSED with prejudice;

6. Defendants' motion for summary judgment is DENIED
as to plaintiff's First Amendment retaliation claim against
defendant Thomas; and

7. Defendants' motion for summary judgment is DENIED
without prejudice as to plaintiff's First and Fourth
Amendment claims against defendants Cornell, Lovejoy,
Schramm, and Ederer for the incidents occurring on
July 9, 2015, to defendants renewing this argument and
requesting a hearing to assess whether plaintiff exhausted
his administrative remedies.

IT IS SO ORDERED.

2018 WL 1399340

**All Citations**

Slip Copy, 2018 WL 1399340

---

**End of Document**                                    © 2018 Thomson Reuters. No claim to original U.S. Government Works.

2015 WL 3901637
Only the Westlaw citation is currently available.
United States District Court,
S.D. New York.

Raphael TIMMONS, Plaintiff,
v.
Dr. Dora B. SCHRIRO, et al. Defendants.
Jeffrey Smitherman, Plaintiff,
v.
Dr. Dora B. Schriro et al. Defendants.

Nos. 14–CV–6606 RJS, 14–CV–6857 RJS.
|
Signed June 23, 2015.

*OPINION AND ORDER*

RICHARD J. SULLIVAN, District Judge.

**\*1** Plaintiffs Raphael Timmons and Jeffrey Smitherman, both proceeding *pro se* and *in forma pauperis*, bring claims under 42 U.S.C. § 1983 ("section 1983") for injuries arising out of their treatment at the Anna M. Kross Center ("AMKC"), a prison facility on Rikers Island operated by the New York City Department of Correction ("DOC"). Now before the Court are Defendants' motions for summary judgment on the grounds that Plaintiffs failed to exhaust administrative remedies. For the reasons set forth below, the motions are granted.

## I. BACKGROUND [1]

[1] The facts are drawn from Defendants' unopposed Local Rule 56.1 Statements. (No. 14–cv–6606, Doc. No. 13; No. 14–cv–6857. Doc. No. 16.)

Each of these cases is brought by an inmate who was incarcerated at the AMKC prison facility during 2013 and 2014 and alleges mistreatment during his time there. Plaintiff Timmons alleges that during October 2013, and again beginning on March 30, 2014, he was at AMKC with "no bed, medical attention, and very little food." (No. 14–cv–6606, Doc. No. 13 at 1.) He further alleges that during various facility lockdowns at unspecified times, he was "denied showers, phone, mail, time sensitive mail, visits, counsel visits, barbershop, commissary, legal aid,

social service[s], religious services, recreation, and law library." (*Id.*) Plaintiff Smitherman alleges that from April 23, 2013 to April 26, 2013, he was denied a bed at AMKC. (No. 14–cv–6857, Doc. No. 16 at 1.) He further alleges that since May 26, 2013, he has been subjected to various facility lockdowns during which he was deprived of "showers, T.V., phone, mail, law library, social service[s], religious services, visits, [and] counsel visits." (*Id.* at 2.)

The DOC has an administrative grievance procedure, known as the Inmate Grievance and Request Program ("IGRP"), which was available and in effect at all times relevant to this lawsuit. (No. 14–cv–6606, Doc. No. 13 at 2–3; No. 14–cv–6857, Doc. No. 16 at 2–3.) The IGRP requires that inmates first file a complaint with the Inmate Grievance Resolution Committee ("IGRC") within ten days of the complained-of act, that the IGRC attempt to resolve the grievance informally within five days, and that if the grievance is not informally resolved, the inmate may request a formal hearing before the IGRC. (*Id.*) An inmate may appeal the IGRC's decision to the commanding officer, or his or her designee, and subsequent appeals may be taken to the Central Office Review Committee and Board of Correction. (*Id.*) Finally, an inmate has the option of appealing and proceeding to the next level of review at any point throughout the grievance process should the grievance not be decided within the allotted time frame. (*Id.*)

The Southern District of New York Prison Complaint form asks incarcerated plaintiffs to describe the grievance steps they took at their facility before they filed their lawsuit. In response to the questions, "What steps, if any, did you take to appeal that decision," and "Describe all efforts to appeal to the highest level of the grievance process," both Plaintiffs Timmons and Smitherman only stated "I wrote the warden." (No. 14–cv–6606, Doc. No. 13 at 3; No. 14–cv–6857, Doc. No. 16 at 3.) Under the question, "If there are any reasons why you did not file a grievance, state them here," Plaintiff Timmons wrote "N/A," while Plaintiff Smitherman left it blank. (*Id.; Id.*)

**\*2** Plaintiff Timmons filed his complaint on August 18, 2014 (No. 14–cv–6606, Doc. No. 2) and Plaintiff Smitherman filed his complaint on August 22, 2014 (No. 14–cv–6857, Doc. No. 2). On March 3, 2015, the Court issued orders in each case stating that, because "it appears from the face of the Complaint that Plaintiff failed to comply with the administrative exhaustion requirement

of the Prison Litigation Reform Act," Defendants may submit motions for summary judgment in place of motions to dismiss. (No. 14–cv–6606, Doc. No. 11; No. 14–cv–6857, Doc. No. 10.) On April 2, 2015, Defendants filed their motion for summary judgment against Plaintiff Timmons (No. 14–cv–6606, Doc. No. 12), and on April 3, 2015, Defendants filed their motion for summary judgment against Plaintiff Smitherman (No. 14–cv–6857, Doc. No. 11). Although the Court's Order directed Plaintiffs to submit opposition briefs and responsive 56.1 statements by May 1, 2015 (No. 14–cv–6606, Doc. No. 11; No. 14–cv–6857, Doc. No. 10), neither Plaintiff has submitted anything to date. [2]

[2]    Each of the Court's Orders has been mailed to the addresses listed by Plaintiffs on ECF. Where the Court has specifically been made aware by the Law Department or the Pro Se Office that an address is outdated, the Court has also mailed copies of the orders to the address listed on the DOC's Inmate Lookup system. However, it is Plaintiffs' responsibility to alert the Pro Se Office of address changes. *See* Pro Se Litigation Manual at 6.

## II. LEGAL STANDARD

Pursuant to Rule 56(a) of the Federal Rules of Civil Procedure, summary judgment should be granted "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ, P. 56(a). There is "no genuine dispute as to any material fact" where (1) the parties agree on all facts (that is, there are no disputed facts); (2) the parties disagree on some or all facts, but a reasonable fact-finder could never accept the nonmoving party's version of the facts (that is, there are no genuinely disputed facts), *see Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.,* 475 U.S. 574, 587 (1986); or (3) the parties disagree on some or all facts, but even on the nonmoving party's version of the facts, the moving party would win as a matter of law (that is, none of the factual disputes are material), *see Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248 (1986).

In determining whether a fact is genuinely disputed, the court "is not to weigh the evidence but is instead required to view the evidence in the light most favorable to the party opposing summary judgment, to draw all reasonable inferences in favor of that party, and to

eschew credibility assessments." *Weyant v. Okst,* 101 F.3d 845, 854 (2d Cir.1996). Nevertheless, to show a genuine dispute, the nonmoving party must provide "hard evidence," *D'Amico v. City of N.Y.,* 132 F.3d 145, 149 (2d Cir.1998), "from which a reasonable inference in [its] favor may be drawn," *Binder & Binder PC v. Barnhart,* 481 F.3d 141, 148 (2d Cir.2007) (internal quotation marks omitted). "Conclusory allegations, conjecture, and speculation." *Kerzer v. Kingly Mfg.,* 156 F.3d 396, 400 (2d Cir.1998), as well as the existence of a mere "scintilla of evidence in support of the [nonmoving party's] position," *Anderson,* 477 U.S. at 252, are insufficient to create a genuinely disputed fact. A moving party is "entitled to judgment as a matter of law" on an issue if (1) it bears the burden of proof on the issue and the undisputed facts meet that burden; or (2) the nonmoving party bears the burden of proof on the issue and the moving party " 'show[s]'-that is, point[s] out ... -that there is an absence of evidence [in the record] to support the nonmoving party's [position]." *see Celotex Corp. v. Catrett,* 477 U.S. 317, 325 (1986). Furthermore, a "nonmoving party's failure to respond to a [Local Civil] Rule 56.1 statement permits the court to conclude that the facts asserted in the statement are uncontested and admissible." *T.Y. v. New York City Dep't of Educ.,* 584 F.3d 412, 418 (2d Cir.2009) (citing *Gubitosi v. Kapica,* 154 F.3d 30, 31 n. 1 (2d Cir.1998)). Typically, assuming the other requirements of Rule 56 are met, the nonmoving party's failure to file a responsive 56.1 statement results in a grant of summary judgment. *See, e.g., Millus v. D'Angelo,* 224 F.3d 137, 138 (2d Cir.2000).

## III. DISCUSSION

**\*3** As the Court previously noted, "it appears from the face of the Complaint that Plaintiff[s have] failed to comply with the administrative exhaustion requirement of the Prison Litigation Reform Act." (Doc. No. 11.) Specifically, under the Prison Litigation Reform Act ("PLRA"), inmates bringing claims with respect to prison conditions under section 1983 must exhaust the administrative remedies that are available at that prison before proceeding in federal court. 42 U.S.C. § 1997e(a). To exhaust the administrative procedure at the AMKC, an inmate must appeal several layers of review, even if the inmate does not receive a timely disposition at the initial stages. (No. 14–cv–6606, Doc. No. 13 at 2–3; No. 14–cv–6857, Doc. No. 16 at 2–3.) Here, Plaintiffs' Complaints establish that neither of them exhausted

the AMKC administrative procedure. (*Id.*) Rather, each stated that he "wrote the warden," but otherwise did not appeal his grievance or seek further review through the IGRP process. (*Id.*) Such allegations fail to satisfy the PLRA exhaustion requirement, as the law is well-settled that informal means of communicating and pursuing a grievance, even with senior prison officials, are not sufficient under the PLRA. *See, e.g., Macias v. Zenk,* 495 F.3d 37, 44 (2d Cir.2007); *Simon v. Campos,* No. 08–cv–8797 (PKC), 2010 WL 1946871, at *6 (S.D.N.Y. May 10, 2010); *Adames v. New York City Dep't of Corrs.,* No. 07–cv–4021 (GBD), 2008 WL 2743835, at *3 (S.D.N.Y. July 14, 2008). Accordingly, the Complaints demonstrate on their face that Plaintiffs did not exhaust their administrative remedies.

Nevertheless, the Second Circuit has held that under certain circumstances, an inmate's failure to exhaust administrative remedies under the PLRA may be excused. This inquiry is generally guided by the Second Circuit's decision in *Hemphill v. New York,* which directs courts to consider: (1) "whether administrative remedies were in fact available to the prisoner," (2) "whether the defendants may have forfeited the affirmative defense of non-exhaustion by failing to raise or preserve it or whether the defendants' own actions inhibiting the inmate's exhaustion of remedies may estop one or more of the defendants from raising the plaintiff's failure to exhaust as a defense," and (3) "whether special circumstances have been plausibly alleged that justify the prisoner's failure to comply with administrative procedural requirements." 380 F.3d 680, 686 (2d Cir.2004). Should an inmate fail to exhaust administrative remedies and fail to set forth facts that would excuse his failure to exhaust, the PLRA bars his claims.

Here, neither Complaint alleges facts that could excuse Plaintiffs' failure to exhaust under *Hemphill.*

Furthermore, neither Plaintiff took advantage of the opportunity to set forth facts in a responsive 56.1 statement to excuse his failure to exhaust. The IGRP process was available to Plaintiffs (No. 14–cv–6606, Doc. No. 13 at 2–3; No. 14–cv–6857, Doc. No. 16 at 2–3), Defendants timely raised the affirmative defense of non-exhaustion (No. 14–cv–6606, Doc. No. 10; No. 14–cv–6857, Doc. No. 9), Plaintiffs do not allege that AMKC staff retaliated against them or prevented them from pursuing administrative remedies, and Plaintiffs do not allege any "special circumstances" that would otherwise justify their failure to comply with the PLRA exhaustion requirements. Therefore, in light of the fact that the Complaints on their face demonstrate that Plaintiffs failed to exhaust administrative remedies, the Complaints fail to allege any facts that would excuse Plaintiffs' failure to exhaust under *Hemphill,* and Plaintiffs failed to submit responsive 56.1 statements, the Court finds that Plaintiffs' claims are barred for failure to comply with the administrative exhaustion requirement of the PLRA.

## IV. CONCLUSION

**\*4** For the reasons set forth above, IT IS HEREBY ORDERED THAT Defendants' motions for summary judgment are GRANTED. The Clerk of the Court is respected directed to terminate the motions pending at docket entry 12 in No. 14–cv–6606 and docket entry 11 in No. 14–cv–6857 and to close these cases.

SO ORDERED.

**All Citations**

Not Reported in F.Supp.3d, 2015 WL 3901637

---

**End of Document**

© 2018 Thomson Reuters. No claim to original U.S. Government Works.

2016 WL 4411338
Only the Westlaw citation is currently available.
United States District Court,
N.D. New York.

Nema Salmon, a/k/a Nemar Salmon, Plaintiff,
v.
Officer Bellinger, Defendant.

Civ. No. 9:14-CV-0827 (LEK/DJS)
|
Signed 07/05/2016

**Attorneys and Law Firms**

NEMA SALMON, 11-R-2364, Marcy Correctional
Facility, P.O Box 3600, Marcy, New York 13403,
Plaintiff, Pro Se.

HON. ERIC T. SCHNEIDERMAN, Attorney General
of the State of New York, The Capitol, OF COUNSEL:
JOSHUA L. FARRELL, ESQ., Assistant Attorney
General, Albany, New York 12224, Attorney for
Defendant.

## REPORT-RECOMMENDATION and ORDER

DANIEL J. STEWART, United States Magistrate Judge

**\*1** *Pro se* Plaintiff Nema Salmon commenced this action,
pursuant to 42 U.S.C. § 1983, alleging that Defendant
Correctional Officer Donald Bellinger used excessive
force against him at Riverview Correctional Facility
("Riverview C.F."). Dkt. No. 1, Compl. Presently before
the Court is Defendant's Motion for Summary Judgment
based on the ground that Plaintiff failed to exhaust
his administrative remedies prior to filing this action.
Dkt. No. 23, Def.'s Mot. for Summ. J. Plaintiff did not
file a response. For the reasons that follow, the Court
recommends that Defendant's Motion be **granted**.

## I. BACKGROUND

Plaintiff alleges the following facts in his Complaint.
On January 17, 2014, Plaintiff was being taken to the
special housing unit ("SHU") at Riverview C.F. Compl.
at 1. Upon arriving at SHU, Defendant Bellinger and an
unidentified officer conducted a strip search of Plaintiff.

*Id.* at pp. 1-2. During the search, a bag of tobacco fell
out of Plaintiff's clothes. *Id.* at p. 2. Plaintiff alleges that
the officers then used excessive force against him. *Id.*
Following the incident, Bellinger warned Plaintiff "to not
make [his] voice be heard or else [he would] get the beating
of a life time." *Id.*

Ten days after this incident, on June 27, 2014, Plaintiff
was transferred to Gouverneur Correctional Facility
("Gouverneur C.F."). Dkt. No. 23-10, Def.'s Statement
of Material Facts ("Def.'s SMF"). Plaintiff commenced this
action on July 8, 2014. *See* Compl.

## II. DISCUSSION

### A. Summary Judgment Standard

Pursuant to FED. R. CIV. P. 56(a), summary judgment is
appropriate only where "there is no genuine dispute as to
any material fact and the movant is entitled to judgment
as a matter of law." The moving party bears the burden
to demonstrate through "pleadings, depositions, answers
to interrogatories, and admissions on file, together with
[ ] affidavits, if any," that there is no genuine issue of
material fact. *F.D.I.C. v. Giammettei*, 34 F.3d 51, 54 (2d
Cir. 1994) (quoting *Celotex Corp. v. Catrett*, 477 U.S. 317,
323 (1986)).

To defeat a motion for summary judgment, the non-
movant must set out specific facts showing that there
is a genuine issue for trial, and cannot rest merely
on allegations or denials of the facts submitted by the
movant. FED. R. CIV. P. 56(c); *see also Scott v. Coughlin*,
344 F.3d 282, 287 (2d Cir. 2003) ("Conclusory allegations
or denials are ordinarily not sufficient to defeat a motion
for summary judgment when the moving party has set
out a documentary case."); *Rexnord Holdings, Inc. v.
Bidermann*, 21 F.3d 522, 525-26 (2d Cir. 1994). To that
end, sworn statements are "more than mere conclusory
allegations subject to disregard ... they are specific and
detailed allegations of fact, made under penalty of perjury,
and should be treated as evidence in deciding a summary
judgment motion" and the credibility of such statements
is better left to a trier of fact. *Scott v. Coughlin*, 344 F.3d
at 289 (citing *Flaherty v. Coughlin*, 713 F.2d 10, 13 (2d Cir.
1983) and *Colon v. Coughlin*, 58 F.3d 865, 872 (2d Cir.
1995)).

Case 9:16-cv-01062-DNH-TWD    Document 62    Filed 07/20/18    Page 97 of 116
Salmon v. Bellinger, Not Reported in F.Supp.3d (2016)
2016 WL 4411338

**\*2**  When considering a motion for summary judgment, the court must resolve all ambiguities and draw all reasonable inferences in favor of the non-movant. *Nora Beverages, Inc. v. Perrier Group of Am., Inc.*, 164 F.3d 736, 742 (2d Cir. 1998). "[T]he trial court's task at the summary judgment motion stage of the litigation is carefully limited to discerning whether there are any genuine issues of material fact to be tried, not to deciding them. Its duty, in short, is confined at this point to issue-finding; it does not extend to issue-resolution." *Gallo v. Prudential Residential Servs., Ltd. P'ship*, 22 F.3d 1219, 1224 (2d Cir. 1994). Furthermore, where a party is proceeding *pro se*, the court must "read [his or her] supporting papers liberally, and ... interpret them to raise the strongest arguments that they suggest." *Burgos v. Hopkins*, 14 F.3d 787, 790 (2d Cir. 1994), *accord*, *Soto v. Walker*, 44 F.3d 169, 173 (2d Cir. 1995). Nonetheless, summary judgment is appropriate "[w]here the record taken as a whole could not lead a rational trier of fact to find for the non-moving party." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986).

When a motion for summary judgment is unopposed, the court may "grant summary judgment if the motion and supporting materials—including the facts considered undisputed—show that the movant is entitled to it." FED. R. CIV. P. 56(e)(3); *see also* N.D.N.Y.L.R. 7.1(b)(3) ("Where a properly filed motion is unopposed and the Court determines that the moving party has met its burden to demonstrate entitlement to the relief requested therein, the non-moving party's failure to file or serve any papers ... shall be deemed as consent to the granting or denial of the motion."). "If the evidence adduced in support of the summary judgment motion does not meet [the movant's] burden [of production], 'summary judgment must be denied *even if no opposing evidentiary matter is presented*.' " *Amaker v. Foley*, 247 F.3d 677, 681 (2d Cir. 2001) (quoting *Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 160 (1970)). "An unopposed summary judgment motion may also fail where the undisputed facts fail to 'show that the moving party is entitled to judgment as a matter of law.' " *Vermont Teddy Bear Co. v. 1-800 Beargram Co.*, 373 F.3d 241, 244 (2d Cir. 2004) (quoting *Champion v. Artuz*, 76 F.3d 483, 486 (2d Cir. 1996)).

**B. Exhaustion**

Defendant argues that this action must be dismissed because Plaintiff failed to exhaust his administrative remedies. Dkt. No. 23-11, Def.'s Mem. of Law.

*1. Exhaustion Procedure*

The Prison Litigation Reform Act ("PLRA") provides, in pertinent part, that "[n]o action shall be brought with respect to prison conditions under section 1983 of this title, or any other Federal law, by a prisoner confined in any jail, prison, or other correctional facility until such administrative remedies as are available are exhausted." 42 U.S.C. § 1997e(a). The Supreme Court has held that "the PLRA's exhaustion requirement applies to all inmate suits about prison life, whether they involve general circumstances or particular episodes, and whether they allege excessive force or some other wrong." *Porter v. Nussle*, 534 U.S. 516, 532 (2002) (citation omitted). Exhaustion in prisoner cases covered by § 1997e(a) is mandatory. *Id.* at 524; *Ross v. Blake*, ___ S. Ct. ____, 2016 WL 3128839, at \*5 (2016) (stating that mandatory language of § 1997e(a) forecloses judicial discretion to craft exceptions to the requirement). Furthermore, § 1997e(a) requires "proper exhaustion," which means using all steps of the administrative process and complying with "deadlines and other critical procedural rules." *Woodford v. Ngo*, 548 U.S. 81, 93 (2006). The defendant bears the burden of proving that the administrative remedies available to the plaintiff were not exhausted prior to the initiation of a civil action. *Howard v. Goord*, 1999 WL 1288679, at \*3 (E.D.N.Y. Dec. 28, 1999). [1]

[1]    Exhaustion of administrative remedies is an affirmative defense which must be raised by the defendant. See *Jenkins v. Haubert*, 179 F.3d 19, 28-29 (2d Cir. 1999). Defendant properly raised the defense in his Answer. Dkt. No. 18, Answer at ¶ 11.

**\*3**  In New York, the administrative remedies consist of a three-step Inmate Grievance Program ("IGP"). First, a grievance is submitted to the Inmate Grievance Resolution Committee ("IGRC"), a committee comprised of both inmates and facility employees. N.Y. COMP. CODES R. & REGS. tit. 7, § 701.5(b). The IGRC reviews and investigates the formal complaints and then issues a written determination. *Id.* Second, upon appeal of the IGRC decision, the superintendent of the facility reviews the IGRC's determination and issues a decision. *Id.* at § 701.5(c). Finally, upon appeal of the superintendent's

Case 9:16-cv-01062-DNH-TWD   Document 62   Filed 07/20/18   Page 98 of 116
Salmon v. Bellinger, Not Reported in F.Supp.3d (2016)
2016 WL 4411338

decision, the Cental Office Review Committee ("CORC") makes the final administrative determination. *Id.* at § 701.5(d). Only upon exhaustion of all three levels of review may a prisoner seek relief in federal court. *Bridgeforth v. Bartlett*, 686 F. Supp. 2d 238, 239 (W.D.N.Y. 2010) (citing, *inter alia*, *Porter v. Nussle*, 534 U.S. at 524); *see also Neal v. Goord*, 267 F.3d 116, 121 (2d Cir. 2001), *overruled on other grounds by Porter v. Nussle*, 534 U.S. 516.

In addition to the formal grievance procedure described above, the regulations provide for an expedited grievance procedure for claims of employee "harassment." N.Y. COMP. CODES R. & REGS. tit. 7, § 701.8. Pursuant to this expedited procedure, the inmate may first report the incident to the employee's immediate supervisor. *Id.* at § 701.8(a). The inmate's allegations are then given a grievance number and the superintendent (or his designee) must promptly decide whether the grievance, if true, would represent a bona fide case of harassment. *Id.* at §§ 701.8(b) & (c).

If the superintendent determines that the allegations do not represent a bona fide case of harassment, the allegations are automatically routed to the IGRC for resolution according to the formal three-step grievance procedure outlined above. *Id.* at § 701.8(c). If the superintendent finds that the allegations do represent a bona fide case of harassment, then he must either initiate an in-facility investigation by higher ranking personnel, or request an investigation by the Inspector General's Office, and if criminal activity is involved, the superintendent may request an investigation by the New York State Police Bureau of Criminal Investigations. *Id.* at §§ 701.8(d); *see also Perez v. Blot*, 195 F. Supp. 2d 539, 542-43 (S.D.N.Y. 2002) (describing the grievance system).

The superintendent must render a decision within twenty-five calendar days of receipt of the grievance. N.Y. COMP. CODES R. & REGS. tit. 7, § 701.8(f). If the superintendent fails to respond within this required time-frame, the inmate may appeal his grievance to CORC by filing a notice of decision to appeal with the inmate grievance clerk. *Id.* at § 701.8(g). If the inmate receives a response from the superintendent and wishes to appeal to CORC, he must file a notice of decision to appeal with the inmate grievance clerk within seven calendar days of receipt of the response. *Id.* at § 701.8(h).

In sum, the expedited procedure set forth above allows inmates to bypass filing a formal grievance by instead "reporting" the incident. *See Perez v. Blot*, 195 F. Supp. 2d at 544. Such a process is wholly consistent with the underlying concern of employee harassment.

### 2. Plaintiff's Failure to Exhaust Administrative Remedies

In this case, it is undisputed that Plaintiff did not file any grievance relative to the incident alleged in his Complaint and therefore did not exhaust his administrative remedies. There is no record on file at either Riverview C.F. or Gouverneur C.F. of a grievance filed by Plaintiff regarding the June 17, 2014 excessive force incident. Dkt. No. 23-2, Decl. of Kristina Monnet, dated Sept. 29, 2015, at ¶ 5; Dkt. No. 23-3, Decl. of Laura Looker, dated Oct. 1, 2015, at ¶ 6. Plaintiff's only grievance filed at either of these facilities concerned a deduction from his inmate account for lost sneakers. Looker Decl., Ex. A. There is also no record of Plaintiff having appealed a grievance regarding this incident to CORC. Dkt. No. 23-1, Decl. of Jeffery Hale, dated Sept. 28, 2015, at ¶¶ 15-17.

**\*4** Moreover, Plaintiff admitted at his deposition that he did not file a grievance regarding this incident. Dkt. No. 23-6, Joshua Farrell Decl., Ex. A, Pl.'s Dep., dated July 15, 2105, at pp. 47-49. Instead, Plaintiff sent letters to Anthony Annucci, Acting Commissioner of the Department of Corrections and Community Supervision ("DOCCS"), and the Inspector General of DOCCS. Dkt. No. 23-7, Farrell Decl., Ex. E; Dkt. No. 23-8, Farrell Decl., Ex. F. These letters requested that criminal charges be filed against the correctional officers and that the letter not be treated "as a grievance complaint" because Plaintiff felt his life was in danger. Farrell Decl., Exs. E & F. Plaintiff stated that he knew there were grievance procedures in place, but did not want to access it because he did not want his complaint investigated by officers at the facility. *See* Pl.'s Dep. at pp. 47-49. Letters sent outside of the grievance process, such as Plaintiff's letters to Commissioner Annucci and the Inspector General, are insufficient to satisfy the exhaustion requirement. *See Timmons v. Schriro*, 2015 WL 3901637, at \*3 (S.D.N.Y. June 23, 2015) ("[T]he law is well-settled that informal means of communicating and pursuing a grievance, even with senior prison officials, are not sufficient under the PLRA."); *Muhammad v. Pico*, 2003 WL 21792158, at \*8 (S.D.N.Y. Aug. 5, 2003) ("District court decisions in this

2016 WL 4411338

circuit have repeatedly held that complaint letters to the DOCS Commissioner or the facility Superintendent do not satisfy the PLRA's exhaustion requirements."); *Grey v. Sparhawk*, 2000 WL 815916, at *2 (S.D.N.Y. June 23, 2000) ("Any complaint ... made directly to the Inspector General's office does not serve to excuse plaintiff from adhering to the available administrative procedures."). Plaintiff's letters therefore neither satisfy the IGP, nor the expedited alternative for allegations of harassment.

### 3. Whether Plaintiff's Failure to Exhaust Administrative Remedies may be Excused

Plaintiff's obligation to exhaust administrative remedies may be nonetheless be excused if remedies were unavailable. *Ross v. Blake*, ___ S. Ct. ____, 2016 WL 3128839, at *7 (2016). As the Supreme Court recently stated, "[a]n inmate ... must exhaust available remedies, but need not exhaust unavailable ones." *Id.* The Court stated three potential circumstances where administrative remedies may be unavailable: (1) where the administrative procedure technically exists but operates as a "dead end – with officers unable or consistently unwilling to provide any relief to aggrieved inmates"; (2) where the administrative scheme is "so opaque that it becomes, practically speaking, incapable of use"; and (3) where prison administrators "thwart inmates from taking advantage of a grievance process through machination, misrepresentation, or intimidation." *Id.* at *7-8. [2]

---

[2]    The Second Circuit has previously identified three circumstances when a failure to exhaust may be excused: "(1) administrative remedies are not available to the prisoner; (2) defendants have either wived the defense of failure to exhaust or acted in such a way as to estop them from raising the defense; or (3) special circumstances, such as a reasonable misunderstanding of the grievance procedures, justify the prisoner's failure to comply with the exhaustion requirement." *Ruggiero v. Cty. of Orange*, 467 F.3d 170, 175 (2d Cir. 2006) (citing *Hemphill v. New York*, 380 F.3d 680, 686 (2d Cir. 2004)). The Supreme Court in *Ross* explicitly rejected the "special circumstances" exception, and focused the inquiry on the "availability" of administrative remedies. *Ross v. Blake*, ___ S. Ct. ____, 2016 WL 3128839, at *7. The Court therefore will focus its analysis on the availability of administrative remedies to Plaintiff.

The Court will also discuss estoppel, although it is unclear whether the doctrine survives *Ross*.

Plaintiff admits that the grievance process was available to him. Pl.'s Dep. at p. 47. However, Plaintiff claims that he did not file a grievance because he feared retaliation based on threats that Defendant Bellinger had made. *Id.* at pp. 51 & 55. Under *Ross*, threats or other intimidation by prison employees may render administrative remedies unavailable. 2016 WL 3128839, at *8 n.3. The Second Circuit has stated that "[t]he test for deciding whether the ordinary grievance procedures were available must be an objective one: that is, would 'a similarly situated individual of ordinary firmness' have deemed them available." *Hemphill v. New York*, 380 F.3d 680, 688 (2d Cir. 2004).

Plaintiff's claim that Bellinger made a specific threat to retaliate against him if he filed a grievance regarding the assault, Pl.'s Dep. at pp. 43, 51, & 55, would be sufficient to create an issue of material fact as to whether administrative remedies were available to Plaintiff at Riverview C.F. Specific threats of retaliation could reasonably deter a prisoner in Plaintiff's situation from filing a grievance, particularly when the threats followed an assault. *See, e.g.*, *Hemphill v. New York*, 380 F.3d at 688 (remanding for determination of availability of administrative remedies where officer threatened to retaliate against the plaintiff if he filed a complaint); *Lunney v. Brureton*, 2007 WL 1544629, at *9 (S.D.N.Y. May, 29, 2007) (finding that "a reasonable factfinder could conclude that a prisoner in [the plaintiff's] situation would be deterred from complaining about an assault that had just occurred); *Hepworth v. Suffolk Cty.*, 2006 WL 2844408, at *6 (E.D.N.Y. Sept. 29, 2006) (finding that officers' threats of violence if the plaintiff reported assault may have deterred person of ordinary firmness from using grievance process). Defendant's argument that Plaintiff's claims are contradicted by the fact that he sent complaint letters to the DOCCS Commissioner and Inspector General is misplaced. Dkt. No. 23-11, Defs.' Mem. of Law at p. 8. In *Hemphill*, the Second Circuit stated "that threats or other intimidation by prison officials may well deter a prisoner of 'ordinary firmness' from filing an internal grievance, but not from appealing directly to individuals in positions of greater authority within the prison system, or to external structures of authority such as state or federal courts." 380 F.3d at 688.

**\*5** However, Plaintiff has not shown that administrative remedies were unavailable at Gouverneur C.F. Plaintiff was transferred to Gouverneur C.F. on June 27, 2014, ten days after the alleged assault. Monnett Decl. at ¶ 4. An inmate must submit a grievance "within 21 calendar days of the alleged occurrence." N.Y. COMP. CODES R. & REGS. tit. 7, § 701.5(a). Additionally, an inmate may request an extension of the time limit within forty-five days of the date of the alleged occurrence. Id. § 701.6(g). Plaintiff therefore had eleven days to file his grievance and thirty-five days to request an extension after his transfer to Gouverneur C.F. Plaintiff states that he did not file a grievance at Gouverneur C.F. because he believed that officers there might be in contact with officers at Riverview C.F. and would retaliate against him. Pl.'s Dep. at p. 51. This amounts to nothing more than a "generalized fear of retaliation," which is insufficient to excuse a failure to exhaust. See Brown v. Napoli, 687 F. Supp. 2d 295, 297 (W.D.N.Y. 2009); Harrison v. Stallone, 2007 WL 2789473, at \*5-6 (N.D.N.Y. Sept. 24, 2007). Therefore, the Court finds that Plaintiff has not identified any issue of fact as to the availability of administrative remedies at Gouverneur C.F. See Wallace v. Fisher, 2015 WL 9275001, at \*4 (N.D.N.Y. Dec. 18, 2015) (finding that even if administrative remedies were unavailable to the plaintiff at first correctional facility, there was no issue of material fact that they were available following his transfer to a second correctional facility); Newman v. Duncan, 2007 WL 2847304, at \*4 (N.D.N.Y. Sept. 26, 2007) (finding that administrative remedies were available to inmate where he was transferred out of facility where officer had threatened him).

The Second Circuit has also held that "the affirmative defense of exhaustion is subject to estoppel." Ziemba v. Wezner, 366 F.3d 161, 163 (2d Cir. 2004). The Second Circuit has questioned whether the doctrine of estoppel survived the Supreme Court's decision in Woodford v. Ngo, 548 U.S. 81 (2006), which held that the PLRA requires "proper exhaustion." Amador v. Andrews, 655 F.3d 89, 102 (2d Cir. 2011) ("We have questioned whether, in light of Woodford, the doctrines of estoppel and special circumstances survived."); Ruggiero v. Cty. of Orange, 467 F.3d 170, 176 (2d Cir. 2006). The Supreme Court's decision in Ross again puts the availability of estoppel in doubt. 2016 WL 3128839, at \*5-6. In Ross, the Supreme Court made clear that the mandatory nature of the exhaustion required by the PLRA forecloses judicial discretion to craft exceptions. Id. at \*5; see also id. at

\*6 ("Exhaustion is no longer left to the discretion of the district court." (quoting Woodford v. Ngo, 548 U.S. at 85)). Nonetheless, in an abundance of caution, because the Second Circuit has not yet addressed the impact of Ross on the inquiry stated in Hemphill, the Court will discuss whether Defendant Bellinger would be estopped from asserting the exhaustion defense.

A defendant who "inhibit[s] an inmate's ability to utilize grievance procedures" may be estopped from raising exhaustion as an affirmative defense. Abney v. McGinnis, 380 F.3d 663, 667 (2d Cir. 2004). A prisoner must demonstrate that the "defendants took affirmative action to prevent him from availing himself of grievance procedures." Amador v. Andrews, 655 F.3d at 103. "[V]erbal and physical threats of retaliation, physical assault, denial of grievance forms or writing implements, and transfers constitute such affirmative action." Id. "Estoppel is found where 'an inmate reasonably understands that pursuing a grievance through the administrative process will be futile or impossible.' " Kasiem v. Switz, 756 F. Supp. 2d 570, 577 (S.D.N.Y. 2010) (quoting Winston v. Woodward, 2008 WL 2263191, at \*9 (S.D.N.Y. May 30, 2008)).

In this case, for the same reasons that the Court found that administrative remedies were available to Plaintiff at Gouverneur C.F., the Court finds that Defendant Bellinger did not inhibit Plaintiff's ability to exhaust administrative remedies at Gouverneur C.F. There is no evidence in the record that suggests that Plaintiff reasonably feared retaliation by Bellinger at Gouverneur C.F. or that administrative remedies were otherwise unavailable to him there. See Contino v. City of New York, 2013 WL 4015816, at \*6 (S.D.N.Y. Aug. 7, 2013) ("An inmate's fear that disciplinary actions will be taken against him if he proceeds with a grievance process must, at a minimum, be reasonable in order to relieve the plaintiff of his obligation to exhaust."); Goodson v. Silver, 2012 WL 449937, at \*8 (N.D.N.Y. Sept. 25, 2012) ("[E]ven if the Court were to find that Plaintiff was effectively prevented by Defendants from filing a grievance while he was at Clinton C.F., the Court would find that he was not prevented by Defendants (or anyone) from filing that grievance ... once he was transferred from Clinton C.F."); Mateo v. O'Connor, 2010 WL 3199690, at \*5 (S.D.N.Y. Aug. 12, 2010) ("[I]n this case, the threats were of no consequence. By his own admission, [the plaintiff] was not prevented from following the prison's internal grievance

procedure."). Thus, Defendant Bellinger is not estopped from raising exhaustion as an affirmative defense.

 **\*6**  Accordingly, the Court recommends that Defendant's Motion for Summary Judgment be **granted** on account of Plaintiff's failure to exhaust his administrative remedies.

### III. CONCLUSION

For the reasons stated herein, it is hereby

**RECOMMENDED**, that Defendant's Motion for Summary Judgment (Dkt. No. 23) be **GRANTED** and this action be **DISMISSED**; and it is further

**ORDERED**, that the Clerk of the Court serve a copy of this Report-Recommendation and Order upon the parties to this action.

Pursuant to 28 U.S.C. § 636(b)(1), the parties have fourteen (14) days within which to file written objections to the foregoing report. Such objections shall be filed with the Clerk of the Court. **FAILURE TO OBJECT TO THIS REPORT WITHIN FOURTEEN (14) DAYS WILL PRECLUDE APPELLATE REVIEW.** *Roldan v. Racette*, 984 F.2d 85, 89 (2d Cir. 1993) (citing *Small v. Sec'y of Health and Human Servs.*, 892 F.2d 15 (2d Cir. 1989)); *see also* 28 U.S.C. § 636(b)(1); FED. R. CIV. P. 72 & 6(a).

**All Citations**

Not Reported in F.Supp.3d, 2016 WL 4411338

---

**End of Document**

© 2018 Thomson Reuters. No claim to original U.S. Government Works.

2016 WL 4275733
Only the Westlaw citation is currently available.
United States District Court,
N.D. New York.

Nema Salmon, a/k/a Nemar Salmon, Plaintiff,

v.

Officer Bellinger, Defendant.

9:14-CV-0827 (LEK/DJS)
|
Signed 08/12/2016

**Attorneys and Law Firms**

Nema Salmon, Marcy, NY, pro se.

Joshua L. Farrell, New York State Attorney General, Albany, NY, for Defendant.

## ORDER

Lawrence E. Kahn, U.S. District Judge

**\*1** This matter comes before the Court following a Report-Recommendation filed on July 5, 2016, by the Honorable Daniel J. Stewart, U.S. Magistrate Judge, pursuant to 28 U.S.C. § 636(b) and Local Rule 72.3. Dkt. No. 31 ("Report-Recommendation").

Within fourteen days after a party has been served with a copy of a magistrate judge's report-recommendation, the party "may serve and file specific, written objections to the proposed findings and recommendations." Fed. R. Civ. P. 72(b); L.R. 72.1(c). If no objections are made, or if an objection is general, conclusory, perfunctory, or a mere reiteration of an argument made to the magistrate judge, a district court need review that aspect of a report-recommendation only for clear error. Barnes v. Prack, No. 11-CV-857, 2013 WL 1121353, at \*1 (N.D.N.Y. Mar.

18, 2013); Farid v. Bouey, 554 F. Supp. 2d 301, 306–07, 306 n.2 (N.D.N.Y. 2008), overruled on other grounds by Widomski v. State Univ. of N.Y. (SUNY) at Orange, 748 F.3d 471 (2d Cir. 2014); see also Machicote v. Ercole, No. 06-CV-13320, 2011 WL 3809920, at \*2 (S.D.N.Y. Aug. 25, 2011) ("[E]ven a pro se party's objections to a Report and Recommendation must be specific and clearly aimed at particular findings in the magistrate's proposal, such that no party be allowed a second bite at the apple by simply relitigating a prior argument." (quoting Howell v. Port Chester Police Station, No. 09-CV-1651, 2010 WL 930981, at \*1 (S.D.N.Y. Mar. 15, 2010))). "A [district] judge ... may accept, reject, or modify, in whole or in part, the findings or recommendations made by the magistrate judge." 28 U.S.C. § 636(b).

No objections were filed in the allotted time period. See Docket. The Court has therefore reviewed the Report-Recommendation for clear error and has found none.

Accordingly, it is hereby:

**ORDERED**, that the Report-Recommendation (Dkt. No. 27) is **APPROVED and ADOPTED in its entirety**; and it is further

**ORDERED**, that Defendant's Motion for Summary Judgment (Dkt. No. 23) is **GRANTED** and Plaintiff's Complaint (Dkt. No. 1) is **DISMISSED with prejudice**; and it is further

**ORDERED**, that the Clerk of the Court serve a copy of this Order on all parties in accordance with the Local Rules.

**IT IS SO ORDERED.**

**All Citations**

Not Reported in F.Supp.3d, 2016 WL 4275733

End of Document    © 2018 Thomson Reuters. No claim to original U.S. Government Works.

2017 WL 2791063
Only the Westlaw citation is currently available.
United States District Court,
N.D. New York.

Edy RODRIGUEZ, Plaintiff,

v.

J. CROSS, Sergeant, Clinton
Correctional Facility; et al., Defendants.

No. 15-CV-1079 (GTS/CFH)
|
Signed 05/09/2017

**Attorneys and Law Firms**

Edy Rodriguez, East Elmhurst, NY, pro se.

Ryan E. Manley, Harris, Conway & Donovan,
Christopher J. Hummel, New York State Attorney
General, Albany, NY, for Defendants.

**REPORT-RECOMMENDATION AND ORDER** [1]

[1]    This matter was referred to the undersigned for report
and recommendation pursuant to 28 U.S.C. § 636(b)
and N.D.N.Y.L.R. 72.3(c).

Christian F. Hummel, U.S. Magistrate Judge

**\*1** Plaintiff pro se Edy Rodriguez ("Plaintiff"), an inmate
who was, at all relevant times, in the custody of the
New York Department of Corrections and Community
Supervision ("DOCCS"), brings this action pursuant to
42 U.S.C. § 1983, alleging that Sergeant ("Sgt.") J. Cross,
Sgt. R. Furnia, Correction Officer ("C.O.") G. Falcon,
and C.O. J. Roberts (collectively "Defendants") violated
his constitutional rights under the First and Eighth
Amendments. Dkt. No. 1 ("Compl."). [2]

[2]    On March 27, 2017, this Court granted plaintiff an
extension until May 1, 2017 to file a motion to amend
his complaint. Dkt. No. 38. The deadline has expired
and plaintiff has not filed a motion to amend his
complaint.

Presently pending is defendants' motion for summary
judgment pursuant to Federal Rule of Civil Procedure
("Fed. R. Civ. P.") 56(a) for plaintiff's failure to exhaust

administrative remedies before commencing this action.
Dkt. No. 26. Plaintiff filed a response in opposition to
defendants' motion. Dkt. No. 34. Defendants filed a reply.
Dkt. No. 39.

**I. Background**

The facts are reviewed in the light most favorable to
plaintiff as the non-moving party. See subsection II(A)
infra. At the relevant times giving rise to plaintiff's
claims, plaintiff was an inmate incarcerated at Clinton
Correctional Facility ("Clinton").

On July 10, 2014, plaintiff wrote a letter to Sgt. Cross
"complaining about being harassed" by staff at Clinton.
Compl. at 4. Plaintiff further alleges that he was taken out
of his cell on July 14, 2014, brought to the second floor
of the facility's hospital, and subjected to a "beating" by
defendants. Compl. at 4-5. Sgt. Cross grabbed him by the
hair; Sgt. Furnia punched him; and C.O. Falcon and C.O.
Roberts punched him in the face, back, and neck. Id. at
4. Plaintiff alleges "each one of the blows" he suffered
was from the named defendants, as well as other officers
he cannot identify by name. Id. at 5-6. After the alleged
incident, plaintiff was seen by a nurse with "about ten"
officers present in the room, where he admits "having no
choice," but to tell the nurse that officers had just beat him
up. See Affirmation of Christopher J. Hummel ("Hummel
Aff."), Dkt. No. 26-1, Exhibit ("Exh.") A [3] at 59-60. [4]

[3]    Exhibit A to the Affirmation of Christopher J.
Hummel is a transcript of plaintiff's deposition,
held on September 19, 2016 at Great Meadow
Correctional Facility. See Dkt. No. 26-1.

[4]    When citing documents within the record, the Court
uses the page numbers generated by CM/ECF.

While at Clinton, plaintiff filed five grievances. See
Declaration of Christine Gregory ("Gregory Decl."), Dkt.
No. 26-3 Exh. A at 6. Only one grievance was appealed.
Declaration of Jeffrey Hale ("Hale Decl."), Dkt. No.
26-2 ¶¶ 12-13. The subject matter of the single appealed
grievance does not concern the matter before the Court.
Id. ¶ 12. The only grievance filed that is pertinent to
the pending motion was filed on July 29, 2014. See
Gregory Decl. Exh. B at 8. This grievance alleges that
plaintiff suffered "an assault by (C.O.)" and, following the
assault, did not receive appropriate medical care. Id. The

investigation into the July 29, 2014 grievance concluded that plaintiff saw his medical provider, and medicine was given to him without any further action. Id. at 10. The investigation did not mention anything about an assault. Id.

**\*2** Plaintiff alleges that he filed a grievance regarding the incidents described in his complaint, but an unidentified Sergeant destroyed the grievance. Compl. at 2. He also alleges that he was beaten by correction staff for filing the grievance. Id. Plaintiff also states that he filed a handwritten grievance (not on a grievance form) on July 19, 2014, regarding the July 14, 2014 incident. See Hummel Aff. Exh. A at 93. Plaintiff alleges that he sent a copy of this grievance to his mother and instructed her to send it directly to Clinton "[f]rom outside." Id. at 94. Defendants have no record of this grievance being filed. See Gregory Decl. Exh. A at 6. Plaintiff never inquired further about the July 19, 2014 grievance, but maintains that he has handwritten copies of the grievance since he did not have access to carbon paper when he originally drafted this grievance. See Hummel Aff. Exh. A at 94-95, 96-97. The July 19, 2014 grievance was drafted while plaintiff was in keeplock. Id. at 93.

Plaintiff further alleges, in his response to defendants' motion for summary judgment, that defendants have total control over facility mail and any failure to exhaust administrative remedies occurred because defendants strategically removed grievances from the mailbox to cover up their use of excessive force against plaintiff. See Dkt. No. 34 at 4. Plaintiff further alleges a general belief that there is a pattern of prison officials threatening and retaliating against inmates for filing grievances, thus making administrative remedies unavailable. Id. at 6. Lastly, plaintiff alleges that there is an "unwritten posture" at Clinton where inmates are not given grievance forms unless they provide a clear description of their complaint, or the complaint does not involve staff misconduct. Id. at 8.

## II. Discussion [5]

[5]    All unpublished opinions cited to by the Court in this Report-Recommendation and Order are, unless otherwise noted, attached to this Report-Recommendation and Order.

Plaintiff alleges that defendants retaliated against him in violation of the First Amendment, used excessive force against him in violation of the Eighth Amendment, and violated his Due Process rights under the First and Fourteenth Amendments. See Compl. at 7. Defendants argue that plaintiff's complaint should be dismissed in its entirety as plaintiff failed to exhaust his administrative remedies with respect to the causes of action outlined in the Complaint. See Defendants' Memorandum of Law, Dkt. No. 26-5 at 3.

### A. Legal Standard For Motions Pursuant to Fed. R. Civ. P. 56(a)

"A court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." FED. R. CIV. P. 56(a). The moving party has the burden of showing the absence of disputed material facts by providing the Court with portions of "pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any," which support the motion. FED. R. CIV. P. 56(c); Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986). A fact is material if it may affect the outcome of the case as determined by substantive law, such that "a reasonable jury could return a verdict for the nonmoving party." Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 249 (1986). "In determining whether summary judgment is appropriate, [the Court] will resolve all ambiguities and draw all reasonable inferences against the moving party." Skubel v. Fuoroli, 113 F.3d 330, 334 (2d Cir. 1997).

To avoid summary judgment, a non-moving party "must do more than simply show that there is some metaphysical doubt as to the material facts." Carey v. Crescenzi, 923 F.2d 18, 19 (2d Cir. 1991) (quoting Matsushita Elec. Indus. Co., Ltd. V. Zenith Radio Corp., 475 U.S. 574, 586 (1986)). A non-moving party must support such assertions by evidence showing the existence of a genuine issue of material fact. Carey, 923 F.2d at 19. "When no rational jury could find in favor of the non-moving party because the evidence to support is so slight, there is no genuine issue of material fact and a grant of summary judgment is proper." Gallo v. Prudential Services, Ltd. Partnership, 22 F.3d, 1219, 1224 (2d Cir. 1994).

**\*3** Where, as here, a party seeks judgment against a pro se litigant, a court must afford the non-movant special solicitude. See Triestman v. Fed. Bureau of Prisons, 470 F.3d 471, 477 (2d Cir. 2006). As the Second Circuit has stated,

> [t]here are many cases in which we have said that a pro se litigant is entitled to "special solicitude," ... that a pro se litigant's submissions must be construed "liberally," ... and that such submissions must be read to raise the strongest arguments that they "suggest," .... At the same time, our cases have also indicated that we cannot read into pro se submissions claims that are not "consistent" with the pro se litigant's allegations, ... or arguments that the submissions themselves do not "suggest," ... that we should not "excuse frivolous or vexatious filings by pro se litigants," ... and that pro se status "does not exempt a party from compliance with relevant rules of procedural and substantive law" ....

Id. (citations and footnote omitted); see also Sealed Plaintiff v. Sealed Defendant, 537 F.3d 185, 191–92 (2d Cir. 2008).

### B. Exhaustion of Administrative Remedies

The Prison Litigation Reform Act ("PLRA") requires that a prisoner exhaust any administrative remedies available to him or her before bringing an action for claims arising out of his or her incarceration. Porter v. Nussle, 534 U.S. 516, 524 (2002); see also Woodford v. Ngo, 548 U.S. 81, 82 (2006). The exhaustion requirement applies " 'to all inmate suits about prison life, whether they involve general circumstances or particular episodes, and whether they allege excessive force or some other wrong.' " Mauldin v. Kiff, No. 11-CV-107-A, 2014 WL 2708434, at \*4 (W.D.N.Y. June 16, 2014) (quoting Porter, 534 U.S. at 532). Further, the exhaustion requirement applies even where the prisoner seeks relief not available in the administrative grievance process, such as monetary damages. Porter, 534 U.S. at 524. To exhaust administrative remedies, the inmate must complete the full administrative review process set forth in the rules applicable to the correctional facility in which he or she is incarcerated. Jones v. Bock, 549 U.S. 199, 218 (2007) (internal citation omitted).

Although the Supreme Court has deemed exhaustion mandatory, the Second Circuit has recognized that "certain caveats apply." Ruggiero v. County of Orange, 467 F.3d 170, 175 (2d Cir. 2006) (citation omitted). Until recently, courts in this District followed a three-part test established by the Second Circuit in Hemphill v. New York, 380 F.3d 680, 686 (2d Cir. 2004). Under the test established in Hemphill, a plaintiff's failure to exhaust could be excused if a plaintiff established that his or her failure to exhaust was justified by "special circumstances." Id. However, the Supreme Court recently held that "[c]ourts may not engraft an unwritten 'special circumstances' exception onto the PLRA's exhaustion requirement." Ross v. Blake, 136 S. Ct. 1850, 1862 (2016). As such, the special circumstances exception previously promulgated by the Second Circuit in Hemphill is no longer consistent with the statutory requirements of the PLRA. Williams v. Priatno, 829 F.3d 118, 123 (2d Cir. 2016).

**\*4** Although the Supreme Court's decision in Ross eliminates the "special circumstances" exception promulgated by Hemphill, courts must still consider the PLRA's "textual exception to mandatory exhaustion." Ross, 136 S. Ct. at 1858. Under this exception, courts must determine whether administrative remedies were "available" to a prisoner. Id. The Supreme Court identified three circumstances where administrative remedies may be unavailable to a prisoner. First, "an administrative procedure is unavailable when (despite what regulations or guidance materials may promise) it operates as a simple dead end—with officers unable or consistently unwilling to provide any relief to aggrieved inmates." Id. at 1859 (citing Booth v. Churner, 532 U.S. 731, 736, 738 (2001)). "Next, an administrative scheme might be so opaque that it becomes, practically speaking, incapable of use." Id. Lastly, administrative remedies are unavailable where "prison administrators thwart inmates from taking advantage of a grievance process through machination, misrepresentation, or intimidation." Id. at 1860.

Here, there is no genuine dispute that at all relevant times, DOCCS had in place a three-step inmate grievance program. N.Y. COMP. CODES R. & REGS. tit. 7, § 701.5. First, the inmate must file a complaint with an inmate grievance program ("IGP") clerk within twenty-one days of the alleged incident. Id. at § 701.5(a)(1). An IGP representative has sixteen calendar days to informally resolve the issue. Id. at § 701.5(b)(1). If no informal resolution occurs, the Inmate Grievance Review

Committee ("IGRC") must hold a hearing within sixteen days of receipt of the grievance and must issue a written decision within two working days after the conclusion of the hearing. Id. §§ 701.5(b)(2)(i)-(ii). If the determination is unfavorable to the inmate, the inmate may appeal the IGRC's determination to the facility superintendent within seven calendar days of receipt of the determination. Id. § 701.5(c)(1). If the superintendent's determination is unfavorable to the inmate, the inmate may appeal to the Central Office Review Committee ("CORC") within seven days after receipt of the superintendent's determination. Id. §§ 701.5(d)(i)-(ii). CORC must "review each appeal, render a decision on the grievance, and transmit its decision to the facility, with reasons stated, for the [inmate], the grievance clerk, the superintendent, and any direct parties within thirty (30) calendar days from the time the appeal was received." Id. § 701.5(d)(3)(ii).

### 1. Application

First, the Court will address whether there is any genuine dispute that plaintiff failed to exhaust his administrative remedies. Courts in the Second Circuit have consistently held that any informal resolutions or relief outside of the administrative procedures do not satisfy exhaustion requirements. See, e.g., Macias v. Zenk, 495 F.3d 37, 43 (2d Cir. 2007) (holding that regardless of whether prison officials know of plaintiff's complaints in a "substantive sense," procedural exhaustion of remedies must still occur); Ruggiero v. Cty. of Orange, 467 F.3d 170, 177-78 (2d Cir. 2006); Perez v. City of N.Y., No. 14 CIV. 07502(LGS), 2015 WL 3652511, at *4 (S.D.N.Y. June 11, 2015) ("Plaintiff's allegation that he advised others of his grievance does not excuse his failure to exhaust the administrative process.").

Here, subsequent to the alleged events giving rise to the matter before the Court, plaintiff states he and family members contacted the Inspector General's Office to complain about prison conditions and concerns of plaintiff's safety. See Hummel Aff. Exh. A at 89, 90. Such correspondence does not satisfy exhaustion and falls outside of the grievance procedures. See Geer v. Chapman, No. 9:15-CV-952(GLS/ATB), 2016 WL 6091699, at *5 (N.D.N.Y. Sept. 26, 2016), report and recommendation adopted, No. 9:15-CV-952 (GLS/ATB), 2016 WL 6090874 (N.D.N.Y. Oct. 18, 2016) ("It is well-settled that writing letters to prison officials,

or other officials, is insufficient to properly exhaust administrative remedies."); Salmon v. Bellinger, No. 9:14-CV-0827(LEK/DJS), 2016 WL 4411338, at *4 (N.D.N.Y. July 5, 2016), report and recommendation adopted by, No. 9:14-CV-0827(LEK/DJS), 2016 WL 4275733 (N.D.N.Y. Aug. 12, 2016) (holding that letters sent to the Inspector General do not satisfy exhaustion procedures).

**\*5** After the alleged incident of excessive force, plaintiff was seen by a nurse in a room with "about ten" officers present, where he admits "having no choice" but to tell the nurse that the officers had beat him up. Hummel Aff. Exh. A at 59-60. Plaintiff alleges filing grievances on July 19, 2014 and July 29, 2014 that mention the assault. See id. at 93; Gregory Decl. Exh. B at 6, 8-10. Defendants state that there is no record of appeal on any grievances pertaining to the alleged assault. Gregory Decl. ¶ 15. While plaintiff's complaints were aired verbally and in writing, plaintiff failed to utilize the procedures required to exhaust administrative remedies. Timmons v. Schriro, No. 14-CV-6606(RJS), 2015 WL 3901637, at *3 (S.D.N.Y. June 23, 2015) ("[T]he law is well-settled that informal means of communicating and pursuing a grievance, even with senior prison officials, are not sufficient under the PLRA."). Thus, there is no genuine dispute that plaintiff failed to exhaust administrative remedies.

As a result, the Court must determine whether administrative remedies were in fact available to plaintiff. See Ross, 136 S. Ct. at 1858 ("An inmate ... must exhaust available remedies, but need not exhaust unavailable ones"); Mena v. City of New York, No. 13-cv-2430(RJS), 2016 WL 3948100, at *4 (S.D.N.Y. July 19, 2016) (citing Ross, 136 S. Ct. at 1862) ("[T]he lone surviving exception to the PLRA's exhaustion requirement is that embedded in its text: that an inmate need only exhaust those administrative remedies that are 'available' to him."). Plaintiff sets forth three factual arguments as to why administrative remedies were not available to him. First, plaintiff alleges that the grievance procedures were unavailable to him because he was denied access to paper and writing instruments. See Compl. at 3. Next, plaintiff alleges that he was physically beaten when he attempted to take steps to utilize the grievance process. Id. Lastly, plaintiff suggests that he never received a response to his grievance, his mail was tampered with, and his letters were not delivered. See Hummel Aff. Exh. A at 91-92, 94.

### a. Lack of Paper and Pen to
### Complete Grievance Procedures

The third prong of Ross is triggered by plaintiff's argument that he was denied access to pen and paper, as it shows an alleged attempt to stop him from taking part in the grievance process. When a plaintiff-inmate asserts that a defendant-facility withheld pens, courts have granted summary judgment against a plaintiff when "the record does not show that "[p]laintiff indicated to prison officials that he needed a pen so he could file a grievance or that prison officials refused to provide him a pen for this purpose." Mena v. City of N.Y., No. 12 CIV. 6838(GBD), 2013 WL 3580057, at *2 (S.D.N.Y. July 10, 2013). When an inmate argues that a correction officer denies him access to pen or paper, even assuming the allegations are true, courts examine whether the inmate was drafting other documents during the same time period, or whether they were able to access materials from other sources. See Williams v. Ramos, No. 13 CV 826(VLB), 2015 WL 864888, at *3 (S.D.N.Y. Feb. 9, 2015) ("It is unclear how plaintiff was able to submit [other] grievances if defendants took his pens and paper and threatened him ... Moreover, when defendants allegedly stole his pens and papers, plaintiff testified he was able to file grievances on his commissary sheet."); Lahoz v. Orange Cty. Jail, No. 08 CIV. 4364(RWS), 2010 WL 1789907, at *3 (S.D.N.Y. Apr. 29, 2010) (stating that an inmate was not deprived of writing materials when he drafted a handwritten letter during the same time period as the grievance process).

Here, the Court notes contradictory statements within the complaint pertaining to plaintiff's access to writing instruments or paper. When prompted as to why facts relating to the complaint were not presented in the grievance program, plaintiff asserts that he was denied a paper or pen. Compl. at 3. However, plaintiff also states that he wrote a grievance, the grievance was destroyed by a Sergeant, and he was beaten in retaliation for writing the grievance. See id. at 2. The only time plaintiff asserts that he was denied a paper and pen was when he was taken to the Special Housing Unit ("SHU") [6] on July 14, 2014 after the alleged incident. See id. at 3; Hummel Aff. Exh. A at 68. In fact, records indicate that plaintiff filed grievances on July 19, July 29, August 4, and November 19 of that same year. [7] Gregory Decl. Exh. A at 6. Plaintiff does not allege any difficulties obtaining a pen and paper after the July 2014 SHU stay, but rather, admits having "a piece

of paper that an inmate had and a pen" on at least one occasion. See id. at 94.

[6]    SHUs exist in all maximum and certain medium security facilities. The units "consist of single-occupancy cells grouped so as to provide separation from the general population...." N.Y. COMP. CODES R. & REGS . tit. 7, § 300.2(b). Inmates are confined in a SHU as discipline, pending resolution of misconduct charges, for administrative or security reasons, or in other circumstances as required. Id. at pt. 301.

[7]    Both the August and November grievances are unrelated to the cause of action before the Court. Gregory Decl. Exh. A at 6.

**\*6** Lastly, in his response to defendants' motion for summary judgment, plaintiff alleges that there is an "unwritten posture" at Clinton where inmates are not given grievance forms unless they provide a clear description of their complaint, or if their complaint does not involve staff misconduct. Dkt. No. 34 at 8. Such general allegations without any factual support are insufficient to show that procedures were unavailable, coupled with the fact that, grievances can and have been submitted by plaintiff on plain paper. N.Y. COMP. CODES R. & REGS. tit. 7, § 701.5(a)(1) ("If this form is not readily available, a complaint may be submitted on plain paper."); see Veloz v. N.Y., 339 F. Supp. 2d 505, 516 (S.D.N.Y. 2004), aff'd, 178 Fed.Appx. 39 (2d Cir. 2006) (granting summary judgment where plaintiff does not allege that any specific officer thwarted his efforts to timely file a grievance); Hummel Aff. Exh. A at 94.

Even if the Court assumes that plaintiff was denied access to pen and paper while in the SHU, the grievances filed in July 2014 were filed within the twenty-one calendar days required, and his subsequent failure to exhaust administrative remedies regarding those grievances is unaffected by any denial of pen and paper that occurred in the past. Thus, the Court rejects plaintiff's argument as there is no genuine dispute of fact that administrative remedies were unavailable due a lack of writing instruments or paper.

### b. Allegation that Grievance Was
### Not Received and Mail Tampering

Courts have long held that where an inmate does not receive a response to a written grievance, the inmate must appeal to the next level of review. See Khudan v. Lee, No. 12-cv-8147(RJS), 2015 WL 5544316, at *5 (S.D.N.Y. Sept. 17, 2015) (dismissing a plaintiff's complaint where plaintiff failed to appeal to the next level of review after not receiving a response to his filed grievance); see also Veloz v. New York, 339 F. Supp. 2d 505, 516 (S.D.N.Y. 2004), aff'd, 178 Fed.Appx. 39 (2d Cir. 2006) ("[P]laintiff's allegation that these particular grievances were misplaced or destroyed by correctional officers ultimately does not relieve him of the requirement to appeal these claims to the next level once it became clear to him that a response to his initial filing was not forthcoming.").

However, recent decisions by courts in the Second Circuit have addressed the availability of administrative remedies when an inmate's grievance is unfiled and unanswered. These cases have focused on the second prong of the Ross test, where a grievance process becomes unusable for an inmate. Ross, 136 S. Ct. at 1859. In Williams v. Priatno, the Second Circuit held that when an inmate's grievance is not filed, "the regulations plainly do not describe a mechanism for appealing a grievance." See 829 F.3d at 126. Thus, "the process to appeal an unfiled and unanswered grievance is prohibitively opaque, such that no inmate could actually make use of it." Id. The Williams ruling relied upon a scenario where an inmate is housed in a SHU and personally gives a grievance to a correction officer, as required by grievance procedures. Id. at 120-21. Additionally, adding to the "opaque" nature of the procedures, the plaintiff in Williams followed up when he did not receive a response after a week, but was subsequently transferred one week later without any resolution or knowledge of his grievance being filed. Williams, 829 F.3d at 120-21. Ultimately, the Williams Court held that "in giving his grievance to the correction officer, [the plaintiff] exhausted all administrative remedies that were available to him." Id. at 126.

Here, in his September 19, 2016 deposition, plaintiff sets forth facts suggesting prison staff filtered his mail and "when they [saw] grievances" they were thrown to the side, not delivered, "and were never [ ] seen." See Hummel Aff. Exh. A at 91-92. The grievance that plaintiff allegedly filed on July 19, 2014 was sent to the Clinton grievance office by his mother. Id. at 94. Plaintiff never received a response on the grievance or followed up on the status

of the grievance. Id. Without concrete facts, plaintiff states that his grievance was not resolved because "no civilian ... picks up your grievances. It's officers." Id. at 91. Plaintiff's allegations of mail tampering are conclusory and weakened by the fact that other correspondence, including complaints, were sent and received during the general time period material to the issues before the Court. Johnson v. Fraizer, No. 16-CV-6096(CJS), 2016 WL 7012961, at *4 (W.D.N.Y. Dec. 1, 2016) ("Plaintiff makes only a conclusory statement that his mailing was not allowed to leave the facility[,] ... his contention ... is belied by his admission that he was able to send other complaints about the matter to various New York State officials at around the same time."); see Hummel Aff. Exh. A at 89, 94 (providing an example where plaintiff successfully sent legal mail to his mother).

*7 In plaintiff's response in opposition to defendants' motion for summary judgment, he raises general complaints about defendants having total control over facility mail and defendants strategically removing grievances from the mailbox to cover up their excessive use of force against plaintiff and other inmates. See Dkt. No. 34 at 2. Plaintiff's bare assertions do not excuse exhaustion requirements. Courts in this Circuit have continuously held that mere contentions or speculation of grievances being misplaced by officers do not create a genuine issue of material fact when there is no evidence to support the allegations. Khudan, 2016 WL 4735364, at *6 (citations omitted) (holding that under Ross, mere stand alone contentions of mail tampering without support and particularity cannot deem administrative remedies unavailable); Veloz, 339 F. Supp. 2d at 516 (holding that summary judgment is proper where the plaintiff contends that officers misplaced his grievances, but offers no evidence to support his claim). In Khudan, the court did not consider or rely upon conclusory allegations when plaintiff attested he "was informed by other [unnamed] inmates that grievances routinely go 'missing.' " Khudan, 2016 WL 4735364, at *6. This is similar to plaintiff's conclusory theory of injustice and displeasure with mail procedures, and other "recurrent pattern[s]" in New York correctional facilities. Dkt. No. 34 at 2, 4; see Khudan, 2016 WL 4735364, at *6 ("Plaintiff's accusations, which 'stand alone' and are 'unsupported,' are insufficient to withstand summary judgment.") (quoting Bolton v. City of N.Y., No. 13-CV-5749(RJS), 2015 WL 1822008, at *2 (S.D.N.Y. Apr. 20, 2015)).

Courts have denied a defendant's motion for summary judgment when faced with an unanswered and unfiled grievance drafted in SHU. See, e.g., Juarbe v. Carnegie, No. 9:15-CV-01485(MAD/DEP), 2016 WL 6901277, at *1, 4 (N.D.N.Y. Nov. 23, 2016). This is distinguishable from plaintiff's alleged July 19, 2014 grievance drafted in keeplock.[8] Such a difference in inmate housing supports the notion that, "the Second Circuit's decision hinged on the 'extraordinary circumstances' specific to the case before it." Mena v. City of N.Y., No. 13-CV-2430(RJS), 2016 WL 3948100, at *5 (S.D.N.Y. July 19, 2016) (quoting Williams, 829 F.3d at 119); see N.Y. COMP. CODES R. & REGS. tit. 7, § 701.7 (explaining that there are different grievance filing procedures for an inmate housed in the SHU). Inmates not housed in the SHU are in a different position to SHU inmates when determining if grievance procedures are "essentially unknowable" or unavailable. Id. at *5 (quoting Ross v. Blake, 136 S. Ct. at 1859).

[8]     "Keeplock is a form of disciplinary confinement segregating an inmate from other inmates and depriving him of participation in normal prison activities." Green v. Bauvi, 46 F.3s 189, 192 (2d Cir. 1995); N.Y. COMP. CODES R. & REGS. tit. 7, § 301.6.

Plaintiff never followed up on the July 19, 2014 grievance. Hummel Aff. Exh. A at 94-95. However, on July 29, 2014, he filed a grievance in the facility that included medical complaints, but also a reference to the alleged assault on July 14, 2014. See Gregory Decl. Exh. B at 8. The Clinton grievance department received and responded to this grievance. Id. This grievance was not appealed. Id. ¶ 15. Even assuming, as the Court must on this motion, that plaintiff's allegations of mail tampering are true, he did not exhaust his administrative remedies when he failed to appeal the July 29, 2014 grievance to the next level of review. The fact that this grievance was subsequently filed and not appealed within close proximity to the July 19, 2014 grievance, coupled with three unrelated grievances filed within the next year, demonstrates that plaintiff's situation does not rise to the level where the grievance process is "opaque," unavailable, or unascertainable. See Hill v. Tisch, No. 02CV3901(DRH/AYS), 2016 WL 6991171, at *7 (E.D.N.Y. Nov. 29, 2016) (finding that the plaintiff failed to demonstrate that the grievance "procedures were essentially unknowable"); Gregory Decl. A at 6.

### c. Allegation that Plaintiff Suffered Retaliation and Physical Beatings

Plaintiff's pleadings also suggest an inquiry under the third prong of Ross, whether "machination, misrepresentation, or intimidation" occurred. See Ross, 136 S. Ct. at 1860. Specifically, plaintiff alleges that he did not comply with the grievance procedures because he was subjected to physical beatings, retaliation, and intimidation after complaining about conditions at Clinton. See Compl. at 3, 4, 7. For these reasons, he believed the grievance procedures were unavailable. See id. at 2-3.

*8 Specific threats of retaliation or intimidation by prison employees can render administrative remedies unavailable. Ross, 136 S. Ct. at 1860 & n.3. However, a generalized fear of retaliation is insufficient to overcome a failure to exhaust administrative remedies. Salmon, 2016 WL 4411338, at *5. Estoppel is found where "verbal and physical threats of retaliation, physical assault, denial of grievance forms or writing implements, and transfers" occur showing that defendants acted affirmatively to prevent an inmate from availing him or herself of the grievance procedures. Id. at *5 (quoting Amador v. Andrews, 655 F.3d 89, 103 (2d Cir. 2011)). In Riles, the Second Circuit affirmed a district court's ruling that prison officials' alleged threats did not interfere with exhaustion efforts when plaintiff stated he was threatened "if he pushed the issue," but then subsequently filed a grievance in spite of the alleged threats. See Riles v. Buchanan, 656 Fed.Appx. 577, 581 (2d Cir. 2016) (summary order).

Relying on Ross, courts have carved out factual limitations to the third prong of unavailability concerning fear of retaliation. See, e.g., Aviles v. Tucker, No. 14-CV-08636(NSR), 2016 WL 4619120, at *3-4 (S.D.N.Y. Sept. 1, 2016) (citing Ross, 136 S. Ct. at 1860). In Aviles, the court noted a longstanding rule that general beliefs of retaliation or fears do not excuse the exhaustion requirement. Aviles, 2016 WL 4619120, at *4 (citations omitted). Circumstances that have met the threshold of unavailability by means of intimidation have included widespread beatings with assertions of fear for one's life, in conjunction with the plaintiff withholding all complaints until he was transferred to a different facility. See, e.g., id. (quoting Thomas v. Cassleberry, No. 03-cv-6394L, 2007 WL 1231485, at *2 (W.D.N.Y. Apr. 24, 2007)). Allegations of threats are conclusory where a plaintiff's

Case 9:16-cv-01062-DNH-TWD    Document 62    Filed 07/20/18    Page 110 of 116

allegation "does not indicate who threatened him, when he was threatened, or how he was threatened." See Johnson v. Fraizer, No. 16-CV-6096(CJS), 2016 WL 7012961, at *5 (W.D.N.Y. Dec. 1, 2016). In contrast, this Court has denied a summary judgment motion when a plaintiff alleged he was threatened by a specific correction that the officer would "break [plaintiff's] bones," and another specific correction officer threatened to beat plaintiff "a [sic] inch from life" if he filed a grievance. Galberth v. Durkin, No. 914CV115(BKS/ATB), 2016 WL 3910270, at *3 (N.D.N.Y. July 14, 2016).

Here, plaintiff offers conclusory allegations in his complaint that "[he] was beaten" while attempting to access Clinton's grievance program. Compl. at 2, 3. Plaintiff offers no information of when or how he was threatened or beaten after the July 14, 2014 incident. Some instances of threats alleged by plaintiff refer to a time period before he filed a grievance and he does not state how any specific threat or subsequent act of violence impacted his ability to exhaust administrative remedies related to the events that occurred on July 14, 2014. See Aviles, 2016 WL 4619120, at *4 (finding grievance procedures available where plaintiff offers conclusory allegations of fear and does not substantiate what specific fears or past acts preclude him from advancing in grievance procedures); Harrison v. Stallone, No. 9:06-CV-902(LEK/GJD), 2007 WL 2789473, at *5 (N.D.N.Y. Sept. 24, 2007) ("It has been held that a 'general fear' of retaliation is not sufficient to excuse the exhaustion requirement.... If an inmate could simply state that he feared retaliation, there would no point in having a grievance procedure.") (citations omitted); see, e.g., Hummel Aff. Ex. A at 58. Much of plaintiff's fear is generalized. For instance, he notes that corrections officers become agitated when they see legal mail and "that's when harassment comes." Hummel Aff. Ex. A at 92. By his own admission, plaintiff denies any actual physical force being used against him that prohibited him from taking part in the grievance program. Hummel Aff. Ex. A at 99; see Salmon, 2016 WL 4411338, at *5 (stating there must be affirmative actions or specific instances of physical assault or threats of retaliation for plaintiff to show unavailability of the grievance process).

**\*9** The Court notes that plaintiff directly contradicted allegations in his complaint by statements made in his deposition. While the complaint alleges conclusory instances of being "beaten by staff," plaintiff admits that

other than being cut on his face by an inmate in the yard on October 5, 2015, there has not been any other physical force used against him by inmates or correction officers since July 14, 2014. Hummel Aff. Ex. A at 99; Compl. at 3. This statement contradicts plaintiff's allegations of being beaten by staff. See Williams v. Doe, No. 12-CV-1147(HKS), 2016 WL 4804057, at *5 (W.D.N.Y. Sept. 14, 2016) (granting a motion for summary judgment after noting that any triable issue of fact on exhaustion of administrative remedies can be eliminated when plaintiff's prior representations to the court are "flatly contradict[ed]").

Further, this Court finds that plaintiff's failure to follow the grievance procedures cannot be excused by fears or intimidation, when he simultaneously made his complaints known through other means. After the alleged incident, plaintiff was seen by a nurse in a room with "about ten" officers, where he admits "having no choice," but to tell the nurse that they had beaten him. Hummel Aff. Exh. A at 57-58. Plaintiff also aired his complaints and concerns in writing outside of the grievance procedures, clearly identifying his complaints in full substance, including the identification of those who committed acts against him. See, e.g., Hummel Aff. Exh. A at 93; Gregory Decl. Exh. A at 8. Similarly in Johnson v. Fraizer, the Court rejected plaintiff's argument that administrative remedies were unavailable where the plaintiff alleged he was threatened by correction officers but continued to make and send formal complaints to prison officials and other New York State officials. Johnson v. Fraizer, No. 16-CV-6096 (CJS), 2016 WL 7012961, at *5 (W.D.N.Y. Dec. 1, 2016). By plaintiff's own admission, it is clear that he sought to file the initial grievance and tell others about his complaints, which disprove any claim of intimidation or fear of retaliation. Quick v. Omittee, No. 14-CV-1503(TJM/CFH), 2016 WL 5219732, at *4 (N.D.N.Y. Aug. 11, 2016), report and recommendation adopted, No. 914CV1503 (TJM/CFH), 2016 WL 5107125 (N.D.N.Y. Sept. 20, 2016) (holding that fear of physical retaliation or assaults does not deem grievance procedures unavailable when plaintiff continuously sought to file complaints with officials). Like in Quick, where the plaintiff filed formal internal grievances and the grievance procedures were deemed available, here the plaintiff alleges drafting two internal grievances outlining the alleged July 14, 2014 incident. See id. at * 4; Hummel Aff. Exh. A at 93; Gregory Decl. Exh.

Case 9:16-cv-01062-DNH-TWD    Document 62    Filed 07/20/18    Page 111 of 116

B at 8. Thus, plaintiff has not shown that administrative remedies were unavailable due to intimidation and threats.

In conclusion, the Court finds that defendants have met their burden in showing that there is no genuine issue of material fact as to plaintiff's failure to exhaust administrative remedies. Accordingly, the Court recommends that defendants' motion be granted.

### III. Conclusion

For the reasons stated above, it is hereby

**RECOMMENDED** that defendants' motion for summary judgment (Dkt. No. 26) on plaintiff Edy Rodriguez's complaint (Dkt. No. 1) be **GRANTED**; and it is further

**RECOMMENDED** that plaintiff Edy Rodriguez's complaint (Dkt. No. 1) be **DISMISSED** in its entirety, without prejudice; and it is further

**ORDERED,** that the Clerk of the Court serve a copy of this Report-Recommendation and Order upon the parties in this action, pursuant to local rules.

Pursuant to 28 U.S.C. § 636(b)(1), the parties may lodge written objections to the foregoing report. Such objections shall be filed with the Clerk of the Court. **FAILURE TO OBJECT TO THIS REPORT WITHIN FOURTEEN DAYS WILL PRECLUDE APPELLATE REVIEW.** Roldan v. Racette, 984 F. 2d 85, 89 (2d Cir. 1993); Small v. Sec'y of HHS, 892 F. 2d 15 (2d Cir. 1989); 28 U.S.C. § 636(b)(1); FED. R. CIV. P. 72, 6(a), 6(e).

**All Citations**

Slip Copy, 2017 WL 2791063

---

**End of Document**     © 2018 Thomson Reuters. No claim to original U.S. Government Works.

2016 WL 6091699
Only the Westlaw citation is currently available.
United States District Court,
N.D. New York.

Pakenauth Geer, Plaintiff,
v.
Officer Chapman, et al., Defendants.

9:15-CV-952 (GLS/ATB)
|
Signed 09/26/2016

**Attorneys and Law Firms**

PAKENAUTH GEER, Plaintiff pro se.

MICHAEL G. McCARTIN, Asst. Attorney General for
Defendants.

### REPORT-RECOMMENDATION

ANDREW T. BAXTER, United States Magistrate Judge

**\*1** This matter has been referred to me for Report and
Recommendation pursuant to 28 U.S.C. § 636(b) and
LOCAL RULES N.D.N.Y. 72.3(c). Plaintiff originally
filed this action in the Eastern District of New York,
against several defendants, alleging violations of his
constitutional rights. (Dkt. No. 1, 4). On June 29, 2015,
the Honorable Carol Bagley Amon, Chief Judge in the
Eastern District of New York found that the complaint
did not state a claim for various reasons.[1] (Dkt. No. 5).
Chief Judge Amon dismissed without prejudice to plaintiff
filing an amended complaint only with respect to his First
Amendment retaliation claim. (Id.)

[1] Chief Judge Amon found that some of plaintiff's
claims were barred by res judicata, and in addition, his
property claims could not be brought in federal court.
(Dkt. No. 5 at 3-4, 5-6). Chief Judge Amon also found
that plaintiff's claim for retaliation failed to state a
claim. (Dkt. No. 5 at 4-5).

On July 22, 2015, the Pro Se Office in the Eastern
District of New York received plaintiff's proposed
amended complaint. (Dkt. No. 6). The proposed
amended complaint alleged that plaintiff's typewriter
was "smashed" by defendants Chapman, McFarren, and
McMillan. (Dkt. No. 6 at 1). On July 29, 2015, after

reviewing the complaint for sufficiency, Chief Judge
Amon transferred plaintiff's amended complaint to the
Northern District of New York. (Dkt. No. 8). Chief Judge
Amon found that "[s]pecifically, he claims that defendant
corrections officers, who he alleges are employed at
Washington Correctional Facility, took adverse action
against him because he has filed lawsuits against other
officers and prison officials. (Id. at 1). Chief Judge Amon
also found that the events of which plaintiff complained
took place in the Northern District of New York. (Id. at
2). Thus, venue was improper in the Eastern District, and
the case was transferred to the Northern District of New
York "in the interest of justice." (Id. at 1-3).

On July 30, 2015, prior to the transfer,[2] plaintiff filed
a motion to amend the amended complaint. (Dkt. No.
9). On October 14, 2015, the Honorable Gary L. Sharpe,
reviewed plaintiff's submissions, including the first
amended complaint and plaintiff's newly filed motion to
amend. (Dkt. No. 14). Judge Sharpe interpreted plaintiff's
first amended complaint as alleging 1) harassment; 2)
wrongful destruction of personal property; 3) First
Amendment retaliation; and 4) First Amendment denial
of access to courts. (Dkt. No. 14 at 5).

[2] Although the transfer order was signed on July
29, 2015 (Dkt. No. 8), the case was electronically
transferred on August 5, 2015. (Dkt. No. 10).

Judge Sharpe dismissed plaintiff's first, second, and fourth
claims. (Dkt. No. 14 at 6-11). Plaintiff's first and second
claims were denied on the merits and on the basis of
res judicata because plaintiff brought the same claims in
a previously dismissed Northern District of New York
action. Geer v. McFarren, No. 9:14-CV-0589, Dkt. No. 1.
Judge Sharpe noted that plaintiff brought his retaliation
claim in 14-CV-589, but that claim had been dismissed
"without prejudice." (Dkt. No. 14 at 7, n.7). Judge Sharpe
denied plaintiff's motion to amend. (Id. at 11-12). Thus,
the only remaining claim in this action is that defendants
Chapman, McFarren, and McMillan destroyed plaintiff's
typewriter in retaliation for plaintiff filing lawsuits against
other corrections officers and prison officials as stated in
the first amended complaint (Dkt. No. 6).[3] (Dkt. No. 14
at 9).

[3] The operative pleading is Dkt. No. 6.

**\*2** Presently before the court is the defendants' motion
for summary judgment pursuant to Fed. R. Civ. P.

56. (Dkt. No. 23). Plaintiff has not responded to the motion, notwithstanding two notices from the court of his response deadline. [4] (Dkt. Nos. 24, 25). For the following reasons, this court agrees with defendants and will recommend dismissal of the amended complaint.

[4]    On June 23, 2016, plaintiff filed a letter, complaining that, because defense counsel had failed to include an "errata sheet" with his motion, plaintiff could not respond to the motion for summary judgment. (Dkt. No. 26). Plaintiff apparently believed that defendants were required to file such a "sheet" because an "errata sheet" was sent with the transcript of plaintiff's deposition. (Dkt. No. 26). When plaintiff received his copy of his deposition, it appears to have utilized the errata sheet to make arguments about the merits of the action while citing to specific pages of the deposition. Defense counsel responded to plaintiff's allegations, and on June 28, 2016, I issued a Text Order, informing plaintiff that defendants did produce an errata sheet with their deposition transcript. I directed the Clerk to send plaintiff a copy of the errata sheet, but denied plaintiff's "request" that defendants produce another "errata sheet" before plaintiff responded to the summary judgment motion. My June 28, 2016 Text Order was "returned undeliverable" because plaintiff had been released to the Buffalo Federal Detention Center. (Dkt. No. 29). Plaintiff ultimately filed a change of address, indicating that he had been moved to the Federal Detention Center. (Dkt. No. 30). The court sent the Text Order to plaintiff's new address, but plaintiff still failed to respond to the summary judgment motion. (Dkt. No. 31).

### DISCUSSION

### I. Facts

Plaintiff alleges that on April 26, 2014, Officers Chapman and McMillan "ordered" Officer McFarren to smash plaintiff's typewriter at the end of Officer McFarren's "count." (Amended Complaint ("AC") at 1). Plaintiff claims that this "order" was issued because plaintiff "filed lawsuits against many officers and officials." (Id.) The second page of the amended complaint appears to be a June 13, 2014 letter that plaintiff wrote to Attorney General ("AG") Eric Schneiderman, in which plaintiff mentions that the defendants broke his typewriter, [5] but essentially complains about subsequent events. Plaintiff states that he ordered another typewriter, which allegedly

arrived at the facility on June 13, 2014. [6] However, in his letter to AG Schneiderman, plaintiff claims that unnamed officials refused to allow him to pick up the package, even after he was notified of its arrival. (Id.)

[5]    The letter states that it was "another notice of intention to file a claim, in which my typewriter are [sic] broken by officer McFarren and I've filed a lawsuit for my broken typewriter; so now I've order another typewriter from Union Supply Direct ...." (AC at 2).

[6]    It appears that plaintiff wrote the letter to the Attorney General on the same day that he was allegedly prevented from obtaining the new typewriter from the package room. The letter also states that the typewriter was "shipped" on June 13, 2014, which is not possible if it arrived on June 13, 2014 and plaintiff wrote the letter on June 13, 2014. However, the court finds that plaintiff may have written the incorrect date or he has interpreted "shipping" as "arriving."

### II. Summary Judgment

**\*3** Summary judgment is appropriate where there exists no genuine issue of material fact and, based on the undisputed facts, the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56; Salahuddin v. Goord, 467 F.3d 263, 272–73 (2d Cir. 2006). "Only disputes over ["material"] facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment." Anderson v. Liberty Lobby, 477 U.S. 242, 248 (1986). It must be apparent that no rational finder of fact could find in favor of the non-moving party for a court to grant a motion for summary judgment. Gallo v. Prudential Residential Servs., 22 F.3d 1219, 1224 (2d Cir. 1994).

The moving party has the burden to show the absence of disputed material facts by informing the court of portions of pleadings, depositions, and affidavits which support the motion. Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986). If the moving party satisfies its burden, the nonmoving party must move forward with specific facts showing that there is a genuine issue for trial. Salahuddin v. Goord, 467 F.3d at 273. In that context, the nonmoving party must do more than "simply show that there is some metaphysical doubt as to the material facts." Matsushita Electric Industrial Co., Ltd. v. Zenith Radio Corp., 475 U.S. 574, 586 (1986). However, in determining whether

there is a genuine issue of material fact, a court must resolve all ambiguities, and draw all inferences, against the movant. *See United States v. Diebold, Inc.*, 369 U.S. 654, 655 (1962); *Salahuddin*, 467 F.3d at 272.

### III. Exhaustion of Administrative Remedies

#### A. Legal Standards

The Prison Litigation Reform Act, (PLRA), 42 U.S.C. § 1997e(a), requires an inmate to exhaust all available administrative remedies prior to bringing a federal civil rights action. The exhaustion requirement applies to all inmate suits about prison life, whether they involve general circumstances or particular episodes, and regardless of the subject matter of the claim. *See Giano v. Goord*, 380 F.3d 670, 675-76 (2d Cir. 2004) (citing *Porter v. Nussle*, 534 U.S. 516, 532 (2002)). Inmates must exhaust their administrative remedies even if they are seeking only money damages that are not available in prison administrative proceedings. *Id.* at 675.

The failure to exhaust is an affirmative defense that must be raised by the defendants. *Jones v. Bock*, 549 U.S. 199, 216 (2007); *Johnson v. Testman*, 380 F.3d 691, 695 (2d Cir. 2004). As an affirmative defense, it is the defendants' burden to establish that plaintiff failed to meet the exhaustion requirements. *See, e.g, Key v. Toussaint*, 660 F. Supp. 2d 518, 523 (S.D.N.Y. 2009) (citations omitted).

The Supreme Court has held that in order to properly exhaust an inmate's administrative remedies, the inmate must complete the administrative review process in accordance with the applicable state rules. *Jones v. Bock*, 549 U.S. at 218-19 (citing *Woodford v. Ngo*, 548 U.S. 81 (2006)). In *Woodford*, the Court held that "proper" exhaustion means that the inmate must complete the administrative review process in accordance with the applicable procedural rules, including deadlines, as a prerequisite to bringing suit in federal court. 548 U.S. at 90-103.

The grievance procedure in New York is a three-tiered process. The inmate must first file a grievance with the Inmate Grievance Resolution Committee ("IGRC"). N.Y. Comp. Codes R. & Regs., tit. 7 §§ 701.5(a)(1) and (b). An adverse decision of the IGRC may be appealed to the Superintendent of the Facility. *Id.* § 701.5(c). Adverse decisions at the Superintendent's level

may be appealed to the Central Office Review Committee ("CORC"). *Id.* § 701.5(d). The court also notes that the regulations governing the Inmate Grievance Program encourage the inmate to "resolve his/her complaints through the guidance and counseling unit, the program area directly affected, or other existing channels (informal or formal) prior to submitting a grievance." *Id.* § 701.3(a) (Inmate's Responsibility). There is also a special section for complaints of harassment. *Id.* § 701.8.

**\*4** Until recently, the Second Circuit utilized a three-part inquiry to determine whether an inmate had properly exhausted his administrative remedies. *See Brownell v. Krom*, 446 F.3d 305, 311-12 (2d Cir. 2006) (citing *Hemphill v. State of New York*, 380 F.3d 680, 686 (2d Cir. 2004)). The *Hemphill* inquiry asked (1) whether the administrative remedies were available to the inmate; (2) whether defendants' own actions inhibiting exhaustion estops them from raising the defense; and (3) whether "special circumstances" justify the inmate's failure to comply with the exhaustion requirement. *Id.*

However, the Supreme Court has now made clear that courts may not excuse a prisoner's failure to exhaust because of "special circumstances." *Ross v. Blake*, ___ U.S. ____, 136 S. Ct. 1850, 1857 (2016). " '[M]andatory exhaustion statutes like the PLRA establish mandatory exhaustion regimes, foreclosing judicial discretion.' " *Riles v. Buchanan*, No. 15-3336-pr, 2016 WL 4572321, at \*2 (2d Cir. Sept. 1, 2016) (quoting *Ross*, ___ U.S. at ____, 136 S. Ct. at 1857). Although *Ross* did away with the "special circumstances" exception, the other two factors in *Hemphill* – availability and estoppel – are still valid. The court in *Ross* referred to "availability" as a "textual exception" to mandatory exhaustion, and "estoppel" has become one of the three factors in determining availability. *Ross*, ___ U.S. at ____, 136 S. Ct. at 1858. Courts evaluating whether an inmate has exhausted his or her administrative remedies must focus on whether those remedies were "available" to the inmate. *Id. See Riles*, 2016 WL 4572321 at \*2. An administrative procedure is "unavailable" when

(1) "it operates a simple dead end – with officers unable or consistently unwilling to provide any relief to aggrieved inmates; (2) it is "so opaque that is [sic] becomes, practically speaking, incapable of use"; or (3) "prison administrators thwart inmates from taking advantage of a grievance process through machination, misrepresentation, or intimidation."

*Riles, supra* (quoting *Ross*, ___ U.S. at ___, 136 S. Ct. at 1859-60).

In *Ross*, the Supreme Court gave examples of the circumstances under which each of the above would apply. *Ross*, ___ U.S. at ___, 136 S. Ct. at 1859-60. The first circumstance listed above involves a case in which the relevant "administrative procedure" lacks the authority to provide "any" relief. *Id.* at 1859. The second example is when the administrative procedure "exists," but is so complicated or "opaque" that no ordinary prisoner could "discern or navigate it." *Id.* Finally, administrative remedies are not available if prison administrators prevent inmates from taking advantage of the grievance process by misleading or threatening them, preventing their use of the administrative procedure. *Id.* at 1860.

### B. Application

Defendants argue that plaintiff has failed to exhaust his administrative remedies with respect to his First Amendment retaliation claim. Defendants state that plaintiff failed to grieve the retaliation claim through the DOCCS three-level grievance mechanism. (Def.s' Mem of Law at 3-7). Defendants have filed the declaration of Karen Bellamy, the Director of the Inmate Grievance Program for the Department of Corrections and Community Supervision ("DOCCS"). (Bellamy Decl. ¶ 1) (Dkt. No. 23-2). Director Bellamy states that she has searched the CORC records to determine whether plaintiff ever filed a grievance appeal to the CORC relating to the destruction of plaintiff's typewriter at Washington in April of 2014. (Bellamy Decl. ¶ 2). Director Bellamy declares that there are no such appeals. (*Id.*) She has attached as Exhibit A to her declaration a computer print-out listing the one CORC appeal filed by plaintiff, which is not related to the retaliation issue that he raises in this amended complaint. (Bellamy Decl. ¶ 3 & Ex A). According to the computer print-out, on June 21, 2013, plaintiff filed a grievance complaining that his legal mail was not sent out. (Bellamy Decl. Ex. A at 1). The CORC appeal was decided on January 22, 2014. (*Id.*) It is the only grievance appeal brought by plaintiff that appears on the CORC list of closed cases. (*Id.*)

**\*5** Plaintiff was deposed on February 12, 2016 at Washington Correctional Facility. (Pl.'s Dep.) (Dkt. No. 23-5). At his deposition, plaintiff testified that he wrote letters to the grievance committee, the Attorney General,

and the Superintendent, but that was "the extent" of his exhaustion. (Pl.'s Dep. at 44-45). Plaintiff testified that he did not write to anyone else because a previous grievance was denied, and when he wrote to the CORC, "they sent me back to them so I say I have wasted my time." (*Id.* at 46). Defense counsel asked:

> Q. You are describing a situation in which you wrote to the Central Office?
>
> A. Yes.
>
> Q. But that was about a different matter not about the typewriter?
>
> A. Yes. I didn't write to them about this, because it's going to be the same. They're going to say I have to put it through a grievance and I have to put it through the superintendent and they don't answer. They won't answer.

(Pl.'s Dep. at 46). It is clear that plaintiff did not file a grievance [7] or appeal it properly because he did not think that he was going to get results, because he filed a previous grievance that was denied. He believed that doing so would be a "waste of time." He believed that he would not get an answer, but had no basis for that statement. The fact that his legal mail grievance was denied at the CORC level did not justify plaintiff's failure to exhaust his retaliation grievance or any other grievance that he may have had. It is well-settled that writing letters to prison officials, or other officials, is insufficient to properly exhaust administrative remedies. *See Macias v. Zenk*, 495 F.3d 37, 44-45 (2d Cir. 2007) (informal steps, putting officials on "notice" are insufficient to exhaust administrative remedies); *Gizewski v. NY DOCCS*, No. 9:14-CV-124, 2016 WL 3661434, at *14 (N.D.N.Y. July 5, 2016) (notice through informal channels, including verbal complaints, is insufficient to exhaust administrative remedies).

---

[7]    During his deposition, plaintiff stated that, before he wrote to the Attorney General, he "wrote" to the superintendent and the grievance committee. (Pl.'s Dep. at 44). Plaintiff stated that he knew they would not respond.

As stated above, attached to the complaint, there is a letter that plaintiff "wrote" to the Attorney General on June 13, 2014, stating that the letter was "another" notice of intention to file a claim. (AC at 2). The letter is in

reference to the subsequent typewriter incident, and also states that plaintiff has already filed a lawsuit about the broken typewriter. [8] (*Id.*)

[8]    Plaintiff may be referring to the lawsuit that he brought in 2014 regarding the broken typewriter that was mentioned by Judge Sharpe in his October 14, 2015 order in this case. *Geer v. McFarren*, No. 9:14-CV-589 (DNH/TWD). The court notes that the complaint in 14-CV-589 states that he filed a grievance with the grievance committee and the superintendent. He also alleged that he sent the complaint to the CORC, but no action was taken. As shown herein, there was no appeal to the CORC of any grievance filed by plaintiff, relating to his claims in this case.

This is not a situation in which the administrative procedure was "unavailable" as discussed in *Ross, supra*. The grievance procedure was not complex. Plaintiff was not moved from Washington until long after the incident. Plaintiff was well-aware of how to bring a proper grievance because he had at least one previous grievance that was appealed to the CORC. Finally, there is no claim that the defendants prevented him from filing a grievance regarding the incident. Plaintiff's belief that bringing a grievance would be a waste of his time because it would be denied, or his unfounded belief that "they" would not answer, is not sufficient to justify his failure to exhaust. Thus, plaintiff has failed to exhaust his administrative remedies, and the complaint may be dismissed on that basis.

**\*6 WHEREFORE**, based on the findings above, it is

**RECOMMENDED**, that defendant's motion for summary judgment (Dkt. No. 23) be **GRANTED**, and the complaint **DISMISSED IN ITS ENTIRETY**.

Pursuant to 28 U.S.C. § 636(b)(1) and Local Rule 72.1(c), the parties have fourteen (14) days within which to file written objections to the foregoing report. Such objections shall be filed with the Clerk of the Court. **FAILURE TO OBJECT TO THIS REPORT WITHIN FOURTEEN DAYS WILL PRECLUDE APPELLATE REVIEW.** *Roldan v. Racette*, 984 F.2d 85, 89 (2d Cir. 1993) (citing *Small v. Sec. of Health & Human Servs.*, 892 F.2d 15 (2d Cir. 1989)); 28 U.S.C. § 636(b)(1); Fed. R. Civ. P. 6(a), 6(e), 72.

Dated: September 26, 2016.

**All Citations**

Not Reported in F.Supp.3d, 2016 WL 6091699

---

**End of Document**    © 2018 Thomson Reuters. No claim to original U.S. Government Works.